IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ANTHONY BERNARD JUNIPER,

Petitioner,

v.                                          Civil Action No. 3:11-cv-00746

EDDIE L. PEARSON,
*Warden, Sussex I State Prison,*

Respondent.

## MEMORANDUM OPINION

This matter is before the Court on the respondent's motion to dismiss the petition for writ of habeas corpus. The petitioner, Anthony Bernard Juniper ("Juniper"), was convicted in the Circuit Court for the City of Norfolk on four counts of capital murder and other related felony charges. Following a jury trial, Juniper was sentenced to death for each of the capital murder convictions. The jury unanimously found the death sentence justified by the two aggravating factors of vileness and future dangerousness.

On appeal, the Supreme Court of Virginia unanimously affirmed Juniper's convictions and death sentences. The Supreme Court of the United States denied certiorari.

Juniper then filed a petition for writ of habeas corpus in the Supreme Court of Virginia. This petition was dismissed, and the federal petition for writ of habeas corpus was later filed. Soon thereafter, the respondent filed his motion to dismiss. For the reasons stated below, the Court will grant the respondent's motion and deny the petition.

## BACKGROUND

The following statement of facts is adopted without change from the Supreme Court of Virginia's opinion on Juniper's direct appeal. *Juniper v. Commonwealth*, 626 S.E.2d 383 (Va. 2006). Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2001); *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008); *Pope v. Netherland*, 113 F.3d 1364, 1367 (4th Cir. 1997) (citing *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981)). The record fully supports the Supreme Court of Virginia's factual recitation. Footnotes in the statement of facts are those of the Supreme Court.

### A. Guilt Phase.

On the afternoon of January 16, 2004, Keshia Stephens, her younger brother Rueben Harrison, III,[1] and two of Keshia's daughters, Nykia Stephens and Shearyia Stephens,[2] were killed in Keshia's apartment in the City of Norfolk. When police arrived, they found that the door to Keshia's apartment had been forcibly opened. All four victims were discovered in the master bedroom; each had died as a result of gunshot wounds.

Keshia was stabbed through her abdomen, shot three times, and grazed by a fourth bullet. One bullet went through her intestine, kidney, and spine, causing spinal shock and leg paralysis. Another bullet also passed through her intestines and then proceeded to her abdominal aorta and inferior vena cava, causing extensive bleeding.

The stab wound did not fatally wound Keshia, but tore through the muscle of her abdominal wall. There was a great deal of blood accompanying the wound, however, which led the medical examiner performing the autopsy to conclude that the stab wound was probably the first injury inflicted on Keshia. The stab wound was consistent with a wound that would have been caused by the knife blade found at the scene of the crime.

---

[1] The record contains several different spellings of Rueben Harrison, III's first name. We will spell his name "Rueben," consistent with the indictment.
[2] Shearyia Stephens was also known as Sheryia Benns.

Two-year old Shearyia was shot four times while in her mother's arms. Two bullets entered Shearyia's body in the shin of her left leg, fractured the bone, and exited through her calf. A third bullet entered and exited Shearyia's body through her thigh. The fourth bullet entered the crown of her head and passed through her brain, causing bone fragments to chip off.

Rueben Harrison was shot three times. One bullet struck his pelvic bone, and ricocheted through his body into his abdomen, liver, heart and lung, finally coming to rest in his armpit. A second bullet hit his hip bone, and exited through the front of his leg. A third bullet broke his femur bone, and exited his body at his front thigh. The medical examiner testified that the broken bones would have caused excruciating pain and immediately disabled Rueben.

Four-year old Nykia was shot one time behind her left ear. The bullet moved through her skull and cerebellum to the base of her skull, into her esophagus and trachea, causing substantial damage and bleeding, before exiting her chest. The medical examiner testified that the bullet's path was consistent with Nykia ducking her head and body toward the shooter prior to being shot. In addition, the presence of blood in Nykia's lungs indicated that she had taken one or two breaths between being shot and dying. Her body was found lying on top of her uncle's body.

Evidence presented at trial showed that Juniper and Keshia had been involved in an on-again, off-again tumultuous relationship for approximately two years. On the morning of the shootings, Juniper telephoned his friend, Renee Rashid, from his mother's house where he was living at the time. Juniper asked Rashid to drive him to Keshia's apartment so that he could retrieve some of his belongings. A short time later Rashid picked up Juniper at his mother's house and drove him to Keshia's apartment.

Both Juniper and Rashid entered Keshia's apartment, which was on the second floor of the apartment building. Rashid saw four individuals in the apartment: Keshia, Rueben, who was asleep on the couch, and two of Keshia's children, Nykia and Shearyia, who were preparing to take a bath. After helping Juniper disconnect a DVD player, Rashid was talking to the two girls, but overheard Juniper and Keshia arguing in another room. Keshia repeatedly made comments such as, "[T]here's nobody but you. I told you I'm not seeing anybody but you."

After Rashid announced that she was leaving, Juniper followed her to the door of the apartment. Hearing the door shut, Rashid assumed Juniper was behind her as she began to descend the apartment building steps. But as she was going down the stairway outside Keshia's apartment, Rashid heard a "loud boom" that she described as "sound[ing] like the door being kicked in." Not stopping to look behind her, Rashid hurried to her car. While waiting in her car outside the apartment, Rashid heard Keshia crying and repeating her statement that she was not seeing anyone but Juniper. Rashid sounded her horn to alert Juniper that she

wanted to leave. Juniper yelled at Rashid to "Go ahead" so she began to drive away. As she drove away from the apartment she heard four "booms," which she described as "sound[ing] like gunshots."

Rashid did not stop, but proceeded to Juniper's mother's house, and expressed her concern that Juniper had remained at Keshia's apartment. Juniper's friend, Keon Murray, was there when Rashid arrived. Juniper called his mother's house and Murray talked to him on the telephone. Murray observed that Juniper was calling from Keshia's apartment because the Caller ID number matched Keshia's telephone number. Juniper told Murray that "They gone," and that Keshia's apartment was surrounded. He also stated that he "killed them," although he did not name particular individuals.

Murray then called Tyrone Mings, a friend who lived near Keshia's apartment building, and asked him to check Keshia's apartment. Mings walked to the apartment and observed that the front door appeared to have been kicked in. Upon entering Keshia's apartment, Mings testified that he saw Juniper standing in the living room with a white substance on his face and holding an automatic pistol. When Mings asked Juniper about Keshia, Juniper directed Mings to the back of the apartment. Upon entering the master bedroom, Mings saw Rueben and a young girl lying on the bed. Mings did not see Keshia and asked Juniper where she was. Juniper told Mings she was "between the bed and the dresser." Mings returned to the bedroom and called to the people in the room, but no one answered. Mings departed Keshia's apartment, leaving Juniper in the living room, still holding the pistol. Upon returning to his apartment, Mings called the police.

In the meantime, Rashid and Murray picked up Juniper's cousin ("Little John") and drove to Keshia's apartment. Murray and Little John went to look for Juniper, while Rashid stayed in the car. They returned to the car with Juniper, who sat in the front passenger seat next to Rashid, the driver. Rashid described Juniper as being "jittery" and "breathing real hard." Juniper kept looking in the mirrors, saying, "they're behind us" throughout the car ride. Murray stated that Juniper "look[ed] nervous," "[l]ike he was in shock," and that he had a powdery substance like cocaine on his face. Juniper held a black and chrome automatic pistol in his right hand, resting on his lap.

The police first arrived at Keshia's apartment complex at 12:50 p.m., after receiving a telephone call reporting possible gunshots. The responding officer walked around the apartment building and spoke with two residents, but did not go up the stairway to Keshia's apartment. After conferring with a second police officer who had arrived on scene, both officers left the apartment complex believing the call to have been a false report.

Mings observed the officers leave and called the police a second time. Near 2:20 p.m. police officers again arrived at the apartment complex and this time went up the stairway to Keshia's apartment. Officer W.G. Snyder testified the "whole center part of the door was completely knocked . . . inward into the

apartment, and wooden debris from the door was lying inside the apartment." The officers entered the apartment, and observed Nykia's body lying across Rueben on the bed in the master bedroom. They then observed Shearyia's body lying across Keshia's body on the floor beside the bed. The officers received no response from any of them.

Police investigators recovered a cigarette butt from the floor by the front door of Keshia's apartment. From the master bedroom where the bodies were located, investigators recovered a knife blade, a knife handle, and shell casings. Shell casings were also found in a bathroom adjoining the master bedroom.

A firearm and toolmark examinations expert testified that bullet casings found in the apartment and the bullets recovered from the victims' bodies were fired from a single nine-millimeter, Luger semi-automatic pistol.[3] The expert also analyzed the recovered knife blade and knife handle and determined that the blade and handle were originally joined.

A latent fingerprint expert testified a fingerprint found on the knife blade had "a minimum of 23 matching characteristics" to Juniper's right thumbprint. In addition, an expert in forensic serology and DNA analysis testified that Juniper's DNA profile matched DNA from the knife handle[4] and the cigarette butt.[5]

The police obtained warrants for Juniper's arrest and he surrendered voluntarily on January 26, 2005. While incarcerated at the Hampton Roads Regional Jail awaiting trial, Juniper admitted to a fellow inmate, Ernest Smith, that he committed the murders. Smith testified that while the two were together in the medical pod at the Hampton Roads Regional Jail, Juniper confessed to shooting the four victims. Smith testified that Juniper told him that he had killed the children because "he didn't want to leave any witnesses at the scene of the crime."

### B. Penalty Phase.

During the penalty phase, the Commonwealth introduced evidence of Juniper's criminal record, which contained convictions for grand larceny, possession of cocaine, possession of marijuana, threatening to kill, disorderly conduct, failure to appear, and numerous motor vehicle violations. The

---

[3] The firearm was never recovered.

[4] Sixteen loci from the knife handle matched Juniper's DNA profile. The DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of another individual having a matching DNA profile being one in greater than six billion individuals, the population of the world.

[5] Fifteen loci matched Juniper's profile from the DNA on the cigarette butt; again, the DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of another individual having a matching DNA profile being one in greater than six billion individuals.

Commonwealth contended its evidence proved the aggravating factors of both future dangerousness and vileness.

The Commonwealth also introduced evidence of Juniper's violent behavior and unadjudicated criminal conduct. Several of the Commonwealth's witnesses testified about Juniper's tumultuous and abusive relationship with Keshia. Ruqayyah Barnes described an incident that occurred at a night club in August 2003. She was present when Juniper accused Keshia of "some guy looking at her, and so he started getting mad and calling her names. He told her, 'Bitch, get over here right now before I whoop your ass,' and said, 'That guy looking at you.'" Ruqayyah testified that Juniper was "screaming" these things to Keshia and "standing right in front of her face." According to her testimony, Juniper yelled at Keshia because "[t]hat [ni* *er] over there looking at you." And accused Keshia of "f* *king with him."

Ruqayyah also testified about an event in September 2003. She and Keshia returned from shopping when Juniper began fighting with Keshia. He complained that Keshia and Ruqayyah were taking too long and [Keshia] don't do s* *t for no kids. He do everything. He feed them. He do their hair. He buy their clothes. He do everything. They're his kids . . . . And then he pulled her by her hair and start screaming in her face about us being gone at the mall too long. Then he punched her in her face. She fell down on the floor. She slid back in the hallway into the kitchen. Ruqayyah clarified that Juniper "just grabbed [Keshia's] hair and yanked it real hard and she came closer to him." When Juniper punched Keshia, he did so "with a closed fist ... right in her eye."

Ruqayyah's sister, Malika T. Barnes, testified that in the spring of 2003, she witnessed Juniper trying to get Keshia's attention, and when Keshia did not respond to her name, he said, " 'B, I know you heard me calling you,'" before "calling her a whole bunch of names." When Keshia sat down in the room where Malika and Juniper were located, Juniper "told [Keshia] to go back in the room." When Keshia did not leave, Juniper "grabbed her by her arm and got her, and guid[ed] her toward the room."

Malika also described an incident that occurred at the food store where Keshia worked. Before Malika entered the store, Juniper told her that Keshia was cheating on him. Juniper followed Malika into the store and "told Keshia to go to the back to get something, and she didn't move fast enough to get it." So Juniper pulled Keshia's arm as he "fuss[ed] and holler[ed] as usual."

In the summer of 2003, Malika witnessed Juniper "grabb[ing] Keshia's arm." In clarifying what she saw, Malika stated that Juniper grabbed Keshia "[f]orcefully" and "grabbed her arm to direct her toward him." When Malika confronted Juniper for acting that way, Malika testified that Juniper responded, "'That's my bitch.' 'That's my hoe.' 'When I tell my bitch to come here, that's what I want her to do.' " He then threatened to "f* *k all [you] bitches up."

The assistant manager of the food store where Keshia worked recounted several verbal and physical altercations between Juniper and Keshia. In January 2003, the assistant manager observed Juniper approach Keshia after she smiled at a customer. She testified that Juniper had told Keshia that he would "smack the s**t out [of] you, bitch, for smiling at the customer that went out."

The manager also described an incident she observed between Keshia and Juniper in the spring of 2003. According to her testimony, Juniper

> punched [Keshia] in her face, and her wig came off. She picked her wig back up and put it on. By that time I was getting out [of] the car. Keshia ran in the [food store], and I unlocked the office. And I took her in the office, and I told her that he had to leave the premises or I was going to call the police. After that he was barred from the store.

The manager confirmed that by "punch" she meant that Juniper's "right hand [was] balled up into a fist with [his] fingers curled into [his] palm."

In June 2003, police responded to a domestic dispute between Juniper and Keshia. Juniper admitted to "slap[ping]" duct tape on Keshia's arm, mouth, and head in order to "keep her quiet," and confirmed that he had "done that before." Juniper was charged with abduction as a result of this incident, but the charges were not prosecuted because Keshia failed to appear in court.

Other witnesses described Juniper's conduct while incarcerated. A deputy in the Norfolk Sheriff's Department testified that when she informed Juniper that he did not have any mail that day, he responded by calling her "a cracker ass whore" and telling her to "Walk away, you f**kin' bitch. Carry your ass away, you f**kin' bitch."

During a search of Juniper and his jail cell in April 2004, corrections officers found a large paper clip concealed under Juniper's tongue. Possession of the paper clip was prohibited contraband because it could be used as a weapon or handcuff key.

In October 2004, Juniper attacked a sleeping inmate with a pillowcase containing dominoes and kicked the inmate in the ribs. Juniper left the scene of the attack when challenged by another inmate and ran into an elderly inmate's cell, whereupon he took the footrest from the inmate's wheelchair. Juniper then confronted the other inmates with the wheelchair footrest, threatening, "I kill you." It required several officers fifteen to twenty minutes to stop Juniper's attack.

Juniper offered evidence in mitigation including testimony from his older sister regarding the physical abuse that he suffered as a child from his stepfather, who sold drugs from the home where Juniper lived. Juniper never met his actual father until he was 23 years old, and had no male role models growing up except his maternal grandfather. Juniper's sister and aunt testified that Juniper had a

close relationship with his maternal grandfather and was greatly affected by the grandfather's death when Juniper was a youth. Witnesses also testified about Juniper's generosity and caring relationship with several young children, including Keshia's children.

Dr. Thomas Pasquale, a clinical psychologist appointed to assist Juniper by performing a psychological assessment, testified as to his findings. He found significant problems with Juniper's family of origin including the lack of a "consistent father figure" and a "withdrawn" and "emotionally absent" mother. These inadequate relationships in addition to physical abuse caused Juniper to "fe[el] abandoned," have "difficult[y] trust[ing] people" and conclude that "if you're not in control, then you're likely to be harmed." Dr. Pasquale found that Juniper had an average I.Q. and was not a psychopath, but he determined that Juniper had "features of a characterological dysfunction, personality disorder which demonstrated a failure to adapt [and] develop." Dr. Pasquale listed the characteristics of this personality disorder for the jury:

> Antisocial thought and behavioral patterns, difficulties with impulsivity, reliance on the more primitive defense mechanisms of denial and blame, an easily compromised conscience, problems with anger, mood instability, alcohol and drug abuse, and chronic difficulties with the legal system.

Dr. Pasquale diagnosed Juniper with depression, alcohol, cocaine and marijuana dependence, and antisocial personality disorder.

