IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

**Richmond Division**

ANTHONY BERNARD JUNIPER,

*Petitioner,*

v.                                                      Civil Action No. 3:11-cv-00746

DAVID W. ZOOK,
*Warden, Sussex I State Prison,*

*Respondent.*

## OPINION

This matter comes back to the Court on remand from the United States Court of Appeals for the Fourth Circuit to consider what, if any, procedurally defaulted claims of ineffective assistance of trial counsel may be raised pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Petitioner Anthony Bernard Juniper, an inmate on death row in Virginia, presents three potential claims in his Amended Petition for Writ of Habeas Corpus. (Dk. No. 144.) David W. Zook, the Warden of Sussex I State Prison ("the Warden"), moves to dismiss the Amended Petition. (Dk. No. 146.) Because the Court finds that Juniper's amended claims do not meet the requirements set forth by the Supreme Court in *Martinez*, each is barred due to procedural default. Accordingly, the Court grants the Warden's Motion to Dismiss and denies Juniper's Amended Petition for Writ of Habeas Corpus.

## I. FACTS AND PROCEDURAL HISTORY

The Court previously set forth the grisly facts of the crimes at the heart of this petition in a Memorandum Opinion dated March 29, 2013, which the Court incorporates herein by reference. *See Juniper v. Pearson*, 2013 WL 1333513, at *1-6 (E.D. Va. Mar. 29, 2013) (Dk.

No. 105) *vacated in part sub nom. Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013).   For the purposes of this Opinion, a brief summary suffices.[1]

On January 16, 2004, in Norfolk, Virginia, police discovered the bodies of Keshia Stephens, her younger brother Rueben Harrison, III, and her two daughters, Nykia Stephens and Shearyia Stephens.   Keshia had been stabbed in the abdomen, shot three times, and grazed by a fourth bullet.   Rueben had been shot three times.   Four-year old Nykia had been shot one time in the head.   Two-year old Shearyia had been shot four times while in her mother's arms, including once through the top of her head.   Witness statements and DNA evidence implicated Juniper, Keshia's off-and-on boyfriend.   While in jail awaiting trial, Juniper admitted to a fellow inmate that he committed the murders.

Following a two-week trial in the Circuit Court for the City of Norfolk, a jury convicted Juniper on four counts of capital murder and other related felony charges.   The jury subsequently sentenced Juniper to death for each of the capital murder convictions, finding the death sentence justified by the two aggravating factors of vileness and future dangerousness.   Years of appeals and collateral proceedings left Juniper's conviction and death sentence intact, so he turned to the federal courts for relief under 28 U.S.C. § 2254.   On March 29, 2013, this Court dismissed Juniper's original § 2254 petition.

In the Final Order denying the petition, the Court certified two questions to the United States Court of Appeals for the Fourth Circuit.   (*See* Dk. No. 106.)   As relevant here, the second question asked whether Juniper was entitled to the appointment of new or additional counsel to

---

[1] The facts summarized come from the Supreme Court of Virginia's opinion on Juniper's direct appeal.  *Juniper v. Commonwealth*, 271 Va. 362, 626 S.E.2d 383 (2006).   As explained in the previous Memorandum Opinion, the record fully supports these facts, which have not been rebutted by Juniper.   *See* 28 U.S.C. § 2254(e)(1) (explaining that "a determination of a factual issue made by a State court shall be presumed to be correct" and a petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence").

determine whether he could assert any claims under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), which the United States Supreme Court decided after Juniper filed his original § 2254 petition.[2]

The Fourth Circuit answered that question in the affirmative. *Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013) (Dk. No. 119). Specifically, the Fourth Circuit held that when the same counsel represents a habeas petitioner at both the state and federal levels, "and the petitioner requests independent counsel in order to investigate and pursue claims under *Martinez* in a state where the petitioner may only raise ineffective assistance claims in an 'initial-review collateral proceeding,' qualified and independent counsel is *ethically required.*" *Id.* at 290. Because this Court denied Juniper's requests for appointment of new federal habeas counsel, the Fourth Circuit vacated this Court's decision "with respect only to the appointment of independent counsel, and remande[ed] for further proceedings." *Id.*

On February 28, 2014, this Court appointed independent counsel to investigate any possible *Martinez* claims and allowed Juniper to file an amended petition. (Dk. No. 122.) The Court appointed additional co-counsel for Juniper on March 31, 2014. (Dk. No. 124.)

Juniper filed his Amended Petition on September 8, 2014. (Dk. No. 144.) In it, he presents three new claims under *Martinez*:

(1)      ineffective assistance of state trial counsel in failing to properly challenge the prosecutor's violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) (Claim VI);

---

[2] The Court owes an apology to Juniper's original federal habeas counsel, and hereby gives it. Early in this litigation, the Court appointed an attorney new to the case to assist in filing the petition. Juniper's counsel, however, insisted that the Court needed to appoint another new attorney to pursue any *Martinez* arguments. The Court rejected this request a number of times, entered an order chastising counsel for raising the same issue over and over again, and threatened sanctions. (Dk. No. 92.) As it turned out, Juniper's counsel was correct in arguing that a second new lawyer should be appointed to evaluate *Martinez* claims. Although an attorney should not raise the same issue time and again, the proof is in the pudding, or, in this case, the appellate decision ordering the appointment of another new lawyer.

(2)    ineffective assistance of state trial counsel in failing to make a constitutional objection to the trial court's exclusion of expert testimony on Juniper's future dangerousness (Claim VII); and

(3)    ineffective assistance of state trial counsel and appellate counsel in failing to make constitutional objections to the trial court's jury instructions under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002) (Claim VIII).

The Warden asks the Court to dismiss the Amended Petition. (*See* Dk. Nos. 145, 146.)

## II. LEGAL STANDARD

Pursuant to the Fourth Circuit's Order, this Court appointed independent federal habeas counsel to examine the record below and determine the availability of any ineffective-assistance-of-state-habeas-counsel claims that might excuse otherwise defaulted ineffective-assistance-of-state-trial-counsel claims, also called *Martinez* claims. Explanation of the nature and standards for *Martinez* claims requires some background in federal habeas procedure.

Federal habeas proceedings brought under 28 U.S.C. § 2254 usually follow years of litigation at many stages in the state court system. The typical procedural journey begins with conviction at the state trial court. If direct appeals through the state court system affirm the conviction, then the defendant may petition the United States Supreme Court for a writ of certiorari. If the Supreme Court denies the petition for certiorari, then the convicted defendant can pursue postconviction relief through the state habeas process. If that state habeas process ultimately yields no relief to the prisoner, he may then file a federal habeas petition under § 2254. Such is the journey Juniper has traveled.

A federal district court reviewing a petition filed under § 2254 must follow certain rules that give respect and finality to the prior state court proceedings. The concept of "procedural default" looms large among those rules. Procedural default dictates that "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear

4

because the prisoner failed to abide by a state procedural rule." *Martinez*, 132 S. Ct. at 1316. The federal habeas court can excuse such a default and reach the merits of the defaulted claim only if the prisoner can show "cause" for his failure to comply with state rules and "prejudice" from a violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).[3] Until 2012, the Supreme Court made clear that mistakes by counsel at state-level postconviction or habeas proceedings could not qualify as "cause" for overcoming procedural default. *Id.* at 754. That changed with the "narrow exception" set out in *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).