*Juniper v. Commonwealth*, 626 S.E.2d 383, 393–398 (Va. 2006).

## STANDARD OF REVIEW

In order to obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. 28 U.S.C. § 2254 *et seq*. "State court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008). AEDPA itself states:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

8

28 U.S.C. § 2254(e)(1). The Supreme Court recently emphasized and made clear the narrow scope of this Court's factual review of state habeas proceedings. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011) (holding that the district court's review under § 2254(d) is limited to the evidentiary record before the state court because "[i]t would be contrary to [AEDPA's] purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*").

Additionally, a federal court may not grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *See Appleby v. Warden*, 595 F.3d 532, 535 (4th Cir. 2010) (quoting *Cummings v. Polk*, 475 F.3d 230, 237 (4th Cir. 2007)). A state court's holding is "contrary to" clearly established federal law "'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law' or 'confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at' an opposite result." *Jackson v. Kelly*, 650 F.3d 477, 492 (4th Cir. 2011) (quoting *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010)). A state court's holding is "an unreasonable application of clearly established federal law when the state court "identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular case." *Id.* (quoting *Wheeler*, 609 F.3d at 300–01).

In other words, "to obtain federal habeas relief, 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that

there was an error well understood and comprehended in the existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). By design, this standard is "difficult to meet." *Id.* This extraordinarily high level of deference— commonly referred to as "AEDPA deference"—governs all legal determinations made on the merits by state habeas courts.

In addition to these substantive limitations on the federal courts' scope of review, the law also imposes procedural limitations to insure that state courts get the first crack at issues. Thus, in the interests of federalism, this Court may not grant a petitioner relief unless he "has exhausted the remedies available in the courts of the State" of which he is in custody. 28 U.S.C. § 2254(b)(1)(A); *see also Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n.10 (1973)). Exhaustion requires not only that all possible remedies be utilized before seeking relief in federal court, but also that any given claim first be "fairly present[ed]" to the state's highest court for disposition. *Matthews v. Evatt*, 105 F.3d 907, 910–11 (4th Cir. 1997).

When a petitioner brings a claim in federal court that has not been fairly presented to the state's highest court, but that state court would now refuse to review the claim because of an adequate and independent state procedural rule, the claim may be procedurally defaulted. This rule generally holds, for instance, when it comes to claims that would be barred by Virginia's statute of limitations on habeas actions. *See Sparrow v. Dir., Dep't of Corr.*, 439 F. Supp. 2d 584, 587–88 (E.D. Va. 2006). In such circumstances, the federal courts will generally not hear

the claim. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."). Nonetheless, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

Even on a procedurally defaulted claim, a petitioner may obtain review by establishing both cause and prejudice. *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998). The petitioner bears the burden of establishing both. *See Burket v. Angelone*, 208 F.3d 172, 183 n.10 (4th Cir. 2000). In general, "cause" refers to some objective factor external to the defense [that] impeded counsel's [or petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999). The following objective, external factors have been held to constitute cause: "(1) interference by officials that makes compliance with the State's procedural rule impracticable; (2) a showing that the factual or legal basis for a claim was not reasonably available to counsel; (3) novelty of a claim; and (4) constitutionally ineffective assistance of counsel." *Wright v. Angelone*, 151 F.3d 151, 160 n.5 (4th Cir. 1995). A *Brady* violation, described in greater detail below, may qualify as official interference under the first factor. *See Strickler*, 527 U.S. at 284.

To show prejudice, the petitioner must demonstrate "'not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *McCarver v. Lee*, 221 F.3d 583, 592 (4th Cir. 2000) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

In *Brady* and *Strickland* claims, the showing of prejudice to overcome a procedural default intersects with the substantive merits of the claims. In claims of ineffective assistance, *Strickland* requires a finding of actual prejudice. Likewise, with alleged *Brady* violations, the cause and prejudice requirements "'parallel two of the three components of the alleged *Brady* violation itself.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler*, 527 U.S. at 282).

## DISCUSSION

The petitioner brings a number of claims, some of which are procedurally defaulted and some of which are exhausted claims that are properly preserved for habeas review. In the Court's Order setting a briefing schedule, the petitioner was instructed to set forth these two different types of claims in separate sections, which he has done. (Dk. No. 9.) Substantively, all the claims fall into one of two categories: (1) *Brady/Napue* claims; and (2) ineffective assistance of counsel claims. After laying out the relevant authorities for these two sets of claims, the Court will consider each one of the petitioner's claims in sequence.

Juniper has alleged both *Brady* and *Napue* claims. *Brady* held that a state violates a defendant's due process rights when it fails to turn over "evidence favorable to an accused . . . where the evidence is material." *Basden v. Lee*, 290 F.3d 602, 609 (4th Cir. 2002) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Favorable evidence may come in the form of exculpatory or impeachment evidence. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

A *Napue* violation occurs when the state knowingly offers or fails to correct false testimony. *Basden*, 290 F.3d at 614 (citing *Napue v. Illinois*, 360 U.S. 264 (1959)). A *Napue* claim requires (1) testimony that is false; (2) testimony that is material; and (3) the prosecutor's knowledge of the testimony's falsity. *Id.* The testimony is material if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

For a petitioner to demonstrate ineffective assistance of counsel in violation of his Sixth Amendment right to counsel, he must satisfy the *Strickland* standard, requiring that "counsel's performance was deficient, and that the deficiency prejudiced the defense." *Jackson v. Kelly*, 650 F.3d 477, 493 (4th Cir. 2011) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* sets a "high bar," and courts must assess trial counsel's efforts with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Kelly*, 650 F.3d at 493 (quoting *Harrington*, 131 S. Ct. at 788)). The "performance prong" requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687–88). In making that determination, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Even assuming, however, that a petitioner can satisfy the "difficult standard" of the performance prong, the petitioner still must show "prejudice" to his case. *Id.* That showing "requires a substantial, not just conceivable, likelihood of a different result." *Kelly*, 650 F.3d at 493 (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007) (quoting *Pinholster*, 131 S. Ct. at 1403)).

As the Supreme Court has recently stated, "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 131 S. Ct. at 788. For this reason, within the context of review under Section 2254(d), another level of deference is added to the already-deferential *Strickland* standard: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly so.'" *Id.* (internal citations omitted). As a result, an exceptionally high standard applies: "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

As a result of these multiple layers of deference, in order to overturn a state judgment affirming a conviction, a federal habeas court must conclude that find trial counsel's alleged errors were "'so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement[.]'" *Branker*, 668 F.3d at 141 (quoting *Harrington*, 131 S. Ct. at 786–87).

The Court now proceeds to each of Juniper's many individual claims.

* * *

Claims Not Presented to, or Found to be Procedurally Defaulted by, the Virginia Supreme Court

I. **The Prosecution Violated Brady When It Concealed the Statements of Wendy and Jason Roberts and the Photo Lineup**

In his first claim, the petitioner argues that the prosecution concealed the police statements made by two of Keshia Stephens' neighbors soon after the killings took place. These neighbors, Wendy and Jason Roberts, lived in an apartment unit at 1425 Kingston Avenue in Norfolk, Virginia, next door to Keshia Stephens' apartment building. On the day of the crime, in

the early afternoon, Wendy now claims that she "heard a series of loud pops." (Appx. 733.) Jason claims that he also heard this sound, which he "recognized . . . as gunshots because of [his] experience in Emergency Response." (*Id.* 736.) Soon after that, they claim to have seen a single black man quickly descending the stairs from Keshia Stephens' apartment, getting into a car, and then driving away. Wendy Roberts, who was walking her service dog at the time, says that she made eye contact with the figure as he was absconding, prompting him to ask, "What the f* *k are you looking at, lady?" (*Id.* 734.) She recognized the man as one of three African-American males that she "regularly saw visiting Apartment 1," where Stephens resided. (*Id.*) "This all occurred sometime between 1:00 p.m. and 2:30 p.m.," which she knew because her grandchildren's school let out at 2:30 and she was "beginning to think about who was going to get [them]." (*Id.*)

Within just a few minutes, a number of police officers appeared at the scene. Both of the Roberts claim to have given the police statements regarding what they observed. Jason soon had to leave to pick up his niece from school. (*Id.* 737.) Officers later returned to speak with Wendy on more than one occasion. (*Id.* 735, 737.) The Roberts claim that the police presented them with a "six-pack"—"a piece of paper with six photographs on it." (*Id.*) Jason was unable to identify any one of the six as the person leaving the apartment, because he did not get a clear look at his face. Wendy, on the other hand, identified one of the six, even though they all "looked similar to one another." (*Id.* 735.) She remains unaware "whether [she] chose the photograph of the suspect." (*Id.*) Neither the prosecution nor defense lawyers contacted the Roberts after their interviews. (*Id.*)

Juniper contends that the Roberts could have formed a critical part of his defense. He maintains that the Roberts, as unbiased bystanders, would have been reliable defense witnesses,

for they could have testified to this incident and created reasonable doubt in the jurors' minds as to whether Juniper was the actual perpetrator. Juniper was allegedly elsewhere in the early afternoon, so jurors would have been left wondering about the actual time of the murders and who was involved. Their testimony would have furthermore contradicted the narrative account that Rashid, Mings, and Murray gave in support of the prosecution's theory, and thereby cast doubt on the credibility of the prosecution's most critical witnesses and the quality of the investigation conducted by police. The petitioner further maintains that the Roberts were inherently more believable than prosecution witnesses, who, in some cases, were either threatened with prosecution or granted immunity in exchange for their testimony. Finally, their testimony could have been used to bolster the testimony of other individuals like Kevin Waterman, who also claims to have heard shots fired in the early afternoon. *See* Part V.B., *infra*. Had they testified, Juniper argues that at least one juror would have decided to spare his life, if not acquitted him altogether. (Pet. 25–26.)

Neither he nor his trial counsel even knew of the Roberts' existence at the time of his trial or appeal. In fact, not "until October 2010, almost four years after his state habeas petition was due," did the petitioner learn of their existence and the fact that investigators had interviewed them about the murders. (Pet. 28.) Juniper only learned about them because certain evidence from Juniper's prosecution became public during a subsequent police corruption trial. The petitioner contends that, before this happenstance discovery, neither he nor his lawyers received any information about the Roberts. Through the corruption prosecution, Juniper learned only of *Wendy* Roberts, for the evidence in fact made no mention of Jason Roberts. (Appx. 643, 671, 674.) State habeas counsel did not learn of Wendy's son Jason's existence or the fact that police had interviewed him "until they fortuitously found him at his mother's house" while trying to

16

find his mother. (Pet. 29.) The Roberts signed the affidavits about their police contacts on July 23, 2011—several months after the Supreme Court of Virginia dismissed Juniper's state habeas petition, and only a few months before he filed his federal habeas petition. (Appx. 735, 737.)

A month after the Roberts signed their affidavits, the petitioner filed a motion in the Supreme Court of Virginia seeking disclosure of all statements that either Wendy or Jason Roberts made to police during the murder investigation, along with the photo line-up that police officers showed Wendy Roberts on January 17, 2004. (*Id.* 638–61.) The respondent opposed this motion. (*Id.* 832–37.) The Supreme Court denied the motion, along with the petitioner's motion for rehearing of the Court's dismissal, in September 2011. (*Id.* 838–39.) Soon thereafter, the petitioner filed a second motion for discovery (*id.* 840–67) and a second petition for writ of habeas corpus, in which this very same *Brady* claim figured prominently. (*Id.* 868–917.) The respondent again opposed the discovery motion. (*Id.* 920–923.) In October 2011, the Supreme Court dismissed the habeas petition as untimely and denied the discovery motion. (*Id.* 925.) Thus, the Supreme Court did not reach an "adjudicat[ion] on the merits" on this particular *Brady* claim due to its determination that the petitioner filed the second habeas petition too late. 28 U.S.C. § 2254(d).

Recognizing the difficulty of assessing the petitioner's *Brady* claim without knowing what evidence was actually in the Commonwealth's possession at the time of Juniper's prosecution, this Court ordered the respondent to produce several categories of evidence, including any record of statements that the Roberts made to police and the photo line-up that police showed to Wendy Roberts during their investigation.[6] (*See* Memorandum Order, Dk. No. 67.) The Court also directed the respondent "to offer any affidavits that he considers relevant in

---

[6] The Court's Order brought to an end the Commonwealth's long, senseless resistance to the disclosure of its information about the Roberts.

support of this document production (for instance, explaining the perspective of the Norfolk Police Department and Norfolk Commonwealth Attorney's Office as to why the production of these documents was not necessary under *Brady*)." (*Id.*) In response, Deputy Commonwealth's Attorney Phillip G. Evans II and William A. Conway of the Norfolk Police Department both filed sworn affidavits. (*See* Dk. Nos. 75, 77.) They also provided three pages of typed notes, two of which formed part of the investigation notes disclosed during the police corruption trial. (*Compare* Dk. Nos. 75-2, 75-3, 77-2, 77-3 *with* Appx. 671, 674.) These two pages, whose heading reads "Notes of investigators W.A. Conway/R.G. Ford," state in relevant part, "At 2120 [on January 16, 2004,] I spoke with Wendy Roberts, whose statement was consistent with the interview given to Detective D.I. Jones," and "At 2240 [on January 17, 2004,] Miss Roberts views a photo line-up at 1425 Kingston Avenue, number B, and said she is not 100 percent sure and picked out the lower left." Other than these two sentences, they contain no reference to either Wendy or Jason Roberts (nor does the remainder of this document). (*See* Appx. 665–74.)

The remaining page of notes is a summary of an interview that an investigator by the name of "D.I. Jones" (now deceased) conducted with the Roberts on January 16, 2004, also at the Roberts' home at 1425 Kingston Ave, Apt B. This page states:

> Ms. Roberts stated that on 1-16-04 about 9:30 to 10:00AM a B/M in an older red Toyota pulled into the apt lot and was arguing with a B/F. She stated that they argue about three or four times a week. She thinks he is an ex-boyfriend. He came back around 12:30 or 12:45 today and they were arguing again. She heard the B/M tell the female that she had not better be there when he returned. About 1:30PM today she heard what she thought was firecrackers. She said it was three or four bangs. She said the female moved into apt 1 around Christmas time. She said the B/M comes around in the Toyota all hours of the day and night and beeps the horn for her. He comes around the apt about 7:30AM each morning wanting to see the kids. She said the male is about 6-2 150 lbs late 20's in an older red Toyota like a Corolla. The female is small 5-1 in her 20's. There is also another B/M that drives a [*sic*] older blue and white Ford 150 with a white camper shell that also goes to the apt. He is a very large fat guy. Jason was not home at the time of the argument, but has seen the people and the vehicles many times. He

also heard the bangs when he got home and thought it was someone hammering. Both will call if they see the vehicles and will write down the license plates [*sic*] numbers. The [*sic*] believed there were 3 children that lived there, but they were not sure.

(Dk. No. 75-1, 77-1.) Notably, this summary contains statements that Wendy Roberts apparently made to police in January 2004 but did not recount in her July 2011 affidavit (*i.e.*, remarks about the arguments that took place outside her building on the day of the murders). It also omits information that she shared in July 2011, for it makes no reference to the man who supposedly descended the stairs from 1427 Kingston Avenue and accosted Wendy Roberts after she heard "a series of loud pops." (Appx. 733–34.)

In addition to the foregoing notes, Conway and Evans provided a six-person photo line-up with three individuals pictured in the top row and three more in the bottom row. (Dk. Nos. 75-4, 77-4.) The petitioner's photo appears in the top-right corner of this line-up, with five other named but otherwise unidentified individuals pictured. (Dk. Nos. 75-4, 77-4.) Though Conway and Evans believe that this is the particular photo line-up ("six-pack") shown to Wendy Roberts during the murder investigation, neither one can confirm this to be the case because police kept no clear record of the evidence. (*See* Dk. Nos. 75 at 2–3, 77 at 2–3.)

Following this production, the Court gave the parties an opportunity to supplement their existing briefs by expanding on this *Brady* claim, which they both did. The petitioner's supplemental brief contends that the newly acquired evidence confirms his earlier allegations of a *Brady* violation, and he asks the Court to grant relief based on the evidence before it or, at minimum, grant further discovery and an evidentiary hearing. (*See* Dk. No. 97.) The respondent opposes any such relief, arguing that the petitioner cannot establish any of the elements of a *Brady* claim.