### A. *Martinez v. Ryan*

In *Martinez*, an Arizona jury convicted Luis Mariano Martinez of two counts of sexual conduct with a minor, and he received two consecutive life sentences. *Id.* at 1313. Martinez believed his trial counsel had been constitutionally ineffective, but Arizona law required him to wait to raise any ineffective-assistance-of-counsel claims until a postconviction collateral proceeding. *Id.* A different attorney filed a postconviction brief claiming he could find no meritorious claims for relief, which gave Martinez the right to file a *pro se* petition. *Id.* But Martinez never did, allegedly because the attorney failed to advise him that he needed to do so in order to preserve those claims. *Id.* By the time Martinez retained new counsel and filed a second state habeas petition, Arizona law barred him from pursuing the ineffectiveness claim because it could have been raised earlier. *Id.*

When Martinez filed his § 2254 petition in the federal district court, he argued he could overcome the procedural default because his own state-habeas counsel's failure to advise him of the need to file the *pro se* petition amounted to constitutionally ineffective assistance at the

---

[3] Default can also be overcome if the petitioner can "demonstrate that failure to consider the federal claim will result in a 'fundamental miscarriage of justice.'" *Coleman*, 501 U.S. at 750 (internal quotation marks omitted). Juniper's Amended Petition sets forth only *Martinez* claims, which fit into the "cause and prejudice" framework of *Coleman*.

habeas level. *Id.* This habeas-counsel ineffectiveness, Martinez argued, provided the cause necessary to overcome procedural default. *Id.* at 1314-15. The district court, relying on the rule from *Coleman*, denied the claim, because "an attorney's errors in a postconviction proceeding do not qualify as cause for default." *Id.* at 1315 (citing *Coleman*, 501 U.S. at 754-55). The Court of Appeals for the Ninth Circuit affirmed. When Martinez appealed to the United States Supreme Court, he asked the Court to find that prisoners have a constitutional right to effective assistance of counsel in a state collateral proceeding where that was their one chance to raise ineffective-assistance-of-trial-counsel claims, thus creating a way to overcome procedural default of those claims. *Id.*

The Supreme Court avoided that question, however, and instead opted to find a "narrow exception" to *Coleman* without constitutionalizing the issue: "[i]nadequate assistance of counsel at initial-review collateral proceedings *may* establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* (emphasis added). This equitable rule has been broken down into four elements:

> a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler v. Joyner*, 753 F.3d 446, 461 (4th Cir. 2014) (quoting *Trevino v. Thaler*, 133 S. Ct. 1911, at 1918)).[4] If, and only if, the prisoner meets each element, the federal habeas court can "find 'cause,' thereby excusing a defendant's procedural default." *Trevino*, 133 S. Ct. at 1918.

---

[4] "*Trevino* held that the *Martinez* exception would also apply in states that have procedures which 'make it highly unlikely in a typical case that a defendant will have a meaningful

Accordingly, in order for the Court to reach the merits of Juniper's three amended claims, each must meet the four elements of *Martinez*.

At the outset, the Court can quickly pass through the third and fourth elements, because Virginia requires ineffective-assistance-of-counsel claims to be raised only in an initial-review collateral proceeding. *See Lentz v. Commonwealth*, 261 Va. 451, 460, 544 S.E.2d 299, 304 (2001) ("Claims raising ineffective assistance of counsel must be asserted in a habeas corpus proceeding and are not cognizable on direct appeal."). With these elements satisfied by Virginia law, the Court focuses on the first and second elements to determine whether Juniper can overcome the procedural-default bar. Due to the matrioshkan design of *Martinez*, some explanation of these two elements simplifies the analysis.

The first element of *Martinez* deals with the underlying, otherwise procedurally defaulted ineffective-assistance-of-trial-counsel claim. Specifically, the prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. The Supreme Court indicated that the "some merit" threshold bore some relation to the standards for issuing a certificate of appealability ("COA"). *Id.* at 1318-19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).[5] Phrased in the alternative, a claim is not substantial if "it does not have any merit or is wholly without factual support." *Id.* at 1319. Obviously, this requires consideration of the claim under the standards for effective assistance of counsel first outlined in

---

opportunity to raise the claim on direct appeal.'" *Fowler*, 753 F.3d at 461 (quoting *Trevino*, 133 S. Ct. at 1921) (alterations omitted). Because Virginia falls squarely within the original holding of *Martinez*, the *Trevino* expansion has no impact on Juniper's claims.

[5] "Under the controlling standard [for issuing a COA], a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal quotations and alterations omitted).

*Strickland v. Washington*, 466 U.S. 668 (1984): (1) whether the petitioner's trial "counsel's performance was deficient"; and (2) whether "the deficient performance prejudiced the defense." 466 U.S. at 687.

The second element of *Martinez* focuses on the petitioner's state-habeas proceedings. Specifically, the petitioner must establish that he either lacked counsel or had ineffective counsel during his state-habeas proceedings. 132 S. Ct. at 1318. If the prisoner lacked counsel entirely, then the element is met automatically. If the prisoner had state-habeas counsel, however, this element requires a full analysis under *Strickland* to determine whether the state-habeas counsel's conduct fell below the constitutionally permissible threshold and prejudiced the outcome of the habeas proceeding.[6] To be clear, this *Strickland* analysis applies to the conduct of the prisoner's state-habeas counsel, and asks specifically whether he or she was constitutionally ineffective for failing to raise trial counsel's ineffectiveness.

Although *Martinez* separates the first and second elements, the two blend together. Specifically, the prejudice prong for habeas-level ineffectiveness requires a consideration of the merits of the underlying trial-level ineffectiveness claim, because *Strickland* prejudice requires consideration of "whether it is 'reasonably likely' the result would have been different" in that proceeding. *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 693). In reviewing a *Martinez* claim, a court asks whether the state-level habeas proceeding

---

[6] Some courts have determined that the second *Martinez* element focuses only on the deficiency prong of Strickland and bypasses the prejudice prong. *See, e.g., Canales v. Stephens*, 765 F.3d 551, 569 (2014); *Detrich v. Ryan*, 740 F.3d 1237, 1245-56 (9th Cir. 2013) (en banc) (plurality opinion). But *Martinez* itself requires an analysis of whether the state-habeas counsel "was ineffective *under the standards of* Strickland." 132 S. Ct. at 1318 (emphasis added). This indicates that both prongs must be considered. Without any indication that the habeas-ineffectiveness claim is limited to only the first half of *Strickland*, the Court must apply the whole test. *See, e.g., Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014); *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).

8

would have come to a different result if habeas counsel brought forward the trial-level ineffectiveness claim. "Thus, the facts that bear on the *Strickland* prejudice analysis and the *Martinez* substantiality analysis will largely be the same," because both questions ask a court to consider the merits of that underlying claim. *Teleguz v. Davis*, No. 7:10-cv-254, 2014 WL 3548982, at *24 (W.D. Va. July 17, 2014). Somewhat circuitously, therefore, the *Martinez* exception to the procedural-default bar includes within it consideration of the merits of the procedurally defaulted claim.

Juniper's amended petition calls for analysis under these serpentine rules. In the amended petition, Juniper raises three claims of ineffective assistance of counsel that he did not raise during his state-habeas proceedings. Because Virginia's postconviction collateral proceeding rules fall within the *Martinez* exception, Juniper must show that his state-habeas counsel was ineffective under *Strickland* and that his underlying ineffective-assistance-of-trial-counsel claims have some merit to excuse this procedural default.

A preliminary merits review of each ineffective-assistance-of-trial-counsel claim gives the Court the most efficient manner in which to decide the applicability of *Martinez* to the amended claims. If an underlying trial-ineffectiveness claim has no merit, then it fails not only under *Martinez*'s first element, but also the second element, because state-habeas counsel could not have been ineffective for failing to raise a meritless claim. *See, e.g., Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996) ("Failure to raise a meritless argument can never amount to ineffective assistance."). If the underlying claim has some merit, then the Court must decide whether state-habeas counsel's failure to raise it during the initial-review collateral proceedings violated the standards from *Strickland*. If state-habeas counsel lived up to the constitutional standard, then the amended claims are procedurally defaulted. If, on the other hand, the

9

amended claims meet both the first and second elements, then the Court can determine the appropriate relief on the merits.

## III.  DISCUSSION

### A.  Claim VI

Juniper alleges that his state trial counsel were ineffective in their attempts to challenge the prosecution's *Batson* violations.   Specifically, he makes three arguments.   First, and primarily, he argues that his counsel should have pressed harder during one of the *Batson* challenges raised during jury selection by conducting a comparative juror analysis between a struck juror and a purportedly similarly situated non-black juror.   Second, he argues his counsel were ineffective for failing to object when the trial court inappropriately provided the prosecutor with a race-neutral reason for striking a black venire member.   Third, he argues his counsel were ineffective for failing to preserve a record of panel members' races so that a *Batson* objection could be adequately pursued on appeal.

As discussed above, the *Strickland* framework requires Juniper to show both that his trial counsel's conduct was deficient by falling below an objective standard of reasonableness and that this deficiency prejudiced the outcome of the proceeding. *Strickland*, 466 U.S. at 688.   With respect to prejudice, "an analysis focusing solely on the mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

Here, the ineffective-assistance-of-trial-counsel claim requires a review of the *Batson* framework.   In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the Supreme Court held that the use of peremptory challenges to strike jurors on the basis of their race violates the Fourteenth Amendment. *Batson* challenges follow a three-step process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (internal quotation marks and alterations omitted). "The critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell* (*"Miller-El I"*), 537 U.S. 322, 338-39 (2003). The credibility of the race-neutral justification hinges on, "among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in an accepted trial strategy." *Id.* "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke* (*"Miller-El II"*), 545 U.S. 231, 241 (2005). With all of that said, the burden never leaves the party opposing the strike, "and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (internal citations and quotation marks omitted).