Though the Court concludes that the petitioner cannot show prejudice—and must therefore dismiss his claim—it nevertheless believes that the prosecution likely withheld exculpatory evidence, in clear violation of its legal duties.

As discussed above, *Brady* held that a state violates a defendant's due process rights when the state fails to turn over "evidence favorable to an accused . . . where the evidence is material." *Basden v. Lee*, 290 F.3d 602, 609 (4th Cir. 2002) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). In other words, a petitioner must satisfy three elements in order to prevail on a *Brady* claim: "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Because the petitioner did not present this claim to the Supreme Court of Virginia, and because it would now be time-barred by Virginia's applicable statute of limitations for habeas petitions,[7] he would have to meet the cause-and-prejudice requirement in order for the Court to reach the merits. In the context of alleged *Brady* violations, cause and prejudice "'parallel two of the three components of the alleged *Brady* violation itself.'" *Id.* (quoting *Strickler*, 527 U.S. at 282). Thus, if the petitioner cannot overcome the procedural bar, he necessarily fails on the merits, and vice versa.

*A. The Evidence Was Favorable To The Petitioner And Was Likely Withheld From Him*

The Court recognizes the clear differences between the statements that the Roberts supposedly made to Investigator D.I. Jones back in 2004 and the statements that they made in mid-2011 in their affidavits. Of course, neither the Court nor any other disinterested party has any idea what the Roberts actually said to police back in 2004 because the police made no

---

[7] Indeed, the Supreme Court of Virginia appeared to conclude as much when it dismissed his second state habeas petition as "untimely" under state law.

verifiable, contemporaneous record of their statements, subject to the Roberts' own affirmation. That said, even assuming for the benefit of the prosecution that Jones' notes were accurate, they were unmistakably favorable to the petitioner and should have been turned over to the petitioner's trial counsel.

First of all, these notes contradict the prosecution's theory of the murders by suggesting that Keshia Stephens was still alive around 12:30 or 12:45 p.m. on the day of the murders[8]—a solid hour or more after the prosecution's witnesses claimed that the petitioner had committed the murders, and, even more importantly, at a time that overlapped with the first 911 call, which took place at 12:44:27 p.m. (State Habeas Record 3188.) If one believed such an account, it would peg the murders to a time when the prosecution's eyewitnesses all claimed the petitioner had already fled the scene and would undercut these eyewitnesses' accounts of what they saw and heard. For instance, if Roberts saw Stephens alive during that time frame, such an observation would have impeached Tyrone Mings' testimony about going to the apartment, seeing the petitioner with a gun after he committed the murders, and seeing the petitioner gesturing to Stephens' dead body "between the bed and the dresser" of her bedroom. Likewise, it would have cast doubt on Renee Rashid's story about hearing gunshots go off as she drove away from the apartment earlier that morning, for Stephens would have still been alive several hours later. Finally, it would have made one question Keon Murray's story about receiving a call from the petitioner, during which the latter allegedly told Murray "[t]hey gone" and that he had

---

[8] The notes refer only to a "B/F," or black female, so the Court cannot necessarily assume that the person that Wendy Roberts saw in an argument on the morning of the murders was Keshia Stephens. At the same, given the similarity of the woman's stature to the victim's, and given the fact that Stephens also moved into the property around the same time specified in the notes, the assumption seems fairly safe. At any rate, no one presently contends that the woman cited in the notes was anyone other than Keshia Stephens, so the Court will not dwell on the woman's lack of name identification.

"killed them." In short, the Roberts' 2004 eyewitness accounts, as memorialized in D.I. Jones' typed notes and confirmed by Detectives Conway and Ford in their interview of Wendy Roberts, flatly contradicted those of the prosecution's key witnesses: Rashid, Mings, and Murray.

Moreover, Wendy Roberts did not simply claim to see Keshia Stephens at a time when she was supposedly dead. Rather, Roberts saw her get into an argument with a man on the morning of the murders and again between 12:30 and 12:45 p.m. that same day. The man whom Wendy Roberts described from that confrontation bore little physical similarity to the petitioner—who weighed around 300 pounds at the time of the murders (State Habeas Record 3)—and the man drove a car that obviously did not belong to the petitioner either. In other words, Wendy Roberts' version of the events raised the possibility that someone other than the petitioner may have been angry with Stephens, and even threatened her not to stay on the premises any longer, just hours before someone killed her. Such evidence is therefore exculpatory as well, because it tends to show that a still unidentified individual, who could not have been confused with the petitioner even from far away, may have also had a motive to harm her.

Lastly, the prosecution should have properly preserved and turned over the photo line-up and corresponding names that investigators showed to Wendy Roberts, for she apparently identified someone other than Juniper as the person with whom Keshia Stephens twice argued on the day of the murders. An eyewitness account pointing to a different suspect undoubtedly constitutes exculpatory material. Between the notes and the photo line-up, the petitioner meets the first prong of the *Brady* test without any difficulty.

Oddly, the respondent maintains that no proof exists that prosecutors actually concealed this evidence at all. "In fact," he contends in his supplemental brief, "it is highly likely that the

prosecutor did provide the information to Juniper's trial counsel." (Dk. No. 100 at 6.) He bases this argument on Deputy Commonwealth's Attorney Evans' befuddling statement, "I cannot remember with certainty whether the canvas statement of Wendy Roberts was specifically mentioned but I do know the fact that witnesses may have seen or heard things after the time of the murders due to the two police responses and thereby created confusing witness statements/timelines *not directly relevant to the murders* was discussed [sic] with counsel for Anthony Juniper."[9] (Dk. No. 75 at 8 (emphasis added).) Evans' statement sheds no light on whether the prosecution told the petitioner about the Roberts.

If anything, the record before the Court compels the conclusion that the prosecution did not give the defense information about the Roberts. The Court has seen no sign in the voluminous record that the Roberts' names came up before the police corruption prosecution. Granted, neither of the petitioner's trial attorneys has affirmatively stated that the prosecution withheld the Roberts' statements from them, but it is simply implausible that the Roberts' names and statements were disclosed without so much as a hint of their existence arising during state proceedings. Moreover, if it is "highly likely that the prosecutor did provide the information to Juniper's trial counsel," then why has the respondent, throughout years of habeas proceedings, steadfastly opposed production of the documents when the petitioner's habeas counsel has sought them? If prosecutors had already shared the documents with trial counsel, what is it precisely that the Commonwealth and its various representatives have been so desperate to protect, and for what reason? The events leading up to this point, far from demonstrating a lack

---

[9] To the extent that prosecutors or investigators in this matter engaged in "'scrutiny and credibility determinations . . . regarding the relevance of any potential exculpatory evidence,'" this Court and the Fourth Circuit have both made absolutely clear that this role belongs solely to the jury, not law enforcement officers. *Wolfe v. Clarke*, 691 F.3d 410, 423 (4th Cir. 2012) (quoting *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 567 (E.D. Va. 2011) (Jackson, J.)).

of concealment, show the Commonwealth's entrenched resistance to transparency in this criminal prosecution and subsequent post-conviction proceedings.

In the end, the Court concludes that the petitioner can establish the prosecution's concealment of the Roberts' statements, which likewise establishes the "cause" aspect of the cause-and-prejudice test for overcoming procedural default. *See Strickler*, 527 U.S. at 284 (recognizing that a *Brady* violation may qualify as "official interference," an objective, external factor sufficient to constitute cause); *Wright v. Angelone*, 151 F.3d 151, 160 n.5 (4th Cir. 1995) (identifying three potential "cause" factors). The petitioner therefore meets the first two prongs of the *Brady* analysis.

### B. The Petitioner's Claim Fails Because He Cannot Establish Materiality/Prejudice

Once Juniper has shown cause by demonstrating the prosecution's concealment of favorable evidence, *see Strickler*, 527 U.S. at 284, he must also make a showing of prejudice, which, in this context, is the same as the materiality showing on the merits. *Banks*, 540 U.S. at 691 ("[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes.") (quoting *Strickler*, 527 U.S. at 281–82).

The Supreme Court has articulated the standard for materiality in different, albeit substantively equivalent, ways. It has explained, "Our touchstone on materiality is *Kyles v. Whitley*, 514 U.S. 419 (1995). *Kyles* instructed that the materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 (quoting *Kyles*, 514 U.S. at 435). "In short," the Court continued, "'[a petitioner] must show a "reasonable probability of a different result."'" *Id.* at 699 (quoting *Kyles*, 513 U.S. at 434).

24

Earlier, the Court stated that "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Inasmuch as *Banks* acknowledged the "parallel" between prejudice in the context of procedural default and prejudice for the purposes of *Brady*, *Banks*, 540 U.S. at 691, the issue can be succinctly stated as whether the petitioner can show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Regardless of how one phrases the materiality standard, the Court concludes that the petitioner cannot meet it. Accordingly, the petitioner's claim must be dismissed. In reaching this conclusion, and likewise deciding that no evidentiary hearing is necessary to address conflicting storylines, the Court accepts all of petitioner's allegations as true. *Wolfe v. Johnson*, 565 F.3d 140, 169 (4th Cir. 2009) ("*Wolfe I*"); *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006).[10]

Ultimately, all of the Roberts' statements bear on prosecution witnesses' credibility, but they cannot unsettle certain basic facts about the murders. For this reason, the Court finds no "reasonable probability of a different result,'" even if prosecutors had properly disclosed the exculpatory information, as they were supposed to do. *Banks*, 540 U.S. at 699 (quoting *Kyles*,

---

[10] In *Conaway*, the Fourth Circuit held that a § 2254 petitioner "who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, *if the facts alleged would entitle him to relief*, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963)." *Conaway*, 453 F.3d at 582 (emphasis added). Because the Court concludes that the petitioner's facts, as alleged, do not entitle him to relief, the Court ultimately disposes of this claim (and all the others) without an evidentiary hearing.

513 U.S. at 434). Nothing the Roberts could say would affect the probative value of the powerful forensic evidence against Juniper. As discussed above, investigators discovered his DNA and fingerprint on the blade of the knife with which Keshia Stephens was stabbed before being shot, and on a cigarette butt found at the scene of the crime. The petitioner would have the Court believe that his fingerprint remained perfectly intact on the knife blade because of his regular visits to Stephens' apartment. Thus, the Court would have to imagine another assailant coming to the apartment, using the knife to inflict deep stab wounds on Stephens, and yet managing not to disrupt the petitioner's fingerprint on the knife's *blade*—a location where a person preparing food does not normally place his or her fingers, and a piece of the object which is normally cleaned after each usage. Even accepting the petitioner's arguments about what the Roberts saw and heard, his contentions regarding how this physical evidence ended up on one of the murder weapons strain credulity. Further, Juniper's conduct and statements after the killings are additional strong evidence of his guilt. Consequently, one cannot seriously doubt that the petitioner was at least one of the murderers, and if anyone else was involved, the petitioner himself has yet to say so. Hence, the favorable evidence cannot "'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 (quoting *Kyles*, 514 U.S. at 435).

Similarly, we know from undisputed phone records that the first 911 call was registered at 12:44:27 p.m. (State Habeas Record 3188.) According to this record, the caller complained of gunshots about an hour earlier at 1427 Kingston Ave, Apt B. The caller furthermore said that she was worried about her neighbor because she usually heard noise coming from the apartment but had not heard anything since the shots were fired. (*Id.*) Even assuming that the Roberts saw someone other than the petitioner absconding from Stephens' apartment "sometime between

26

1:00 p.m. and 2:30 p.m.," it again stretches the imagination to believe this person was the murderer or also involved in the murders. Not only would he have had to remain at the crime scene for well over an hour after initially firing shots, but he would have had to arrive on the scene to finish the job that the petitioner started when he stabbed Keshia Stephens. Again, this sort of supposition does little to undermine confidence in the outcome of the trial.

The petitioner maintains, however, that the Roberts were not alone in hearing gunshots around this time, for a third witness, Kevin Waterman, also claims to have heard four shots between 1:30 and 2:00 p.m.[11] (State Habeas Record 3210); *See* Part V.B., *infra*. Thus, from the petitioner's perspective, not only was this evidence materially exculpatory, but it was also corroborated by a third witness, whom defense counsel might have called to testify had they known that other witnesses made similar observations. But the problem for the petitioner is that several witnesses testifying to gunshots fired after 1:00 p.m. cannot unsettle the fact that the first 911 call took place at 12:44 p.m. any more than a lone witness can achieve that end. In order to believe that the murders continued to occur until 1:30 p.m., one would have to believe either that the killer(s) strung them out over nearly two hours or that someone planted a fake 911 call prior to the killings in order to create confusion about the murder timeline. One would have to maintain these notions, more importantly, over the word of people who claim to have seen the petitioner either at or leaving the crime scene with a gun. As with the scenario involving the killer fleeing Stephens' apartment in front of the Roberts, the story simply will not write.

---

[11] Again, since one is supposed to accept the petitioner's allegations as true at this stage, the Court assumes for the sake of argument that the Roberts reported "gunshots" or a "series of loud pops," as they maintain in their 2011 affidavits, and not "three or four bangs" that "[Wendy] thought were firecrackers," as reported in D.I. Jones' notes or "the bangs" that Jason thought "was someone hammering."

In the last analysis, this case demonstrates the crucial distinction between *exculpatory* evidence and *material* evidence for *Brady* purposes. Although the Roberts' statements and photo identification are exculpatory, they lack materiality, and the prosecution's concealment therefore did not prejudice the outcome of the petitioner's case.

*Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012) ("*Wolfe II*"), in fact, presents an excellent counterpoint to the instant case. There, the withholding of evidence was material because, without the key witness's testimony, literally no evidence remained to establish an essential element of the petitioner's murder-for-hire conviction. *Wolfe II*, 691 F.3d at 424 ("In these circumstances, where the jury had to believe that [the witness] was credible and that his version of events was in fact truthful and accurate in order to support [Wolfe's] conviction, the materiality of the [concealed evidence] is manifest."). Here, by contrast, the cornerstone of the petitioner's conviction was not a lone eyewitness's testimony but instead uncontroverted forensic evidence implicating him and him alone. *Cf. id.* at 424–25. Moreover, the forensic evidence was coupled with Juniper's own behavior and statements after the offense that clearly indicate guilt. Because none of the petitioner's allegations based on newly discovered evidence would entitle him to relief even if true, the petitioner can neither overcome procedural default nor support a *Brady* claim on the merits. The Court therefore dismisses the claim.

Because the Court concludes that the petitioner has not alleged sufficient facts to entitle him to § 2254 relief, he is not entitled to an evidentiary hearing to resolve the factual disputes surrounding this claim. *See* 28 U.S.C. § 2254(e)(2)(B) ("[T]he court shall not hold an evidentiary hearing on the claim unless the applicant shows that . . . the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional

error, no reasonable factfinder would have found the applicant guilty of the underlying offense."); *Wolfe I*, 565 F.3d at 168–70.

## II. Ineffective Assistance of Counsel due to Failure to Obtain and Present to the Jury Favorable Information Possessed by Wendy and Jason Roberts

The petitioner contends that trial counsel rendered ineffective assistance by failing to obtain eyewitness information from Wendy and Jason Roberts, who were discussed in the previous section. This claim is a non-starter. Even assuming that the petitioner can show cause for his procedural default and resulting prejudice,[12] he certainly cannot show that trial counsel's performance fell below the constitutional standard of reasonableness.

This claim is just an extension or alternative formulation of the *Brady* claim in the previous section: if the information sought was not impermissibly withheld under *Brady*, then one might as well claim that trial counsel were ineffective in failing to acquire it. According to the petitioner, trial counsel should have canvassed the neighborhood more thoroughly and interviewed more neighbors of the victims. If they had done so, they would have encountered the Roberts and discovered their police report and their identification of a man leaving the scene of the crime in time for the petitioner's trial. (Pet. 31–33.)