Within the *Strickland* framework, Juniper must show that his trial counsel's conduct during the *Batson* challenge fell below the "objective standard of reasonableness" by failing to live up to "prevailing professional norms." *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quoting *Strickland*, 466 U.S. at 688). Juniper must also show that, absent these "unprofessional errors, the result of the proceeding would have been different." *Id.* In this setting, the relevant proceeding is the trial court's consideration of the *Batson* challenge. Accordingly, Juniper must show that, but for his trial counsel's ineffectiveness in failing to make certain arguments, the

11

result of the *Batson* challenge would have been different, i.e., the trial court would have found

the prosecutor in violation of *Batson*.[7]

## 1. Ineffectiveness for Failing to Use Comparative Juror Analysis

### i. Relevant Background

During voir dire, the following exchange took place between the trial court and two

prospective jurors, Charlotte McClain, a black female, and Gerald Hackworth, a purportedly

non-black male[8]:

> THE COURT:  Have you or has any member of your immediate family ever been
> prosecuted by the Norfolk Commonwealth Attorney's Office?
>
> A PANELIST:  No.
>
> A PANELIST:  Yes.
>
> A PANELIST:  Yes.
>
> THE COURT:  Yes?  That's Ms. McClain.
>
> MS. MCCLAIN:  Uh-huh.
>
> THE COURT:  Was it you or a relative?
>
> MS. MCCLAIN:  A relative.
>
> THE COURT:  What relation?
>
> MS. MCCLAIN:  Brother.

---

[7] "*Batson* errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim." *United States v. King*, 36 F. Supp. 2d 705, 710 (E.D. Va. 1999) (citing *Young v. Bowersox*, 161 F.3d 1159, 1161 (8th Cir. 1998) and *Davidson v. Gengler*, 852 F. Supp. 782, 787 (W.D. Wis. 1994)).  Presumptive prejudice in *Strickland* only comes with errors that cause "actual or constructive denial of assistance of counsel altogether," the state's "interference with counsel's assistance," or "an actual conflict of interest."  *Strickland*, 466 U.S. at 692. Accordingly, although a *Batson* violation is a structural error subject to automatic reversal, a claim of ineffective assistance for failing to properly raise or pursue a *Batson* challenge requires the petitioner to show he was prejudiced by his lawyer's failure.

[8] The record does not state Hackworth's race.  Juniper provides an affidavit from a law student who avers that he went to an address listed for an individual with the same name in Norfolk, Virginia, in 2014, and came into contact with someone he believed to be white.  Am. Pet. Supp. App'x 8-9.  The Court will assume for the sake of argument that Hackworth is not black.

> THE COURT:  How long ago was that?
>
> MS. MCCLAIN:  A year ago.
>
> THE COURT:  Was he convicted?
>
> MS. MCCLAIN:  Yes.
>
> THE COURT:  Mr. Hackworth, you or a relative?
>
> MR. HACKWORTH:  Me.
>
> THE COURT:  How long ago was it?
>
> MR. HACKWORTH:  Seven years.
>
> THE COURT:  It must have been a misdemeanor charge?
>
> MR. HACKWORTH:  Yes, sir.
>
> THE COURT:  Were you convicted?
>
> MR. HACKWORTH:  Yes.

(S.H. 996-97.)[9]

Both McClain and Hackworth stated that these experiences would not in any way affect their ability to remain fair and impartial to both sides in the case. (*Id.* 997.)

In addition to the above, voir dire uncovered that McClain worked for a company that printed and distributed military newspapers, that her father was a retired local police officer, that she was unmarried, and that she had no children. (*Id.* 899, 908, 917, 1010.) She had not heard any news about Juniper's case from the media, and she stated she did not have a belief that would prevent or impair her ability to impose the death penalty or follow the Court's instructions regarding the death penalty. (*Id.* 998, 1000-01.) When asked by the defense counsel, she said she had not formed an opinion regarding Juniper's guilt. (*Id.* 1005.)

---

[9] The Court refers to the page numbers from the State Habeas Record as "S.H. xxx."

Hackworth, a construction project manager, was married to a middle school teacher, who also did security at her middle school and at one point served as a "block captain" for their neighborhood, and had a six-year-old daughter. (*Id.* 907, 917, 1008, 1010.) He admitted to previously hearing about the Juniper case from the media, but stated that he maintained an open mind about the case, which he confirmed when defense counsel followed up with questioning about media exposure. (*Id.* 998, 1005.) He stated he had started a new job the day before the trial, but the trial court reassured him he could not be punished for serving jury duty. (*Id.* 1002.) He also stated that he did not have a belief that would prevent or impair his ability to impose the death penalty or follow the Court's instructions in that arena and that he had not formed an opinion regarding Juniper's guilt. (*Id.* 1000-01, 1005-06.)

After the conclusion of voir dire, each side struck seven jurors using peremptory challenges. The prosecution struck McClain, but not Hackworth. (*Id.* 1132.) Defense counsel raised a *Batson* challenge, alleging that the prosecution struck McClain on the basis of her race. (*Id.*) Rather than waiting for the defense to make out a prima facie case, the prosecutor offered a race-neutral reason for each strike. The prosecutor explained that he struck McClain because "[h]er brother was convicted by the Norfolk Commonwealth Attorney's Office one year ago. And that was a concern." (*Id.* 1136.) The defense counsel countered,

> with regard to Ms. McClain, I do not recall any questions by her and certainly no answers by her as to the effect that her brother being prosecuted by the Norfolk Commonwealth's Attorney would have on her ability to give the Commonwealth a fair and impartial trial in this case. Her father I believe was a former Norfolk police officer. And I don't recall a single answer by Ms. McClain to suggest that she is anything other than fair and impartial with regard to the Commonwealth's case.

(*Id.* 1137.) The trial court denied the Batson challenges, finding that defense counsel failed to make out a prima facie case of discrimination, and even if a prima facie case had been made, the prosecutor gave credible race-neutral explanations for the strikes. (*Id.* 1137-38.)

14

Juniper's state-habeas counsel did not raise any *Batson*-related ineffective-assistance-of-counsel claims in his state-habeas petition. Accordingly, Juniper procedurally defaulted any claim related to the ineffectiveness of trial counsel with respect to *Batson* objections.

### ii. Analysis

#### a. Ineffective-Assistance-of-Trial-Counsel Claim

At the outset, Juniper and the Warden argue over whether this Court should defer to the trial court's ruling that Juniper's trial counsel failed to make out a prima facie case of discrimination, but the point is moot. The trial court specifically ruled that Juniper's counsel failed to make out a prima facie case, but also ruled that the prosecutor provided valid and acceptable race-neutral reasons for his strikes, including the strike of McClain. (*Id.* 1137-38.) "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991). Accordingly, the Court need examine the effectiveness of Juniper's counsel at *Batson*'s first step, because the prosecutor's offer of race-neutral reasons and the trial court's ultimate decision made that step unnecessary. Juniper does not contend that the prosecutor did not provide a race-neutral explanation for his use of a peremptory strike against McClain, and for good reason: the prosecutor's basis for striking McClain—her brother's prosecution one year earlier—clearly was race-neutral.

Instead, the Court focuses on the third step, where Juniper claims his trial counsel ought to have made an argument for purposeful discrimination. He claims that a competent attorney would have exposed the prosecutor's apparently race-neutral basis as pretext for purposeful discrimination. Specifically, he says his counsel should have pointed out that the reason given

by the prosecutor for striking McClain applied equally, if not more so, to Hackworth, who ultimately served as the jury foreman.[10]

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El II*, 545 U.S. at 241. The individuals need not be "identical in all respects," *id.* at 247 n.6, but they must still be similar *enough* in material ways in order to draw the inference that the race-neutral basis is actually pretext, *see United States v. Morrison*, 594 F.3d 626, 633 (8th Cir. 2010) (explaining that even fine distinctions between similar jurors can support a peremptory challenge).