The record shows, however, that trial counsel's investigator looked at the surrounding neighborhood and interviewed nearby residents of the Kingston Avenue apartment where the

---

[12] On this claim, the Court will leapfrog the procedural default analysis and get straight to the merits, for that will allow the claim to be disposed of easily. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.") With respect to procedurally defaulted ineffective assistance of counsel claims, the "prejudice" showing necessary for overcoming default is the same as the "prejudice" showing on the merits. *See Burket v. Angelone*, 208 F.3d 172, 189 n.17 (4th Cir. 2000). Given this fact—along with the fact that the analysis of the claim on the merits is very simple—the Court will avoid delving deeply into the issue of default. *See Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) (finding that avoidance of default analysis may be appropriate when a petitioner's claim is "patently without merit").

murders took place. (MTD 28 (citing State Habeas Record 2863– 89).) It is always possible for defense counsel to interview more people, search for more potentially exculpatory evidence, or explore novel theories that might create doubt about their client's guilt. But trial counsel are not required to go to the ends of the evidentiary universe in order to meet the *Strickland* standard. "'The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources.'" *Tice v. Johnson*, 2009 WL 2947380, at *10 (E.D. Va. Sept. 14, 2009) (quoting *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992)); *see United States v. Roane*, 378 F.3d 382, 411 (4th Cir. 2004); *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) (emphasizing that the Court should consider the "practical limitations" facing defense counsel). Moreover, the petitioner acknowledges that trial counsel would have realistically had difficulty locating the Roberts, given that they did not even live in the apartment building where the murders took place but in the building next door. (Reply 14, n.13.) It is unreasonable to expect trial counsel to locate the two local residents—out of many—whose testimony or other evidence might have proven helpful to the defense. More to the point, the simple fact that they did not locate the Roberts does not establish ineffective assistance.

The petitioner turns *Strickland* on its head by arguing that trial counsel's failure to obtain any and all potentially helpful evidence is proof positive of their ineffective assistance. *Strickland* requires this Court to consider what counsel, acting reasonably, would have done at the time of the investigation and subsequent trial—not with the benefit of perfect hindsight. Without any reason to believe that trial counsel should have spoken to Wendy and Jason Roberts *during* the investigation, this Court cannot conclude that trial counsel failed to meet *Strickland*'s

performance prong. As a result, the claim lacks merit and must be dismissed, whether or not the petitioner can overcome his default.[13]

## III. The Prosecution's Failure to Disclose Exculpatory Evidence Relating to John Jones

The petitioner contends that the prosecution failed to disclose statements that John Jones made to the police during their investigation. The petitioner offers no support, however, for the exculpatory character of these statements, and without such proof, a *Brady* claim cannot succeed. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003) (recognizing that a *Brady* claim requires, first and foremost, that the evidence be favorable to the accused). The fact that Jones initially denied knowing what happened to the murder victims before giving his final account does not in any way help the petitioner. Indeed, many individuals under interrogation claim ignorance at the outset, only to reveal more information as time progresses. Nevertheless, the petitioner seizes on the fact that Jones, Renee Rashid, and Tyrone Mings all omitted reference to Keon Murray when first describing to police the events of January 16, 2004. From the petitioner's perspective, this collective omission is "favorable to Juniper" because it shows "coordination of the accounts of these witnesses, and it raises reasonable doubts about the credibility of their statements and testimony, and the objectivity and fairness of the prosecution's methods in developing a case against Juniper." (Pet. 35–36.) Similarly, the petitioner claims, "[i]t would have caused reasonable jurors to suspect that other aspects of the witnesses' testimonies had been scripted and coordinated by the police." (Reply 18.)

---

[13] The claim's lack of merit means that it is necessarily not a "substantial" claim under *Martinez v. Ryan*. Thus, the petitioner cannot overcome procedural default based on state habeas counsel's ineffective assistance in failing to raise the claim, because the petitioner cannot establish prejudice. *Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012) ("To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.").

The Court must reject this claim because the allegedly withheld evidence fails to meet the *Brady* materiality standard.[14] First of all, trial counsel knew that Rashid omitted reference to Murray in her initial account to police. On cross-examination, counsel directly asked Rashid about the omission, suggesting that she had made it up. (Pet. 35 (citing State Habeas Record 1776).) The defense was therefore aware of the possibility that Murray did not go with Rashid and Jones to retrieve Juniper from Stephens' apartment and questioned Rashid specifically about it. This questioning did nothing to change the outcome of Juniper's trial.

The petitioner argues, however, that Jones' initial omission would have strengthened this cross-examination because it would have shown a consistent change among two firsthand witnesses' stories. Even assuming this is true, it does the petitioner no good. First of all, Jones did not testify at Juniper's trial; consequently, his testimony neither hurt nor helped Juniper. If the defense had called Jones simply to establish Murray's absence from Jones' initial account to police, the prosecution would have surely utilized cross-examination to elicit the fact that Jones placed Juniper at the crime scene with a gun. (MTD 29.) Far from altering the outcome of the case, Jones' testimony would have likely compounded the evidence of Juniper's guilt, for that would have made four different individuals—Rashid, Murray, Mings, and now Jones—who personally saw Juniper at the crime scene with a gun.

Moreover, even if Jones' testimony undermined the likelihood that Murray traveled with the others to the crime scene, it would not have changed Murray's testimony about his phone conversation with Juniper on the morning of the murders, in which Juniper allegedly admitted that he had "killed them" and that "the house was surrounded." (MTD 7 (citing State Habeas

---

[14] As discussed above, with respect to procedurally defaulted *Brady* claims, the "prejudice" showing necessary for overcoming default is the same as the "materiality" showing on the merits. Since the petitioner cannot prevail on the merits, he necessarily cannot overcome the default in the first place. *See Burket v. Angelone*, 208 F.3d 172, 189 n.17 (4th Cir. 2000).

32

Record 1810–11).)  In sum, Jones' statements might have injected some doubt about other witnesses' credibility, but the likelihood that it would have changed the outcome of the trial is exceedingly low. *Kyles v. Whitley*, 514 U. S. 419, 435 (1995) (explaining that prejudice or materiality requires that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). *Brady* imposes a high bar on individuals who wish to attack their convictions; Jones' omission of Keon Murray from his initial statement, standing alone, comes nowhere near it. The Court must reject this claim, as the petitioner has failed to show prejudice, which is necessary to overcome procedural default, and materiality, which is critical to the merit of the claim.

* * *

## Claims that the Petitioner Asserts Have Been Properly Exhausted

IV.     *Brady* and *Napue* Violations

A.     *Prosecution Failed to Disclose Exculpatory Evidence Related to Keon Murray in Violation of Brady and Napue*

The petitioner claims that the prosecution violated *Brady* by failing to disclose that Murray was threatened with capital murder prosecution unless he agreed to testify against Juniper. The petitioner maintains that without this "valuable impeachment advice," defense counsel's "efforts to impeach Murray fell flat." (Pet. 37.) The Supreme Court of Virginia heard this claim but concluded that the prosecution never actually threatened Murray, as alleged. Given the required deference under AEDPA to a state court's findings of fact, and the lack of evidence to undermine this finding, this Court must accept the Supreme Court of Virginia's conclusion.  In light of that finding, the *Brady* claim fails, for there was no exculpatory information for the prosecution to turn over.

The Supreme Court of Virginia stated the following regarding Keon Murray:

33

Petitioner alleges that police detectives created the story that Murray related at trial and threatened to charge him with being an accessory after the fact if Murray did not comply. Petitioner further contends that after Murray invoked his Fifth Amendment right and refused to testify, Murray was removed from the courtroom and the prosecutor threatened Murray by telling him that if he did "not testify as instructed" he would be charged with capital murder and would face the death penalty.

*The record reveals that none of the alleged evidence was favorable to petitioner.* The record, including the trial transcripts, demonstrates that Murray was removed from the courtroom while the prosecutor and defense counsel discussed whether the prosecutor would offer Murray immunity, and was returned only after the court accepted the prosecutor's plan to grant immunity to Murray. In addition, the trial transcript and the affidavits of the prosecutor and the detectives demonstrate that *the prosecutor did not threaten Murray with criminal charges related to the murder.* Murray's taped statement to police implicated petitioner and thus was not exculpatory.

707 S.E.2d at 297 (emphasis added). The petitioner's contentions cannot be reconciled with the above passage. In stating that "none of the alleged evidence was favorable to petitioner" and that "the prosecutor did not threaten Murray with criminal charges related to the murder," the Supreme Court clearly made findings of fact precluding a *Brady* claim.[15]

The petitioner nevertheless claims, "Unbeknownst to jurors, during the recess, Murray was removed from the courtroom and taken out of the presence of defense counsel. Prosecutors took this opportunity to threaten Murray with capital murder charges and the death penalty. . . . Prosecutors never revealed the meeting or the threats that induced Murray's false testimony."[16]

---

[15] The petitioner argues in vain that the Supreme Court made no findings of fact in deciding this claim. (Reply 18.) The Supreme Court concluded that the petitioner had failed to satisfy the first element of a *Brady* claim, namely, that the evidence must be favorable to the accused. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003). In order to reach this conclusion, it specifically stated that "the prosecutor did not threaten Murray with criminal charges related to the murder." 707 S.E.2d at 297. The notion that this was not a factual finding is simply untenable.

[16] The Court acknowledges that there is some disagreement about whether Murray actually left the courtroom. (*See, e.g.,* Appx. 391–92, 395.) The trial transcript, however, makes clear that the Circuit Court recessed and that the bailiff took Murray "from the courtroom to an adjoining room." (Trial Tr. 985–86.) There was consequently nothing unreasonable about the Supreme

(Pet. 37 (citations omitted).) The petitioner would therefore have the Court believe that some prosecutors remained in the courtroom to discuss immunity on the accessory charge while others surreptitiously threatened Murray with murder charges outside the courtroom. In rejecting this version of the facts, the Supreme Court of Virginia considered the record before it, including the trial transcripts and the prosecutors and detective's sworn affidavits. (Appx. 391–92, 395, 414, 417.)

Ultimately, the petitioner's claim rests only on Murray's recanting his testimony after the trial and claiming—notwithstanding his statement to the contrary while under oath—that the state threatened him with prosecution. But there is simply no independent proof of this threat, and Murray's after-the-fact allegation is far from the clear and convincing evidence necessary to rebut the presumption of correctness in the state court's findings. 28 U.S.C. § 2254(e)(1); *United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are 'looked upon with the utmost suspicion.'") (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)). For this reason, the Court must reject the petitioner's *Brady* claim.

Likewise, because the state did not threaten Murray with capital murder prosecution, he did not falsely testify when he denied being threatened with capital murder prosecution. As such, the prosecution neither elicited false testimony, nor did it have any false testimony to correct. The *Napue* component of this claim fails as well.

Lastly, the Court notes that the petitioner cannot show prejudice even if he can somehow prove a *Brady* or *Napue* violation. Even without Murray's testimony, Renee Rashid still placed

---

Court of Virginia's factual determination that the witness left the courtroom. More importantly for this Court's purposes, the Supreme Court *separately* found that the "the prosecutor did not threaten Murray with criminal charges related to the murder." 707 S.E.2d at 297. The petitioner has presented no reason to question *this* factual finding, even though Murray's location was the subject of debate.

Juniper at the crime scene, heard him arguing with Keshia Stephens before the murders occurred, heard him reenter the victims' apartment forcefully, heard the gunshots ring out, and saw Juniper with a gun after the killings took place. Similarly, Tyrone Mings saw Juniper at the crime scene and personally saw the bodies of two victims. Finally, none of the witnesses' testimony has any impact on the forensic evidence, which includes both Juniper's thumbprint on the blade of the knife with which Stephens was stabbed and his DNA sample on the very same weapon. In short, the tremendous weight of the remaining evidence also compels the Court to reject these claims, because the petitioner fails to show that the alleged violation would have undermined confidence in the outcome of the trial.

B. *Prosecutors Concealed the Conditional Promise of a More Favorable Sentence in Exchange for Smith's Testimony against Juniper*

The petitioner next brings a couple of claims dealing with prosecution witness Ernest Smith. Smith testified that Juniper admitted his crime to him while the two were in Hampton Roads Regional Jail leading up to Juniper's trial. According to the petitioner, he has recanted his story and "now admits that he had no legitimate information about the crime." (Pet. 41.) Juniper says that the prosecution failed to disclose that it had worked out a deal to give Smith a lighter sentence in exchange for his testimony.

The Supreme Court of Virginia squarely addressed the disclosure claim but found that it lacked merit because the prosecution had not actually promised Smith anything and therefore had nothing to disclose. This Court is in no position to question this decision because, again, AEDPA requires a high degree of deference to a state court's factual findings, and the petitioner has presented no evidence to make one question its judgment. Smith's recantation, without more, is not enough to rebut the finding's presumption of correctness. 28 U.S.C. § 2254(e).

With respect to the prosecution's supposed deal with Ernest Smith, the Supreme Court of Virginia specifically stated the following:

> [P]etitioner contends that the Commonwealth failed to disclose the promise to informant Ernest Smith that the prosecutor would "try and do something after [Smith] testified to help [him] with [his] sentence." Additionally, petitioner contends that the Commonwealth told Smith to "say whatever [he] had worked out with the detectives." In support of his claim, petitioner relies on the affidavit of Smith, the motion for a reconsideration of Smith's sentences filed after Smith's testimony, and the hearing on that motion, in which the Commonwealth joined, held shortly after petitioner was sentenced to death.
>
> The Court holds that this portion of claim (I) is without merit. The record, including Smith's affidavit, the affidavit of the prosecutor and the transcript of the reconsideration hearing, demonstrates that Smith asked for a deal but that the prosecutor made no promises or deals with Smith in exchange for his testimony. Subsequently, the Commonwealth joined Smith's motion to reconsider sentence because Smith testified twice at petitioner's trial and because Smith was receiving threats as a result of his cooperation.

707 S.E.2d at 297. The fact that "Smith asked for a deal but that the prosecutor made no promises or deals with Smith in exchange for his testimony" forecloses any further argument. The Supreme Court of Virginia made an unequivocal factual finding which this Court has no reason to disturb. And since the prosecution did not promise Smith anything, it had nothing to disclose under *Brady*. The Court must reject this claim as well.

### C. Prosecution Presented False Testimony Through Ernest Smith

The petitioner also contends that the prosecution presented knowingly false testimony through Ernest Smith. Though the parties agree that the petitioner fairly presented this claim to the Virginia Supreme Court in his state habeas petition, they disagree as to whether that court actually adjudicated the claim on its merits. (Pet. 44; MTD 32). The Court cannot find any place in the Supreme Court's opinion where it addressed this claim. In any event, the claim lacks merit and must be rejected, even if it is entitled to *de novo* review as a claim properly preserved but not previously adjudicated.

Assuming for the sake of argument that Smith's testimony *was* false—and this itself is a huge assumption—the petitioner presents no proof that the prosecution or investigators *knew* that his testimony was false. He alleges that a member of the prosecution team "urged Smith to testify to whatever story Smith 'had worked out with the detectives about how Anthony killed the kids because he didn't want any witnesses.'" (Pet. 41–42.) To suggest on the basis of this one statement that the prosecution agreed to present knowingly false testimony is a great exaggeration. Moreover, this statement comes from Smith himself, and it flatly contradicts his testimony, under oath, at Juniper's trial. It is entirely unpersuasive.

Even more fundamentally, the only evidence that Smith's testimony was false is his own recantation and the affidavits of two other inmates at Sussex I State Prison, Jamie White and Marcus Bristow. According to White, Smith admitted that Juniper never said anything to him about killing Keshia Stephens or anyone else. (State Habeas Record 3197–98.) White states, however, that he and Juniper "grew up together in the same . . . area in Norfolk." (*Id.*) As a result, his credibility is questionable, for he might just as easily be motivated by a desire to help his old acquaintance as a desire to reveal the truth.

Bristow similarly claims that Smith admitted to him that the Norfolk Police Department invented the story about Juniper's jailhouse confession and told Smith exactly what to say. (State Habeas Record 3199–3200.) Bristow goes on to allege that he, too, was recruited to lie about others while incarcerated. He says that the police rewarded him for falsely testifying against others in his cell block by allowing him to have sex with his girlfriends at the Police Operations Center when he was supposed to be there to speak with detectives. Bristow provides no support for these accusations. More importantly, neither Bristow nor White has ever been

subject to any form of scrutiny, let alone cross-examination. To credit their affidavits as clear and convincing evidence would be unjustified.