The Supreme Court's decision in *Miller-El II* arrived five months after Juniper's trial, so it cannot provide a standard against which to judge trial counsel's conduct. *Strickland*, 466 U.S. at 690 (requiring a reviewing court to consider counsel's effectiveness "as of the time of counsel's conduct"). And although Miller-El's first trip to the Supreme Court also touched on a comparative-juror analysis, the 2003 case dealt primarily with the standards for granting a certificate of appealability. *Miller-El I*, 537 U.S. at 336. In that context, the Supreme Court discussed how a court should review a *Batson* claim with comparative-juror evidence, but did not mention *Strickland* or standards for counsel. One might infer from *Miller-El I* that raising evidence of non-struck, non-black, similarly situated jurors presents a viable litigation strategy at *Batson's* third step. *See also Buck v. Commonwealth*, 247 Va. 449, 453, 443 S.E.2d 414, 416

---

[10] Juniper devotes some of his Amended Petition to laying out the racial demographics of the venire. *See* Am. Pet. 5-6, 11, 16, 19. This statistical analysis, supplemented by affidavits from investigators who tracked down many members of the panel to ask them their race, goes toward *Batson's* first step. Juniper contends that, with these statistics, "the prosecution struck black venire members at nearly three times the rate of white venire members." Am. Pet. 16. Even if the Court accepted Juniper's statistical arguments, they still only provide evidence of a prima facie case at the first step, not purposeful discrimination at the third step.

16

(1994) (refusing to review a comparative-juror analysis based on arguments and evidence that were not presented to the trial court). But the failure to pursue a viable litigation strategy does not automatically rise to the level of constitutionally deficient performance. *See Strickland*, 466 U.S. at 689-90 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

Nonetheless, assuming for the sake of argument that trial counsel performed deficiently by failing to make the comparison between McClain and Hackworth, Juniper must still show prejudice. Juniper claims that he meets the prejudice prong because his *Batson* claim had merit. Am. Pet. 12. In this regard, he must show a reasonable probability that the trial court would have deemed the prosecutor's basis for striking McClain to be pretext and sustained his *Batson* objection. Juniper fails at this task for several reasons.

First, the race-neutral reason given for striking McClain did not apply "just as well" to Hackworth due to the temporal proximity of their respective interactions with the Norfolk criminal justice system. *See Miller-El II*, 545 U.S. at 241. During the *Batson* challenge, the prosecutor stated that McClain's "brother was convicted in Norfolk by the Nortolk Commonwealth Attorney's office *one year ago.*" (S.H. 1136.) By contrast, Hackworth's conviction came seven years earlier, putting a significantly larger chunk of time between his potential jury service and his time as a defendant.

Second, the race-neutral reason did not apply "just as well" to Hackworth because McClain's brother's charges were unknown. Because Hackworth had been called for jury duty, the trial court correctly assumed that his prior conviction was for a misdemeanor. (*Id.* 997.) McClain's brother's conviction was never uncovered during voir dire. The fact that Hackworth had been convicted of a minor offense at least partially justifies why he was not struck. Taken in

17

tandem with the temporal proximity, a known, distant, and minor conviction does not make Hackworth similarly situated to McClain, whose brother had an unknown, recent conviction.

Third, the race-neutral reason did not apply "just as well" to Hackworth because he himself had been the defendant rather than a loved one. Juniper frames this distinction as further support for his claim, because he thinks that being a convicted defendant makes one a less desirable juror than having a loved one convicted of an offense. *See* Am. Pet. 15. But seeing a family member go through criminal prosecution or get arrested may leave a grudge or subconscious hostility that does not come with being confronted with one's own wrongdoing. In fact, thorough review of the transcript from jury selection shows that seven individuals, including McClain, answered affirmatively when asked if they had a family member prosecuted by the Norfolk Commonwealth's Attorney's Office or a family member whose prior arrest or prosecution might affect his or her ability to serve as an impartial juror. Not one of them served on the jury, either due to strikes for cause or peremptory challenges.[11]   Accordingly, not only did the race-neutral reason not apply "just as well" to Hackworth, but the final composition of the panel fell in line with the prosecution's basis for striking McClain.

Finally, even if the Court assumes that the race-neutral reason applied equally to McClain and Hackworth, enough distinguishing facts remain to convince the Court that the trial court would not have found them similarly situated enough to rule in Juniper's favor on the *Batson* challenge.   McClain was single and childless, whereas Hackworth was married to a middle school teacher, who also provided security at her school and served as a neighborhood watch

---

[11] These included venire members who: had a son she believed had been wrongly charged with a crime earlier that year (S.H. 952); had a brother convicted of capital murder (*id.* 1039); had a nephew convicted of at least one count of armed robbery (*id.* 1055-56); had a husband arrested for DUI two years prior (*id.* 1093-94); had a brother convicted of murder twenty years earlier (*id.* 1094); and had a son prosecuted several years earlier by the Norfolk Commonwealth Attorney's Office (*id.* 1111-12).

block captain, and had a six-year old daughter. It should be obvious why a prosecutor would want someone like Hackworth on the jury for the trial of a man accused of brutally murdering his girlfriend, her younger brother, and her two daughters, ages two and four.

In light of the foregoing, Juniper has not shown a reasonable likelihood that the trial court would have ruled any differently on his *Batson* challenge had his trial counsel made the comparative juror analysis between McClain and Hackworth. Accordingly, he cannot make out the required prejudice for his ineffective-assistance-of-trial-counsel claim and, thus, the claim lacks merit. Without merit, the claim cannot serve as the basis for habeas relief under *Martinez*.

### b. Ineffective-Assistance-of-Habeas-Counsel Claim

Even if Juniper could show that his underlying claim had some merit, he could only overcome the procedural-default bar through *Martinez* by also showing both prongs of *Strickland* with respect to his state-habeas counsel for failing to raise the underlying ineffectiveness claim.

Juniper attempts to rebut the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, by submitting an affidavit from his state-habeas counsel. The affidavit states, in relevant part:

> No one involved in Mr. Juniper's state habeas representation proposed or discussed raising a claim of trial counsel's failure to investigate and present evidence of violations of *Batson v. Kentucky*. There was no strategic reason for omitting such a claim from the state habeas petition. I have reviewed the claim in Mr. Juniper's amended petition and find it meritorious and consistent with claims about other deficient aspects of trial counsel's representation that we presented in the state habeas corpus petition. This also would have been my assessment at the time of Mr. Juniper's state court habeas corpus proceedings.

Am. Pet. Supp. App'x 11. Although the affidavit may show habeas counsel's subjective mindset and remove the possibility of litigation strategy, it does not necessarily show that habeas counsel's conduct was unreasonable under *Strickland*. *See Keel v. French*, 162 F.3d 263, 272

(4th Cir. 1998) (explaining that reasonableness is measured objectively).[12] Moreover, given that Juniper's underlying ineffective-assistance-of-trial-counsel claim has no merit, his habeas counsel cannot be deemed ineffective for failing to raise it during the state-habeas proceedings.

Finally, regarding prejudice, Juniper cannot show a reasonable probability of a different outcome at the state-habeas stage. Without a meritorious underlying claim, he cannot reasonably argue that the Supreme Court of Virginia would have reached a different outcome on his state habeas petition. Accordingly, Juniper's ineffective-assistance-of-habeas-counsel claim fails under *Strickland* and, thus, the underlying defaulted claim fails to pass muster under *Martinez*.

### 2. Failure to Object to Trial Court Providing Race-Neutral Reason

#### i. Relevant Background

During the initial voir dire from the trial court, potential juror India Mix stated that one of Juniper's lawyers, Mr. Reed, previously represented her but that this would not affect her ability to be fair and impartial. (S.H. 888-89.) In follow-up questioning from the trial court, Mix revealed that the representation entailed a criminal charge for assault, which she characterized as a "false accusation" that was dismissed when the accuser never came to court. (*Id.* 938.) Each attorney also asked her follow-up questions about her ability to remain impartial, to which she responded that the representation would have no effect on her ability to judge the case solely on the evidence without any untoward bias. (*Id.* 939-41.)

The prosecution struck Mix from the panel with one of its peremptory challenges. Juniper's trial counsel raised a *Batson* challenge for the strike. (*See id.* 1132.) Before the trial

---

[12] "[T]he suggestion that a court is somehow bound by trial counsels' own assertion that they were ineffective is troubling at the very least, since it clearly raises the specter that all trial counsel will deliberately fail to raise a [*Batson*] challenge at trial, then successfully raise it later on collateral review when they seek even more expansive discovery than they might have obtained at trial." *United States v. Lighty*, 2014 WL 5509205, at *6 (E.D. Va. Oct. 30, 2014). Similarly, affidavits from former counsel may simply reflect wistful second-guessing.

court determined whether Juniper's counsel made a prima facie case for discrimination, the prosecutor, Mr. Doyle, offered to run through his race-neutral reasons for each of his strikes, which included Mix. (*Id.* 1134.) As the prosecutor gave his reasons for each strike, but before he specifically addressed the strike of Mix, the following exchange occurred:

> THE COURT:  I suppose the strike for Ms. Mix, to shorten it, would be she's previously been Mr. Reed's client. Said it would have no effect on her.