Still, the petitioner maintains that Smith had no incentive to take back his story, which renders the recantation believable. (Reply 23.) The Court is not so convinced. For one, Smith might want to reap the advantage of cooperating with the government while avoiding the stigma of being known as a jailhouse snitch. In addition, he might feel remorseful about his role in proving another individual's guilt, especially because Juniper has been sentenced to death. The Court does not have to identify Smith's specific motive in order to doubt the veracity of his recantation. The point is simply that his change of heart might also be driven by selfish motives rather than a desire to do the right thing. Moreover, prior decisions make clear that recantations are to be "looked upon with utmost suspicion." *United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)). It would therefore be a mistake for the Court to automatically believe the recantation, as the petitioner argues one should.

In short, the Court has substantial reason to doubt the notion that Ernest Smith testified falsely when he implicated Juniper. And even if Smith was lying, the Court has absolutely no proof—other than Smith's say-so—that the prosecution knew about his lies. Finally, given the mountain of other incriminating evidence against the petitioner, the presentation of Smith's testimony, even if knowingly false, could not be considered material to the outcome. This evidence is far from sufficient for habeas relief, even under a less exacting *de novo* review standard. The Court accordingly dismisses this claim.

### D. Prosecutors Concealed the Favorable and Material Statements of Chaunte Hodge and Mrs. Frazier

The petitioner next alleges that the prosecution violated *Brady* by concealing statements made by two women who lived in the same apartment building as Keshia Stephens. One of the women, Chaunte Hodge, lived in the apartment next to Stephens, while her mother-in-law, Mrs. Frazier, lived in the apartment directly below. Frazier has since passed away, but she apparently "did not hear any unusual noises," even though she remained at home throughout the day of the murders. (State Habeas Record 3201.) Hodge says that she "was working on the day of the murders, and was in and out of the apartment during the day." (*Id.*) Hodge recalls telling police "that everything had seemed normal when I came home at lunch time, and that [she] heard nothing unusual." (*Id.*) The petitioner maintains that these statements should have been disclosed to the defense before trial, but the Supreme Court of Virginia disagreed. This Court cannot say that the Supreme Court's determination was unreasonable, so the claim must be dismissed.

The Supreme Court of Virginia directly addressed this claim, stating:

> [P]etitioner alleges that the Commonwealth failed to disclose to petitioner Chaunte Hodge's identity and the statements Hodge and her mother-in-law, Mrs. Frazier, made to police that Mrs. Frazier did not hear any unusual noises from the apartment during the time that the murders occurred.

> The record, including Investigator Kennedy's notes, demonstrates that defense counsel were aware of Chaunte Hodge and had attempted to contact her. Petitioner has not alleged that Mrs. Frazier's alleged failure to hear anything unusual on that date establishes that the murders did not occur or that petitioner was not the perpetrator. Therefore, any failure to disclose the evidence does not constitute a *Brady* violation.

707 S.E.2d at 282. The Supreme Court's analysis is admittedly brief, but this Court concurs that there was no *Brady* material to turn over.

First and foremost, the defense actually cross-examined Thomas Atkinson, the police officer who first came to the crime scene, about his conversations with Hodge and Frazier. (State Habeas Record 1238–1253.)   This cross-examination clearly demonstrates that Hodge's statement to police was already well known to the defense.   According to the trial transcript, Hodge approached Officer Atkinson around the time that he arrived, shortly before 1:00 p.m. (*Id.* 1249.)  From Atkinson's perspective, it appeared that she had not been home and was just returning to the building, though he was not certain of that.   (*Id.* 1251.)  The following exchange took place between defense counsel and Atkinson during the petitioner's trial:

> Counsel: You ask that first lady (*i.e.*, Hodge) whether or not she had heard anything?
> Atkinson: I did.
>
> . . .
>
> Q: But the first call that you received was that there was a call of shots fired from the upstairs?
> A: Yes.
> Q: [Hodge] told you there were no shots fired from her apartment upstairs?
>
> . . .
>
> Q: The answer was that she had not heard any shots fired?
> A: You're talking about the first woman?
> Q: First lady?
> A: The first woman indicated to me that she hadn't been home.  She had been in and out most of the day.  That's how I ended up downstairs at the other apartment.
>
> . . .
>
> Q: Your conversation with her lasted just a few minutes?
> A: Just a couple minutes.
> Q: Then you made your way around to this front door that faces the little lot that you parked in?
> A: Yes, sir.
> Q: Did you knock on that door?
> A: She took me in.  It was her mother or mother-in-law.
> Q: Did you ask that person whether or not they'd heard shots fired?
> A: Yes, I did.

Q: Without telling us what that person had said, as a result of that discussion you did not believe there was any further reason to investigate the upstairs?
A: Yes, sir.

(*Id.* 1250–52.) In light of the foregoing statements at trial, it is hard to understand what the petitioner thinks the prosecution concealed. Defense counsel were well aware that these neighbors had denied hearing anything. When the allegedly withheld information is actually available to the defendant, there is simply no *Brady* violation.

Even assuming for the sake of argument that the prosecution failed to disclose any information, the petitioner's claim fails. To begin with, Frazier's statement that she did not hear anything, despite being home the entire day, neither helps nor hurts the petitioner. The fact that she heard no gun shots whatsoever does not somehow make an alternate explanation for the deaths more likely than the prosecution's theory. There is no doubt, after all, that four people were savagely murdered and numerous gun shots were fired directly above Frazier's apartment on that very day. Whether it was Juniper who committed the murders in the morning, or another individual who committed the murders later in the day, Frazier was apparently oblivious to all that occurred. To seize on the fact that she "had not heard any gunshots as of the time of the first police response" misrepresents what actually took place.[17] (Reply 28.) Frazier heard nothing—period. As a result, there was nothing exculpatory for the prosecution to turn over, for Frazier's statements did not make *any* potential cause of the murders more or less likely.

The same can be said for Hodge's statements to police. First of all, we do not know precisely when she returned to her apartment, how long she was there, or what she was able to

---

[17] The petitioner argues that "[i]t was not the occurrence, but the *timing* of the murders that was important to the case. The information obtained from Hodge and Frazier . . . placed the murders much later in the day than when the prosecution argued they were committed. . . ." (Reply 27–28.) In truth, the information obtained from them was, at most, ambiguous as to the timing of the murders.

42

observe in and around in the neighboring apartment. She claims only that she came back at "lunchtime" and that "everything seemed normal" because she "heard nothing unusual." (*Id.*) Of course, she would not have heard anything unusual if the murders had already taken place. More importantly, she does not say that she looked at the entrance to Stephens' apartment and saw that it was still intact at that time. A statement of that sort would clearly have been *Brady* material, but we have nothing like that at all. We do not know whether she was even able to see the entrance to Stephens' apartment from her vantage point. In short, Hodge apparently knew very little about the crime scene, because she actually observed very little of the crime scene.

To call Frazier and Hodge's impressions *Brady* material is to blow them way out of proportion. Neither one "directly contradicted the prosecution's other evidence about when the crimes took place." (Pet. 51.) More importantly, calling their statements *Brady* material would impose on the prosecution a duty to disclose every profession of ignorance by any person in the general vicinity of a crime scene. It is for this reason that *Brady* carries a materiality requirement. It ensures that the burden on the prosecution is reasonable and that the information at stake will actually matter in some way or another.

The Virginia Supreme Court found that defense counsel were aware of Chaunte Hodge and attempted to contact her *prior* to the trial. The petitioner tries to argue that defense counsel's knowledge of Chaunte Hodge is distinct from the information that she conveyed to police after the murders. (Pet. 53 (citing *Strickler v. Greene*, 527 U. S. 263, 285 (1999)).) Though technically true, the distinction is negligible in a practical sense. For if defense counsel had actually communicated with Hodge, they would have learned almost immediately what she knew and what she said to police (*i.e.*, not very much). Again, to say that the police "suppressed" Hodge's statement is untenable, given that defense counsel knew about Hodge and the fact that

what she actually saw and reported to police neither proved nor undermined the prosecution's theory.

In sum, the Court concludes that the Supreme Court's ruling was not unreasonable. For one, defense counsel appears to have been well aware of the allegedly withheld information, which eviscerates any *Brady* claim. Moreover, even if information was not turned over, the petitioner cannot show a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The claim is thus dismissed.

### E.    *Cumulative Materiality*

On Juniper's state habeas petition, the Supreme Court of Virginia addressed his claim of cumulative prejudice stemming from withheld exculpatory evidence as follows:

> Petitioner argues that all of the allegedly exculpatory evidence must be considered in its totality when determining the materiality of the evidence. Petitioner is correct that when considering materiality, we consider suppressed evidence as a whole, not item by item. The Court holds that all of the allegedly exculpatory evidence upon which petitioner relies was either available to petitioner or was not favorable.

707 S.E.2d at 299 (internal citations omitted). The Supreme Court obviously did not consider any procedurally defaulted claims, such as Claims I – III, *supra*. At the same time, its assessment of the cumulative impact of the remaining claims, which were properly exhausted, is generally consistent with this Court's view. Juniper either had access to all of the evidence or could not have ultimately benefited from it. As a result, even with the new claims about Wendy and Jason Roberts (Claim I) and John Jones (Claim III), the cumulative materiality of the withheld evidence as a whole is still insufficient to grant relief. The Court concluded that the prejudice ensuing from the prosecution's concealment of the Roberts' statements fell below the constitutional standard and that the petitioner did now show John Jones' statements to be

44

exculpatory at all.  Since the petitioner has not established multiple *Brady* violations, the Court

has no need to aggregate materiality in any event.

## V.        Ineffective Assistance of Counsel

The petitioner was represented at trial by two lawyers, both of whom were appointed by

the Circuit Court for the City of Norfolk.  The petitioner brings an assortment of claims against

them, none of which satisfy the standard for ineffective assistance of counsel.  In fact, not a

single claim can succeed on either the performance or the prejudice prong of *Strickland*.  In

formulating and presenting his claims, the petitioner repeatedly seizes on actions that counsel

declined to take.  To make these claims appear meritorious—and to make counsel's decisions

seem inadequate—he must ignore the trial strategies that defense counsel actually, and quite

reasonably, employed.  But as soon as one looks at the complete picture, one quickly sees the

weakness in his claims and the reasonableness of counsel's actions.  In short, the Court must

dismiss all the petitioner's claims of ineffective assistance of counsel for failure to show both

deficient performance and prejudice.

### A.      *Trial Counsel Unreasonably Failed to Investigate Michael Lassiter*

The petitioner claims that trial counsel rendered ineffective assistance through their

failure to investigate Michael Lassiter, whom the petitioner argues could have provided an alibi.

To prevail on this claim, however, the petitioner must overcome the Supreme Court of Virginia's

finding that "Lassiter never provided [Juniper] an alibi." 707 S.E.2d at 303.  After examining the

evidence, this Court cannot say that the Virginia Supreme Court's finding was erroneous based

on the record before it.  And since Lassiter did not provide trial counsel an exculpatory theory,

the Supreme Court correctly concluded that trial counsel were not deficient in their efforts to

investigate and speak with Lassiter further.  The Court must dismiss this claim.

Trial counsel's notes from a meeting with Juniper on May 11, 2004 show that the petitioner attempted to provide his lawyers with an alibi.[18] (State Habeas Record 2893, 3186–87.) According to this story, Juniper spent part of the day of the murders with Lassiter after briefly visiting Keshia Stephens' apartment that morning. (*Id.*) One lawyer's notes indicate that Lassiter, nicknamed "Wolf," was "willing to testify." (*Id.* 2891, 2893) Of course, this was only Juniper's estimation. Lassiter himself had not informed counsel that he would testify in Juniper's defense or what specifically he would be willing to say. Ultimately, Juniper did not provide trial counsel with Lassiter's phone number until November 2004—six months after the above meeting and two months before trial. (*Id.* 2896.)

The record shows that both counsel and their court-appointed investigator, Wayne Kennedy, attempted to speak with Lassiter on multiple occasions. Not only was Lassiter unresponsive more than once (*id.* 2880, 2885), but, when he met with trial counsel and Kennedy on December 14, 2004, he also failed to mention *anything* about an alibi. (*Id.* 2877–79.)

---

[18] On January 25, 2005, after the trial's conclusion, trial counsel created a memorandum regarding Juniper's "behavior and lack of cooperation" during and prior to trial. (State Habeas Record 2896–2897.) In this memorandum, his lawyers wrote:

> Throughout our numerous discussions with the client, he offered no alibi (although it should be noted that he attempted to do so for the first time the morning after the Commonwealth had rested it's [*sic*] case in chief in the guilt phase). For example, when asked where he was when he first learned that Keisha and the others had been killed, he responded that he would have to think about that and speak with his people first. At no time did he offer any alternative explanation or assistance to counsel or Wayne Kennedy. Each time we met with him, he would give a little information about a possible witness but would qualify that he would have to talk to them first before we could have the information sufficient to locate or speak with them.

(*Id.* 2897.) Based on the trial counsel's own handwritten notes from the May 2004 meeting, it is clear that the foregoing passage is not accurate. Indeed, both lawyers independently wrote the word "alibi" in their notes as they discussed the events of that day. The Court acknowledges this discrepancy but finds it ultimately irrelevant to the determination of whether *Lassiter* provided trial counsel with an alibi and was willing to testify to it in Court.

46

Lassiter had much to say about the character and credibility of the prosecution's anticipated witnesses, and also discussed Keshia Stephens' checkered past, but, remarkably, he said nothing about what he and Juniper were doing on the day of the murders.[19]  One would think that if Lassiter was eager to exonerate Juniper, he would have offered any helpful information that he possessed.  The fact that he did not provide an alibi is more indicative of his inability or unwillingness to help than a deficiency in trial counsel.  This meeting—along with the investigator's two unsuccessful attempts to communicate with Lassiter—only bolsters the Supreme Court's finding that, "[a]lthough petitioner suggested Lassiter as an alibi witness, Lassiter could not provide counsel with an alibi for petitioner."  707 S.E.2d at 300.  It also supports the Supreme Court's legal conclusion that trial counsel were not unreasonable in their performance with respect to Lassiter.  *Id.* at 303.

Trial counsel's post-trial assessment of Lassiter's level of cooperation was as follows:

> Mr. Lassiter's assistance consisted of coming to the office and meeting with [Investigator] Wayne Kennedy and myself for approximately 1½ hours.  While he was very enthusiastic during this meeting, he soon disappeared and would not respond to telephone calls or visits by Wayne.  His only contribution other than mitigation evidence (which he was reluctant to provide after our client told him not to help) was to say that he sold drugs to Renae [*sic*] Rashid approximately 4 plus years ago.  At no time did he produce any other persons who could assist the client.[20]

(*Id.* 2896.)  This account is consistent with counsel and the investigator's notes leading up to trial.  There is simply no reason to believe that Lassiter was prepared to offer an alibi for Juniper, other than Juniper's assertion months earlier.  Counsel met with Lassiter for 1½ hours, giving

---

[19] No reason exists to believe that Wayne Kennedy omitted anything from his notes.  Based on those notes, the Court may safely assume that Lassiter said nothing about an alibi or the murders themselves during this meeting.

[20] Lassiter also made statements about John Jones' truthfulness and "morals" but gave no specific examples to bring them into question.  (*Id.* 2878.)

him a full and fair opportunity to tell them what he knew. Counsel cannot be faulted for failing to pry information out of him when he had their undivided attention but failed to raise the alibi.

Accordingly, the Court also cannot fault counsel for deciding not to call Lassiter as a witness during the guilt phase. The only information that he had been able to offer counsel dealt with the credibility of the prosecution's witnesses, whom defense counsel already had an opportunity to cross-examine. 707 S.E.2d at 299–300. Contrary to the petitioner's argument, trial counsel did not "misrepresent[ ] to the court that Lassiter's 'primary purpose, if only purpose, in this case would be to attack the credibility of Renee Rashid, Tyrone Mings, and Keon Murray,'" for that was all Lassiter could have done. (Pet. 58.) It is likewise inaccurate to say that "[c]ounsel's mischaracterization of Lassiter's potential testimony was the result of counsel's unreasonable failure to investigate Juniper's alibi." (*Id.*) Counsel represented to the court what they reasonably understood, which was based on what Lassiter had actually said to them. Lassiter's assertion, well after the fact, that "he was willing and prepared to testify . . . to Juniper's alibi" is irrelevant, for it has no bearing on what counsel knew at the time of the trial. (*Id.*; State Habeas Record 3246.)