> MR. DOYLE:  Correct, but not only was she a client in a criminal matter, she referred to it as a false accusation, but, yes, the primary thing was Mr. Reed's former client.

(*Id.* 1135.) In an attempt to rebut this justification, Juniper's trial counsel pointed out that Mix "indicated by her answers that nothing in our past lawyer/client relationship would affect her ability to consider the evidence and apply the law to the evidence as instructed by the Court." (*Id.* 1137.) The trial court found Juniper failed to make a prima facie case of discrimination and that, even if the prima facie case had been made, the prosecutor provided a race-neutral basis for striking Mix, even if that basis did not provide a reason to strike for cause. (*Id.* 1137-38.)

Juniper's state-habeas counsel did not raise any *Batson*-related ineffective-assistance-of-counsel claims in his state-habeas petition. Accordingly, Juniper procedurally defaulted any claim related to the ineffectiveness of trial counsel with respect to *Batson* objections.

### ii. Analysis

### a. Ineffective-Assistance-of-Trial-Counsel Claim

Juniper claims his trial counsel's failure to object when the trial court suggested the race-neutral basis for striking Mix constituted ineffective assistance of counsel. This claim fails because trial counsel's conduct in this respect was objectively reasonable.

In reviewing a *Batson* challenge for pretext, "pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown

up as false." *Miller-El II*, 545 U.S. at 252. In other words, the race-neutral basis for a peremptory strike cannot be hypothetical or imagined by the trial court, but instead must come from the prosecutor himself. Juniper points to *Hopkins v. Commonwealth*, 53 Va. App. 394, 400, 672 S.E.2d 890, 893 (2009), in which the Court of Appeals of Virginia specified that a trial court may "not substitute its own reason for the strike" when reviewing a *Batson* challenge.

Setting aside the fact that *Hopkins* was decided more than four years after Juniper's trial and thus cannot be used to establish a standard of conduct for his trial counsel, the principle from that case does not apply with the same force to Juniper's situation. In *Hopkins*, the prosecutor's race-neutral justification applied just as well to non-black similarly situated jurors, but the prosecutor gave no explanation for the disparity when confronted with it. *See* 53 Va. App. at 400, 672 S.E.2d at 893. The trial court offered an explanation based on its own observation of the panel, but "the Commonwealth gave no such reason for its strike." *Id.* By contrast, the prosecutor in Juniper's case concurred, on the record, that the reason stated by the trial court was the reason he struck Mix. (*See* S.H. 1135.) The trial court did not substitute its own judgment, but instead jumped the gun by stating the obvious. Juniper's trial counsel's failure to object to this did not fall below the objectively reasonable standard required by *Strickland*.

Moreover, even if Juniper's trial counsel acted deficiently, Juniper has not shown how the conduct prejudiced him in the proceedings. When the prosecutor responded to the trial court's statement that the strike was based on Mix's prior relationship with defense counsel, he added that he struck her not only on that basis, but also because "she referred to [the prior representation] as a false accusation." (*Id.* 1135.) Juniper does not explain how his counsel should have overcome this race-neutral basis. Without any explanation as to how things would have been different had the objection been made, Juniper fails to adequately show prejudice.

22

Juniper's underlying ineffectiveness claim does not meet either prong of *Strickland*, and thus has no merit. Lacking merit, the claim cannot provide the basis for the *Martinez* exception to the procedural-default bar.

### b. Ineffective-Assistance-of-Habeas-Counsel Claim

Even if the claim had some merit, it still fails to meet the threshold required by *Martinez* because Juniper fails to address habeas-level ineffectiveness with respect to the reason given for striking Mix. Presumably, the broad affidavit from habeas counsel could be read to cover every *Batson*-related error discussed in the Amended Petition, but that does not automatically mean habeas counsel acted deficiently. The underlying trial-ineffectiveness claim's total lack of merit convinces the Court that state-habeas counsel did not act unreasonably in failing to raise it during the state-habeas proceedings. In addition, Juniper has not explained how his habeas proceedings would have been different had the claim been raised and, thus, fails to show prejudice. Accordingly, Juniper has not met the standard required for the ineffective-assistance-of-habeas-counsel element of this particular claim. As such, the underlying trial-ineffectiveness claim does not meet the elements of *Martinez* and is procedurally barred.

### 3. Failure to Make a Record of Juror's Races for Appeal

#### i. Relevant Background

Last among his *Batson*-related amended claims, Juniper argues that his trial counsel provided ineffective assistance by failing to preserve a record of panelists' races so that the *Batson* objection raised by trial counsel "could be adequately pursued on appeal." Am. Pet. 12. Essentially, Juniper thinks that had his trial counsel logged the races of each panel member, his appellate counsel would have pursued the *Batson* claims based on the comparative analysis discussed in his previous claim.

### ii. Analysis

#### a. Ineffective-Assistance-of-Trial-Counsel Claim

Assuming, without deciding, that Juniper's trial counsel was deficient for failing to create or preserve a record of the panelists' races, he cannot show prejudice. Juniper posits two outcomes from a properly created record of the panelists' races. First, he says that appellate counsel, aided with a proper record, could have pointed out the disparity in strikes between black and non-black jurors. Second, he argues that because Hackworth's race was never established in the record, appellate counsel could not engage in a comparative race analysis that would have shown the prosecution's strike of McClain violated *Batson*. But, as explained above, the statistical disparity between black and non-black jurors goes to the first step of *Batson*, which the prosecutor and trial court rendered moot. *See Hernandez*, 500 U.S. at 359. Moreover, the Court addressed the Hackworth-McClain comparison under the assumption that Hackworth is white and concluded that the claim lacked merit. Accordingly, Juniper fails to show how trial counsel's failure to make a record of the panelists' races prejudiced him.

#### b. Ineffective-Assistance-of-Habeas-Counsel Claim

Because the underlying ineffective-assistance-of-trial-counsel claim totally lacks merit, habeas counsel cannot have been deficient for failing to raise the argument in the state-habeas proceedings. Moreover, Juniper has not shown how state-habeas counsel's failure to raise the argument prejudiced the outcome of the state-habeas proceedings. Accordingly, he fails to satisfy the requirements for showing "cause" under *Martinez*, and the claim remains procedurally defaulted.[13]

---

[13] Juniper also argues that the trial court wrongly refused to ask venire member Malia Bailey to self-identify her race. Am. Pet. 17-18. During the *Batson* arguments, the trial court admitted he believed Bailey was white, while Juniper's trial counsel asked the court to conclude that, by

## B. CLAIM VII

In Claim VII, Juniper argues that his trial counsel was ineffective during the penalty phase of his trial by failing to object to the exclusion of certain mitigating evidence regarding his future dangerousness. Before addressing the trial and habeas ineffectiveness elements, the Court must review the issues and law behind the claim.

In Virginia, death may be imposed only if a jury finds at least one of two aggravating factors, commonly referred to as "future dangerousness" and "vileness." Specifically,

> [t]he penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

Va. Code § 19.2-264.4(C); *see also id.* § 19.2-264.2 (requiring the jury to consider "the past criminal record of convictions of the defendant" before determining future dangerousness or vileness in a capital sentencing). Under these statutes, the aggravating factors require the jury to focus on the capital defendant's personal and criminal history as well as the characteristics of the capital offense.

Several Supreme Court decisions reflect the rule that a capital defendant has the constitutional right to offer relevant mitigating evidence to rebut the showing of aggravating

---

appearance, she was African American. (S.H. 1132-34.) The prosecutor made this discussion irrelevant by offering a race-neutral basis for her strike. (*Id.* 1134.) Juniper does not raise the argument pertaining to Bailey's race to gain any specific relief under *Martinez*, but instead says that the trial court's factual findings are not reliable. Am. Pet. 19. This Court has not relied on factual findings of the trial court, but has instead limited its analysis to those facts that are clear and undisputed from the record. The truth of Bailey's race may affect percentages in a statistical comparison of race on the panel, but that comparison matters at *Batson*'s first step. As discussed several times already, that step became moot when the prosecutor gave his race-neutral basis for striking jurors and the trial court found no discrimination. *Hernandez*, 500 U.S. at 359.

factors. *Eddings v. Oklahoma*, 455 U.S. 116, 114 (1982). Under those rulings, a jury must be allowed to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 110 (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)). Juniper's argument under Claim VII goes to *Eddings* and its progeny, which the Court discusses below.

### 1. Failure to Make a Constitutional Objection to Exclusion of Mitigation Evidence

#### i. Relevant Background

At the penalty phase, the prosecution pursued both future dangerousness and vileness. In addition to the evidence of the murders for which Juniper had been convicted, the prosecution elicited testimony from thirteen witnesses. These witnesses included family and friends of Keshia Stevens, police officers who previously investigated Juniper for other crimes, and jail staff who interacted with Juniper after his arrest for the murders.