Notwithstanding Lassiter's lack of alibi, the petitioner attempts to tack on a couple makeweight arguments to show counsel's deficiency. First, the petitioner refers to a December 21, 2004 hearing, during which the trial court instructed defense counsel to serve subpoenas on witnesses "promptly." (State Habeas Record 793.) The Court has no reason to believe that counsel failed to do so.[21] Moreover, this argument has nothing to do with whether counsel properly investigated Michael Lassiter as a potential witness, so it is irrelevant to this claim.

---

[21] To the contrary, the Court has reason to believe that counsel fully complied, for they were prepared to present "a number of witnesses" at trial, at least some of whom—Wayne Kennedy, Lassiter, and Kevin Waterman—were intended for the guilt phase. (State Habeas Record 2004–

Second, the petitioner argues that Lassiter's testimony would have been helpful to the defense's effort to impeach the credibility of the prosecution's three witnesses. Again, based on the limited information that Lassiter had actually communicated, counsel were well within their professional discretion to decide not to call Lassiter and instead attack these witnesses' credibility through closing argument, as they decided to do. Counsel discussed this decision with Juniper (and mentioned this discussion in open court with Juniper present), and even proffered to the Court precisely why this decision was made. (State Habeas Record 2004–2007.) The petitioner has presented no basis to doubt the reasonableness of this professional judgment, which the Court must presume falls within the wide range permissible under the law.

Lastly, the Court agrees with the Supreme Court's conclusion that Juniper fails to meet the prejudice prong of this claim. Even if there had been a deficiency in performance, the Supreme Court observed that the prosecution was prepared to present "an audio recording of a conversation between Lassiter and [Juniper] in which the two were attempting to fabricate an alibi." 707 S.E.2d at 303. As a result, Lassiter's testimony, far from helping Juniper, would only have damaged his defense.[22] Additionally, even if one assumes that Lassiter's testimony would have successfully impeached the credibility of the prosecution's witnesses, it could have done nothing to undermine the forensic evidence central to Juniper's conviction: his thumbprint and DNA on the knife with which Keisha Stevens was stabbed before being shot, Stephens' blood on the blade of that knife, and Juniper's DNA on a cigarette butt found at the crime scene. In short,

---

2011.)

[22] The Supreme Court was incorrect, however, that the existence of this recording justified the decision not to call Lassiter as a witness, for defense counsel were unaware of its existence at the time. (State Habeas Record 2897.) It goes without saying that their performance cannot be judged—either positively or negatively—based on information on which they could not have relied at the time of trial. Thus, in this instance, the recording is only relevant to the prejudice prong, not the performance prong, of the analysis. *Cf.* 707 S.E.2d at 303.

the Supreme Court reasonably concluded that Juniper failed to meet both the performance and prejudice prongs of this claim, and the claim is therefore dismissed.

B. *Trial Counsel Unreasonably Failed to Investigate or Present Available Evidence in Juniper's Defense*

The petitioner next argues that trial counsel were deficient in deciding not to call witnesses or present rebuttal evidence in Juniper's defense. This claim has several different parts, some of which have already been addressed. The main argument centers on counsel's decision not to call Kevin Waterman as a witness or "investigate" him further (Pet. 62–63), but the petitioner also rehashes the earlier arguments about trial counsel's failure to conduct a general neighborhood investigation and failure to utilize Michael Lassiter as an alibi witness. In regard to the latter arguments, the petitioner presents nothing material and new, and the Court will not address claims that have already been rejected for good reason.[23] Instead, the Court will focus solely on trial counsel's claims regarding Waterman.

The Supreme Court of Virginia concluded that the decision not to call him as a witness was justifiable as a "tactical decision." This Court cannot say that the Supreme Court's conclusion was unreasonable and will therefore dismiss this claim as well.

---

[23] With respect to the thoroughness of trial counsel's general investigation, however, the petitioner does make one novel point that deserves comment, because it involves a misrepresentation of the factual record. The petitioner argues that trial counsel evinced "an inability to recognize, or an outright refusal to investigate, evidence that would have confronted the case against Juniper." (Pet. 64.) To support this argument, he claims that "defense counsel indicated her refusal to go places to investigate on Juniper's behalf." (*Id.*, n.23.) This statement grossly mischaracterizes what actually took place. Defense counsel's statement about not wanting to go to certain places occurred during a hearing on a motion that she had filed to have the Court appoint an investigator (namely, Wayne Kennedy). She stated, "I think it's important. And we have discussed it will save the Commonwealth money to have him do various things rather than myself and [co-counsel]." The court responded, "I expect he's a little more street savvy." Counsel replied, "I expect he'd like to go places I won't, Judge." (State Habeas Record 678.) Even assuming that counsel's reply was not tongue-in-cheek, the petitioner blithely ignores the context of the statement: Juniper's defense counsel were specifically seeking the Court's assistance in carrying out an investigation on his behalf.

50

The Supreme Court directly addressed this argument on the merits. It stated:

> [P]etitioner alleges that he was denied the effective assistance of counsel because counsel failed to adequately investigate Kevin Waterman, one of Keshia's neighbors, who told police that he heard four gunshots in Keshia's apartment around 1:30 p.m.

> The Court holds that this . . . claim . . . satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the affidavits of counsel and Waterman, demonstrates that counsel made a tactical decision not to call Waterman as a witness. Even accepting Waterman's affidavit that he heard gunshots in the general vicinity of the apartment building between 1:30 and 2:00 p.m. on the day of the murders, counsel could not reconcile this information with the other evidence that the murders occurred earlier in the day. Petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

707 S.E.2d at 304.[24]

Though the Supreme Court did not elaborate on the "other evidence" with which the Waterman testimony was irreconcilable, it was substantial. For one, there were several witnesses who testified to seeing Juniper either at or departing from the murder scene with a gun earlier in the day. Additionally, there was more than one witness who testified to Juniper's admitting to the killings. And even if Waterman had been able to create doubt about these witnesses' credibility, he could have done nothing to alter the forensic evidence at the crime scene—in particular, Juniper's thumbprint on the blade of the knife with which Keshia Stephens was stabbed before she was shot. Nor could his testimony have unsettled the fact that the first 911 call was placed at 12:44 p.m.—before Waterman claims to have heard any shots. Finally, Waterman's claim to have heard "four" gunshots between 1:30 p.m. and 2:00 p.m. is less than compelling when the victims collectively suffered a dozen or more bullet wounds.

---

[24] Despite the petitioner's arguments to the contrary, the Supreme Court very clearly addressed both the alleged failure to investigate Waterman and the decision not to call him as a witness. For this reason, no part of the claim regarding Waterman is entitled to *de novo* review.

For the Waterman testimony to have had any impact on the outcome of the case, the jurors would have had to believe one of a couple different possibilities. One possibility is that Juniper stabbed Keshia Stephens but was not the gunman who shot and actually killed her and the three other victims. The other possibility is that Juniper's thumbprint and DNA were on the knife-blade from a previous visit to the apartment and just happened to remain intact, despite intervening usage and, in all likelihood, cleaning. Neither of these alternatives was credible.

For one, there was no evidence of multiple assailants at the crime scene.[25] Finally, Juniper himself could not attest to when he had previously used that same kitchen knife, so there was no reason to believe the suggestion that it was merely a remnant from past visits.[26] In short, the Supreme Court of Virginia, far from being unreasonable, correctly determined that the testimony was irreconcilable with other incriminating evidence and that trial counsel's decision not to call Waterman did not prejudice Juniper's defense.

Because of the irreconcilability of the Waterman testimony and the evidence incriminating Juniper, the Supreme Court was similarly correct that the decision not to "investigate" him further or call him as a witness was not deficient. Even with perfect hindsight, the petitioner is still unable to say what additional investigation of Waterman would have achieved. It is entirely conclusory to suggest that investigating Waterman would have led to

---

[25] At most, there were assorted rumors about individuals that might have wanted to target Keshia Stephens or her brother, Rueben. Some of these rumors were never relayed to trial counsel. Furthermore, they were, and remain, completely unsubstantiated, so they could not have constituted a plausible defense, particularly in light of other evidence inculpating Juniper. More importantly, trial counsel reasonably concluded that it was not in Juniper's interest to "smear" the murder victims' reputation through unfounded allegations about their character and why they might have been targeted, for this attack might have badly "backfired." (*See* Appx. 400–403, 404–05, 408–09, 409–10.)

[26] At the very least, there is nothing *in the record* indicating when Juniper had last been to the crime scene and used the knife. Again, if he held some relevant information but did not share it with defense counsel, the Court can hardly fault his lawyers for failure to introduce it as evidence.

Wendy and Jason Roberts, who, like Waterman, also claim that they heard gunshots in the early afternoon. And if the Roberts had been located and all three testified to hearing gunshots in the afternoon, their words, even collectively, still could have done nothing to undermine Juniper's thumbprint and DNA evidence at the crime scene or the preceding 911 call.

Both during the trial and post-trial, defense counsel explained why they believed Waterman's testimony would not advance Juniper's defense. (State Habeas Record 2010–12; Appx. 410). The Supreme Court of Virginia considered this explanation within the context of all the evidence against Juniper and concluded that the ineffective assistance of counsel claim failed on both the performance and the prejudice prongs. Even if the Supreme Court did not explicitly address the failure to investigate—as distinct from the decision not to call Waterman to testify—this Court agrees that the petitioner has met neither the performance nor the prejudice prong of his claim. The claim is thus dismissed.

## C. Trial Counsel Failed to Reasonably Investigate Tyrone Mings

The petitioner contends that trial counsel were ineffective in failing to investigate Tyrone Mings, who testified to seeing Juniper at the crime scene with a gun, along with the bodies of two victims. There are again several parts to this claim: (1) counsel failed to investigate and question Mings' reason for going to Stephens' apartment on the day of the murders, which was supposedly to collect the paycheck of his girlfriend, Melinda Bowser, who worked at a local convenience store ("Tinee Giant") where Keshia Stephens also previously worked; (2) counsel failed to investigate the conflict between Mings' statement about making a 911 call from a payphone and his trial testimony that he made two calls to police from his apartment; (3) counsel failed to scrutinize Mings' purported fear of Juniper, in light of the fact that he called Juniper's home minutes after the 12:44 p.m. phone call to 911 and went to Keshia Stephens' apartment

with his pregnant girlfriend, knowing that Juniper was there; (4) counsel failed to investigate the accuracy of the claim that Keon Murray called Mings from Juniper's home, thus prompting Mings to visit Stephens' apartment; (5) counsel failed to interview Bowser and request her statements to police; and (6) counsel failed to investigate Mings' pending charges or what he expected to gain in exchange for his testimony, particularly in light of a letter to the presiding judge in his case indicating that Mings was "assiting [*sic*] the commonwealth in a very big case." (Pet. 66–70.) The petitioner argues that trial counsel were deficient in failing to investigate these issues, because such an investigation would have allowed counsel to undercut Mings' credibility as a witness. This deficiency, he alleges, undermines confidence in the outcome of the case.

The petitioner and the respondent both devote a great deal of energy to debating whether this multifaceted claim was fairly presented to the Supreme Court of Virginia. The respondent's brief and petitioner's reply brief say very little, in fact, about the merits of Juniper's allegations. After reviewing these briefs, as well as the state habeas petition, the Court concludes that the petitioner did raise all of the foregoing claims to the Supreme Court and shall accordingly address them on the merits.[27] Ultimately, they all warrant dismissal.

---

[27] In his state habeas petition, Juniper made the following arguments about trial counsel's performance in regard to Tyrone Mings: (1) trial counsel failed to secure a letter that Mings wrote to the presiding judge in his case indicating that he was "assiting [*sic*] the commonwealth in a very big case," which was relevant to his expectations of what he would receive in exchange for testifying (Appx. 289, n.2); (2) counsel failed to investigate the veracity of Mings' claim that his girlfriend, Melinda Bowser, worked with Stephens at a local convenience store ("Tinee Giant") and that he was trying to contact Stephens on the day of the shootings to retrieve Bower's paycheck (Appx. 295); (3) counsel failed to investigate whether Mings had, in fact, been in Stephens' apartment at any time prior to the murders, in contrast to his trial testimony (Appx. 296); (4) counsel failed to investigate Mings' payphone call to police in the early afternoon on the day of the murders, which counsel should have known about through Investigator Kennedy, and to use that call to discredit his testimony (Appx. 296); (5) counsel failed to investigate why Mings called Juniper's home at 12:46 p.m. if he was truly afraid of Juniper (Appx. 296); (6) counsel failed to investigate Mings' contradictory statements to police, including the fact that he did not mention seeing Juniper at the crime scene for several months

54

On direct examination, Mings testified that he went to Keshia Stephens' apartment on the morning of the murders after receiving a phone call from Keon Murray, who asked Mings to "check on somebody at Keshia's house. . . ." (State Habeas Record 1841.) Mings also said that he and his girlfriend, Melinda Bowser, had another reason for wanting to get in touch with Stephens, namely, that Stephens had a paycheck from the Tinee Giant, where Bowser and Stephens both worked at different points in time. (*Id.* 1844.) Upon arriving, he found the door kicked in, and began calling for both Keshia Stephens and Juniper. (*Id.* 1845.) After entering the apartment, he saw Juniper standing inside with a gun in his hand and "some white stuff on his face." (*Id.* 1847.) He soon saw the unresponsive bodies of a man and a baby on the bed. (*Id.* 1849.) He then asked where Keshia was, and Juniper responded that she was between the bed and the dresser. (*Id.*) After calling for her and getting no response, Mings left the apartment and returned to his own home. (*Id.* 1850–51.) He and Bowser then placed two separate calls to the police. (*Id.* 1854–56.)

The petitioner argues, first, that it was ineffective assistance not to "expose Mings's false claim about retrieving Bowser's paycheck" by investigating his "true reason" for going to Stephens' apartment on the morning of the murders. (Pet. 67.) The petitioner premises this argument on the fact Stephens no longer worked at the Tinee Giant because of a shortfall in the amount of money in her cash register, thus making it "unreasonable" to believe that she would have Bowser's paycheck in her possession. (*Id.* 68 nn.25–26.) Juniper argues that effective counsel would have investigated the matter further.

---

after the murders (Appx. 296–97); (7) counsel failed to identify and interview Bowser and obtain her statements to police (Appx. 297); and (8) counsel failed to pursue phone records of outgoing calls from Juniper's home on the day of the murders, which would have included a record of Murray's call to Mings, if it actually took place (Appx. 306, n.12). In short, there were some claims in the state habeas petition that are absent from the federal petition, but all of the federal claims appear to have been presented in substantially similar form in the state petition.

The Supreme Court of Virginia directly addressed this claim. There, Juniper similarly "contend[ed] that counsel failed to use available information to impeach Mings, such as using information that Keshia 'did not work at the Tinee Giant at the time the crimes occurred' to impeach Mings' testimony that 'he was trying to contact [Keshia] on the day of the shootings to retrieve [Melinda] Bowser's paycheck.'" 707 S.E.2d at 301. The Supreme Court concluded, however, that the claim satisfied neither prong of the *Strickland* analysis. *Id.* It found that the "[p]etitioner speculates, but does not proffer any evidence, that Keshia could not have had Bowser's check simply because she no longer worked at Tinee Giant. Furthermore, the record, including the trial transcript, demonstrates that Mings went to Keshia's apartment because Murray called and told Mings that a shooting had occurred." *Id.*

This Court cannot say that the Supreme Court's analysis was unreasonable. It is correct, after all, that Mings cited Murray's phone request as his main reason for going to Stephens' apartment (State Habeas Record 1841) and mentioned the paycheck only when specifically asked if he had another reason for wanting to speak to her. (*Id.* 1844.) Moreover, the entire exchange about the Tinee Giant check took a matter of seconds, so we do not have any further information about the circumstances. It was not unreasonable for the Supreme Court to conclude that Stephens might have had Bowser's check and therefore decide that defense counsel were not deficient for declining to impeach Mings on this basis. And most importantly, as far as Mings' "real reason" for wanting to go to Stephens' apartment that day, the petitioner has never offered anything more than rumors from Michael Lassiter—an individual with multiple felony convictions, who has made unsupported accusations of criminal activity against nearly every person involved in this case, and yet apparently knew very little about the violent past of his "best friend," Anthony Juniper. (*See* State Habeas Record 2411–28, 3243–3247.) The Supreme

Court stated, "Lassiter does not articulate how he knew about Mings' alleged drug purchases" at Stephens' apartment. 707 S.E.2d at 301. Given his unproven basis of knowledge and questionable credibility, this Court concurs that trial counsel made a reasonable judgment in deciding not to further probe Mings' "real" motive for going there on the day of the murders.