For Juniper's mitigation defense, trial counsel called Juniper's sister, her friend, his aunt, and a childhood friend, all of whom discussed Juniper's difficult upbringing and positive traits. Juniper also called Dr. Thomas Pasquale, a clinical and forensic psychologist appointed by the trial court to assist in Juniper's defense. Dr. Pasquale offered expert testimony about Juniper's upbringing, mental health, and how those factors affected his behavior.

When defense counsel asked for Dr. Pasquale's opinion as to future dangerousness, Dr. Pasquale explained that "[i]t depends on whether the person is living out in our community or whether they are in a maximum security penitentiary." (S.H. 2467.) The prosecution objected to this testimony on the ground that mitigation evidence related to the general conditions of prison are irrelevant to future dangerousness. (*Id.* 2467.) Outside the presence of the jury, Juniper's trial counsel explained that Dr. Pasquale's opinion on future dangerousness would explain the

difference between "future dangerousness in an open community such as the one we live in and in a prison environment such as the one Mr. Juniper will live in." (*Id.* 2470.)

The trial court allowed voir dire of Dr. Pasquale in order to determine the substance of his opinion and its relevance to future dangerousness.   In response to defense counsel questioning, Dr. Pasquale testified that the distinction he mentioned "has to do with the person's characteristics and how those characteristics apply open community versus incarceration." (*Id.* 2473-74.) In explaining the defense position, trial counsel said, "It is the impact and the effect of the prison environment, in other words, the prison setting, that is a factor in this defendant's risk assessment specifically related to future dangerousness." (*Id.* 2480.)   The trial court sustained the prosecution's objection and held that Juniper's "likelihood of committing criminal acts in prison is not proper evidence." (*Id.* 2477, 2480.)

Ultimately, the trial court permitted the following exchange, which concluded the defense's direct examination of Dr. Pasquale:

> MR. REED:   Dr. Pasquale, my final question to you would be this: In your opinion is the risk assessment of Mr. Juniper's future dangerousness dependent on or related to the circumstances of his environment?
>
> DR. PASQUALE: Yes.

(*Id.* 2482.)  On redirect examination, defense counsel tried to ask whether incarceration could have an inhibiting effect on someone like Juniper, but the trial court sustained the prosecution's objection to this question. (*Id.* 2492.)

The jury ultimately found beyond a reasonable doubt both aggravators for each of the four counts of capital murder and fixed Juniper's punishment at death. (*Id.* 2540.)

Juniper's state-habeas counsel objected to the trial court's limitation of Dr. Pasquale's testimony, but did not raise the issue as an ineffective-assistance-of-trial-counsel claim. Accordingly, the underlying trial-ineffectiveness claim is procedurally defaulted.

27

### ii. Analysis

#### a. Ineffective-Assistance-of-Trial-Counsel Claim

Juniper argues his trial counsel was ineffective for failing to mount a constitutional challenge to the trial court's limitation of Dr. Pasquale's testimony on future dangerousness. Am. Pet. 20-21. Specifically, he argues his counsel should have argued that the Supreme Court's decisions on mitigation evidence conflict with the Virginia law supporting the limitation.

In *Eddings*, the Supreme Court adopted the plurality rule from *Lockett v. Ohio*, and required states to allow mitigating evidence in the form of "a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 604). "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider *as a matter of law*, any relevant mitigating evidence." *Id.* at 113-14.

The Supreme Court's next major mitigation-evidence decision, *Skipper*, involved a capital defendant's attempt to introduce evidence of his adjustment to incarceration and good behavior while in jail pending his trial. *Skipper v. South Carolina*, 476 U.S. 1, 3 (1986). The Supreme Court held that exclusion of this evidence "deprived petitioner of his right to place before the sentencer relevant evidence in mitigation of punishment." *Id.* at 4. Just like other evidence of a defendant's past conduct, "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id.* at 5. The Court noted, however, that not "all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating." *Id.* at 7 n.2.

Finally, in *Simmons*, the Supreme Court held that a jury considering future dangerousness must be instructed on the availability of parole for a capital defendant sentenced to life

imprisonment. *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994). This rule has no relevance to Juniper's amended claim, because his jury was instructed that "[t]he words imprisonment for life mean imprisonment for life without possibility of parole." (S.H. 2518.) Nonetheless, Juniper cites *Simmons* for the proposition that "due process requires capital defendants to be allowed to rebut a prediction of future dangerousness." Am. Pet. 26 (citing *Simmons*, 512 U.S. at 169).

Even before Juniper's trial, the Supreme Court of Virginia held that *Eddings* and *Skipper* protect the right to present relevant mitigation evidence related to a defendant's background or history or the characteristics of the underlying offense. If evidence goes beyond those categories, however, the trial court may exclude it on relevance grounds. *See Cherrix v. Commonwealth*, 257 Va. 292, 309, 513 S.E.2d 642, 653 (1999). In *Cherrix*, the defendant sought to introduce expert testimony on "prison life and its effect on his 'future dangerousness,'" but the trial court found this evidence immaterial. *Id.* On appeal the defendant argued, in part, that this limitation violated the holdings from *Skipper* and *Eddings*. *See id.* The Supreme Court of Virginia disagreed, and pointed out that the trial court maintained the authority to decide whether the evidence sought to be presented was actually relevant to those categories protected by *Skipper* and *Eddings*. *Id.* Because generic prison information did not encompass the defendant's individual characteristics, experience, or background, the Supreme Court of Virginia deemed it inadmissible as future dangerousness testimony. *Id.* at 310 n.4, 513 S.E.2d at 653 n.4. Ultimately, "what a person may expect in the penal system is not relevant mitigation evidence." *Id.* at 310, 513 S.E.2d at 653.

Every related decision leading up to Juniper's conviction reinforced the same proposition. *See, e.g., Bell v. Commonwealth*, 264 Va. 172, 201, 563 S.E.2d 695, 714 (2002) (reiterating that

"the conditions of prison life and the kind of security features utilized in a maximum security facility" are "not relevant to the future dangerousness inquiry"); *Burns v. Commonwealth*, 261 Va. 307, 339, 541 S.E.2d 872, 893 (2001) (explaining that the limitations of a maximum security prison are not relevant to future dangerousness, because "the relevant inquiry is not whether [the defendant] *could* commit criminal acts of violence in the future but whether he *would*"); *Walker v. Commonwealth*, 258 Va. 54, 70, 515 S.E.2d 565, 574 (1999) (upholding the exclusion of testimony on "the conditions of prison life, specifically life without parole in a maximum security prison," because "such testimony is not proper mitigating evidence); *cf. Lovitt v. Commonwealth*, 260 Va. 497, 517, 537 S.E.2d 866, 879 (2000) (explaining that the "society" to be considered in the future dangerousness decisions is not limited to "prison society"). In the years leading up to Juniper's conviction, Virginia's highest court time and again explained that relevant mitigation of future dangerousness focused on the defendant's particular characteristics and history, his criminal record, and the circumstances of his capital offense.

Juniper does not attempt to distinguish the testimony of Dr. Pasquale from the evidence excluded by Virginia courts. Instead, he argues the Virginia cases starting with *Cherrix* are wrong.[14] Given the settled state of Virginia's law on this point, however, Juniper cannot reasonably argue that his counsel's performance fell below the constitutionally required standard. Arguments based on the constitutionality of the rules from *Cherrix* had been rejected prior to Juniper's trial. *See, e.g., Bell*, 264 Va. at 199, 563 S.E.2d at 713 (rejecting the argument that the *Cherrix* decision was "inconsistent with decisions of the United States Supreme Court"). Juniper thinks the trial court's decision violated *Skipper* in particular, but the Supreme Court of Virginia had distinguished *Skipper* from cases like Juniper's, because *Skipper* involved "evidence peculiar

---

[14] *See* Am. Pet. 34 ("Virginia's law on this subject is clearly unconstitutional.").

to a defendant's character, history and background." *Id.* Juniper has not adequately explained how, in light of the clear Virginia precedent, his trial counsel's failure to constitutionalize the objection constituted deficient performance.[15]

Moreover, because the same constitutional argument had been rejected in Virginia, Juniper cannot show prejudice. Juniper frames the proper prejudice analysis as one in which this Court asks whether the jury would have found Dr. Pasquale's mitigation testimony compelling. But that assumes the trial court would have accepted Juniper's lawyer's constitutional argument and allowed Pasquale's full testimony. The proper prejudice inquiry asks whether the trial court would have made a different determination on the admissibility of Dr. Pasquale's testimony if trial counsel had raised a constitutional argument. Given the rejection of such arguments in Virginia, this Court cannot conclude that a different outcome would have resulted.[16]

Even if the proper prejudice inquiry asks whether the jury would have returned with the death sentence, none of Dr. Pasquale's testimony touched on the other aggravating factor found beyond a reasonable doubt: vileness. Although a death sentence cannot be sustained automatically just because a valid aggravator remains, "the invalidation of one aggravator does not necessarily *require* that a death sentence be set aside." *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (per curiam). In this scenario, the assessement of prejudice requires the Court to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 439 U.S. 510, 534 (2003). Dr. Pasquale's expert report and testimony, both

---

[15] The constitutional arguments made by Juniper have also been rejected since his conviction. *See, e.g., Morva v. Commonwealth*, 278 Va. 329, 345-51, 683 S.E.2d 553, 562-66 (2009).