The lack of merit in the remaining claims becomes clear once one considers how defense counsel actually did seek to impeach Mings' credibility as a witness. At the outset, defense counsel cross-examined Mings about the fact that the judge who would be sentencing him on a probation violation had been advised of his cooperation with the government. (*See* State Habeas Record 1858–60.) Counsel even got Mings to concede that he could be "saving [himself] as much as four years in the penitentiary." (*Id.* 1860.) Indeed, this was precisely what Mings "wanted to happen" and "what did happen" in exchange for his cooperation. (*Id.*)

Next, counsel cross-examined Mings about how he supposedly feared for his safety and therefore did not tell police what he saw in the apartment when first questioned. (*Id.* 1861.) The following is excerpted from the trial transcript:

> Q: You feared for your safety because you were afraid that Anthony might consider you a witness against him?
> A: Yes.
> Q: Well, did you consider yourself safer with him on the street?
> A: Would I consider myself safer?
> Q: You testified you didn't tell the police he was in the house because you feared for your safety; correct?
> A: Yeah. You're right.
> Q: If you had told the police that you saw him standing there with a gun and you saw the four victims in the bedroom, wouldn't it have been safe to assume they would have arrested him?
> A: Yes.
> Q: And, therefore, you would have been safer if you had told them; isn't that correct?
> A: I probably would have. I wasn't thinking like that.
> Q: Can you think of any reason why Juniper didn't shoot you?
>
> . . .

Q: Did you have a gun with you when you went inside that apartment?
A: No.
Q: And Mr. Juniper did?
A: Yes.
Q: And you walked back to that bedroom not once, but twice?
A: Yes.
Q: With a gun standing between you and the front door with a gun in his hand?
A: Yes.
Q: And cocaine all over his face?
A: Yes.
Q: At that point in time you thought he was out of his mind?
A: Yeah, I did.
Q: And if the gun had had bullets in it he could have easily shot you and there was nothing you could have done about it?
A: Yeah, wouldn't.
Q: But you did not think it would be a prudent thing for your safety to tell the police what you had seen?
A: I wasn't thinking like that.
Q: Well, what caused you to start thinking like you're thinking now?
A: What caused me?
Q: Yes, sir.
A: I mean, just the kids caused me.
Q: Was it the probation violation?
A: No. I can do any time they give me.
Q: Well, was it Investigator Wray or Investigator Ford threatening you with additional criminal charges?
A: No.
Q: Did they do that?
A: No.
Q: They didn't mention that if you didn't come in here and testify?
A: No.
Q: Ever?
A: (Witness shakes head.)
Q: Any other detective?
A: No.

(*Id.* 1862–64.) In light of the foregoing attack on Mings' credibility, the petitioner's claims about defense counsel's alleged failure to investigate clearly fail.

With respect to whether the first 911 call was placed from a payphone or Mings' own phone, the Court holds that the petitioner satisfies neither the performance nor prejudice prong of *Strickland.* Even if counsel had been able to elicit this inconsistency, it would have been

relevant only to whether Mings was credible, not his motive for implicating Juniper. By questioning Mings about his sentencing on his probation violation, defense counsel were able to address both credibility and motive. In short, the lack of investigation into the actual phone from which the call was placed proves neither deficiency nor prejudice.

Furthermore, the claim that counsel failed to scrutinize Mings' supposed fear of Juniper is simply untrue. In fact, counsel did a fine job of showing why this fear was a dubious justification for not calling the police and why his decision to go to Stephens' apartment in the first place was suspicious. The simple fact that counsel did not ask about Mings' call to Juniper's home at 12:46 p.m. (just two minutes after the 911 call) shows neither deficient performance nor prejudice. Counsel adequately attacked the substance of Mings' claim. The fact that they didn't bring up every single way in which this "fear" might be questioned is of no consequence under *Strickland*. It certainly had no impact on the outcome of Juniper's case.

It is similarly inaccurate to say that counsel failed to investigate Mings' pending charges or what he expected to gain in exchange for his testimony. Again, counsel got Mings to admit that he was testifying for the specific purpose of reducing his sentence on his probation violation sentence by *four years*. That counsel might have been able to bolster this line of questioning by finding out about other potential charges is insignificant. The cross-examination unmistakably revealed Mings' potential motive for implicating Juniper. Given that fact, it was entirely reasonable not to expend additional time and energy simply in order to reinforce this point. Furthermore, this choice clearly did not alter the outcome of Juniper's trial and does not undermine confidence in it.

In the end, all the petitioner is left with are his claims that counsel failed to investigate whether Keon Murray actually called Mings from Juniper's home and that counsel failed to

interview Bowser or request her statements to police. The petitioner's argument for further investigation of Bowser is premised, again, on the dubiousness of Mings' supposed fear of Juniper. (Pet. 69.) Defense counsel's cross-examination of Mings demonstrated, however, that they were more than prepared to deal with this issue and did so effectively. Regarding the call from Murray to Mings, the petitioner's argument is just baseless speculation. He writes, "Records of outgoing calls would confirm that, contrary to Mings's testimony, Murray did *not* call Mings 'to check on somebody at Keshia's house or whatever that he heard some shots.'" (Pet. 68 (citing State Habeas Record 1841).) Even now, the petitioner presents absolutely no reason for such certainty. A meritorious claim of ineffective assistance of counsel cannot be based on pure conjecture about what additional investigation might uncover when there is no objective reason for that investigation in the first place.

In short, the petitioner can establish neither the performance nor prejudice prong on any of his ineffective assistance of counsel claims dealing with a failure to investigate Tyrone Mings. This claim is dismissed.

D. *Trial Counsel Failed to Investigate and Adequately Impeach Renee Rashid*

The petitioner next alleges that trial counsel failed to adequately investigate Renee Rashid and therefore could not explain to jurors why she was not a trustworthy witness. Specifically, the petitioner believes that they should have done more to get information about Rashid's crack cocaine usage and to utilize this behavior against her. According to the petitioner, "[t]his [evidence] would have provided a more accurate understanding of Rashid's criminal background, the influence or control criminals responsible for the crimes would have over her testimony, and her motivations to avoid criminal investigation by doing whatever was necessary to secure the prosecution's immunity offer." (Pet. 74–75.) The petitioner argues that

counsel's failure to impugn Rashid's testimony with information about her drug usage undermines confidence in the jury's decision. The Supreme Court of Virginia rejected this claim, and this Court concurs that the petitioner has failed to satisfy both the performance and prejudice prongs under *Strickland*.

One of Juniper's defense lawyers said the following about the decision not to call Michael Lassiter to testify about Rashid's alleged drug habit:

> We had no desire to put Lassiter on the stand for the sole purpose of attempting to impeach Renee Rashid with an allegation that she sold drugs to her 4 years prior to the trial. Aside from the fact that Judge Martin almost certainly would not have permitted that sort of attack on a witness, it was our desire to preserve the viability of Lassiter as a witness for the sentencing phase in the event Juniper was convicted. He was far more valuable in trying to put a positive face on Juniper at the sentencing and there was nothing he had to offer at trial that would have justified putting him on the stand for the sole purpose of smearing Renee Rashid and risking him being perceived negatively by the jury. This was an intentional tactical decision on our part, and I would make the same tactical decision even today. . . .

(Appx. 401.) What matters most is not whether defense counsel called Lassiter in particular, but counsel's observation that evidence of Rashid's drug usage would probably not have been permitted in the first place and that such testimony would have reflected poorly on the witness and the defense more generally. This professional judgment, which was entirely reasonable, would also extend to their decision not to dredge up additional people to attest to Rashid's drug use. After all, if the judge would not have been permitted Lassiter to testify about this matter—which the petitioner expressly acknowledges (Reply 36–37)—it is difficult to understand what additional value these other individuals would have had.[28]

---

[28] Incidentally, the three individuals whom the petitioner contends had additional relevant information—Bernice Taylor, Renee Archibald, and Keon Murray—could offer nothing more than conclusory labels about Rashid's alleged drug habit. (State Habeas Record 3193, 3215, 3242.) Their statements in no way indicate that further investigation was warranted or would have been fruitful to Juniper's defense.

Still, the petitioner argues that further factual development of Rashid's drug history would have allowed trial counsel to attack her motives for testifying on cross-examination. One problem, however, is that her immunity agreement with the prosecution only extended to the misdemeanor charge of accessory after the fact. It had absolutely no impact whatsoever on any other felony offenses, which Rashid well understood. (State Habeas Record 1790–91.) As a result, the argument that Rashid testified because of a desire "to avoid criminal investigation by doing whatever was necessary to secure the prosecution's immunity offer" is dubious, because the actual immunity offer that she got had nothing to do with any potential charges for crack cocaine use.

The record shows that trial counsel vigorously cross-examined Rashid, thus bringing to light inconsistencies in her statements and doubts about what she may have actually observed. (State Habeas Record 1744–45, 1750, 1751, 1756–57, 1767–68, 1774, 1775–76, 1786, 1791.) Indeed, defense counsel even asked her about the prosecution's immunity agreement. (*Id.* 1789–90.) Counsel therefore took reasonable steps to undercut Rashid's credibility, without raising issues like drug usage that were arguably not relevant, not admissible (even on direct questioning), and might have reflected poorly on defense counsel and the defendant.

The Supreme Court of Virginia—again, far from being unreasonable in its judgment—correctly concluded that this claim satisfies neither prong of the *Strickland* test. It noted defense counsel's cross-examination about Rashid's inconsistent statements and their "tactical decision" not to attack Rashid on the basis of her drug use. 707 S.E.2d at 299–300. In the end, it correctly determined that the petitioner failed to show deficiency in performance or a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Id.*

62

E.    *Trial Counsel Unreasonably Failed to Investigate Forensic Evidence*

The petitioner claims that trial counsel were ineffective in failing to investigate the various pieces of forensic evidence found at the crime scene, including bullets, tool marks, fingerprints, and DNA traces on cigarette butts. The petitioner raised this same claim before the Supreme Court of Virginia, which found that it failed to satisfy either the performance or prejudice prong of *Strickland*. This Court agrees and will therefore dismiss the claim.

Jupiter's trial counsel have expressed, in sworn affidavits, their judgment that a defense forensic expert was not necessary under the circumstances. (Appx. 402–03, 410.) The Supreme Court considered these affidavits, as well as the full record before it, and concluded the following:

> Petitioner has not identified a particularized need for the expert, or set forth any reason to believe that a forensic expert would be able to obtain fingerprint or DNA results that the Commonwealth's forensic laboratory would not. The fact that two different brands of bullets were recovered does not refute the Commonwealth's evidence that both brands of bullets were fired from the same gun. Petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

707 S.E.2d at 305.

The Supreme Court was not unreasonable in finding that the petitioner failed to identify any particularized need for an independent forensic expert. As the Supreme Court said, the mere presence of two different *brands* of bullets does not at all mean that more than one *gun* was used. And, contrary to the petitioner's assertion, the Supreme Court did not "address only one small piece of the evidence" when making this determination. (Pet. 83.) It clearly recognized that Juniper was raising concerns about evidence other than the bullets. 707 S.E.2d at 305.[29]

---

[29] "Petitioner has not . . . set forth any reason to believe that a forensic expert would be able to obtain *fingerprint or DNA results* that the Commonwealth's forensic laboratory would not." *Id.*

The petitioner seems to suggest that one of two possible outcomes might have arisen had an independent expert been sought: first, the evidence would have shown that Juniper was not at all involved in the killings; second, the evidence would have shown that multiple killers were involved. Since the petitioner had done nothing to suggest that either one of these possibilities was plausible, counsel were not unreasonable in deciding to forego an independent expert.

As the Supreme Court of Virginia held, counsel's decision not to seek an independent fingerprint expert was reasonable, given that the defendant had done nothing to account for the fingerprints that positively matched to him. The *Strickland* standard makes clear that the defendant has a role to play in helping defense counsel formulate decisions about whether or not to investigate further. The Fourth Circuit has explained:

> [T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. With particular respect to the duty to investigate, what investigation decisions are reasonable depends critically on information supplied by the defendant. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Elmore v. Ozmint*, 661 F.3d 783, 857 (4th Cir. 2011) (citing *Strickland*, 466 at 691). The defendant provided no theory to explain the most persuasive and incriminating forensic evidence found at the crime scene. In light of this fact, trial counsel cannot be faulted for deciding that an independent expert would not have significantly aided his defense.

The petitioner's argument that an independent expert could have brought into question *all* of the prosecution's forensic evidence, including tool mark, fingerprint, and DNA evidence (Reply 39), is simply untenable. Indeed, much of the petitioner's claim rests on the pure speculation that a challenge to the forensic evidence could have led to an entirely different set of

---

(emphasis added).

evidence before the jurors. But counsel's actions cannot be judged deficient based on the remote possibility that the prosecution's evidence was a complete sham.

Nevertheless, the petitioner attempts to compare his case to *Elmore v. Ozmint*, a South Carolina capital case in which the Fourth Circuit concluded that defense counsel had been deficient because of a failure to investigate the forensic evidence. 661 F.3d 783 (4th Cir. 2011). Juniper's case is simply nothing like *Elmore*. Elmore was sentenced to death for the killing of an elderly woman, and his lawyer failed to challenge the forensic evidence used against him, despite the fact that blood fingerprints from the victim's bathroom and hairs recovered from the victim's body matched neither the victim nor the defendant, despite irregularities in the evidence's chain of custody, and despite nearly a three-day window within which the victim may have died. *Id.* at 803–04, 854–55. Indeed, a hair on the victim's body clearly came from a Caucasian person, while the defendant was African-American, raising an unmistakable doubt about the evidence's reliability. *See id.* at 841–42. Elmore's defense counsel never even considered questioning the forensic evidence and "admitted to being lulled into inaction by the belief that the police were above reproach." *Id.* at 854. As a result, they "blindly stipulated to its admissibility," and one of them later "acknowledged that he saw the guilt phase as a lost cause." *Id.*

Unlike *Elmore*, in the instant case, the forensic evidence here raises no obvious red flags calling for independent forensic analysis. Additionally, one important distinction between this case and *Elmore* is that Juniper's defense counsel actually considered the possibility of seeking an independent forensic expert before deciding to forego that route. *Cf. Elmore*, 661 F.3d at 864 ("Because Elmore's lawyers' investigation into the State's forensic evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered."). They prepared a memorandum in

support of a motion for the appointment of an independent expert, but, based on what they saw and what Juniper told them, they decided not to file it. (Appx. 175–78; State Habeas Record 2863–64.) This judgment cannot be considered unreasonable under the circumstances.

In the end, the petitioner faults counsel for failing to search for the needle in the haystack of forensic evidence before it at trial. *Cf. Elmore*, 661 F.3d at 860. But the *Strickland* standard makes clear that this is not trial counsel's duty. Ultimately, this Court is in no position to find that either prong of *Strickland* has been met, particularly under the "doubly" deferential standard created by *Strickland* and AEDPA. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). This claim must be dismissed.[30]

### F. Trial Counsel Unreasonably Failed to Uncover and Present Mitigation Evidence

The petitioner next claims that trial counsel failed to "discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." 707 S.E.2d at 307 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)) (emphasis in original). From his standpoint, counsel allegedly "abandoned their investigation of [his] background after having acquired only rudimentary knowledge." (Pet. 86.) This claim is patently untrue. The Supreme Court of Virginia held that it met neither prong of the *Strickland* test, 707 S.E.2d at 307, and this Court similarly finds the claim entirely lacking in merit.