[16] Moreover, given that the Supreme Court of Virginia addressed the trial court's limitation of Dr. Pasquale's testimony in Juniper's direct appeal by, in part, reconciling the *Cherrix* line of cases with the Supreme Court's decisions in *Skipper*, the Court fails to see how a full-throated constitutional challenge could have made a difference on appeal or in the state-habeas setting. *See Juniper v. Commonwealth*, 626 S.E.2d 383, 422-24 (Va. 2006).

during the trial and in voir dire, went entirely to Juniper's future dangerousness.[17]  This does nothing to expand the universe of evidence of or rebut the facts related to the vileness of the four murders at the center of the case.  Accordingly, nothing in the record disturbs the jury's finding of vileness beyond a reasonable doubt.

Because Virginia law has been so consistent on this issue for more than fifteen years and there is no reason to believe that a constitutional argument would sway the Supreme Court of Virginia, one suspects that Juniper thinks the real prejudice befalls him at the doorstep of this Court.  In other words, had his trial counsel raised this objection, a preserved constitutional argument would have made its way from the trial court, through direct appeal, to the state-habeas proceeding, and into his § 2254 habeas petition.  Under that logic, it would be up to this Court to determine whether *Cherrix* and its progeny constitute a reasonable application of the law.  *See* 28 U.S.C. § 2254(d)(1) (limiting habeas relief for state prisoners to convictions "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States").[18]  But rather than accepting the call to analyze the constitutionality of Virginia's law in 2015, the Court must examine the constitutional effectiveness of a decision made by Juniper's trial counsel in January 2005.  Juniper's counsel was not ineffective by failing to mount an assault on clearly established precedent.  *Cf.*

---

[17] Juniper points out that, because the trial court prevented Dr. Pasquale from testifying fully and his trial counsel did not proffer all of Dr. Pasquale's testimony for the record, the sum total of testimony remains unknown.  Because Dr. Pasquale has since passed away, he offers the affidavit of Dr. Michael Griffin, a clinical psychologist, to opine on the topics Dr. Pasquale may have broached.  Dr. Griffin's affidavit focuses exclusively on Juniper's risk of violence in the future, which goes to future dangerousness, not vileness. *See* Am. Pet. Supp. App'x 13-16.

[18] A federal habeas court recently found the distinction between Virginia's rule and the Supreme Court's decision in *Skipper* to be a reasonable application of the law.  *See Morva v. Davis*, No. 7:13-cv-283, 2015 WL 1710603, at *16 (W.D. Va. Apr. 15, 2015).

*Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) (explaining that "an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law").

In sum, Juniper's trial-ineffectiveness claim relating to mitigation evidence lacks merit. Because it lacks merit, it fails to meet the standards of *Martinez* and does not overcome the procedural-default bar.

### b. Ineffective-Assistance-of-Habeas-Counsel Claim

The attached affidavit from Juniper's state-habeas counsel also addresses Claim VII by disclaiming any strategic decision to abandon trial-ineffectiveness claims with respect to Dr. Pasquale's testimony:

> I have also reviewed the claim in Mr. Juniper's amended petition alleging that trial counsel unreasonably failed to argue constitutional bases requiring the admission of expert testimony about the probability that Mr. Juniper would commit criminal acts of violence that would constitute a continuing serious threat to society if he was sentenced to life imprisonment without the possibility of parole. It is my estimation that this claim is meritorious and consistent with claims about other deficient aspects of trial counsel's representation that we presented in the state habeas corpus petition. There was no strategic reason for omitting this particular claim from the state habeas petition. This also would have been my assessment at the time of Mr. Juniper's state court habeas corpus proceedings.

Am. Pet. Supp. App'x 11. This may remove the presumption of reasonableness generally attributable to counsel's decisions, but because the underlying ineffective-assistance-of-trial-counsel claim lacks merit, habeas counsel cannot have been deficient for failing to raise it in the state-habeas proceedings. Moreover, given the Virginia Supreme Court's consistent rejection of mitigation-evidence arguments similar to Juniper's, there is no reasonable probability of a different outcome had the argument been made. Thus, Juniper fails to show either prong of *Strickland* at the habeas stage with respect to his mitigation evidence claim. The claim fails to meet the standards outlined by *Martinez* and does not overcome procedural default.

## C. Claim VIII

### 1. Failure to Raise a Constitutional Objection to the Trial Court's Jury Instructions

Juniper's last amended claim deems his trial counsel constitutionally ineffective for failing to object to the trial court's instructions to the jury on the unanimity requirements at the penalty phase. Specifically, he argues that his counsel should have objected to the trial court's violation of the constitutional rules announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002). In addition, he calls his *appellate* counsel ineffective for failing to raise the argument on direct appeal.

This claim raises a number of preliminary issues. First, *Martinez* on its own terms appears to apply only to procedurally defaulted claims of *trial* ineffectiveness. *See Martinez*, 132 S. Ct. at 1320 ("The holding in this case . . . does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at *trial*, even though the initial-review collateral proceeding may be deficient for other reasons." (emphasis added)).[19] Juniper points to the Ninth Circuit for support that the logic behind *Martinez* applies just as well to claims of ineffective-assistance-of-appellate counsel. Am. Pet. 39-41 (citing *Nguyen v. Curry*, 736 F.3d 1287, 1294 (9th Cir. 2013)).

Second, Juniper asserts the ineffectiveness of both his trial counsel and appellate counsel under *Martinez*, but his state habeas petition raised the jury-instruction issue in some form. This Court previously found that the state-habeas petition did not fairly present the issue of appellate ineffectiveness, because Juniper buried the claim in the section dealing with trial ineffectiveness and titled it "Trial Counsel Unreasonably Failed to Ensure that Jurors Were Properly Instructed

---

[19] The Court made this observation in dismissing Juniper's first § 2254 petition. *See Juniper*, 2013 WL 1333513, at *44 n.33 ("*Martinez* does not appear to apply to ineffective assistance of *appellate* counsel claims.").

at the Sentencing Phase." *Juniper*, 2013 WL 1333513, at *43. Given this conclusion, Juniper logically returns with the same claim under *Martinez*.

The flip-side of that recognition, however, means that the trial-ineffectiveness claim cannot be pursued under *Martinez*. Despite Juniper's argument that the state petition presented appellate ineffectiveness, the Supreme Court of Virginia clearly treated it as a claim of trial ineffectiveness. *See Juniper v. Warden of Sussex I State Prison*, 281 Va. 277, 299, 707 S.E.2d 290, 309 (2011). Because Juniper exhausted his trial-level ineffectiveness claim under state law, the claim has not been procedurally defaulted and therefore falls outside the ambit of *Martinez*. Raising the claim at this late stage amounts to an attempt to amend the original § 2254 petition outside of the parameters of this Court's instructions for determining the viability of any *Martinez* claims.

Because this constructive amendment goes beyond the instructions of the Court, the normal rules regarding amendment apply. "[H]abeas applications 'may be amended . . . as provided in the rules of procedure applicable to civil actions.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (omission in original) (quoting 28 U.S.C. § 2242). Under Federal Rule of Civil Procedure "15(a) leave to amend shall be given freely, absent bad faith, undue prejudice to the opposing party, or futility of amendment." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000).[20]

---

[20] Presumably, Juniper phrases Claim VIII in constitutional terms to side-step a comparison to the claim considered by the Supreme Court of Virginia in his state petition. He points out that neither trial counsel nor the Supreme Court of Virginia mentioned either *Ring* or *Apprendi*. Pet.'s Opp'n 39. But even if trial counsel did not assert a constitutional basis for the objection at trial, habeas counsel did by citing *Ring v. Arizona*, and the case relied upon by the Supreme Court in denying the habeas claim derived its rule from an analysis of *Apprendi* and *Ring*. *See Prieto v. Commonwealth*, 278 Va. 366, 411, 682 S.E.2d 910, 934 (2009). The Court fails to see how Claim VIII's ineffective-assistance-of-trial-counsel component was procedurally defaulted.