In bringing this claim, Juniper altogether ignores the large amount of mitigation evidence that defense counsel actually found and presented at trial, including the types of evidence that he claims counsel neglected. (*See* Pet. 86–87.) Defense counsel called a handful of individuals to

---

[30] At the tail end of this claim, the petitioner seems to argue, pursuant to *Winston v. Kelly*, 592 F.3d 535 (4th Cir. 2010), that the Supreme Court of Virginia unreasonably denied him the opportunity to develop the factual record, despite the petitioner's diligence in pursuing this claim during state-level habeas review. (Pet. 84–85.) In *Winston*, the Fourth Circuit held that a petitioner may be entitled to *de novo* review of a claim when such a denial occurs. Juniper, however, has not shown that the Supreme Court unreasonably denied him such an opportunity.

testify as mitigation witnesses, including Juniper's sister Jacqueline, her best friend Rene Archibald, his aunt Janet Juniper, his best friend Michael Lassiter, and clinical psychologist Dr. Thomas Pasquale. A brief summary of the mitigation evidence shows clearly that counsel did explore avenues to mitigate the offense. It also shows that additional character witnesses that the petitioner believes trial counsel should have located—a juvenile counselor and a psychology instructor who both knew Juniper—would have been, at most, marginally valuable to his mitigation defense.

The first witness was Jacqueline Juniper, the petitioner's sister. She testified to the fact that Juniper's father played no role in his life. (State Habeas Record 2366.) She also explained the vicious abuse that she, Juniper, and their brother suffered at the hands of their step-father. He apparently held the boys upside-down from their ankles and whipped them with a belt when they were small children. He tried to rape Juniper's sister when she was barely a teenager, and then held the entire family at gunpoint, before leaving for good. (*Id.* 2367–71.) She described Juniper as a "fun, loving child" prior to this abuse. He even played with dolls as a young boy, and as an adult played with Keshia Stephens' children when they, too, played with dolls. (*Id.* 2374, 2377.) Juniper suffered further trauma at the age of twelve when his grandfather—perhaps the only stable male figure in his life—was killed by a drunk driver. (*Id.* 2375, 2388.) As a result of his abuse-filled childhood, Juniper went on to experience "rage." (*Id.* 2379.)

The next witness was Rene Archibald, who testified to Juniper's generosity and the way that he took care of her children when she needed a break from her parental duties. (*Id.* 2390–92.) After that came Janet Juniper, who said, similarly, that Juniper provided for Keshia Stephens' children. (*Id.* 2400–02.) Defense counsel then attempted to call Reuben Harrison,

Keshia Stephens' father, in order to testify to his conscientious objection to the death penalty. (*Id.* 2409–11.) The trial court disallowed Harrison's testimony on this issue.

Defense counsel subsequently called Michael Lassiter, who said that Juniper supported him both "mentally" and "financially," in particular when Lassiter's home was nearly subject to foreclosure. (*Id.* 2414–15.) According to Lassiter, Juniper also played "Santa Claus" by giving Christmas presents to random children, not to mention helping Keisha Stephens' family with bills and groceries. (*Id.* 2415–16.) During Lassiter's testimony, one of Juniper's lawyers responded to a prosecution objection by stating, "I think the jury is entitled to know both sides of my client. The Commonwealth wants to make him out as a monster, and *I'm trying to show them that he's a caring human being who helped his family and his friends.*" (*Id.* 2414 (emphasis added).)

Perhaps the most important mitigation witness of all was Dr. Thomas Pasquale, a clinical psychologist with over twenty years of experience and an extensive record of forensic psychology work. (*Id.* 2428–29.) The trial court appointed Pasquale to conduct a psychological assessment of the defendant, which entailed an examination of his personal history, character, and mental condition. (*Id.* 2431–32.) His assessments normally involve a review of police reports, the defendant's own statements, school records, hospital records, and any other available documents. (*Id.* 2433–34.)

Pasquale met with Juniper five times. He also spoke to various relatives—including Juniper's long-missing father—and a therapist from Juniper's early teenage years. (*Id.* 2435–38.) Pasquale indeed emphasized the importance in forensic psychology of searching for information from sources other than the defendant. (*Id.* 2439.) Based on these meetings with Juniper and his other research, Pasquale made the following findings: that Juniper's lack of a

father, coupled with his stepfather's abuse, had damaged him (*id.* 2441–46); that Juniper's mother was emotionally absent from his life (*id.* 2448–49); that Juniper was "impulsive," had "problems with attaching to others," and was furthermore "directionless, mistrusting, [and] unguided" (*id.* 2452); and that Juniper and Stephens had a mutually "aggressive" and "volatile" relationship. (*Id.* 2453.)

Pasquale also conducted psychological testing. (*Id.* 2454.) He determined that Juniper was not, clinically speaking, a "psychopath" but that he did have a "characterological dysfunction," which included "a failure to adapt, to develop." Juniper also demonstrated "antisocial thought and behavioral patterns," including "difficulties with impulsivity, reliance on the more primitive defense mechanisms of denial and blame, an easily compromised conscience, problems with anger, mood instability, alcohol and drug abuse, and chronic difficulties with the legal system." (*Id.* 2457–58.) He elaborated on these terms at length. (*Id.* 2458–61.) He furthermore diagnosed Juniper as dependent on alcohol, marijuana, and cocaine. (*Id.* 2462.) In making these determinations, Pasquale had access to a 1988 social history report prepared in the Norfolk Juvenile and Domestic Relations Court. (*Id.* 2484.)

Finally, before defense counsel rested its case, the trial court asked Juniper whether he wished to say anything on his own behalf. Not only did he affirm on the record that he did not wish to testify, but he also declined to say anything at all. (*Id.* 2493–94.) His lack of initiative at that time bolsters the Supreme Court of Virginia's finding that he was "uncooperative" when it came to presenting mitigation evidence. 707 S.E.2d at 307.

The petitioner now claims that trial counsel were deficient due to their lack of contact with counselor Yvette Rice-Stevens, juvenile counselor Ted Miller, Gwendolyn Rogers (Juniper's mother), Juniper's father, and other family members and friends. (*Id.* 86–87.) The

69

foregoing summary of defense counsel's mitigation evidence shows why this claim fails. First of all, defense counsel called several close relatives and friends who attested to their direct knowledge of Juniper's good character and his very difficult childhood. The petitioner fails to show what materially different and relevant information additional friends and relatives could have offered. On top of that, the Supreme Court found, based on trial counsel's representations, that some of the "petitioner's relatives, including his mother, refused to cooperate or testify." 707 S.E.2d at 308.

Likewise, a review of Rice-Stevens and Miller's affidavits reveals that they had little information to share regarding Juniper's childhood, psychological state, or future disposition that was not captured by Dr. Pasquale and the other testifying witnesses.[31] (*See* State Habeas Record 3218–20, 3224–25.) Quite simply, counsel cannot be judged constitutionally deficient because they could have supplemented their case with even more of the same information. Regardless of the trial phase, counsel are expected to act reasonably, not pile on evidence endlessly.

Contrary to the petitioner's assertions, trial counsel did not present a "'superficially reasonable' mitigation case," which would have been "dramatically changed" had they carried out a deeper investigation and presented more mitigation evidence. (Pet. 90.) The Supreme Court of Virginia accurately found that counsel "sought to humanize petitioner by invoking images of the abuse petitioner suffered as a child and by asking the jury to show mercy on him by considering any evidence that 'in fairness or mercy may extenuate or reduce the degree of moral culpability and punishment.'" 707 S.E.2d at 308.

---

[31] To the extent that Miller wanted to testify to Juniper's prior nonviolent adjustment to an institutional setting, the trial court would have almost certainly prevented him from doing so. (*See* State Habeas Record 2466–83.)

Lastly, the Court observes that the result remains the same even if the Supreme Court's conclusion was based on an erroneous determination of the facts. The Supreme Court of Virginia arguably erred when it found that the "petitioner never mentioned to his trial counsel a possible mitigation witness who he contends could have provided information regarding his family's or his alleged mental health issues." 707 S.E.2d at 308. The record unmistakably indicates that Juniper informed the court-appointed investigator, if not defense counsel, of Yvette Rice-Stevens (then Yvette Steward). (*Compare* State Habeas Record 2866 *with* Appx. 400.) His mother, Gwendolyn Rogers, also told the investigator about her. (State Habeas Record 2867.) That said, it is not clear that either one elaborated on the sort of information that Rice-Stevens had to offer, so even characterizing her as a "possible mitigation witness" may be inaccurate, based on what trial counsel knew at the time. As a result, this Court cannot say that the Supreme Court's factual determination was unreasonable. Regardless, as discussed earlier, trial counsel's lack of contact with her did not prejudice the petitioner in any way, because her testimony would have basically duplicated the information that trial counsel actually presented in mitigation.

As the respondent argues, another reason that the petitioner cannot show prejudice is the "overwhelming" aggravating evidence that the Commonwealth presented at sentencing. It went to great lengths to display the "controlling and abusive relationship" that the petitioner had with Keshia Stephens prior to her killing. (MTD 48–52.) For this reason, the Court cannot say that the additional testimony of the above mitigation witnesses would have been likely to change the petitioner's death sentence. In sum, the Supreme Court correctly determined that the petitioner failed to satisfy the *Strickland* standard, and the claim is thus dismissed.[32]

---

[32] Before concluding this claim, the petitioner yet again argues that the Supreme Court placed him in a "Catch-22" by unreasonably denying him an opportunity to develop the factual record. (Pet. 91–92.) Specifically, he says that the Supreme Court denied his motion to have a mental

71

## G. *Trial Counsel Did Not Receive Effective Assistance of Counsel on Appeal*

The petitioner next argues that he did not receive effective assistance of counsel on appeal, but the record before the Court makes it abundantly clear that this claim was not "fairly presented" to the Supreme Court of Virginia. As a result, the claim is procedurally defaulted, and this Court may address the merits only if the petitioner can show both cause and prejudice. If the petitioner wished to make this showing, he was required to make this claim in the section of his petition devoted to defaulted claims and to brief the issues accordingly. He has not done so. This Court must therefore dismiss the claim as procedurally barred.

During state habeas proceedings, the petitioner raised a claim that had to do with *trial counsel's* failure to object to an improper verdict form at sentencing. (Appx. 325–26.) The heading for this claim, which was Part IV.F of his state habeas petition, read, "Trial Counsel Unreasonably Failed to Ensure that Jurors Were Properly Instructed at the Sentencing Phase." (*Id.*) In fact, Part IV of his state habeas petition was comprised solely of claims about *trial counsel's* allegedly ineffective assistance during the sentencing phase of his case. (*Id.* 317.) It is incorrect to suggest that he fairly presented a claim regarding *appellate counsel's* performance to the Supreme Court of Virginia. He attempts to obscure this fact by citing the following passage from his Supreme Court brief:

> Trial counsel objected to the provision of forms #3 and #7 at trial (App. 2512-13), but the issue was not properly pursued on appeal to this Court. (*See* Brief of Appellant at 47-50, *Juniper v. Commonwealth*, No. 051423-44.) Had counsel done so, there is a reasonable probability that this Court would have reversed the sentence on direct appeal.

---

health expert appointed, which prevented him from showing how a fuller mental examination would have altered the evidence presented to the jury. The trial court appointed Dr. Pasquale to play precisely that role.

(Appx. 326) Based on the foregoing lines, he now contends that he properly raised a claim regarding appellate counsel's performance—seemingly *in addition to* the claim regarding trial counsel's performance—and that the Supreme Court of Virginia neglected to adjudicate that claim on the merits. He justifies burying this claim within another claim—and within a section dealing only with trial counsel's performance—on the basis that he "necessarily condensed" his arguments "to comply with the state court's page limitation." (Reply 43.) Regardless of his motives, Juniper simply failed to fairly present this issue to the state habeas court.

Fair presentation requires that the "ground relied upon be presented face-up and squarely," for "[o]blique references . . . will not turn the trick." *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994). The petitioner's method of presentation at the state level lacked the requisite level of clarity to give the Supreme Court of Virginia notice that such a claim was being made.

The petitioner raised more than twenty separately labeled claims for relief at the Supreme Court of Virginia. In addition, as this Court has previously noted, he sometimes raised claims in footnotes by incorporating arguments from other sections of his petition. *See* Part V.C, *supra*. If, on top of that, he had been permitted to raise claims through stray sentences in his petition, the already difficult task facing the Supreme Court would have become an impossible burden to bear. This Court, in turn, would be left to sift through his state petition in order to determine which claims were inadvertently missed and should therefore receive *de novo* review. This is simply not the way that habeas review, at either the state or federal level, is designed to work.

Because the petitioner did not fairly present the claim in his state habeas petition, fails to present it properly at this time (as a procedurally defaulted claim), and does not make a showing of cause and prejudice, this Court is required to dismiss it. *Mueller v. Angelone*, 181 F.3d 557,

581–82 (4th Cir. 1999) (holding that the failure to brief a claim fully will preclude review on appeal and thereafter). The claim is therefore dismissed.[33]

## H.    Cumulative Prejudice

Since the petitioner has failed to show any individual instance of deficient performance, the Court need not engage in an analysis of cumulative prejudice. *See Fisher v. Angelone*, 163 F.3d 835, 852–53 (4th Cir. 1998). "[A]ttorney acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" *Id.* at 853 (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)). Nevertheless, even if Juniper can show any sort of deficiency, he cannot overcome the very high threshold on prejudice, for

---

[33] Nevertheless, the Court notes that the Supreme Court of Virginia did address the underlying issue of whether the jury instructions and verdict forms were proper, and it found absolutely no defect. It stated:

> The record, including the trial transcript, written jury instructions, and verdict forms, demonstrates that the jury was properly instructed and that the verdict forms gave the jury the option to find either or both aggravating factors beyond a reasonable doubt. *See Prieto v. Commonwealth*, 278 Va. 366, 406, 682 S.E.2d 910, 931 (2009), *cert. denied,* — U.S. —, 130 S. Ct. 3419, 177 L.Ed.2d 332 (2010). Jurors are presumed to follow the trial court's instructions. *Muhammad*, 269 Va. at 524, 619 S.E.2d at 58. Furthermore, the jury unanimously found beyond a reasonable doubt that petitioner "would commit criminal acts of violence that would constitute a continuing serious threat to society" and unanimously found beyond a reasonable doubt that petitioner's "conduct in committing the offense was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind and/or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder."

707 S.E.2d at 309. Given the Supreme Court's ruling on the propriety of the instructions and verdict forms, there is no reason to believe that a direct appeal on the same issue—also, in the final instance, to the Supreme Court of Virginia—would have led to a different outcome. Because of the claim's lack of merit, and the lack of prejudice resulting from appellate counsel's failure to raise it, this claim would not be "substantial" under *Martinez v. Ryan*. 132 S. Ct. at 1318 ("To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."). *Martinez* does not appear to apply to ineffective assistance of *appellate* counsel claims, but the Court notes the claim's lack of substantiality simply to foreclose any argument that it should apply under these circumstances.

74

nothing that counsel did or failed to do can alter the unmistakable forensic evidence against Juniper. The simple fact that his thumbprint and DNA were discovered on the knife with which Keshia Stephens was stabbed, shortly before being shot and killed, sufficiently deflects any collateral attack based on ineffective assistance of counsel during the guilt phase of trial. Likewise, none of the alleged deficiencies can undermine the Commonwealth's powerful evidence of aggravating circumstances during the penalty phase—including the many times that Juniper physically and verbally abused Keshia Stephens in public and private. Ultimately, he has failed to show that any of defense counsel's actions, either individually or cumulatively, were likely to alter, or undermine confidence in, the outcome of his case.

## CONCLUSION

For the foregoing reasons, the Court grants the respondent's motion to dismiss and denies the petition for writ of habeas corpus.[34]

The Court will enter an appropriate order.

Date: <u>March 29, 2013</u>
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[34] No one should view this opinion as an endorsement of capital punishment. Like the late Justice Blackmun, the undersigned opposes the death penalty for "intellectual, moral, and personal" reasons. *Callins v. Collins*, 510 U.S. 1141, 1147 (1994) (Blackmun, J., dissenting from denial of certiorari). Earlier in his tenure, however, Justice Blackmun also observed that judges "should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these." *Furman v. Georgia*, 408 U.S. 238, 411 (1972) (Blackmun, J., dissenting). Were the personal preferences of judges to guide our decisions, we would be a nation of men, not laws. This would be the antithesis of democracy. And, thus, I reach the decision in this case.