The Court can resolve all of these complications, however, by going straight to the substance of the underlying issue with the jury instructions.   The Court concludes that no prejudice resulted at any stage.   Accordingly, Juniper's appellate-ineffectiveness claim lacks merit, leave to amend the § 2254 petition to add the trial-ineffectiveness claim would be futile, and habeas counsel's conduct did not amount to ineffective assistance of counsel for failing to pursue either or both claims.

### i. Relevant Facts

After the conclusion of the evidence in the penalty phase, and outside the presence of the jury, the trial court discussed his proposed instructions with the prosecution and defense counsel. Juniper's trial counsel lodged the following objection:

> Lastly, your Honor, I object to the Commonwealth's instruction which reads: "In fixing the punishment at death, there is no requirement that your verdict be unanimous as to which aggravating factor you rely upon.  However, any decision to fix the punishment of the defendant at death must be unanimous."

> I do not object to the second sentence.  I object to the first sentence.  We believe the law requires that the jury find by unanimous vote that—which aggravating factor, future dangerousness or aggravated battery the jury is relying upon.

(S.H. 2505.)  Despite this objection, the trial court instructed the jury on each of the four capital murder convictions, that "[i]f you find from the evidence that the Commonwealth has proved beyond a reasonable doubt either of the aggravating circumstances, then you may fix the punishment of the defendant at death." (*Id.* 2515, 2517.)

The trial court also explained to the jurors that they would receive a packet of verdict forms representing the various combinations of verdicts they could reach for the four capital

convictions. For each victim, the jury received nine forms that included the statutory definitions of the aggravating factors[21]:

1. Life imprisonment[22] with neither aggravating factor found;

2. Life imprisonment based on a unanimous finding of future dangerousness *and* a unanimous finding of vileness;

3. Life imprisonment based on a unanimous finding of future dangerousness *or* vileness;

4. Life imprisonment based on a unanimous finding of future dangerousness but not vileness;

5. Life imprisonment based on a unanimous finding of vileness but not future dangerousness;

6. Death based on a unanimous finding of future dangerousness *and* a unanimous finding of vileness;

7. Death based on a unanimous finding of future dangerousness *or* vileness;

8. Death based on a unanimous finding of future dangerousness but not vileness;

9. Death based on a unanimous finding of vileness but not future dangerousness.

The jury returned the sixth form for each victim, meaning they imposed the death sentence in each conviction based on a unanimous finding of future dangerousness and a unanimous finding of vileness. (*Id.* 547, 565, 574, 583.)

### ii. Analysis

#### a. Ineffective-Assistance-of-Trial-Counsel Claim

Juniper argues that his trial counsel failed to properly assert a constitutional objection to the trial court's instructions to the jury. He contends that the trial court gave unconstitutional instructions by failing to advise the jury that they must find at least one verdict unanimously. He

---

[21] The forms for Nykia omitted the portion of "vileness" defined as "aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder," because she had been shot only once. In all other respects, the forms were identical. (*See id.* 542-50, 560-86.)

[22] Each of the life-imprisonment forms also provided the option to impose life imprisonment with a fine of up to $100,000.00.

says the prosecution compounded the error by emphasizing the erroneous instruction in his closing argument, explaining that as long as each juror found at least one factor beyond a reasonable doubt, the death sentence could be imposed.[23]

*Apprendi* stands for the rule that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Two years after *Apprendi*, the Supreme Court extended that rule in *Ring* by holding that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 588. The decision in *Ring* overturned Arizona's system of allowing a judge, not a jury, to decide whether to impose the death penalty. *Id.* at 602.

In 2009, the Supreme Court of Virginia applied *Apprendi* and *Ring* to Virginia's death-penalty scheme and found that "[t]he death penalty may not be imposed unless the jury finds either or both of the aggravating factors of 'vileness' or 'future dangerousness' beyond a reasonable doubt." *Prieto v. Commonwealth*, 278 Va. 366, 411-12, 682 S.E.2d 910, 935 (2009). Obviously, *Prieto* does not serve as a standard for judging Juniper's counsel, because it came four years after his conviction. Nonetheless, *Prieto* represents a straightforward interpretation and application of *Apprendi* and *Ring* that could have been applied at the time of Juniper's trial.

---

[23] For example:

> So you have two aggravating factors you need. All everyone have—has to find at least one of those aggravating factors. You don't have to agree on which one. . . . Eight could find both. Four could find one. Just as long as each one of you individually finds at least one aggravating factor, doesn't matter, or both. It doesn't matter what combination is as long as each of the twelve of you find at least one aggravating factor in the case, but you will find both.

(S.H. 2523-24.)

Assuming that Juniper's trial counsel gave ineffective assistance by failing to constitutionalize his objection to the trial court's instructions or object to the prosecutor's incorrect statement of the law, the verdict forms leave no doubt that there was no prejudice. Given the opportunity to voice their unanimity in any iteration of the aggravating factors, the jury returned the sixth form for each charge. By finding both factors unanimously, the jury's verdict did not violate *Ring* or *Apprendi*.

Juniper argues his case is like *Prieto*, but the verdict forms in that case belie the comparison. The *Prieto* forms made it "impossible to discern from the verdict forms whether the jury unanimously found either or both aggravating factors beyond a reasonable doubt." *Prieto*, 682 S.E.29 at 935.[24] By contrast, the verdict forms returned in Juniper's case separated the factors so that the jury could clearly indicate its finding of each factor "unanimously and beyond a reasonable doubt." (S.H. 547, 565, 574, 583.)

With the jury's verdict so clear (and constitutional), Juniper cannot argue that the outcome would have been different had his counsel mounted a more forceful constitutional challenge to the trial court's instructions. The jury's verdict matched the instruction Juniper wanted. Likewise, to the extent Juniper presses this amended claim as an ineffective-assistance-of-appellate-counsel claim—if such claims can be pursued under *Martinez*—he cannot reasonably argue the outcome on appeal would be different. Although his direct appeal would have reached the Supreme Court of Virginia before *Prieto*, and therefore could have provided the vehicle for the Supreme Court to clarify Virginia's death-sentencing scheme under *Appendi* and *Ring*, *Prieto* offers no indication that the outcome for Juniper would have been any different.

---

[24] In fact, the language of the forms in *Prieto* essentially matched the language from the seventh form in Juniper's case. Had the jury returned the seventh form instead of the sixth form, then Juniper's case would be similar to *Prieto*.

Because Juniper cannot possibly show prejudice, his underlying ineffectiveness claims lack merit. The lack of merit with respect to the appellate-ineffectiveness means the claim is not "substantial" and therefore does not overcome the procedural default bar.   The trial-ineffectiveness claim's lack of merit shows that leave to amend the § 2254 petition to add the non-defaulted claim would be futile.

### b. Ineffective-Assistance-of-Habeas-Counsel Claim

Regarding the habeas-level ineffectiveness, the Court first notes that the affidavit from Juniper's state-habeas counsel expressly states that, in his opinion, the appellate-ineffectiveness claim "was fairly presented in state habeas proceedings, and therefore is not defaulted."   Am. Pet. Supp. App'x 11.   The affidavit mentions nothing about trial-level ineffectiveness on the jury instruction claim.   In any event, Juniper's habeas counsel cannot have been deficient for failing to pursue whichever claim Juniper thinks he ought to have pursued, because both underlying ineffective-assistance-of-counsel claims lack merit.   And even if the failure to pursue the defaulted claim amounted to deficient performance, Juniper has not shown the reasonable probability of a different outcome at the state-habeas proceedings.   With neither prong of *Strickland* met at the habeas stage, the claim fails under *Martinez* and fails to overcome the procedural-default rule.

### D. Certificate of Appealability

An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A).   A COA will not issue unless a prisoner makes a "substantial showing of the denial of a constitutional right."   *Id.* § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that

40

the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Juniper fails to meet this standard.

## IV. CONCLUSION

None of Juniper's three amended claims meet the "narrow exception" created by *Martinez*. Accordingly, the Court finds that each claim is procedurally defaulted. For the foregoing reasons, the Court grants the Warden's motion to dismiss Juniper's Amended Petition and denies the Amended Petition for Writ of Habeas Corpus. The Court denies the issuance of a certificate of appealability.

The Court will enter an appropriate order.


Date: August 3, 2015
      Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge