IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANTHONY BERNARD JUNIPER,
　　　　　　　　　　　Petitioner,

v.　　　　　　　　　　　　　　　　　　　　　　Civil Action No. 3:11cv746

ISRAEL HAMILTON,
Warden, Sussex I State Prison,
　　　　　　　　　　　Respondent.

## OPINION

This matter comes before the Court on the parties' cross-motions for summary judgment in this habeas corpus matter. In 2005 a jury in the Circuit Court for the City of Norfolk convicted Petitioner Anthony Bernard Juniper of, among other things, four counts of capital murder for killing Keshia Stephens, Keshia's brother Rueben, and Keshia's two-year-old and four-year-old daughters, Nykia and Shearyia. The jury recommended the death penalty for each murder, and the Circuit Court sentenced Juniper to death.[1]

The Supreme Court of Virginia affirmed Juniper's conviction on appeal, and the Supreme Court of the United States denied certiorari. Juniper then returned to the Supreme Court of Virginia and unsuccessfully sought habeas relief.

In November 2011 he moved this Court for a stay of execution, and then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. After years of contentious litigation, the parties have filed cross-motions for summary judgment. The Court now decides those motions.

---

[1] Juniper no longer faces execution because Virginia has abolished the death penalty and converted all existing death sentences to sentences of life imprisonment without the possibility of parole. *See* Press Release, Off. of the Governor, Governor Northam Signs Law Repealing Death Penalty in Virginia (Mar. 24, 2021) (available at https://bluevirginia.us/2021/03/press-release-governor-northam-signs-law-repealing-death-penalty-in-virginia).

## I. **BACKGROUND**

### *A. Procedural History*

This case has followed an unusual procedural path. After his direct appeal and state post-conviction proceedings, Juniper sought habeas relief in this Court.[2] The Court appointed counsel, and Juniper filed his original petition on January 30, 2012, asserting claims under *Brady*,[3] *Napue*,[4] and *Strickland*.[5] He also sought the appointment of additional counsel to submit claims based on *Martinez*.[6] The Court denied Juniper's request for counsel to address the *Martinez* issue, and ultimately dismissed the entire habeas petition.[7] *Juniper v. Pearson* (*Juniper I*), No. 3:11cv746, 2013 WL 1333513 (E.D. Va. Mar. 29, 2013).

On review, the Fourth Circuit concluded that this Court should have appointed Juniper additional counsel to pursue his *Martinez* claims. *Juniper v. Davis* (*Juniper II*), 737 F.3d 288, 290

---

[2] In November 2011 Juniper sought an immediate stay of his execution in this Court. The Court granted the motion, appointed Juniper counsel, and directed him to file a habeas petition.

[3] *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the prosecution violates due process when it withholds material, exculpatory evidence).

[4] *Napue v. Illinois*, 360 U.S. 264 (1959) (holding that the prosecution violates due process when it knowingly offers or fails to correct false or misleading testimony).

[5] *Strickland v. Washington*, 466 U.S. 668 (1984) (holding that deficient performance of trial counsel violates the Sixth Amendment to the United States Constitution if it prejudices the defendant's ability to receive a fair trial).

[6] *Martinez v. Ryan*, 566 U.S. 1 (2012) (holding that federal habeas courts may hear ineffective assistance of counsel claims when a petitioner fails to raise them at an earlier stage due to ineffective assistance of counsel).

[7] After dismissing the petition, the Court granted a certificate of appealability on one of Juniper's *Brady* claims and on whether it had correctly denied Juniper's requests for new counsel to assert *Martinez* claims. *Cf.* 28 U.S.C. § 2253(c)(1)(A).

(4th Cir. 2013). Without addressing the *Brady* issue, the Fourth Circuit vacated in part this Court's decision and remanded for the Court to appoint independent counsel. *Id.* at 290.

The Court appointed additional counsel to assert the *Martinez* claims and allowed Juniper to file an amended habeas petition. Ultimately, the Court found that procedural default barred his *Martinez* claims, and it dismissed his amended petition. Juniper appealed the dismissal.[8]

In Juniper's second trip to the Fourth Circuit, that court did not address any *Martinez* issues and instead returned to the remaining issue in Juniper's first appeal—this Court's 2013 *Brady* decision on Claim I. *Juniper v. Zook* (*Juniper III*), 876 F.3d 551 (4th Cir. 2017). Claim I asserted that the prosecution had withheld information about Wendy and Jason Roberts, neighbors of the murder victims. The Robertses may have told the police a version of the events on the day of the murders that differed from the story told by the prosecution's witnesses at trial. The Fourth Circuit held that this Court should have granted Juniper an evidentiary hearing covering the Robertses' testimony, and it remanded the case for a hearing. *Id.* at 573. The Fourth Circuit also said that this Court could give Juniper an opportunity to develop more evidence about the Robertses' testimony, *see id.* at 572 n.9, which this Court construed as authorizing the Court to grant Juniper discovery.

The Court scheduled a motions hearing for May 24, 2018, and set the evidentiary hearing for August 20–24, 2018. Two days before the motions hearing, the Warden moved for summary judgment, arguing, for the first time in more than twelve years of state and federal habeas proceedings, that the prosecution had disclosed to Juniper's trial counsel the alleged *Brady* material on which Claim I was based. In support, the Warden attached affidavits from Cynthia

---

[8] This Court denied Juniper a certificate of appealability on any of the *Martinez* issues raised in his amended petition, but the Fourth Circuit granted him a certificate of appealability on three *Martinez* issues.

Collard, Juniper's lead trial attorney, and Wayne Kennedy, Juniper's investigator. Their affidavits stated that they knew about the evidence underlying Claim I at the time of Juniper's trial, but they had declined to use it because of credibility issues with the Robertses.

In light of this new evidence, the Court canceled the August evidentiary hearing and allowed Juniper to conduct additional discovery. It later granted him leave to amend his petition two more times based on information learned in discovery. With numerous stops and starts—and needing frequent intervention by the Court—the parties conducted discovery from May 2018 until August 2019. On August 1, 2019, Juniper filed his Amended Petition.[9]

The Warden replied with a Rule 5 answer and motion to dismiss, and a 188-page brief. Juniper objected on the grounds that the tome of legal documents was too confusing and burdensome to parse through. The Court deemed the Warden's Rule 5 answer and motion to dismiss as a motion to dismiss only and denied it without prejudice. Hoping to get the case resolved in a reasonable length of time, the Court instructed the parties to file stipulations of fact, and, if appropriate, motions for summary judgment. The parties wrangled over the stipulations for months and finally filed them in June 2020. In August 2020 they filed cross-motions for summary judgment, supported by lengthy briefs.

### B. Factual Background

At Juniper's criminal trial, the prosecution presented a mountain of testimonial and forensic evidence of his guilt. This evidence drives Juniper's strategy in this case: he wants a new trial in

---

[9] Juniper calls his petition a "Third Supplemental Petition," but it is clearly an amended, not a supplemental, petition. *See* 6A Fed. Prac. & Proc. Civ. § 1504 (3d ed.) ("Amended and supplemental pleadings differ in two respects. The former relate to matters that occurred prior to the filing of the original pleading and entirely replace the earlier pleading; the latter deal with events subsequent to the pleading to be altered and represent additions to or continuations of the earlier pleadings." (footnote omitted)).

which he can bring forth evidence that would undercut the Commonwealth's case.  Because of this tactic by Juniper, the Court must recite in some detail the prosecution's evidence of guilt.

The Supreme Court of Virginia reviewed the trial record and found the following facts.[10]

Except when in brackets, the footnotes are those of the state court.

> On the afternoon of January 16, 2004, Keshia Stephens, her younger brother Rueben Harrison, III,[11] and two of Keshia's daughters, Nykia Stephens and Shearyia Stephens,[12] were killed in Keshia's apartment in the City of Norfolk. When police arrived, they found that the door to Keshia's apartment had been forcibly opened. All four victims were discovered in the master bedroom; each had died as a result of gunshot wounds.
>
> Keshia was stabbed through her abdomen, shot three times, and grazed by a fourth bullet.  One bullet went through her intestine, kidney, and spine, causing spinal shock and leg paralysis.  Another bullet also passed through her intestines and then proceeded to her abdominal aorta and inferior vena cava, causing extensive bleeding.
>
> The stab wound did not fatally wound Keshia, but tore through the muscle of her abdominal wall.  There was a great deal of blood accompanying the wound, however, which led the medical examiner performing the autopsy to conclude that the stab wound was probably the first injury inflicted on Keshia.  The stab wound was consistent with a wound that would have been caused by the knife blade found at the scene of the crime.
>
> Two-year old Shearyia was shot four times while in her mother's arms. Two bullets entered Shearyia's body in the shin of her left leg, fractured the bone, and exited through her calf.  A third bullet entered and exited Shearyia's body through her thigh.  The fourth bullet entered the crown of her head and passed through her brain, causing bone fragments to chip off.
>
> Rueben Harrison was shot three times.  One bullet struck his pelvic bone, and ricocheted through his body into his abdomen, liver, heart and lung, finally coming to rest in his armpit.  A second bullet hit his hip bone, and exited through the front of his leg.  A third bullet broke his femur bone, and exited his body at his front thigh.  The medical examiner testified that the broken bones would have caused excruciating pain and immediately disabled Rueben.
>
> Four-year old Nykia was shot one time behind her left ear.  The bullet moved through her skull and cerebellum to the base of her skull, into her esophagus

---

[10] When a state prisoner like Juniper seeks federal habeas relief, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).

[11] The record contains several different spellings of Rueben Harrison, III's first name.  We will spell his name "Rueben," consistent with the indictment.

[12] Shearyia Stephens was also known as Sheryia Benns.

and trachea, causing substantial damage and bleeding, before exiting her chest. The medical examiner testified that the bullet's path was consistent with Nykia ducking her head and body toward the shooter prior to being shot. In addition, the presence of blood in Nykia's lungs indicated that she had taken one or two breaths between being shot and dying. Her body was found lying on top of her uncle's body.

Evidence presented at trial showed that Juniper and Keshia had been involved in an on-again, off-again tumultuous relationship for approximately two years. On the morning of the shootings, Juniper telephoned his friend, Renee Rashid, from his mother's house where he was living at the time. Juniper asked Rashid to drive him to Keshia's apartment so that he could retrieve some of his belongings. A short time later Rashid picked up Juniper at his mother's house and drove him to Keshia's apartment.

Both Juniper and Rashid entered Keshia's apartment, which was on the second floor of the apartment building. Rashid saw four individuals in the apartment: Keshia, Rueben, who was asleep on the couch, and two of Keshia's children, Nykia and Shearyia, who were preparing to take a bath. After helping Juniper disconnect a DVD player, Rashid was talking to the two girls, but overheard Juniper and Keshia arguing in another room. Keshia repeatedly made comments such as, "[T]here's nobody but you. I told you I'm not seeing anybody but you."

After Rashid announced that she was leaving, Juniper followed her to the door of the apartment. Hearing the door shut, Rashid assumed Juniper was behind her as she began to descend the apartment building steps. But as she was going down the stairway outside Keshia's apartment, Rashid heard a "loud boom" that she described as "sound[ing] like the door being kicked in." Not stopping to look behind her, Rashid hurried to her car. While waiting in her car outside the apartment, Rashid heard Keshia crying and repeating her statement that she was not seeing anyone but Juniper. Rashid sounded her horn to alert Juniper that she wanted to leave. Juniper yelled at Rashid to "Go ahead" so she began to drive away. As she drove away from the apartment she heard four "booms," which she described as "sound[ing] like gunshots."

Rashid did not stop, but proceeded to Juniper's mother's house, and expressed her concern that Juniper had remained at Keshia's apartment. Juniper's friend, Keon Murray, was there when Rashid arrived. Juniper called his mother's house and Murray talked to him on the telephone. Murray observed that Juniper was calling from Keshia's apartment because the Caller ID number matched Keshia's telephone number. Juniper told Murray that "They gone," and that Keshia's apartment was surrounded. He also stated that he "killed them," although he did not name particular individuals.

Murray then called Tyrone Mings, a friend who lived near Keshia's apartment building, and asked him to check Keshia's apartment. Mings walked to the apartment and observed that the front door appeared to have been kicked in. Upon entering Keshia's apartment, Mings testified that he saw Juniper standing in the living room with a white substance on his face and holding an automatic pistol. When Mings asked Juniper about Keshia, Juniper directed Mings to the back of the apartment. Upon entering the master bedroom, Mings saw Rueben and a young girl lying on the bed. Mings did not see Keshia and asked Juniper where she was.

Juniper told Mings she was "between the bed and the dresser." Mings returned to the bedroom and called to the people in the room, but no one answered. Mings departed Keshia's apartment, leaving Juniper in the living room, still holding the pistol. Upon returning to his apartment, Mings called the police.

In the meantime, Rashid and Murray picked up Juniper's cousin ("Little John") and drove to Keshia's apartment. Murray and Little John went to look for Juniper, while Rashid stayed in the car. They returned to the car with Juniper, who sat in the front passenger seat next to Rashid, the driver. Rashid described Juniper as being "jittery" and "breathing real hard." Juniper kept looking in the mirrors, saying, "they're behind us" throughout the car ride. Murray stated that Juniper "look[ed] nervous," "[l]ike he was in shock," and that he had a powdery substance like cocaine on his face. Juniper held a black and chrome automatic pistol in his right hand, resting on his lap.

The police first arrived at Keshia's apartment complex at 12:50 p.m., after receiving a telephone call reporting possible gunshots. The responding officer walked around the apartment building and spoke with two residents, but did not go up the stairway to Keshia's apartment. After conferring with a second police officer who had arrived on scene, both officers left the apartment complex believing the call to have been a false report.

Mings observed the officers leave and called the police a second time. Near 2:20 p.m. police officers again arrived at the apartment complex and this time went up the stairway to Keshia's apartment. Officer W.G. Snyder testified the "whole center part of the door was completely knocked . . . inward into the apartment, and wooden debris from the door was lying inside the apartment." The officers entered the apartment, and observed Nykia's body lying across Rueben on the bed in the master bedroom. They then observed Shearyia's body lying across Keshia's body on the floor beside the bed. The officers received no response from any of them.[13]

Police investigators recovered a cigarette butt from the floor by the front door of Keshia's apartment. From the master bedroom where the bodies were located, investigators recovered a knife blade, a knife handle, and shell casings. Shell casings were also found in a bathroom adjoining the master bedroom.

A firearm and toolmark examinations expert testified that bullet casings found in the apartment and the bullets recovered from the victims' bodies were fired from a single nine-millimeter, Luger semi-automatic pistol.[14]  The expert also

---

[13] The paramedic who pronounced Keshia, Rueben, Shearyia, and Nykia dead at about 2:40 p.m. testified that, based on his training, Keshia's lividity (the pooling of blood in her skin) and the "dark, dried blood" on her shirt, indicated that she had not been killed "within the last hour." State Habeas Appendix (SH App'x) at 1313.

[14] The firearm was never recovered.

analyzed the recovered knife blade[15] and knife handle and determined that the blade and handle were originally joined.

A latent fingerprint expert testified a fingerprint found on the knife blade had "a minimum of 23 matching characteristics" to Juniper's right thumbprint. In addition, an expert in forensic serology and DNA analysis testified that Juniper's DNA profile matched DNA from the knife handle[16,17] and the cigarette butt.[18]

The police obtained warrants for Juniper's arrest and he surrendered voluntarily on January 26, 200[4].[19] While incarcerated at the Hampton Roads Regional Jail awaiting trial, Juniper admitted to a fellow inmate, Ernest Smith, that he committed the murders. Smith testified that while the two were together in the medical pod at the Hampton Roads Regional Jail, Juniper confessed to shooting the four victims. Smith testified that Juniper told him that he had killed the children because "he didn't want to leave any witnesses at the scene of the crime."

*Juniper v. Commonwealth*, 271 Va. 362, 375–80, 626 S.E.2d 383, 393–396 (2006).

To summarize, the prosecution had five key categories of evidence linking Juniper to the killings:

1)   Renee Rashid's testimony. She drove Juniper to Keshia Stephens' apartment, heard the two arguing, heard the door getting kicked in as she left the apartment, and heard four apparent gun shots minutes later as she drove away. She later picked Juniper up from the apartment, and he was carrying a gun and seemingly upset.

---

[15] The Commonwealth's DNA expert testified that there was "a very thin film of blood" about three inches long on the knife. SH App'x at 1655. The DNA on the blade matched Keshia's with odds greater than one in six billion odds of it matching another person's DNA.

[16] Sixteen loci from the knife handle matched Juniper's DNA profile. The DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of another individual having a matching DNA profile being one in greater than six billion individuals, the population of the world.

[17] The DNA expert testified that "[t]here was quite a bit of DNA" on the knife handle and all of it came from Juniper. SH App'x at 1685.

[18] Fifteen loci matched Juniper's profile from the DNA on the cigarette butt; again, the DNA expert testified that Juniper could not be excluded as the source of the DNA, with the odds of another individual having a matching DNA profile being one in greater than six billion individuals.

[19] In a clear typographical error, the Supreme Court of Virginia stated that Juniper surrendered on January 26, 2005. *See Juniper v. Commonwealth*, 271 Va. 362, 380, 626 S.E.2d 383, 396 (2006).

2) Keon Murray's testimony. He spoke with Juniper over the phone on the day of the murders and Juniper said "[t]hey gone" and that he had "killed them." Murray also went with Rashid to pick Juniper up at Keshia's apartment and saw Juniper leave the apartment carrying a gun, seemingly upset, and with white powder on his face.

3) Tyrone Mings' testimony. He went to Keshia's apartment the day of the murders and saw the door kicked in and Juniper in the apartment with a gun and white powder on his face. Juniper directed him to the bodies in the apartment. Mings called 911 after leaving the apartment.

4) Ernest Smith's testimony. Juniper confessed to him in jail.

5) Officer Atkinson's testimony. He helped establish the time frame of the murders by saying that he arrived at Keshia's apartment complex in response to the first 911 call but never located her apartment or its entrance.

6) Forensic evidence. Juniper's fingerprint was on the knife blade, his DNA was on the knife handle, and his DNA was on a cigarette butt on top of the debris from the kicked-in front door.

### C. Juniper's Amended Petition

Juniper's 273-page Amended Petition lists nineteen claims invoking *Brady*, *Napue*, or *Strickland*. The heart of his petition attacks the credibility of the witnesses listed in the previous section. He does not challenge the validity or admissibility of the scientific evidence.

Many of the claims in his Amended Petition appeared, in one form or another, in his original petition.[20] And he has "intentionally left blank" in his Amended Petition some of the claims that appeared in his original petition, causing gaps in the numerical order of his claims.[21]

---

[20] Four claims (Claims V.G., VI, VII, and VIII) relate to Juniper's *Martinez* claims, which he appealed but the Fourth Circuit has not yet decided. *See Juniper v. Zook* (*Juniper III*), 876 F.3d 551, 556 n.1 (4th Cir. 2017) (declining to resolve Juniper's *Martinez* claims because "those claims would be moot if the district court rules in [Juniper's] favor" on remand). He does not raise those claims in his Amended Petition.

[21] The Court construes this to mean that Juniper has abandoned the claims he left blank.

*See, e.g.*, Am. Pet., ECF No. 366, at ii.  The claims that Juniper pursues in his Amended Petition

are:

| | |
|---|---|
| Claim I: | The prosecution concealed exculpatory information related to Wendy and Jason Roberts (*Brady*) |
| Claim II: | Trial counsel rendered ineffective assistance when they failed to obtain and present to the jury the favorable information about Wendy and Jason Roberts (*Strickland*) |
| Claim III: | The prosecution concealed exculpatory evidence relating to John A. Jones, Jr. (*Brady*) |
| Claim IV.C: | The prosecution concealed the conditional promise of a benefit given to Ernest Smith in exchange for his testimony against Juniper (*Brady*) |
| Claim IV.D.: | The prosecution concealed the favorable and material statements of Chaunte Hodge and Frances Frazier[22] (*Brady*) |
| Claim V.A.: | Trial counsel unreasonably failed to investigate Michael Lassiter (*Strickland*) |
| Claim V.B.: | Trial counsel unreasonably failed to investigate or present available evidence in Juniper's defense (*Strickland*) |
| Claim V.C.: | Trial counsel unreasonably failed to investigate Tyrone Mings (*Strickland*) |
| Claim V.F.: | Trial counsel unreasonably failed to uncover and present mitigating evidence (*Strickland*) |
| Claim IX.A.:[23] | The prosecution concealed Mings' January 16, 2004 statement (*Brady*) |
| Claim IX.B.: | The prosecution elicited false and misleading testimony from Mings (*Napue*) |

---

[22] Frazier's name is spelled differently throughout the record—sometimes as "Frazer," and sometimes as "Frazier."  The Court will use "Frazier," the spelling that Hodge, her daughter-in-law, used in her affidavit.  *See* SH App'x at 3201.

[23] Juniper pleads Claim IX as one claim alleging violations of both *Brady* and *Napue*. The Court separates Claim IX into subparts for clarity.

Claim X:         The prosecution concealed exculpatory information related to Mings (*Brady*)

Claim XI:        The prosecution concealed information related to Mings' criminal history and prosecutor Phil Evans' involvement in Mings' probation revocation proceedings (*Brady*)

Claim XII.A.:    The prosecution concealed evidence regarding Murray's credibility (*Brady*)

Claim XII.B.:    The prosecution elicited and failed to correct Murray's misleading testimony that he had no self-interested motive for testifying (*Napue*)

Claim XIII.A.:   The prosecution elicited and failed to correct Officer Atkinson's false testimony that he did not know the location of Keshia's apartment (*Napue*)

Claim XIII.B.:   The prosecution concealed information showing that Officer Atkinson learned the location of Keshia's apartment when he responded to the 12:44 p.m. 911 call (*Brady*)

Claim XIV:       The prosecution concealed information about people who were in the area of Keshia's apartment around the time of the murders (*Brady*)

Claim XV:        The prosecution concealed information impeaching Ernest Smith (*Brady*)

Claims I through V.F. were included in some form in Juniper's original petition. Claims IX through XV are newly pled. And, according to Juniper, only Claims IV.C. through V.F. were exhausted in state court.

As noted, the parties have filed cross-motions for summary judgment. The Warden seeks summary judgment on all of Juniper's claims except V.F. and X.[24]  Juniper seeks summary judgment on all of Claims I, III, IX, X, XII.A., and XII.B. He seeks summary judgment on parts of Claims IV.C., XIII.A., XIII.B., and XIV. He does not seek summary judgment at all on his remaining claims.

_____

[24] The Warden makes no argument about those claims, possibly by oversight. But the Warden has not sought to amend his pleadings.

The Court will address the parties' arguments on summary judgment below. But this case's unique history has created several procedural issues the Court must address. The first of those is the mandate rule.

## II. <u>THE MANDATE RULE</u>

The mandate rule precludes the Court from considering some of the claims in Juniper's Amended Petition.[25] "Few legal precepts are as firmly established as the doctrine that the mandate of a higher court is 'controlling as to matters within its compass.'" *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939)). The mandate rule requires a district court to "implement the spirit of the mandate," prohibits it from altering "rulings impliedly made by the appellate court," and prevents it from reconsidering issues "the parties failed to raise on appeal." *Atl. Ltd. P'ship of Tenn., LP v. Riese*, 356 F.3d 576, 584 (4th Cir. 2004). Thus, the mandate rule would ordinarily prevent the Court from reconsidering its previous dismissal of any of Juniper's amended claims that he did not appeal and the Fourth Circuit did not remand—which is every claim except Claim I.[26]

But the mandate rule "is not without exception when a lower court is faced with extraordinary circumstances." *Bell*, 5 F.3d at 67. As relevant here, a district court may reopen

---

[25] The Warden contends that the law-of-the-case doctrine bars the Court from reconsidering Claims II through V.D., which it had previously rejected. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). That doctrine, prudential but not directive, does not prevent this Court from reconsidering claims that Juniper previously raised. But the mandate rule, "a more powerful version of the law of the case doctrine," might. *Atl. Ltd. P'ship of Tenn., LP v. Riese*, 356 F.3d 576, 583 (4th Cir. 2004) (quotation marks omitted).

[26] Juniper was granted a certificate of appealability only on the Court's dismissal of Claim I and on issues related to his *Martinez* claims, so those are the only claims he could appeal. *See* 28 U.S.C. § 2253(c)(1)(A). His *Martinez* claims are not currently before the Court.

an issue that the mandate rule would otherwise preclude from reconsideration upon a showing that "significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light." *United States v. Aramony*, 166 F.3d 655, 662 (4th Cir. 1999) (quoting *Bell*, 5 F.3d at 67). This opens the door for the Court to reconsider its previous dismissal of some of Juniper's dismissed claims.

Many of the claims in Juniper's Amended Petition rely in substantial part on evidence unearthed for the first time in post-remand discovery.[27] Others, however, simply rehash arguments he made—and the Court rejected—years ago. To determine whether the exception for "significant new evidence" applies, the Court must compare each of Juniper's amended claims with the claim as originally pled.[28]

### A. Amended Claims Not Barred by the Mandate Rule

#### 1. Claim II

In Claim II, Juniper asserts that his trial counsel rendered ineffective assistance, in violation of *Strickland*, when they failed to "obtain and present to the jury the favorable information possessed by Wendy and Jason Roberts." Am. Pet. at 64 (capitalization altered).[29]

---

[27] Claims IX through XV are entirely new matters, based on information obtained for the first time in post-remand discovery. Thus, neither this Court nor the Court of Appeals has previously considered them, and the mandate rule and law-of-the-case doctrine do not apply to them. As discussed below, however, habeas procedural and substantive rules still apply to the new claims.

[28] Two other circumstances allow a district court to reconsider an issue expressly or impliedly decided by the appellate court without violating the mandate rule: (1) "a showing that controlling legal authority has changed dramatically," and (2) a showing that "a blatant error in the prior decision will, if uncorrected, result in a serious injustice." *United States v. Bell*, 5 F.3d 64, 67 (4th Cir. 1993) (quotations omitted). Neither situation is at issue in this case.

[29] Juniper pleads Claim II in the alternative to Claim I, maintaining that the prosecution never disclosed information about Wendy and Jason Roberts, but if they did disclose it, his lawyers were constitutionally ineffective in failing to pursue and present testimony from the Robertses.

Juniper bases this claim on trial counsel Cynthia Collard's alleged failure to ensure that her investigator, Wayne Kennedy, tracked down the Robertses.

The mandate rule does not prevent the Court from reconsidering its dismissal of this claim because Juniper's amended Claim II falls squarely *within* the Fourth Circuit's mandate. On remand, the Fourth Circuit directed this Court to hold an evidentiary hearing on Claim I and also noted that this Court might authorize additional discovery and could "reconsider its previous rulings on any related issues." *Juniper III*, 876 F.3d at 572 n.9. Claim II, which Juniper pleads in the alternative to Claim I, is the flip side of the factual coin from Claim I. The Fourth Circuit expressly authorized this Court to reconsider its ruling on this related issue.

### 2. *Claim III*

The mandate rule does not bar the Court from considering the merits Juniper's amended Claim III because it relies on "significant new evidence, not earlier obtainable in the exercise of due diligence." *Aramony*, 166 F.3d at 662 (quoting *Bell*, 5 F.3d at 67).

In Claim III, Juniper asserts that the prosecution violated *Brady* by suppressing information about the Norfolk Police Department's investigation and questioning of John Jones, Jr.[30] Juniper's amended Claim III relies on information included in the police Investigation Notes related to the murder, two recorded statements Jones gave to police during the murder investigation, and recordings of several phone calls Jones made on January 22, 2004, while in the Norfolk City Jail. Juniper argues that this information could have been used to "impeach[] numerous prosecution witnesses" and "undermin[e] the credibility of the prosecution's case in general and the police investigation." Am. Pet. at 84.

---

[30] Jones did not testify at trial, but Rashid and Murray, referring to him as "Little John," both testified that he went with them to pick up Juniper at Keshia's apartment.

Juniper's original Claim III also alleged a *Brady* violation related to the police's questioning of Jones. His original Claim III, however, relied almost entirely on information in the Investigation Notes, which included only a *description* of *one* of Jones' statements. Juniper's amended Claim III relies also on two recorded statements Jones made to police and Jones' recorded jail phone calls. Armed with this new evidence, Juniper points to additional and specific inconsistencies between Jones' statements and those of other prosecution witnesses— inconsistencies that he could only speculate about in his original Claim III. Thus, Juniper's amended Claim III relies on significant new evidence.

Juniper diligently pursued this evidence, to no avail until now. Before trial, Juniper filed several discovery motions seeking *Brady* material. He filed similar motions during state habeas proceedings, each of which sought "all taped, typed, or otherwise memorialized interviews or statements taken in connection" with the investigation of the Juniper, and each of which expressly invoked Jones' name. App'x at 98, 183, 449–50.[31] He continued to seek such information during habeas proceedings in this Court. Despite his efforts, Juniper only received the new evidence in post-remand discovery.

Juniper's amended Claim III satisfies the new-evidence exception to the mandate rule. *See Aramony*, 166 F.3d at 662.

---

[31] The Court will cite to the Appendix Juniper submitted with his original habeas petition (ECF Nos. 18–34) as "App'x."

### B. *Amended Claims Barred by the Mandate Rule*

No exception to the mandate rule allows this Court to reconsider its previous dismissal of Claims IV.C., IV.D., V.A., V.B., V.C., and V.F.[32]  Juniper argues that most of these claims rely on new evidence he diligently sought but could not obtain earlier.  The allegations in his Amended Petition, however, belie that argument.  The Court will dismiss these claims as barred by the mandate rule.[33]

### 1. *Claim IV.C.*

In Claim IV.C. Juniper says that the prosecution violated *Brady* by concealing prosecutor Phil Evans' conditional promise of a benefit to Ernest Smith in exchange for Smith's testimony against Juniper.[34]  Juniper's amended Claim IV.C. relies on Smith's 2007 affidavit, notes Evans

---

[32] The Warden makes no argument about Claim V.F. But because the Court has "no power or authority to deviate from the mandate," the Court must nevertheless determine whether it may reconsider its dismissal of this claim. *Doe v. Chao*, 511 F.3d at 461, 465 (4th Cir. 2007).

[33] It is unclear whether the mandate rule is jurisdictional in the Fourth Circuit.  On one hand, the Fourth Circuit has described the mandate rule as "a more powerful version of the law of the case doctrine." *Riese*, 356 F.3d at 583 (quotation marks omitted). And "[t]he law of the case doctrine . . . simply 'expresses' common judicial 'practice'; it does not 'limit' the courts' power." *Castro v. United States,* 540 U.S. 375, 384 (2003), *quoting Messenger v. Anderson,* 225 U.S. 436, 444 (1912).  This indicates that the mandate rule is merely prudential, not jurisdictional. *Cf. United States v. Thrasher,* 483 F.3d 977, 982 (9th Cir. 2007) (discussing whether the mandate rule is jurisdictional in the Ninth Circuit, noting a circuit split on the issue, and collecting cases).

On the other hand, the Fourth Circuit has described the mandate rule as "foreclos[ing] litigation" of issues outside the scope of the mandate, *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993), "requir[ing]" district courts to "faithfully apply" the mandate, "preclud[ing]" parties from raising arguments on remand that are outside the scope of the mandate, *JTH Tax, Inc. v. Aime*, 984 F.3d 284, 291 (4th Cir. 2021), and "restrict[ing] the district court's authority," *Chao*, 511 F.3d at 465.  That language is jurisdictional. *See, e.g., Stewart v. Iancu*, 912 F.3d 693, 700–01 (4th Cir. 2019) (distinguishing between non-jurisdictional procedural rules and "jurisdictional rules that govern a court's adjudicatory authority").

Regardless, whether for prudential or jurisdictional reasons, the Court will dismiss Claims IV.C., IV.D., V.A., V.B., V.C., and V.F.

[34] At trial, Smith testified that the prosecution had not promised him anything.

took during an interview of Smith, emails requesting that Smith not be transferred from custody in the local jail, and information about Smith's motion for reconsideration of his sentence. Juniper's original Claim IV.C. relied solely on Smith's affidavit and information about Smith's motion for reconsideration.

Although at first glance Claim IV.C. appears to rely on significant new evidence that Juniper first obtained in post-remand discovery (Evans' notes and the emails about Smith's transfer), the mandate rule nevertheless bars this Court from reconsidering its dismissal of this claim because the *substance* of Claim IV.C. has not changed. Juniper's original Claim IV.C. alleged, based on Smith's affidavit, that the prosecution had suppressed the conditional promise Evans gave Smith for his testimony. Juniper's amended Claim IV.C. alleges the same thing; it just cites to additional evidence in support. The new-evidence exception to the mandate rule, therefore, does not allow this Court to reconsider its dismissal of this claim. *Cf. United States v. Butler*, 67 F. App'x 798, 801 (4th Cir. 2003) (holding that the new-evidence exception to the mandate rule did not apply when the new evidence "consisted of nothing more than statements taken from a few prosecution witnesses and co-conspirators that differed, mostly in inconsequential fashion, from portions of testimony by others at [the defendant's] sentencing hearing").

### 2. *Claim IV.D.*

In Claim IV.D. Juniper asserts that the prosecution violated *Brady* by concealing the statements of Chaunte Hodge and Frances Frazier, which he contends "contradicted the prosecution's other evidence about when the crimes took place." Am. Pet. at 100. As relevant to Claim IV.D., Hodge and Frazier, both of whom lived near Keshia, each told police that she had been home for parts of the day of the murders and had not heard anything unusual. Juniper's

17

amended Claim IV.D. relies on an affidavit Hodge executed in 2006, police canvass notes from the day of the murders summarizing each woman's statements, and a transcript of a recorded statement Hodge gave to police on the evening of the murders.  Juniper's original Claim IV.D. relied only on Hodge's affidavit.

As with Claim IV.C., it appears at first glance that Claim IV.D. relies on significant new evidence that Juniper first obtained in post-remand discovery—the canvass notes and Hodge's statement.  These new materials add nothing to the claim, however, and simply repeat in a different form what Juniper already drew to the Court's attention.  Because amended Claim IV.D. does not rely on significant new evidence, the Court may not reconsider its dismissal of this claim.[35]

### 3. *Claim V.A.*

In Claim V.A. Juniper asserts that his trial counsel rendered ineffective assistance, in violation of *Strickland*, when they failed to adequately investigate Michael Lassiter.  Juniper says that Lassiter "had significant information favorable to" him, including the ability to give him an alibi for the time of the murders.  Am. Pet. at 107.  In support of this claim, Juniper relies mainly on Lassiter's 2006 affidavit.  Juniper's original Claim V.A. also relied mainly on Lassiter's affidavit.

Claim V.A. does not rely on significant new evidence.  At best, Juniper's amended Claim V.A. has additional record citations and a more fulsome discussion of evidence, including

---

[35] Juniper's newly pled Claim XIII.B. also relies on statements Hodge made to the police investigating the murders.  But as the Court discusses in its analysis of that claim, the portion of Hodge's statement relevant to Claim XIII.B. *is* new evidence that Juniper diligently sought but could not obtain earlier.  *See infra* pages 57–60.

evidence uncovered during post-remand discovery.  But it does not rely on significant new evidence, so the Court may not reconsider its dismissal of this claim.

### 4. *Claim V.B.*

In Claim V.B. Juniper asserts that his trial counsel rendered ineffective assistance, in violation of *Strickland*, when they failed to "investigate or present available evidence in Juniper's defense." Am. Pet. at 120 (capitalization altered).[36]  In support of this claim, Juniper argues that "[m]ultiple disinterested witnesses, including Waterman, Wendy and Jason [Roberts], Hodge, and Fraz[i]er have provided evidence that . . . . contrasts starkly with the prosecution's timeline," *id.* at 121, and "would have created a reasonable doubt about Juniper's involvement in the crimes," *id.* at 120.  According to Juniper, his investigator canvassed the neighborhood too late, nobody on his trial team followed up on information from the canvass, nobody on his trial team timely followed up on several witness subpoenas the prosecution issued, and his trial counsel "blind[ly] trust[ed] the prosecution to abide by their *Brady* obligations." *Id.* at 124.  Juniper contends that without these myriad failings, his defense team would have uncovered significant exculpatory evidence.  Juniper's original Claim V.B. relied largely on his trial counsel's failure to call Waterman as a witness or to investigate him further.

Claim V.B. does not rely on significant new evidence.  That much is clear just from looking at Juniper's record citations for this claim, most of which refer to the State Habeas Appendix or the Appendix to his original petition.  Moreover, Juniper knew of the witnesses he bases this claim on—Waterman, the Robertses, Hodge, and Frazier—as well as the substance of

---

[36] Juniper pleads Claim V.B. in the alternative to his *Brady* claims that the prosecution concealed favorable evidence related to these witnesses—Claims I, IV.D.

their allegedly favorable statements when he filed his original petition.[37]   Juniper's amended

Claim V.B. contains new arguments and more supporting facts than his original Claim V.B., but

the mandate rule expressly prohibits that sort of second try. *See, e.g.*, *Volvo Trademark Holding*

*Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 481 (4th Cir. 2007) ("[U]nder the mandate rule a

remand proceeding is not the occasion for raising new arguments or legal theories."). The Court

may not reconsider its dismissal of this claim.

### 5.  *Claim V.C.*

In Claim V.C. Juniper alleges that his trial counsel rendered ineffective assistance, in

violation of *Strickland*, when they failed to adequately investigate Tyrone Mings.[38]  He also

alleges that a "reasonable investigation and cross-examination" of Mings would have uncovered

evidence impeaching his testimony. Am. Pet. at 144.  The main difference between Juniper's

original and amended versions of Claim V.C. is that amended Claim V.C. adds evidence related

to Melinda Bowser, Mings' girlfriend.

Assuming that the Bowser evidence is significant (a big assumption), Juniper did not

diligently pursue it.  During state habeas proceedings Juniper filed three motions seeking

discovery, none relating to Bowser.  In these federal proceedings, before the Fourth Circuit's 2017

remand, Juniper filed three motions seeking discovery, none relating to Bowser.  Juniper never

sought *any* information related to Bowser until November 1, 2018—just shy of seven years after

---

[37] Juniper asserts that "[t]he canvass notes[ and] Hodge's statement . . . are new and material evidence, which would make it inappropriate to defer to this [C]ourt's earlier judgment." Juniper Resp., ECF No. 425, at 92.  But he acknowledges that the documents are merely "consistent with Hodge's affidavit," which he had when he filed his original petition. Am. Pet. at 102. This new evidence therefore cannot result in reopening Claim V.B.

[38] Juniper pleads Claim V.C. in the alternative to his *Brady* claims that the prosecution concealed favorable evidence related to Mings—Claims IX, X, and XI. Am. Pet. at 133 n.97.

he filed his original petition in this Court—when he sought leave to depose Bowser, among many other people. The record does not support the conclusion that the newly discovered information related to Bowser was "not earlier obtainable in the exercise of due diligence." *Aramony,* 166 F.3d at 662 (quoting *Bell,* 5 F.3d at 67). The Court may not reconsider its previous dismissal of this claim.

### 6. *Claim V.F.*

Finally, in Claim V.F. Juniper alleges that his trial counsel rendered ineffective assistance, in violation of *Strickland,* when they failed to adequately investigate his background and interview potential mitigation witnesses. This claim relies on information and testimony from three sources: Ted Miller, a juvenile counselor, Yvette Rice-Steward, a mental health professional, and various family members. *Id.* The substance of Juniper's Claim V.F. in his Amended Petition does not differ from Claim V.F. in his original petition. *Compare* Am. Pet. at 149–52 *with* Pet. at 86–89. Rather, Juniper merely updated the citation convention and fixed typographical errors. The Court may not reconsider its previous dismissal of this claim.

*     *     *     *

In sum, the mandate rule bars this Court from considering the merits of Juniper's amended Claims IV.C., IV.D., V.A., V.B., V.C., and V.F. but not his amended Claims II and III. The Court will dismiss Claims IV.C., IV.D., V.A., V.B., V.C., and V.F. as barred by the mandate rule.

### III. **HABEAS LEGAL STANDARD**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 constrains this Court's authority to grant relief by way of a writ of habeas corpus. 28 U.S.C. § 2254 *et seq*. To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). When a petitioner

21

seeks *federal* habeas relief from a *state* conviction, as Juniper does, AEDPA's limitations are especially strong.

When a state court has adjudicated the merits of a habeas claim, a federal court may only grant a writ of habeas corpus if the adjudicated claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d).  The parties agree that Juniper did not present any of his remaining claims in state court, so this standard does not govern the Court's analysis.

Instead, the related concepts of exhaustion and procedural default limit Juniper's ability to obtain relief.  Principles of federalism and comity "dictate that the state[s] be given the first opportunity to correct constitutional errors" in their own criminal proceedings. *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000).  For these reasons, a federal court may not grant a state prisoner habeas relief unless he "has exhausted the remedies available in the courts of the State" of which he is in custody.  § 2254(b)(1)(A).  The exhaustion requirement "is satisfied so long as a claim has been 'fairly presented' to the state courts." *Baker*, 220 F.3d at 288 (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

Procedural default occurs when a federal habeas petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).  In Juniper's case, a Virginia court would find his claims barred by the statute of

limitations. *See* Va. Code § 8.01-654.1. That means Juniper has procedurally defaulted each of his claims.

Even when a petitioner has procedurally defaulted a claim, however, he may nevertheless obtain review by establishing both cause and prejudice. *Breard*, 134 F.3d at 620. In general, "cause" refers to some "objective factor external to the defense [that] impeded counsel's [or petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quotations omitted).[39] The prosecution's suppression of favorable evidence constitutes cause for a procedural default. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). "Prejudice" requires a showing that the alleged trial error not only "created a *possibility* of prejudice" but that it "worked to [the petitioner's] "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *McCarver v. Lee*, 221 F.3d 583, 592 (4th Cir. 2000) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Here, Juniper raises numerous *Brady* claims—claims based on the prosecution's failure to disclose evidence to him. In this context, the "cause" and "prejudice" requirements to excuse procedural default "'parallel two of the three components of the *Brady* violation itself'" — "suppress[ion]" of evidence amounts to "cause" and a showing of *Brady* materiality establishes "prejudice." *Banks*, 540 U.S. at 691 (quotations omitted). Accordingly, if Juniper establishes a *Brady* violation, he will have shown grounds to excuse his procedural default of that claim.[40]

---

[39] The following objective, external factors have been held to constitute cause: "(1) interference by officials that makes compliance with the State's procedural rule impracticable; (2) a showing that the factual or legal basis for a claim was not reasonably available to counsel; (3) novelty of a claim; and (4) constitutionally ineffective assistance of counsel." *Wright v. Angelone*, 151 F.3d 151, 160 n.5 (4th Cir. 1995) (cleaned up).

[40] The Warden argues, without citing a specific subsection, that each of Juniper's claims IX through XV are barred by the statute of limitations in 28 U.S.C. § 2244, and that Juniper was required to present each claim by July 16, 2012. These claims, which are based largely on evidence

## IV. ANALYSIS[41]

Each of Juniper's claims asserts one of three constitutional violations: (1) *Brady*, (2) *Napue*, and (3) *Strickland*. The Court will discuss each category of alleged violations in turn. The vast majority of Juniper's claims allege *Brady* violations, so the Court will discuss those claims first. It will then discuss his alleged *Napue* violations, and finally turn to his single alleged *Strickland* violation.

But the Court first notes that both of the parties approached their summary judgment motions in ways that were often unhelpful and that sometimes disregarded well-established principles of summary judgment. Juniper mischaracterized parts of the record and relied on facts that he had not pled in his Amended Petition. The Warden argued contrary to the parties' stipulations of fact, encouraged the Court to make credibility determinations on the written record,

---

uncovered in post-remand discovery, draw their statute of limitations from 28 U.S.C. § 2244(d)(1)(D). That subsection gives a habeas petitioner one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" to file his federal habeas petition. § 2244(d)(1)(D). The Warden's statute of limitations argument ignores this provision.
Because the Warden makes no arguments under this subsection and does not tailor his statute of limitations arguments to the evidence underlying each claim, the Court will deny his statute of limitations arguments at this time.

[41] On the parties' motions for summary judgment, the Court applies the established standard for summary judgment in civil cases. *See Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir. 2005) ("The Civil Rules are to be applied, when appropriate, in habeas corpus proceedings to the extent that they are not inconsistent with the Habeas Rules." (cleaned up)). Rule 56 of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Nevertheless, if the non-moving party fails to sufficiently establish the existence of an essential element to its claim on which it bears the ultimate burden of proof, the court should enter summary judgment against that party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

and advocated for the Court to draw inferences in his favor when ruling on his motion for summary judgment.

### A. Brady *Claims*

All or part of nine of Juniper's claims assert a *Brady* violation. After discussing the general principles of *Brady*, the Court will address each claim separately.

### 1. Brady *Claims: Legal Standard*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Favorable evidence may either be exculpatory or impeaching of the prosecution's case. *See Banks*, 540 U.S. at 691. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Establishing a "reasonable probability" does not require a petitioner "to show by a preponderance of the evidence that disclosure of the evidence would have resulted in acquittal." *United States v. Ellis*, 121 F.3d 908, 915 (4th Cir. 1997). Nor is *Brady*'s reasonable probability standard a sufficiency-of-the-evidence test. *See Strickler*, 527 U.S. at 290 ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). Rather, a petitioner satisfies this standard by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Finally—and crucially for Juniper's *Brady* claims—evidence can be material either on its own or cumulatively with other evidence. *See id.* at 436 n.10. So when a petitioner asserts multiple

*Brady* claims, courts must "evaluate the tendency and force of the undisclosed evidence item by item" as well as "its cumulative effect" to determine whether the evidence satisfies the *Brady* materiality standard. *Id.*

For each claim, therefore, the Court will examine all three Brady elements: (1) favorability of the evidence, (2) suppression, and (3) materiality. The Court may grant summary judgment on all or some of the elements of the claim. *See* Fed. Rule Civ. P. 56(a) (allowing summary judgment on "part of each claim"),

### 2. *Claim I*

In Claim I, Juniper alleges that the prosecution violated *Brady* by suppressing what the Court will call the Roberts Material: (1) statements that Wendy and Jason Roberts made to Norfolk Police investigators on the day of the murders, and (2) the fact that the police had shown Wendy a photo lineup that included a picture of Juniper and she selected the photograph of someone other than Juniper. Juniper and the Warden both move for summary judgment on Claim I in its entirety. The Court will grant summary judgment to Juniper on the favorability of all of the Roberts Material. The Court will grant summary judgment to Juniper on the suppression of the photo lineup and deny summary judgment to both parties on suppression of the Robertses' statements. The Court will deny summary judgment to both parties on materiality.

### a. *The Roberts Material*

At the time of the murders, Wendy Roberts and her son Jason lived in an apartment in the complex next door to Keshia. On the day of the murders, D.I. Jones, an investigator with the Norfolk Police Department, spoke with Wendy and Jason. He typed a one-page summary of their statements (the Jones Summary).

26

According to the Jones Summary, Wendy told Investigator Jones that she saw a "small" black female "in her 20's," who had "moved into apt 1 around Christmas time" arguing with a black man twice on the day of the murders: once around 9:30 or 10:00 a.m., and later around 12:30 or 12:45 p.m.[42] Supp. App'x at 928.[43] During the second argument, the man told the woman that "she had not better [sic] be there when he returned." *Id.* Wendy described the man as about 6'2" and 150 pounds, in his late 20s, and driving "an older red Toyota like a Corolla." *Id.* She said that the man "comes around the [apartment] about 7:30[] each morning wanting to see the kids," and she thought he was "an ex-boyfriend." *Id.* Jason Roberts told Investigator Jones that he was not home at the time of the arguments his mother described, but that he "ha[d] seen the people and the vehicle[] many times." *Id.* Wendy also said that about 1:30 on the afternoon of the murders she heard "three or four bangs" that "she thought w[ere] firecrackers." *Id.* Jason also heard the noises, and he "thought it was someone hammering." *Id.*

Wendy gave two more statements to investigators. First, at 9:20 on the evening of the murders, she spoke with Investigator Conway. Conway wrote in his notes (the Investigation Notes) that Wendy's statement to him "was consistent with that of the interview given to Detective D.I. Jones." App'x at 671.

Second, Wendy spoke with Norfolk investigators Ford and Conway the next day. They showed her a six-person photo lineup with a picture of Juniper in the upper right corner.[44] Wendy

---

[42] Wendy did not identify Keshia by name, but nobody really disputes that Wendy had described Keshia. Keshia had moved into Apartment 1 in early December, was African American, was 4'11" tall, weighed 110 pounds, and was 27 years old.

[43] The Court will cite to the Appendix Juniper submitted during post-remand proceedings (ECF Nos. 224-2, 367–79) as "Supp. App'x."

[44] Juniper contends, citing to a portion of Investigator Ford's deposition, that "[t]he photographic lineup, in fact, included men selected for their similar appearance to Juniper." Am.

"picked out the lower left," although she "said she [was] not 100 percent sure." *Id.* at 674. The Investigation Notes contain no other description of that interview, and Investigator Conway testified in his deposition that he would have noted it if Wendy had said something inconsistent with what she said in her previous two interviews with police.

### b. *Favorability*

No matter how you look at it, the Roberts Material is favorable to Juniper.[45] Wendy's statement that she saw Keshia arguing with someone at 12:30 or 12:45 p.m. undermines the prosecution's timeline, which indicated that the murders occurred around 11:45 a.m. It impeaches Mings' testimony that he saw Juniper in the apartment with a gun and the murder victims sometime before the first 12:44 p.m. 911 call. And it impeaches Murray's testimony that Juniper confessed to committing the murders in a phone call that, according to the prosecution, occurred around 11:00 a.m.

Wendy's and Jason's statements that they each heard loud bangs around 1:30 p.m. on the day of the murders could have placed the murders at a time long after, according to the prosecution,

---

Pet. at 22 n.12. That portion of Investigator Ford's deposition cannot be reasonably interpreted to support Juniper's assertion, nor is his assertion supported by other parts the record.

[45] Juniper asserts that "both this Court and the Court of Appeals have already held that Juniper has established favorability for this *Brady* claim." Juniper Mem. Supp. at 3. This assertion is wrong for many reasons. For one thing, the Fourth Circuit has vacated this Court's ruling on Claim I, which means that the Court's previous holdings relevant to this claim no longer stand. For another, on these cross-motions for summary judgment on claims in Juniper's Amended Petition, the Court has before it a different petition, a different record, and a different procedural context than it had before it when it ruled on the Warden's motion to dismiss Juniper's original petition. It would defy common sense for the Court to merely defer to findings it had made when faced with a different record. Finally, it is black letter law that a motion to dismiss—like the one the Court ruled on in 2013—"tests the sufficiency of a [petition]—it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N. C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). So even if the Court were faced with the same petition, none of the conclusions it reached about the sufficiency of Juniper's petition at the motion-to-dismiss stage would bind it here, at the summary-judgment stage.

Juniper had left Keshia's apartment. And it also could have contradicted Rashid's testimony that she heard gunshots as she drove away from Keshia's apartment, which the prosecution placed at sometime between 10:30 and 11:00 a.m.

Finally, Wendy's description of a man who did not resemble Juniper arguing with Keshia on the day of the murders, as well as Wendy's identification in the photo array of that man as someone other than Juniper, points to a possible alternative suspect. The existence of an alternative suspect both would have undermined the prosecution's case against Juniper and could have led to avenues of further investigation.

The Court will grant summary judgment to Juniper on the favorability prong of Claim I.

### c. *Suppression*

On this record, genuine disputes of material fact remain about whether the prosecution disclosed either the fact or the substance of Wendy's and Jason's statements to investigators Jones and Conway.

First, as Juniper points out, through years of litigation, the prosecution never even hinted that it disclosed the Robertses' statements to the defense. Instead, everything in the record led both this Court and the Fourth Circuit to conclude that the prosecution had not disclosed the evidence. For example, the Commonwealth "steadfastly opposed" producing the Roberts Material and showed an "entrenched resistance to transparency in [Juniper's] criminal prosecution and subsequent post-conviction proceedings." *Juniper I*, 2013 WL 1333513, at *15. Evans submitted an affidavit stating that "he did not believe the Roberts materials were subject to disclosure under *Brady* because the Roberts[es]'s statements were 'factually inconsistent' with the prosecution's conclusion." *Juniper II*, 876 F.3d at 566. And in 2017, the Fourth Circuit reasonably concluded that Evans seemed to "have fundamentally misunderstood his obligation under *Brady*."

29

*Id.* It is still "simply implausible that the Roberts[es]' names and statements were disclosed without so much as a hint of their existence arising during state proceedings." *Juniper I*, 2013 WL 1333513, at *15.

But in 2018, the Warden submitted two affidavits: one from Juniper's lead defense attorney, Cynthia Collard, and one from his investigator, Wayne Kennedy. In those affidavits Collard and Kennedy each swore that they knew about the Robertses and the exculpatory information they had but declined to use them as witnesses because of credibility issues with Wendy. In 2019 Juniper deposed both Collard and Kennedy. Collard largely stuck to that story, but Kennedy waffled a bit.

So the record now also includes Collard's assertion—albeit coming quite late—that the prosecution informed her of at least some of Wendy's statements; that she sent Kennedy to speak with the Robertses; and that Kennedy reported to her about his conversation with them, leading her to conclude that they were not credible and their accounts were not worth investigating further.[46] In his deposition, Kennedy was not so sure about this. Thus, the Warden's own evidence contains some internal inconsistencies. The affidavits say that Juniper's defense team knew about the Roberts information, but parts of their deposition testimony seem to tell a different story.

The Commonwealth's conduct has understandably led Juniper to cry foul. He has asked the Court to strike parts of the affidavits of Collard and Kennedy as shams, and to rule that the Warden has forfeited his right to present evidence that the prosecution disclosed the Robertses' statements. Something does smell fishy about the eleventh-hour emergence of this evidence, but the conflict is not so great as to require the Court to strike the evidence. Nor will the Court

---

[46] Interestingly, the record also includes both Wendy's and Jason's sworn statements that nobody from Juniper's defense team ever spoke to either of them.

conclude that the Warden (or Collard or Kennedy) presented the affidavits in bad faith. The events in this case occurred over fifteen years ago, and neither Collard nor Kennedy still possess their own file. Sometimes people remember things later than they ideally would. The Court will not strike the affidavits or find that the Warden has forfeited proving disclosure. Due to the lateness of the submission of evidence and the witnesses' discrepancies in their version of the events, however, the Court will shift the burden of establishing disclosure to the Warden.

Regardless of whose burden it is, the conflicting evidence creates a clear dispute about the most material of facts: whether Juniper's defense team knew about the Robertses' statements. The Court cannot resolve the dispute either way without "improperly ma[king] credibility determinations based on the written record," which it declines to do. *Id.* The Court will deny summary judgment to both Juniper and the Warden on suppression of the Robertses' statements.[47]

In contrast, no genuine dispute exists about whether the Warden suppressed the photo lineup. None of the prosecutors remember giving Juniper's defense team the photo lineup; nobody on Juniper's defense team remembers receiving or learning about a photo lineup; and no photo array appears in the trial record, the state habeas record, or the record Juniper submitted with his original petition. Nothing in the record, therefore, supports the conclusion that the prosecution disclosed the photo lineup. The Court will grant summary judgment to Juniper on suppression of the photo lineup.[48]

---

[47] Because it will deny summary judgment on suppression, the Court will also deny summary judgment on the cause prong of Juniper's procedural default of Claim I. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).

[48] Juniper has therefore established cause to excuse his procedural default of the related *Brady* claim. *See Banks*, 540 U.S. at 691.

#### d. *Materiality*

Juniper and the Warden each seek summary judgment on the materiality of the Roberts Material. Inexplicably, neither party identifies any change in the record that would allow this Court to disregard the Fourth Circuit's holding that this Court "should not have disposed of [Claim I] without holding an evidentiary hearing."[49] *Juniper II*, 876 F.3d at 573. The Warden also makes the baffling argument that this Court should conclude—on the paper record—that the Robertses were not credible because "Collard has consistently stated that . . . [Juniper's trial team] found Wendy Roberts not to be credible because she contradicted herself in describing the events." Warden Mem. Supp. at 26. Of course, Collard has *not* consistently stated that: until 2018 she never even said she knew about Wendy. More importantly, however, the Fourth Circuit has already admonished this Court for "improperly ma[king] credibility determinations"—about the Robertses, no less—"based on the written record." *Juniper II*, 876 F.3d at 568. The Court declines to make the same mistake again.

The Court will deny summary judgment to both Juniper and the Warden on the issue of materiality.[50]

#### 3. *Claim III*

In Claim III, Juniper asserts that the prosecution violated *Brady* by suppressing information about the investigation and questioning of John Jones, Jr. Specifically, Juniper contends that the

---

[49] Juniper smugly argues that "by moving for summary judgment, [the Warden] asked this Court to disregard the Fourth Circuit's mandate to hold a hearing." Juniper Resp. at 39. Of course, Juniper also moved for summary judgment on the entirety of Claim I, also asking the Court to disregard the Fourth Circuit's mandate to hold a hearing.

[50] Because it will deny summary judgment on materiality, the Court will also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim I. *See Banks*, 540 U.S. at 691.

prosecution suppressed statements Jones made when questioned by the police and during phone calls he made while in jail (collectively, the Jones Material).  Although Jones did not testify at trial, Juniper says that the Jones Material could have helped his defense because Jones' statements conflict in minor ways with the testimony of several important prosecution witnesses.  He also contends the Jones Material is exculpatory because it shows an "evolution of Jones' version of events in response to police interrogations [that] calls into question police practices in constructing the statements of key prosecution witnesses."  Juniper Resp. at 55.

Juniper and the Warden each seek summary judgment on the entirety of Claim III.  The Court will grant summary judgment to Juniper on favorability and suppression.  It will deny summary judgment to both Juniper and the Warden on materiality.

### a.  *The Jones Material*

Soon after the murders, police wanted to question John Jones, Jr.  Unable to find him, the police informed "news stations" that Jones was wanted for questioning about the Stephens family murders, as well as for unrelated outstanding warrants for his arrest.  App'x at 676.  Jones turned himself in that evening, and Detective Wray and Investigator Ford questioned him soon after.  Their interrogation of him is recounted in the Investigation Notes.

The two officers questioned Jones over the course of about two hours that evening.  During that questioning, Jones maintained that he had seen Juniper the afternoon of the murders, but he had not been to Keshia's apartment that day and he had no personal knowledge of anything to do with the murders.  After the questioning ended, the police took Jones back to jail.

Two days later, Jones had several recorded phone conversations with his girlfriend, his mother, and his sister, among others.  In the phone calls, Jones' girlfriend and mother described how Norfolk Investigator Ford had pressured them.  For example, Jones' girlfriend told Jones that

she had spoken with Investigator Ford, who had told her that he had "proof and evidence to prove that [Jones] was in [Keshia's apartment], that he was aiding and abetting," that Ford "would have got [Jones] for accessory to murder if he kept lying about it," and that Ford "want[ed] to know where [Juniper] at [sic], but since [Jones] wants to lie, tomorrow morning [Ford would] air that [Jones] murdered four people." Supp. App'x at 3810 (Jones' girlfriend ostensibly quoting Ford). She also told Jones that Ford had told her: "All I wanted [Jones] to do was tell me that he was in [Keshia's apartment]." *Id.* at 3811 (still quoting Ford).

> Again recounting what Ford had told her, Jones' girlfriend said:

> He said "[Jones] kept lying to me, that's why," he said, "I was just going to let him go ahead and do his probation if he would have told me he was in [Keshia's apartment] and didn't keep lying about it." He said, "obviously he lied to you too," and he was like, "it don't make sense." He said, "we can't find [Juniper]" and he said "I was going to get you for accessory." He said "the only thing I could have got you [sic] for was accessory to a murder, but since he want to keep lying to me and saying he wasn't in there, and I can *prove* he was in there." He said, "then, I'm going to charge him with these four murders."

*Id.* at 3812. Jones' girlfriend also described various veiled threats Ford made to her, such as indicating that she might get threatening phone calls after Ford told the media that Jones had committed the murders, or that people might want to "retaliate" against her. *Id.* at 3812–14.

In light of Ford's threats and their fear for Jones' and their own safety, Jones' mother, his sister, his girlfriend, and his girlfriend's mother all pressured him to talk to Ford again. Jones eventually agreed, and his girlfriend initiated a three-way call between Jones, herself, and Ford. In that call, Ford told Jones: "If you come back and you tell me the truth, and you don't bullshit a bit, then I won't charge you." *Id.* at 3847. Jones agreed.

Jones spoke with Ford and Wray that night. This time Jones told them that on the day of the murders a black female had picked him up and they had gone to Keshia's apartment to pick up Juniper. He said that only he, his girlfriend's child, and the black female—whom Jones did not

know—had gone to pick up Juniper. Once they got to Keshia's apartment, the female stayed in the car and Jones went to get Juniper. As Jones approached the apartment door, "he looked up and saw that the door was busted in." App'x at 686. "[T]he door looked closed, but . . . the middle part had been kicked in." *Id.* at 689. He "called for [Juniper] to come out and [Juniper] came out with a gun" pointed at his head. *Id.* at 686. He told Juniper to "put the gun up." *Id.* Jones said he returned to the car with Juniper, and the female dropped them off at Jones' girlfriend's house. Wray and Ford went through Jones' statement with him several times, then took a taped statement from him. Their initial questioning of Jones is recounted in the Investigation Notes, and there is a transcript of Jones' recorded statement.

On February 5, 2004, Detective Wray questioned Jones again. Since last speaking with Jones, Wray had interviewed Rashid. Rashid had told him that Murray was also in the car with her and Jones when they picked up Juniper from Keshia's apartment. So on February 5, Wray questioned Jones "in reference to Keon Murray, who Renee Rashid had stated was also in the car when they went and picked up Anthony Juniper on the day of the homicide[s]." *Id.* at 712. In response to this questioning, Jones also stated that Murray was in the car. After interviewing Jones, Wray and Conway took a taped statement from him. Jones said that he had omitted Murray from his original statement because he "didn't feel nobody else should be involved." Supp. App'x at 3878.

### b. *Favorability*

Jones' prior statements are, in a small way, favorable to Juniper. In his Amended Petition, Juniper lists twelve statements Jones made in his January 23, 2004 statement and ten statements Jones made in his February 5, 2004 statement, and articulates how those statements contradict aspects of Rashid's, Murray's, and Mings' testimony. The Warden asserts that "Juniper does not

demonstrate how [these inconsistencies] would be exculpatory, much less material," but he does not argue that Juniper's identified inconsistencies are incorrect. Warden Mem. Supp. at 44. That was a good choice because the record supports Juniper's identified inconsistencies. Of course, evidence can be favorable "*either* because it is exculpatory, *or* because it is impeaching," so the Warden's argument fails. *Banks*, 540 U.S. at 691 (emphases added) (quoting *Strickler*, 527 U.S. at 281–82). At the very least, information in Jones' statements to the police could have impeached aspects of Rashid's, Murray's, and Mings' testimony, and it is therefore favorable to Juniper.[51]

The transcripts of Jones' jail calls are also favorable to Juniper. Jones' girlfriend's accounts that Ford threatened to retaliate against Jones for not talking to police could have been used, at the least, to "attack . . . the good faith of the investigation." *Kyles*, 514 U.S. at 445; *cf. United States v. Sutton*, 542 F.2d 1239, 1242 (4th Cir. 1976) ("We perceive no difference between concealment of a promise of leniency and concealment of a threat to prosecute.").[52]

The Court will grant summary judgment to Juniper on the favorability prong of Claim III.

---

[51] The Warden argues that this information "appear[s] to address only collateral matters." Warden Mem. Supp. 44. But impeachment is impeachment, whether the impeachment goes to the heart of the prosecution's case or to collateral matters. *See Long v. Hooks,* 972 F.3d 442, 462 (4th Cir. 2020), *as amended* (Aug. 26, 2020) ("[T]he rule is not that only *unassailable* evidence must be disclosed to the defense. Rather, it is clearly established federal law that *any favorable and material evidence must be disclosed.*"). The weight of the impeachment evidence goes to its *materiality*, not to its favorability. *See Kyles v. Whitley*, 514 U.S. 419, 451 (1995).

[52] The Warden argues that the jail call transcripts are not exculpatory because "Ford denied that he ever threatened to put out a statement that Jones committed the four murders," and "Juniper asks this Court to accept [Jones' girlfriend's] hearsay recollection" over Ford's deposition testimony. Warden Mem. Supp. at 45. Once again, the Warden encourages the Court to "improperly ma[k]e credibility determinations based on the written record." *Juniper III*, 876 F.3d at 568.

### c. *Suppression*

There is no dispute that the Jones Material was suppressed.  The parties have stipulated that the prosecution never disclosed the Investigation Notes.  Nothing in the record indicates that the prosecution disclosed the transcripts of Jones' jail calls.  And Juniper previously sought, both in the trial court and in the state habeas court, copies of Jones' statements but was unsuccessful. Nothing in the record could support the conclusion that the prosecution disclosed the Jones Material.

The Court will grant summary judgment to Juniper on the suppression prong of Claim III.[53]

### d. *Materiality*

Genuine disputes of material fact remain about the materiality of the Jones Material.  The Court doubts whether, on the whole, the Jones Material is material under *Brady*.  In order for the jury to hear anything about Jones' allegedly evolving statements or rely on that information to disbelieve the prosecution's other witnesses or doubt the integrity of the murder investigation, Jones likely would have had to testify at trial, which he did not.  *See generally* Fed. R. Evid. 801–807 (defining hearsay and discussing the federal rules prohibiting hearsay).[54]  Had Jones testified, his testimony would largely have reinforced the prosecution's case.  The jury would have heard the account of yet another person who placed Juniper in Keshia's apartment on the day of the murders, with the door broken in, and holding a gun.  Because the Jones Material is not uniformly

---

[53] Juniper has therefore established cause to excuse his procedural default of Claim III.  *See Banks*, 540 U.S. at 691.

[54] *See also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under *Brady*).  *But see United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004) (declining to hold that possibly inadmissible, but not "obviously inadmissible," statements could not satisfy *Brady*'s materiality standard because "many rulings on admissibility . . . . can only be decided in the context of a trial).

favorable (to put it mildly), the Court is skeptical that there is a reasonable probability that, had it been disclosed to the defense, the result of Juniper's trial would have been different.

But, of course, materiality can "turn[] on the cumulative effect of all [the favorable] evidence suppressed by the government." *Kyles*, 514 U.S. at 421. And the Court cannot evaluate cumulative materiality at this time because factual disputes remain about the materiality and suppression of the Roberts Material, the alleged *Brady* evidence underlying Claim I. The Court must deny summary judgment to both Juniper and the Warden on the materiality prong of Claim III.[55]

### 4. *Claims IX.A., X, and XI Related to Tyrone Mings*

Claims IX.A., X, and XI all rely on allegedly suppressed favorable evidence related to prosecution witness Tyrone Mings. In Claim IX.A., Juniper alleges that the prosecution suppressed Mings' January 16, 2004 statement to the Norfolk police. In Claims X and XI, Juniper says the prosecution suppressed Mings' other statements to the police and information about his criminal history.

#### a. *Mings' Testimony*

Mings was a crucial witness for the prosecution: He said he had seen Juniper in Keshia's apartment on the day of the murders, holding a gun and with cocaine on his face, and that Juniper directed him to the victims' bodies. Mings lived down the street from Keshia and testified that he went to Keshia's apartment that day for two reasons: to pick up his girlfriend's check and because Keon Murray had asked him to "check on somebody at Keshia's house or whatever that he heard some shots." SH App'x at 1841. When Mings got to Keshia's apartment he saw the door broken

---

[55] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim III. *See Banks*, 540 U.S. at 691.

in and Juniper in the apartment holding a gun and with cocaine on his face. He asked Juniper where Keshia was, and Juniper directed him to the bedroom and said that Keshia was "in between the bed and the dresser." *Id.* at 1849. In the bedroom, Mings saw the bodies of Rueben and one of Keshia's children. He called Keshia's name and left after getting no response.

After leaving Keshia's apartment, Mings went back to his apartment, and he and his girlfriend, Melinda Bowser, decided to call the police. He "started to walk back down" to Keshia's apartment, but, as he was doing so, he saw Juniper, Murray, and John Jones leaving the apartment. SH App'x at 1852. The three men got in a car parked across the street and drove away. Mings also saw a woman in the car, but he did not get a "good look at her." *Id.* at 1854.

Mings decided not to go back to Keshia's apartment. Instead, he went home, and Bowser called the police. He watched the police come, and then he watched them leave. After seeing them leave he "figure[d] they didn't go up there." *Id.* at 1855. So he called the police again. This time he and Bowser "walked down there with them." *Id.* at 1856. Mings said he talked to the police and told them that he had seen "victims inside." *Id.* He admitted that he did not tell them that he had seen Juniper in the apartment because he "feared for [his] safety." *Id.*

In speaking with the police on January 16, Mings denied having seen any weapons, drugs, or anyone other than two victims in Keshia's apartment. Juniper contends that this "affirmative[] deni[al]" is inconsistent with Mings' trial testimony, which implied that he "merely omitted" the presence of Juniper, weapons, or guns in Keshia's apartment. Am. Pet. at 163–64.

### b. *Claim IX.A.*

In Claim IX.A., Juniper argues that the prosecution suppressed Mings January 16 statement in violation of his *Brady* rights. Both Juniper and the Warden move for summary judgment on all

of Claim IX.A.  The Court will grant summary judgment to Juniper on favorability and deny summary judgment to both Juniper and the Warden on suppression and materiality.

### i. *Favorability*

Mings' January 16 statement is undeniably favorable.  That statement directly conflicts with his trial testimony that he saw Juniper in the apartment, holding a gun, with cocaine on his face. *See, e.g.*, *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 556 (4th Cir. 1999) ("Brown's prior inconsistent statement about whether he was an eyewitness clearly satisfies the first requirement of a *Brady* violation—that the evidence be 'favorable' to the defendant.").

The Court will grant summary judgment to Juniper on the favorability prong of Claim IX.A.

### ii. *Suppression*

The parties have stipulated that the prosecution "had in its possession and did not disclose to Juniper" a copy of Mings' January 16, 2004 statement, Stip. No. 600, but that does not resolve the suppression issue.  Claim IX.A. relies on a specific part of Mings' January 16 statement, so the Court must determine whether the prosecution disclosed that *specific part*.  The Warden argues that it did; Juniper argues that it did not.  The evidence on this point is slightly murky.

According to Juniper, the favorable aspect of Mings' January 16 statement is as follows:

Q: Did you observe anybody else inside the house?
A: No, sir.
Q: Did you observe any kind of weapons in the house?
A: No, sir.
Q: Did you observe any kind of narcotics, drug paraphernalia, or anything like that inside the house?
A: No, sir.

Supp. App'x at 933. In post-remand discovery, Evans and members of Juniper's defense team were asked if Juniper's defense team had been told about this portion of Mings' January 16 statement. Their testimony was mixed.

Defense counsel Tom Reed testified that he had never had access to an audio recording of Mings' interview with police, that he did not remember knowing about Mings' January 16 statement at the time of Juniper's trial, and that he did not remember any of the substance of that statement. Defense counsel Collard, like Reed, could not remember Mings' January 16 statement, nor could she remember Mings' testimony admitting he had left Juniper out of that statement. Kennedy could not remember having access to either a recording or a transcript of Mings' statements.

Prosecutor Phil Evans' memory was clearer. Although he did not remember whether he had given Reed a copy of Mings' January 16 statement, Evans "believe[d] [he] referenced"—by showing Reed the statement—the portion of Mings' statement in which Mings described going into Keshia's apartment and "d[id] not include Juniper there." *Id.* at 2063. Evans also remembered that "well prior to trial" he had told Reed "that Mings had not initially revealed seeing Juniper present when he went" into Keshia's apartment. *Id.* at 2061.

Notwithstanding Evans' memory, factual disputes remain about whether the prosecution disclosed to Juniper the portion of Mings' January 16 statement on which Claim IX.A. relies. First, Evans' deposition testimony itself—even without any evidence to the contrary—does not establish that he shared the relevant portion of Mings' January 16 statement with Reed. His testimony is ambiguous in two ways: it is unclear whether Evans actually remembered showing Reed a portion of Mings' statement, and it is unclear which portion of Mings' statement he may have shown Reed.

As to whether Evans remembered showing Reed a portion of Mings' statement, his deposition testimony is as follows:

> A: *I believe I referenced* Mr. Reed to a portion of [Mings' January 16 statement] where he did not include—describes going in and he does not include Juniper there.
> Q: What do you mean when you say you referenced a portion of it?
> A: In other words, he describes in this statement going to Keshia's house, breaking—you know, going in through the door, which is broken down, and that there is no reference at that point to seeing Juniper in there, and then he later says Juniper is in there, in other words, the area where it would have omitted from.
> Q: *You recall* showing him that portion of Mr. Mings' statement?
> A: Yes, saying he does not include in here that he saw Juniper.
> Q: And showing him that portion of Mr. Mings' statement?
> A: Yes, correct.

*Id.* at 2063 (emphases added). In other words, Evans initially testified only that he "believe[d]" he had shown Reed a portion of the statement, but he later agreed with the question that he "recall[ed]" having done so. *Id.* Thus, Evans' testimony contains inconsistencies and cannot itself establish that Evans showed Reed a portion of Mings' statement.[56]

Evans' testimony is also unclear about which portion of Mings' January 16 statement he may have shown Reed. Evans described the statement he may have shown Reed as one in which Mings described "going to Keshia's house, breaking—you know, going in through the door, which is broken down, and that there is no reference at that point to seeing Juniper in there." *Id.* This is the portion of Mings' January 16 statement that seems to most match up with Evans' description:

> Q: When you initially went over to 1427 Kingston Avenue, apartment 1, and you walked up the stairway, what did you notice?
> A: The door looked like it had been kicked in.
> Q: What do you mean looked like it had been kicked in.

---

[56] Put another way, drawing all inferences in favor of the Warden, Evans' testimony indicates that he remembered showing Reed a portion of Mings' statement. But drawing all inferences in favor of Juniper, Evans' testimony indicates that he did not remember doing so, but only believed he had done so. Thus, the Court cannot resolve the issue on summary judgment.

A: It was broken in—it was broke down. It weren't broke down, but it was a big hole in the door.

Q: Big hole in the center of the door?

A: Yeah.

Q: At that point what did you do?

A: I went back and told my girl, and she told me to go back down there and make sure everything was all right.

. . . .

Q: When you went back to 1427 Kingston Avenue[] apartment 1, what did you do at that point?

A: I went down there, walked up the steps and I was calling her name. I didn't get no response, so I went in, and I was slowly walking towards the hallway. And as I walked, I noticed—I looked inside the bedroom that was on the—I think it was on my right, and I saw some man laying on the bed with a baby on top of him, laying over top of him.

*Id.* at 931–32.

But the portion of Mings' January 16 statement that Juniper relies on for Claim IX.A. is two pages later, when Mings denies seeing anybody but the two bodies or any drugs or guns in the apartment. Therefore, even if Evans had actually remembered showing Reed part of Mings' January 16 statement, it is unclear whether he showed Reed the part of that statement relevant to Claim IX.A.[57]

---

[57] Other evidence in the record supports the inference that Reed did *not* know about the inconsistency between Mings' January 16 statement and his testimony. No member of Juniper's defense team remembers having any portion of Mings' January 16 statement; the record contains no evidence of that statement in Collard's or Kennedy's files; Reed remembers that his main concern about Mings' statement was with Mings' reason for going to Keshia's apartment; and Reed never cross-examined Mings about initially denying seeing anybody else in the apartment.

Of course, those facts do not unequivocally establish that the prosecution suppressed the inconsistency. Reed may have had many reasons not to press on the inconsistency during his cross-examination of Mings. Collard's and Kennedy's failure to remember specific pieces of evidence from a trial that was fourteen years ago is unsurprising. The Court will not resolve these factual issues on summary judgment.

The Court must therefore deny summary judgment to both Juniper and the Warden on the suppression prong of Claim IX.A.[58]

### iii. *Materiality*

The Court has no trouble finding the failure to disclose Mings' January 16 statement by itself not material. First, the difference between Mings' trial testimony indicating that he initially *omitted* Juniper's presence in the apartment when speaking to police and his January 16 *affirmative denial* that anybody else was in the apartment is trifling at best. The jury heard that Mings did not originally implicate Juniper when he spoke with police and that he lied to police about Juniper's presence in the apartment; it is hard to see how the distinction between simply omitting Juniper from his statement and affirmatively denying that anyone else was present could have affected Mings' credibility with the jury.

Moreover, the prosecution presented considerable evidence of Juniper's guilt even without any of Mings' testimony: Rashid's, Murray's, and Smith's testimony; phone records corroborating parts of their testimony; large amounts of Juniper's DNA (and nobody else's) on the handle of a knife that, although separated from, was compatible with a blade that had Keshia's blood on it, both of which were found in the bedroom with the bodies; Juniper's fingerprints on the knife; and Juniper's DNA on a cigarette butt that was found on top of the broken-in door to Keshia's apartment. On its own, the inconsistency between Mings' testimony and his January 16 statement relevant to Claim IX.A. could not have affected the jury's verdict.

---

[58] The Court will therefore also deny summary judgment on the cause prong of Juniper's procedural default of Claim IX.A. *See Banks*, 540 U.S. at 691.

But as with Juniper's other *Brady* claims, the Court must deny summary judgment to both parties on the materiality prong of Claim IX.A. because it cannot evaluate cumulative materiality at this time.[59]

### c. *Claims X and XI*

In Claims X and XI, Juniper alleges that the prosecution suppressed miscellaneous exculpatory and impeaching evidence related to Tyrone Mings.[60]  Claim X is based on "fourteen sources of information" that Juniper alleges would have impeached eight parts of Mings' trial testimony. Am. Pet. at 172.  Claim XI is based on Mings' criminal history, Evans' involvement in Mings' probation violation proceedings, and the alleged "benefit Mings received in exchange for testifying against Juniper." *Id.* at 194.

Juniper, but not the Warden, moves for summary judgment on all of Claim X.[61]  And the Warden, but not Juniper, moves for summary judgment on all of Claim XI.  The Court will assume for purposes of summary judgment that all of the alleged *Brady* material is favorable.  The Court will grant summary judgment to Juniper on suppression for the material in Claim X, deny summary judgment to the Warden on suppression for the material in Claim XI, and deny summary judgment to Juniper on materiality for Claim X and the Warden on materiality for Claim XI.

---

[59] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim IX.A. *See Banks*, 540 U.S. at 691.

[60] Because much of the background information about Mings' testimony is relevant to both Claims X and XI, the Court discusses the two claims together.

[61] It seems that the Warden meant to move—or thought he had moved—for summary judgment on Claim X. He refers several times to his arguments in support of summary judgment on Claim X. *See, e.g.,* Warden Mem. Supp. at 108 (asserting that Juniper's Claim XIII is barred by the statute of limitations "[f]or the same reasons listed in response to Claims IX, X, and XI"). But the Warden never sought to amend his pleadings or submit a supplemental motion.

Mings admitted on direct examination that he had been convicted of two felonies—one in 2001 for possession with intent to distribute cocaine, and one in 2004 for possession of narcotics. He said that at the time he testified he was serving a jail sentence for a probation violation and was scheduled to be released in April. He denied having any pending court cases.

On cross-examination, Reed asked Mings if he and his lawyer had discussed Mings' "cooperation with the Commonwealth" in reference to his probation violation sentence. SH App'x at 1858. Mings had the following colloquy with Reed:

> Q:   You knew that the judge that was going to sentence you on the probation violation was advised about your cooperation?
> A:   Yes.
> Q:   So you knew that by agreeing to testify for the Commonwealth you were saving yourself as much as four years in the penitentiary?
> A:   That could have happened, yes.
> Q:   Well, not could have happened. That's what you wanted to happen?
> A:   Yes.
> Q:   That's what did happen; correct?
> A:   Yes.

*Id.* at 1859–60. Reed also highlighted aspects of Mings' direct testimony that were inconsistent with each other or were not entirely logical. But Reed did not question Mings about any inconsistencies between his trial testimony and other statements he had made to police, nor did he ask Mings about any benefit Mings had sought from or been offered by the Commonwealth.

### i. *Favorability*

As noted, Claim X relies on fourteen pieces of evidence:

1) Mings' January 16, 2004 recorded statement to the police.
2) Mings' May 12, 2004 recorded statement to the police.
3) The Investigation Notes.
4) Evans' notes from his April 21, 2004 interview with Melinda Bowser.
5) Evans' notes from his December 10, 2004 interview with Mings.
6) Evans' notes from his December 29, 2004 interview with Mings.
7) Evans' notes related to his direct examination of Mings.
8) Evans' undated notes related to Mings.

9)   Norfolk Circuit Court records of Mings' 2001 conviction for distribution of cocaine.

10)   Norfolk Circuit Court records of Mings' 2004 conviction for possession of cocaine.

11)   Melinda Bowser's January 16, 2004 statement to the police.

12)   Murray's February 6, 2004 statement to the police.

13)   Mings' January 5, 2005 letter to the Norfolk Circuit Court Judge presiding over his probation revocation hearings.

14)   Information Mings gave to police officers during questioning between May 12, 2004, and January 7, 2005.

Am. Pet. at 172–73.[62]

Juniper argues that this evidence impeaches eight aspects of Mings' testimony: (1) his explanation for going to Keshia's apartment on the day of the murders; (2) whether Mings saw Murray leaving Keshia's apartment; (3) the number of times Mings went to Keshia's apartment on the day of the murders; (4) whether Mings went to Keshia's apartment alone or with someone else; (5) what Juniper said to Mings while they were in Keshia's apartment; (6) Mings' time estimates for what he did on the day of the murders; (7) the number of times Mings called 911; and (8) whether Mings saw anyone outside of Keshia's apartment when he went there to check on Keshia.

Although not entirely clear, Claim XI appears to be based on Norfolk Circuit Court records related to Mings' criminal convictions and probation revocations, evidence of Evans' involvement in Mings' probation violation proceedings, and Mings' January 5, 2005 letter to the Norfolk Circuit

---

[62] Although Juniper lists these fourteen sources of information as underlying Claim X, his *Brady* arguments related to that claim rely only on nine of those sources. *See* Am. Pet. at 173–93. In Claim X, Juniper makes no *Brady* argument related to the following evidence: Evans' notes from his December 29, 2004 interview with Mings (number six); Evans' undated notes related to Mings (number eight); Norfolk Circuit Court records of Mings' 2001 or 2004 drug convictions (numbers nine and ten); or Mings' January 5, 2005 letter to the Norfolk Circuit Court Judge presiding over his probation revocation hearings (number thirteen).

This leaves the Court struggling to discern the precise basis of and allegations supporting Juniper's alleged *Brady* violations, even in a 273-page petition.

Court Judge presiding over his probation revocation hearings.[63]  Juniper asserts that this evidence

would have revealed Mings' "self-interested motivation to implicate Juniper." *Id.* at 197.

The Warden does not contest the favorability of any of the evidence at issue in Claims X

and XI.[64]  For purposes of summary judgment, the Court will therefore assume, but not hold, that

all the evidence is favorable.

### ii. *Suppression*

The parties have stipulated that the prosecution did not disclose the following evidence to

Juniper:

- Mings' January 16, 2004 recorded statement to the police
- The Investigation Notes
- Evans' notes from his April 21, 2004 interview with Melinda Bowser
- Evans' notes from his December 10, 2004 interview with Mings
- Evans' notes from his December 29, 2004 interview with Mings
- Evans' notes related to his direct examination of Mings
- Evans' undated notes related to Mings
- Norfolk Circuit Court records of Mings' 2001 conviction for distribution of cocaine
- Norfolk Circuit Court records of Mings' 2004 conviction for possession of cocaine[65]

---

[63] This evidence also corresponds with many of the sources of evidence that Juniper lists in Claim X but does not rely on in support of that claim. *See supra* note 62. Once again, this leaves the Court struggling to parse precisely what evidence he asserts the prosecution suppressed and how he alleges that evidence is favorable and material.

[64] As to Claim XI, the Warden argues that "[n]one of the information is exculpatory" because "[a]t most, [it] could be impeaching." Warden Mem. Supp. 90. Of course, evidence can be favorable "*either* because it is exculpatory, or because it is impeaching." *Banks*, 540 U.S. at 691 (emphasis added) (quoting *Strickler*, 527 U.S. at 281–82).

[65] Despite having stipulated that the prosecution did not disclose Mings' 2001 and 2004 conviction records to Juniper's counsel, the Warden nevertheless argues that Juniper's arguments that the prosecution suppressed this evidence are "without merit." Warden Resp. at 51. The Warden makes no persuasive argument why he should not be held to his stipulations—nor, indeed, does he even acknowledge the inconsistency. "Factual stipulations are binding and conclusive, and the facts stated are not subject to subsequent variation." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 677 (2010) (cleaned up). The Court therefore finds—as the parties have stipulated—

- Melinda Bowser's January 16, 2004 statement to the police[66]
- Murray's February 6, 2004 statement to the police

And the Court easily concludes that the prosecution did not disclose to Juniper two remaining pieces of allegedly exculpatory evidence: Mings' January 5, 2005 letter to the Norfolk Circuit judge presiding over his probation revocation proceedings and his May 12, 2004 recorded statement to the police.[67] Nothing in the record indicates that Juniper's trial counsel ever possessed either piece of evidence. The evidence is not in any of Juniper's defense team's files and nobody on his team remembers having it. Reed spent nearly half of his cross-examination of Mings asking about his criminal history and any sentencing benefit Mings might get for testifying, yet he did not ask Mings about his January 5, 2005 letter.[68] And although Reed highlighted logical flaws in some

---

that the prosecution "had in its possession and did not disclose to Juniper Norfolk Circuit Court records of" Mings' 2001 and 2004 drug offense convictions. Stip. Nos. 607–08.

[66] The parties have also stipulated that Bowser's recorded January 16 statement, and its contents, "*remain* concealed from Juniper, and cannot be found by the Commonwealth." Stip. No. 561 (emphasis added).

[67] In summary judgment briefing, Juniper appears to rely on one other source of evidence in support of Claim X: "records of the investigation of the October 16, 2003[] shooting of Anthony Hall, and the identification of Mings as a suspect in this shooting." Juniper Mem. Supp. 60. The Court will not consider that evidence in ruling on Juniper's *Brady* claims because Juniper's Amended Petition did not allege any *Brady* violation based on this evidence. The only mention of Anthony Hall in Juniper's Amended Petition is in a footnote in the section addressing Claim XII. *See* Am. Pet. at 206–07 n.141. Juniper does not allege a *Brady* violation in that footnote.

Juniper, like all civil litigants, may not amend his petition in briefing on summary judgment. *See, e.g.*, *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009) ("[A] plaintiff may not raise new claims after discovery has begun without amending his complaint."). The Court therefore will not consider any claim that the prosecution violated *Brady* by suppressing information that Mings was considered a suspect in the shooting of Anthony Hall because Juniper has not properly presented it.

[68] In that letter, Mings asked the judge who had sentenced him on his probation violation to "please consider the good [Mings had] accomplished since [his] incarceration," including that he was "assisting the commonwealth in a very big case." SH App'x at 2854.

of Mings' direct testimony, he did not point out the inconsistencies between Mings' trial testimony and his May 12, 2004 statement.

The record also indicates that, had Reed possessed Mings' January 5 letter or May 12 statement, he would have used them in his cross-examination of Mings. Reed testified that his "goal as a criminal defense attorney is to point out where the Commonwealth witnesses have changed their story, either from prior testimony, prior written statements[,] or just a departure from common sense." Supp App'x at 1761. Reed's failure to cross-examine Mings about either piece of evidence indicates that he did not have them. In all, the lack of any evidence that the prosecution disclosed Mings' January 5 letter or May 12 statement, combined with the evidence indicating that Reed would have cross-examined Mings about that evidence if he had it, supports the conclusion that the prosecution did not disclose the evidence to Juniper. The Warden cites to nothing in the record undermining this conclusion.

The Court will therefore grant Juniper summary judgment on the suppression prong of Claim X.[69] Because, at the least, Juniper has established a factual dispute about whether the evidence underlying Claim XI was suppressed, the Court will deny the Warden summary judgment on the suppression prong of Claim XI.[70]

---

[69] Juniper has therefore established cause to excuse his procedural default of Claim X. *See Banks*, 540 U.S. at 691.

[70] The Court will grant the Warden summary judgment on one aspect of Claim XI: that the prosecution violated *Brady* by suppressing evidence of Evans' "direct involvement" in Mings' probation violation hearings. Am. Pet. at 194. Juniper cannot establish that the Warden suppressed this information.

Reed testified in his deposition that he did not remember knowing that Evans prosecuted Mings' probation violation hearings, but he "may have known it [at the time of Juniper's trial], and this is and was standard operating procedure. . . . So that would not have surprised [him] if Mr. Evans was the prosecutor. If he wasn't the prosecutor, he would have appeared as a witness." Supp. App'x at 1776–77. Because Reed knew that it would have been standard for Evans to be involved in Mings' probation violations, the prosecution cannot have suppressed that information.

### iii. *Materiality*

The Mings material, by itself, would have made no difference in the verdict. As with Juniper's other *Brady* claims, however, the Court must deny summary judgment to both parties on the materiality prong of Claims X and XI because it cannot evaluate cumulative materiality at this time.[71]

### 5. *Claim XII.A.*

In Claim XII.A., Juniper alleges that the prosecution suppressed evidence related to Keon Murray. He asserts this evidence was favorable in a number of ways.[72] Claim XII.A. relies on the following pieces of evidence: the Investigation Notes; Murray's February 6, 2004 recorded statement; information in Wray's, Conway's, and Murray's post-remand deposition testimony; Murray's 2006 affidavit; Norfolk Police Investigator Roger Pederson's Investigation Notes describing his June 15, 2004 interview with Murray about a different murder; and statements Murray made to the police in October 2006 and 2009. According to Juniper, this evidence is favorable for four reasons: (1) it impeaches Murray's testimony that Juniper confessed to him on the day of the murders; (2) it reveals Murray's self-interested motive for testifying and supports the conclusion that he "manufactured" Juniper's confession to obtain a sentencing benefit on his probation violation, Am. Pet. at 216; (3) it shows that "Murray was coached by law enforcement

---

See *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("[I]nformation that is not merely available to the defendant but is actually known by the defendant . . . fall[s] outside of the *Brady* rule."). The Court will grant summary judgment to the Warden on any *Brady* claim related to this information.

[71] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claims X and XI. *See Banks*, 540 U.S. at 691.

[72] In Claim XII.B. Juniper alleges a *Napue* violation based on some of the same evidence. *See infra* pages 74–77.

in what to say against Juniper," *id.* at 217; and (4) it shows that the police considered Murray a "snitch" at the time of Juniper's trial, *id.*

Juniper and the Warden each move for summary judgment on all of Claim XII.A.  The Court will grant summary judgment to the Warden on the *Brady* claim related to Murray's 2006 and 2009 statements to the police, grant summary judgment to Juniper on the favorability of the rest of the evidence, grant summary judgment to Juniper on the suppression of the rest of the evidence, and deny summary judgment to both Juniper and the Warden on the materiality of the suppressed evidence.

### a.  *Murray's Testimony*

Murray testified that he had known Juniper since he was "about nine," and he considered Juniper a "[g]ood friend."  SH App'x at 1795.  He awoke at Juniper's mother's house on the morning of the murders to a "commotion"—Rashid and Juniper's mom "arguing."  *Id.* at 1800. Rashid was crying and "like, in shock."  *Id.* at 1801.  Murray and Rashid eventually left Juniper's house to pick up Jones and then retrieve Juniper from Keshia's apartment.  Before they left, though, Juniper called from Keshia's apartment and spoke to Murray.  Juniper told Murray that "[t]hey gone," and that Keshia's apartment was surrounded.  *Id.* at 1811.  Juniper also said that he "killed them," although he did not name particular individuals.  *Id.* at 1812.

Murray and Rashid picked up Jones and a "little girl" and went to Keshia's apartment. Murray and Jones—but not Rashid or the young girl—got out of the car.  *Id.* at 1813.  Murray went towards the back of the car and Jones went to the sidewalk leading up to Keshia's apartment. Murray heard Jones "calling [Juniper's] name," saying things like, "'Come out.' 'Come on.' 'Come on out of there.' 'What you doing?' 'Come on out.' 'Stop that.'"  *Id.* at 1814.  Juniper came out by himself and got in the car.  He was carrying a black and chrome automatic pistol.  Murray

said that Juniper "look[ed] nervous" and "[l]ike he was in shock," and he had a "powdery substance" on his face that Murray guessed was cocaine. *Id.* at 1815, 1817.

Murray testified that he had made no agreements and received no promises in exchange for his testimony. He also testified that, at the time of his testimony, he was in jail on a probation violation, had already been sentenced, and had no pending charges.

On cross-examination, defense attorney Reed sought to elicit testimony from Murray about his motive for testifying. He had the following exchange with Murray:

> Q: Did your lawyer mention to you that you could come back in on a reconsideration if you cooperated with the Commonwealth?
> A: No, sir.
> Q: So you don't know anything about that?
> A: No, sir.
> Q: But you know what I mean when I say reconsideration, don't you?
> A: Yes, sir.
> Q: And when the Commonwealth asked you if you had an agreement with the Commonwealth, the answer was no; correct?
> A: Yes, sir.
> Q: But you also know that your cooperation could be brought to the attention of the Court?
> A: Yes, sir.

*Id.* at 1825.

Juniper argues that, as it did with Mings, the prosecution undermined Reed's efforts at impeachment by impermissibly withholding material evidence relating to Murray's credibility.

### b. *Favorability*

Most of the evidence at issue in Claim XII.A. is undeniably favorable. The Investigation Notes, Murray's February 6, 2004 recorded statement, and Pederson's investigation notes are all impeachment material, either because they contain statements Murray made to law enforcement

that are inconsistent with his trial testimony or because they contain information undermining Murray's credibility generally.[73]

The same is true of Murray's 2006 affidavit, his post-remand deposition testimony, and Wray's and Conway's post-remand deposition testimony: each contains information that, if true, impeaches specific aspects of Murray's testimony or undermines his credibility generally.  For example, Murray's affidavit says he was "questioned maybe 10 different times" in relation to the Stephens family murders, was told information about what Rashid and Jones had done on the day of the murders, and was "kept . . . in jail and [investigators] let [him] know what the story would be that [he] would have to tell at trial."  SH App'x at 3240–41.  Murray's post-remand deposition testimony contains an account of the events of January 16 that, as Juniper puts it, "bore very little resemblance to [his] trial testimony," and therefore also contains potential impeachment evidence. Am. Pet. at 213.  Wray's and Conway's post-remand deposition testimony contains information that could be used to argue that police investigators coached Murray about what to say.[74] Conway's testimony also contains information that, around the time of the Stephens family murder

---

[73] The Warden argues that Pederson's investigation notes are not favorable, but concedes they contain "potential impeachment evidence."  Warden Mem. Supp. at 99–100.

[74] The Warden argues that "[t]here is no evidence in this record to support the allegation that the investigators coached Murray regarding what to say in his statement."  Warden Resp. at 58.  The Warden is wrong.  The parties' stipulated facts alone support that allegation.  The parties stipulated that "[w]hile interrogating Murray on February 6, 2004, Investigator Wray told Murray that the police had evidence contradicting his version of events and showed that evidence to Murray," Stip. No. 335; that "Wray told Murray what other witnesses had said," *id.* No. 665; and that "investigators showed Murray photographs of alleged suspects and evidence" before he gave a recorded statement, *id.* No. 666.

investigation, he considered Murray a "jailhouse snitch."[75]  Supp. App'x at 3279.  The Court will grant summary judgment to Juniper on the favorability prong of these pieces of evidence.

In contrast, Murray's statements to the police in 2006 and 2009 do not help Juniper.  They deal with unrelated cases, years after the Stephens murders.  The Court will grant summary judgment to the Warden on any *Brady* claim Juniper asserts related to this information.[76]

### c. *Suppression*

Although the Warden contests the suppression of all the evidence Juniper relies on for Claim XII.A., the parties' stipulations resolve the suppression prong for at least three pieces.  The parties have stipulated that the prosecution never disclosed to Juniper the Investigation Notes, Murray's February 6, 2004 recorded statement, or Pederson's investigation notes until post-

---

[75] The Warden argues that "Juniper's characterization of Murray as a 'snitch' is not supported by the record."  Warden Resp. at 56.  The parties' stipulated facts belie the Warden's argument.  The parties stipulated that "[d]uring Investigator Conway's investigation of Murray, he developed information that led Conway to believe that Murray was previously a police informant," Stip. No. 698; that "Murray provided information to police in multiple homicide investigations," *id.* No. 700; and that "Murray noticed that every time he got into a little jam, he could go to the POC for a drug case and the homicide detectives would come talk to him," *id.* No. 703.

[76] Juniper argues that this evidence is favorable because it "support[s]" Conway's deposition testimony that "Murray's frequent presence at the POC while he was incarcerated in the Norfolk City Jail indicated to Conway that Murray was 'a jailhouse snitch.'"  Juniper Reply at 91 n.49 (quoting Supp App'x at 3279).  Juniper is wrong.  In his deposition testimony, Conway was referring to Murray's presence at the POC around the time of the Stephens family murder investigation.  That Murray gave statements to law enforcement years later in different criminal investigations does not corroborate Conway's opinion that—*at the time of this murder investigation*—Murray was a jailhouse snitch.

remand discovery.[77] The Court will grant summary judgment to Juniper on the suppression prong of these pieces of evidence.[78]

The record resolves the suppression issue for the rest of the favorable evidence. As to the information in Murray's affidavit, his post-remand deposition testimony, and Wray's and Conway's post-remand deposition testimony, the record establishes that this information was suppressed. In his cross-examination of Murray, Reed sought to discredit Murray. He questioned Murray about the delay between the murders and the time Murray initially spoke to police; about any benefit Murray might receive in exchange for his testimony; about the prosecution's grant of immunity to compel Murray to testify; and about inconsistencies between Murray's testimony and what Murray had told Juniper's investigator, Kennedy. But he did not ask Murray any questions designed to point out that the police had coached Murray or considered him a snitch. If Reed had this information, he almost surely would have used it. The Warden has not pointed to anything in the record indicating otherwise. *Cf. Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."). The Court will grant summary judgment to Juniper on the suppression prong of these pieces of evidence.[79]

---

[77] The Warden once again makes arguments directly contrary to the parties' stipulations of fact. *See* Warden Resp. at 55–56 (arguing, among other things, that "Juniper presents no affirmative evidence" that Pederson's investigation notes were not disclosed). Despite his arguments, the Warden remains bound by his stipulations of fact. *See supra* note 65.

[78] Juniper has therefore established cause to excuse his procedural default of Claim XII.A. as to this evidence. *See Banks*, 540 U.S. at 691.

[79] Juniper has therefore established cause to excuse his procedural default of Claim XII.A. as to this evidence. *See Banks*, 540 U.S. at 691.

### d. *Materiality*

As with Juniper's other *Brady* claims, the Court must deny summary judgment to both parties on the materiality prong of Claim XIV because it cannot evaluate cumulative materiality at this time.[80]

### 6. *Claim XIII.B.*

In Claim XIII.B. Juniper alleges that the prosecution suppressed two pieces of evidence: (1) Officer Atkinson's notes about responding to the 12:44 p.m. 911 call to Keshia's apartment, and (2) a recorded statement Chaunte Hodge gave to the police that evening.[81] Juniper argues that this evidence contains information that would have impeached Officer Atkinson's testimony.[82] Juniper moves for summary judgment on the favorability and suppression prongs of this claim. The Warden moves for summary judgment on all of it.

---

[80] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim XII.A. *See Banks*, 540 U.S. at 691.

[81] In Claim XIII.A., Juniper alleges a *Napue* violation based on this same information. *See infra* pages 77–80.

[82] Juniper argues that information in Officer Atkinson's report and Hodge's statement also would have undermined the prosecution's timeline and impeached the testimony of Rashid, Mings, and Murray. But Juniper's amended Claim IV.D. addresses that aspect of Hodge's statement and Officer Atkinson's report, and the Court has concluded that Claim IV.D. is barred by the mandate rule. For the reasons discussed related to Claim IV.D., *see supra* pages 17–18, the Court will dismiss any portion of Claim XIII.B. that relies on those parts of Hodge's statement and Officer Atkinson's report.

Juniper also contends that Officer Atkinson's statement that he concluded after speaking with Hodge and Frazier that "someone had been making false calls at" Keshia's apartment building, Supp. App'x at 2225, is favorable because it "provides some explanation for why a false 911 call would have been made at 12:44 p.m.," Am. Pet. at 245. But Officer Atkinson testified at trial that he had concluded the 12:44 p.m. 911 call was false, and Juniper points to nothing indicating he could have uncovered additional favorable information had he known about Officer Atkinson's conclusion earlier.

Thus, the Court will limit the scope of Claim XIII.B. to Hodge's statement that she had told Officer Atkinson about the existence of and entrance to Keshia's apartment.

The Court will grant summary judgment to Juniper on favorability, grant summary judgment in part to Juniper on suppression, deny summary judgment in part to both Juniper and the Warden on suppression, and deny summary judgment to the Warden on materiality.

### a. *The Evidence*

According to Officer Atkinson's testimony, at about 12:44 p.m. on the day of the murders, Officer Atkinson responded to a "possible shots fired call sound of a disturbance" in an apartment at 1427 Kingston Ave. SH App'x at 1239. The call said that "noise was coming from the upstairs apartment, that you had to go upstairs behind the building near trees." *Id.* at 1241. Officer Atkinson arrived at the apartment complex, parked his car, and "went around" the apartment complex to "a set of steps that lead from the back side of the building up toward the front." *Id.* at 1245. He went up those stairs and was about to knock on a door when Chaunte Hodge approached him "out of the parking lot from somewhere." *Id.* After speaking with Hodge, he went "back downstairs" to apartment number two and spoke to the woman in that apartment, *id.* at 1245–46, who was Frances Frazier, Hodge's mother-in-law, *id.* at 1252. Hodge and Frazier denied calling 911, and after speaking with them both, Officer Atkinson was under the impression that the call he had responded to "was more than likely a false call," *id.* at 1247. Officer Atkinson then "stood out in the parking lot for probably another 15, 20 minutes talking" with another officer. *Id.* at 1247. He left at about 1:15 or 1:20 p.m.

After responding to the 911 call Officer Atkinson handwrote a two-page report. His report documented much of what he described in his testimony. It characterized his conversation with Frazier as follows:

> I . . . spoke  to the woman in apartment #2 and asked if she had heard any noises or sounds of a struggle, gunshots, etc. coming from apartment above her or any other apartments, she told me earlier in the morning she heard people upstairs moving

furniture and then saw them leave in a car. She stated she had been home all day
and heard nothing else.

Supp. App'x at 2224. He also wrote, consistent with his testimony, that after speaking with Frazier

and Hodge, he "was left with [the] impression someone had been making false calls at this

location." *Id.* at 2225. And he wrote that he "never saw the stairs which [led] to the apartment

where it turned out the homicide had occurred." *Id.*

At 5:27 p.m. on the day of the murders, Hodge gave a recorded statement to the police. In

that statement she described her interaction with Officer Atkinson.[83]  Much, but not all, of her

description matched Officer Atkinson's report. As relevant to Claim XIII.B., Hodge said that

Officer Atkinson "asked [her] if there was another apartment upstairs," and she "*told him around*

*on the other side.*" *Id.* at 2230 (emphasis added).

### b. *Favorability*

This evidence is favorable. Hodge's description of her interaction with Officer Atkinson

impeaches Officer Atkinson's testimony that he did not learn about the existence of Keshia's

apartment or how to find it until hours after he responded to the 911 call. The Court will grant

summary judgment to Juniper on the favorability prong of Claim XIII.B.[84]

---

[83] She did not use Officer Atkinson's name, but her description of the interaction and its
timing make clear that she is referring to her conversation with Officer Atkinson. She also
described other things she saw on the day of the murders, but other claims in Juniper's Amended
Petition address those aspects of her statement.

[84] The Warden argues that Hodge's affidavit "[a]t most . . . *may* impeach Officer
Atkinson's reflection that he did not know about the second stairwell"—a reflection that he shared
with the jury during his sworn testimony. Warden Resp. at 74 (emphasis added). "The  purpose
of . . . impeachment is to discredit the witness, not to establish the existence of the fact in dispute."
*Brooks v. United States*, 309 F.2d 580, 582 (10th Cir. 1962); *accord Chiasson v. Zapata Gulf
Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) ("Impeachment evidence . . . is offered to
discredit a witness to reduce the effectiveness of her testimony by bringing forth evidence which
explains why the jury should not put faith in her or her testimony." (cleaned up)).  Hodge's

### c. *Suppression*

The prosecution suppressed Hodge's statement. The parties have stipulated that at the time of Juniper's trial the prosecution possessed her statement. They have also stipulated that no member of Juniper's defense team remembers being given, shown, or told about the information in those notes. And they have stipulated that Reed, who cross-examined Officer Atkinson, would have cross-examined him about the contents of Hodge's statement if he had it. These stipulations, combined with the fact that Reed did not cross-examine Officer Atkinson about the favorable information in Hodge's statement, support the conclusion that the prosecution did not disclose her statement to Juniper. The Warden points to no evidence undermining that conclusion. The Court will grant summary judgment to Juniper on the suppression prong of Claim XIII.B. as it relates to Hodge's statement that she told Officer Atkinson about Keshia's apartment.[85]

### d. *Materiality*

As with Juniper's other *Brady* claims, the Court must deny summary judgment to both parties on the materiality prong of Claim XIV because it cannot evaluate cumulative materiality at this time.[86]

### 7. *Claim XIV*

In Claim XIV, Juniper alleges that the prosecution suppressed "evidence regarding people who were in the area of Stephens's apartment around the time of the murder." Am. Pet. at 250

---

statement, which says the opposite of what Officer Atkinson said in his testimony, is classic impeachment evidence.

[85] Juniper has therefore established cause to excuse his procedural default of Claim XIII.B. as it relates to Hodge's statement. *See Banks*, 540 U.S. at 691.

[86] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim XIII.B. *See Banks*, 540 U.S. at 691.

(capitalization altered).  He argues that the prosecution improperly suppressed the statements of Chaunte Hodge (featured in several of Juniper's other claims), Patrick Danso, and Terence Fitzgerald.  According to Juniper, each of these people gave statements to police on the day of the murders that "contrasts starkly with the accounts of critical Commonwealth witnesses." *Id.* at 252. Juniper moves for summary judgment on the favorability and suppression prongs of Claim XIV, and the Warden moves for summary judgment on the entire claim.

The Court will grant summary judgment to Juniper on the favorability and suppression prongs of Claim XIV as it relates to Hodge's and Danso's statements, grant summary judgment to the Warden as it relates to Fitzgerald's statements, and deny summary judgment to both Juniper and the Warden on the materiality of this evidence.

### a. *The Statements*

Soon after discovering the four victims' bodies, the police conducted a canvass of Keshia's neighborhood, during which they spoke with people who lived near Keshia's apartment, including Hodge, Danso, and Fitzgerald.

The police summarized the results of the canvass in notes, and, as discussed above, they recorded Hodge's statement later in the evening.  In her recorded statement, Hodge said that she had come home from work briefly at about 10:45 a.m. on the day of the murders.  At that time she saw a green car with three men in it pull into the parking lot of the apartment complex.  A black man with "light skin" and "braids in his hair" that went "[a]bout to his ear" got out of the car. Supp. App'x at 2228.  The man walked "[a]round the right of the building, to the back," and the car pulled off soon after.[87]  *Id.* at 2228–29.

---

[87] Hodge's statement during the canvass, as summarized in the notes of police investigators, is largely consistent with her recorded statement, but there are some discrepancies.  The canvass notes say that Hodge saw four (not three) men in the car, and that she described all four men as

Danso lived in an apartment two buildings away from Keshia's and on the same side of the street. During the canvass, he told the police that "around" 11:30 the day of the murders, he was in his car in the parking lot "when a black male with dreads walked up to him and asked if Danso was waiting for someone." *Id.* at 4974. The man "walked away from him and walked between [Keshia's] apartment and the fence behind it." *Id.* A few minutes later, the man walked out with another man who "said to the one with the dreads 'Just forget about it it ain't worth it.'" *Id.* Danso said he was "afraid" of the man with the dreads. *Id.*

Terence Fitzgerald told the police that he had picked up two of Keshia's older children at about 9:00 a.m. to take them to school. While picking them up, he saw "a gray car with a missing tag in the parking lot." App'x at 670.

### b. *Favorability*

Hodge's and Danso's statements are favorable.[88] They each describe seeing someone, not matching Juniper's description, in Keshia's apartment complex and near the stairwell to her apartment around the time the prosecution placed the murders. This information could impeach the prosecution's timeline and theory of the murders, which did not involve anyone other than Rashid and Juniper present in Keshia's apartment immediately before the murders. It could also provide a potential alternative suspect.

---

black. (In her recorded statement, she identified only the man who got out of the car as black.) The canvass notes also say that Hodge described the man who got out of the car as "in his twenties," "wearing a black jacket," and "talking on his cell phone" while he walked to the apartment. Supp. App'x at 4972. Finally, the canvass notes say that Hodge said that the men in the car "kept looking back to see if she was watching" as they backed out of the parking lot and "did not leave in a hurry." *Id.*

[88] The Warden notes that this evidence is of little value and contends that it is therefore not favorable. This argument ignores the difference between "the weight of the evidence [and] its favorable tendency"—distinct inquiries in the *Brady* context. *Kyles*, 514 U.S. at 451.

In contrast, Fitzgerald's statement—that he saw a car with no tags around 9:00 a.m. on the morning of the murders—provides no assistance to Juniper. As the parties have stipulated, "[t]he prosecution's evidence at trial was that the victims were killed before 12:44 p.m.," but it also "presented evidence at trial and argued that the murders had occurred closer to 10:20 a.m. than 12:44 p.m." Stip. Nos. 223–24. That means that Fitzgerald's statement describes a car in the parking lot of Keshia's apartment at least 80 minutes before the earliest time the prosecution argued the murders occurred. It has nothing to do with the case.

The Court will grant summary judgment to Juniper on the favorability prong Claim of XIV as it relates to Hodge's and Danso's statements and grant summary judgment to the Warden on all of Claim XIV as it relates to Fitzgerald's statement.

### c. *Suppression*

The parties have stipulated that the Canvass Notes, "containing the evidence that Hodge . . . and Danso told police on January 16, 2004, were not provided to Juniper prior to his trial." Stip. No. 508. And the Court has already found—based on the parties' stipulations—that the prosecution suppressed Hodge's recorded statement. *See supra* p. 59.

The Court will grant summary judgment to Juniper on the suppression prong of Claim XIV as it relates to Hodge's and Danso's statements.[89]

---

[89] Juniper has therefore established cause to excuse his procedural default of Claim XIV as it relates to Hodge's and Danso's statements. *See Banks*, 540 U.S. at 691.

### d. *Materiality*

As with Juniper's other *Brady* claims, the Court must deny summary judgment to both parties on the materiality prong of Claim XIV because it cannot evaluate cumulative materiality at this time.[90]

### 8. *Claim XV*

In Claim XV, Juniper alleges that the prosecution suppressed evidence that police met with at least three inmates other than Ernest Smith who implicated Juniper in the Stephens family murders.[91] Only the Warden seeks summary judgment on Claim XV.

The Court must deny summary judgment to the Warden on Claim XV because disputes of fact exist about whether the evidence was favorable, suppressed, or material.

---

[90] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim XIV as it relates to Hodge's and Danso's statements. *See Banks*, 540 U.S. at 691.

[91] In support of Claim XV, Juniper also points to "Smith's prior relationship with the victims," calling that relationship "a potential source of bias that should have been disclosed to Juniper's trial counsel." Am. Pet. at 267. Although the Warden does not assert the statute of limitations as a defense to this part of Claim XV, the time for Juniper to assert a claim based on Smith's relationship with Keshia and her children may have long since passed.

In his 2007 affidavit, Smith described his relationship with Keshia, stating that he considered Keshia and her children "[his] people," and that he "even babysat for [Keshia's] older girls a couple of times." SH App'x at 3253. So Juniper knew of Smith's relationship with Keshia at least in January 2007, and would likely have had, at most, one year from January 2007 to seek relief based on that relationship. *See* 28 U.S.C. § 2244(d)(1)(D) (giving a habeas petitioner one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" to seek habeas relief).

Because the Warden does not argue that this portion of Claim XV is barred by the statute of limitations, the Court will not dismiss it for that reason at this point.

### a. *The Evidence*

Claim XV relies on evidence uncovered in post-remand discovery that three inmates other than Smith sought to provide information implicating Juniper in the murders. The record contains transcripts of recorded statements from two of the inmates and a letter and affidavit from the other.

In a recorded statement, inmate George Hastings recounted a conversation he had with Juniper when Hastings first arrived in jail. Hastings said he had known Juniper since 1996 and Juniper greeted him warmly when they first saw each other in jail. Hastings said that Juniper told him he had committed the murders and said that he "had to" because otherwise "the drug family [Juniper] worked for . . . . was gonna kill him." Supp App'x at 5007. According to Hastings, Juniper believed he was in danger because he had given Keshia "a brick of cocaine" and she had $13,000 of Juniper's money. *Id.* Hastings also said that Juniper admitted that he was "having sex with her even though he had a relationship," and "he knew she had a boyfriend on the side." *Id.* Hastings said that Juniper told him that "he did the kids, cause the kids knew him, and that when it all came down to witnesses or something, then the kids could've said, 'Well, Anthony came over here and shot my momma.'" *Id.* at 5008.

Inmate Quentin White said that he, Murray, and Juniper had been "snorting a pot of cocaine" the night before the murders, and Juniper "starting talking about [how] he was gonna kill her." *Id.* at 3408. According to White, the woman Juniper planned to kill was "was cheating on him, or she ain't want him no more." *Id.* at 3409. White said he saw Murray the next day and Murray "was like, 'man, he did it.'" *Id.* at 3408. White identified the victims as Juniper's "baby momma, and his kids." *Id.*

A third inmate, Timothy Outlaw, wrote a letter to John Doyle, the lead prosecutor in Juniper's case. Outlaw said:

> I think we can help one another. You have a murder case against Anthony Juniper for killing four people, two adult and two children. How about I have some information that will put Mr. A. Juniper in prison for the rest of his life. So he will not kill anymore children ever again.

*Id.* at 5012. A handwritten note at the bottom of the letter says "10/28/04 at 1:00 to Homicide [FOR]. Thx, PE." *Id.* at 5013.

> The record also contains an April 2019 affidavit from Outlaw, in which Outlaw states:

> I told the officers who talked to me that Anthony Juniper had committed these murders of two adults and two children. However, the truth is that Anthony Juniper did not tell me that. In fact, he never discussed his case with me at all. I never heard him discuss it with others on the pod, and I was often around when we were playing chess together.

*Id.* at 5091. Outlaw also says: "It was a big case, so people on the medical pod at the jail talked about jumping on Anthony Juniper's case to get their own charges reduced." *Id.* at 5092.

### b. *Favorability*

Juniper asserts that "[t]he information these inmates claimed to have . . . was inconsistent with the Commonwealth's theory of events." Am. Pet. at 265. Because of those inconsistencies, and because it shows that numerous inmates tried to provide incriminating information about him, Juniper argues that this evidence was favorable. According to him, it would have "impeached Smith's credibility" because it would have "informed jurors about the culture of snitching, and the ease with which other inmates can concoct stories for their own benefit." *Id.* at 269.

As with much of the *Brady* evidence Juniper cites in this case, the inmates' statements largely cut against Juniper. Although they contain nuggets that could be favorable to Juniper, their statements on the whole support the conclusion that Juniper committed all four murders. But that fact goes to the weight of the evidence, not its tendency to be somewhat favorable. *See Kyles*, 514 U.S. at 451. Because at least parts of the inmates' statements are favorable, the Court must deny summary judgment to the Warden on the favorability prong of Claim XV.

66

c. *Suppression and Materiality*[92]

The Court must also deny summary judgment on the suppression and materiality prongs of Claim XV.[93]  As to suppression, nothing in the record supports the conclusion that Juniper's defense team knew about these individuals.  In these circumstances, the absence of evidence of disclosure creates a factual dispute about whether the prosecution suppressed the evidence.

As to materiality, the Court must deny summary judgment to both parties on the materiality prong of Claim XIV because it cannot evaluate cumulative materiality at this time.[94]

\*     \*     \*     \*

In sum, the Court grants summary judgment to Juniper on the favorability and suppression of the vast majority of the alleged *Brady* material.  Because the Court cannot evaluate the materiality of the evidence underlying Claim I without holding an evidentiary hearing, and because it must assess *Brady* materiality cumulatively, the Court must deny summary judgment to both the Warden and Juniper on the materiality of all of the favorable evidence the prosecution suppressed.

---

[92] Juniper passingly asserts that "at least one juror would have voted to acquit Juniper, *found him ineligible for the death penalty, or voted for life without the possibility of parole*" if the jury had heard this evidence.  Am Pet. at 270 (emphasis added).  But aside from this single conclusory statement, the allegations in Claim XV—as well as the parties' arguments in summary judgment on that claim—relate entirely to how the inmates' statements would have impacted Juniper's *convictions*.  Moreover, it is unclear how Juniper's conclusory assertion of prejudice at the sentencing stage affects his petition now that his death sentence has been converted to a sentence of life imprisonment without the possibility of parole.

[93] The Court will therefore also deny summary judgment on the cause prong of Juniper's procedural default of Claim XV. *See Banks*, 540 U.S. at 691.

[94] The Court will therefore also deny summary judgment on the prejudice prong of Juniper's procedural default of Claim XV. *See Banks*, 540 U.S. at 691.

### 9. *The* Brady *Claims Generally*

Measured in words—or pages, or even pounds—Juniper's *Brady* claims could seem significant. He has identified numerous categories of evidence that could have been used to impeach parts of the prosecution's key witnesses' testimony. The prosecution never shared most of that evidence with Juniper's defense team before or during trial. In fact, the Warden has steadfastly opposed sharing it with Juniper's habeas counsel through twelve years of state and federal habeas proceedings.

Despite the large quantity of evidence Juniper points to, the vast majority of it has little quality. The potential impeachment evidence he identifies nibbles around the edges of the prosecution's case, but it never takes a bite out of its center.

For example, in arguing that the Jones Material would have impeached Rashid's, Murray's, and Mings' testimony, Juniper points to the following discrepancies, among others, between what Jones told police and what other witnesses said to police and in their testimony:

- Jones said the car Rashid drove was burgundy or maroon, but other witnesses said it was brown.

- Jones said that after they arrived at Keshia's apartment, Murray got out of Rashid's car and walked with him towards Keshia's apartment, but Murray said that he stayed near the car.

- Jones said the gun Juniper had when he left Keshia's apartment was a black automatic, but other witnesses said it was black and chrome.

- Jones said that he gave Juniper liquor after Juniper got in the car, but neither Rashid nor Murray mentioned that.

- Jones also said that Juniper smoked while he was in the car, but neither Rashid nor Murray mentioned that, either.

- Jones described Juniper as calm during the car ride, but Rashid and Murray both said Juniper seemed on edge.

- Jones said that Juniper wore a blue or black hoody on the day of the murders, but Rashid said he wore a bulky black jacket.

But aside from Jones' initial claims that he knew nothing about the murders (a claim that Murray also initially made) and that Murray did not go with him and Rashid to Keshia's apartment (a claim that Rashid also initially made), the substance of all three individuals' statements—and of Rashid's and Murray's testimony—is largely consistent. All three of them said that Rashid and Murray picked Jones and his girlfriend's daughter up from Jones' girlfriend's house to go to Keshia's apartment. All three said that Rashid stayed in the car at Keshia's apartment. All three said that Jones called to Juniper, and Juniper eventually came out. And all three said that Juniper had a gun when he got in Rashid's car. Nothing in any of the Jones Material contradicts the portions of Rashid's or Murray's statements that most strongly inculpated Juniper in the murders.

The same is true of the evidence underlying Juniper's *Brady* claims related to Tyrone Mings. Juniper identifies fourteen sources of information and spends eight pages discussing the ways this information conflicts with "[n]umerous fundamental components of Mings's trial testimony." Am. Pet. at 173. Some of the conflicts he identifies are:

- Why Murray went to Keshia's apartment on the day of the murders;

- Whether Murray got out of Rashid's car when Rashid, Murray, and Jones arrived at Keshia's apartment and, if Murray did get out of the car, whether he stayed by the car or walked toward Keshia's apartment;

- How many times Mings went to Keshia's apartment on the day of the murders;

- Whether Mings went to Keshia's apartment on the day of the murders by himself or with someone else;

- Whether Mings went to the bedroom in Keshia's apartment to look for Keshia once or twice;

- What time Mings went to Keshia's apartment—specifically whether he went there "between noon and 1:00 p.m."; "around noon"; "[s]hortly" after 10:00 a.m., or between 10:00 a.m. and noon, *id.* at 179 (quotations omitted);

- How many times Mings and his girlfriend called 911, and how many times Mings had been to Keshia's apartment when they called;

- Whether Mings saw "a black man in a silver vehicle" when he went to Keshia's apartment, *id.* at 180 (quotations omitted).

But as with the Jones Material, the inconsistencies Juniper identifies among Mings' various statements to police, his trial testimony, and the testimony and statements of other prosecution witnesses do not go to the most incriminating parts of Mings' story: that he saw Juniper in Keshia's apartment holding a gun with cocaine on his face, and that when Mings asked Juniper where Keshia was, Juniper directed him to the victims' bodies. And none of the inconsistencies Juniper identifies conflict with the important ways Mings' testimony corroborated Rashid's and Murray's: that he saw Juniper, Jones, and Murray leave Keshia's apartment, get into a car driven by someone else, and drive away. As with the Jones Material, nothing in the evidence underlying Juniper's Mings-related *Brady* claims contradicts the portions of Mings' testimony that most strongly inculpated Juniper in the murders.

The same is true of much of the other evidence underlying the rest of Juniper's claims.

Of course, it is possible that the numerous inconsistencies about facts ancillary to the incriminating portions of Rashid's, Murray's and Mings' testimony could have led the jury to discount some or all of those three witnesses' testimony. But it is also possible that the minor inconsistencies among their stories could have strengthened their credibility in the jury's eyes. Is there that much difference between a black hoody and a bulky black jacket? Is it not entirely understandable to remember a brown car as burgundy or a burgundy car as brown? Could not someone have multiple reasons for going to someone's apartment?

Faced with these insignificant differences in their testimony and statements, the jury could have viewed Rashid, Murray, and Mings as each testifying based on his or her memory, instead of based on a coordinated version of events. And watching a defense attorney cross-examine a

70

witness about these collateral inconsistencies could have hammered home to the jury that these witnesses' testimony differed only in minor ways.

The death-by-a-thousand-cuts approach Juniper takes in his Amended Petition is understandable. And, in this case, it has earned him an evidentiary hearing on a slew of *Brady* claims. But by focusing on the trees of the details of prosecution witnesses' testimony, he may be missing the forest: that the ultimate question in any *Brady* claim is whether the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The Court doubts that inconsistencies in the witnesses' memory of ancillary facts, such as the color of Rashid's car, or the sort of jacket Juniper wore, or whether Juniper smoked or drank (or both) on the drive from Keshia's apartment could put the case in such a light. But, of course, that is what the evidentiary hearing is for.

And regardless of whether Juniper ultimately succeeds in showing that the undisclosed evidence was material to the outcome of his trial, the Court remains—as was the Fourth Circuit— baffled by the Commonwealth's approach to discovery in this case. The Commonwealth withheld from Juniper's defense team a mountain of evidence. That evidence included police investigation notes describing their interviews with witnesses, recorded statements of testifying witnesses, and the identity and statements of individuals who were in the vicinity of the murders near the time of the murders. And the prosecutor responsible for disclosing *Brady* material to Juniper's defense team made statements to this Court indicating that he "fundamentally misunderstood his obligation under *Brady*." *Juniper III*, 876 F.3d at 566.[95]

---

[95] Although referring to different prosecutors, the Fourth Circuit has also expressed exasperation with the Commonwealth's approach to *Brady*. *See Juniper III*, 876 F.3d at 566 n.7 ("We have repeatedly rebuked the Commonwealth's Attorney and his deputies and assistants for failing to adhere to their obligations under *Brady*. . . . We find it troubling that, notwithstanding

71

If the withheld evidence ends up not being cumulatively material, the Commonwealth will not have technically violated *Brady*. But the Court struggles to see how the Commonwealth's tactics result in the appearance, pursuit, or realization of justice. *Cf. Berger v. United States*, 295 U.S. 78, 88 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

### B. Napue *Claims*

Juniper alleges in claims IX.B., XII.B. and XIII.A. that the prosecution violated *Napue*. After outlining the general principles of *Napue* claims, the Court addresses each claim separately.

### 1. Napue *Claims: Legal Standard*

A *Napue* violation occurs when the prosecution knowingly elicits false or misleading testimony or allows such testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (citations omitted)). To establish a *Napue* violation, a petitioner must show that: (1) the testimony was false or misleading; (2) the prosecution knew the testimony was false or misleading; and (3) the testimony was material. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002).[96]

---

these rebukes, officials in the Commonwealth's Attorney's office continue to stake out positions plainly contrary to their obligations under the Constitution.").

[96] The Court will refer to these as the "falsity," "knowledge," and "materiality" prongs.

Although they are a subset of *Brady* claims, a different materiality standard governs *Napue*

claims. *United States v. Agurs*, 427 U.S. 97, 103–04 (1976). To show materiality under *Napue*, a

petitioner need only establish "any *reasonable likelihood* that the false testimony could have

affected the judgment of the jury." *Id.* at 103 (emphasis added). Under *Napue*'s materiality

standard, "the fact that testimony is perjured is considered material unless failure to disclose it

would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 680 (1985).

### 2. *Claim IX.B.*

In Claim IX.B., Juniper alleges that the prosecution elicited and failed to correct misleading

testimony from Tyrone Mings about his January 16 statement to the police. According to Juniper,

the prosecution "presented" Mings' January 16 statement "as generally consistent with Mings's

testimony when, in fact, the statement indicated that Mings made no mention of Juniper when

asked a direct question providing the opportunity to mention him." Juniper Mem. Supp. at 55.

Juniper's argument depends on a fine parsing of both Mings' January 16 statement and his trial

testimony. According to Juniper, in Mings' January 16 statement, he "affirmatively denied" seeing

drugs, guns, or anyone other than two of the victims while he was in Keshia's apartment. Am.

Pet. at 163–64. But in his trial testimony, Juniper says, Mings implied that he had "merely

omitted" having seen Juniper (or the gun in his hand or the drugs on his face) when he spoke to

police on January 16. *Id.* at 163. According to Juniper, this inconsistency—and the prosecution's

allowance of it—violates *Napue*.

Both Juniper and the Warden move for summary judgment on all aspects of Claim IX.B.

The Court will grant summary judgment to the Warden because the undisputed facts show that

Mings' testimony was neither false nor misleading.

The relevant portion of Mings' testimony is as follows:

> Q:  When you talked to the police verbally on January 16, 2004 . . . , did you tell them at that time that you had seen [Juniper] inside?
> A:  No.
> Q:  Why didn't you tell them at that time?
> A:  I feared for my safety.

SH App'x at 1856.

> The relevant portion of Mings' January 16 statement is as follows:

> Q:  Did you observe anybody else inside the house?
> A:  No, sir.
> Q:  Did you observe any kind of weapons in the house?
> A:  No, sir.
> Q:  Did you observe any kind of narcotics, drug paraphernalia, or anything like that inside the house?
> A:  No, sir.

Supp. App'x at 933.

Viewed in its totality, Mings' trial testimony does not differ in any material way from his January 16 statement. Through Mings' testimony the jury heard the difference between his statement to police and his trial testimony: the presence of Juniper in the apartment holding a gun with cocaine on his face. The jurors could thus decide whether they believed Mings had lied to the police or was lying to them. Even drawing all reasonable inferences in Juniper's favor, Mings' testimony was neither false nor misleading. The Court will grant summary judgment to the Warden on Claim IX.B.

### 3. *Claim XII.B.*

In Claim XII.B., Juniper alleges that the prosecution elicited and failed to correct misleading testimony from Murray implying that he had no personal motive for testifying against Juniper. Juniper and the Warden both move for summary judgment on all of Claim XII.B.

The Court will grant summary judgment to Juniper on the falsity and knowledge prongs of Claim XII.B. and deny summary judgment to both Juniper and the Warden on the materiality prong.

### a. *The Testimony*

Juniper argues that two parts of Murray's testimony violated *Napue*. The first was during his direct examination:

> Q: Keon, do you have any agreements with the Commonwealth today concerning your testimony?
> A: No, ma'am.
> Q: Have any promises been made to you by the Commonwealth in exchange for you being here today and testifying?
> A: No, ma'm.

SH App'x at 1794. The second was during his cross-examination:

> Q: Did your lawyer mention to you that you could come back in on a reconsideration [for your probation violation sentences] if you cooperated with the Commonwealth?
> A: No, sir.
> Q: So you don't know anything about that?
> A: No, sir.

*Id.* at 1825.

Juniper argues that Murray's testimony implied that he "had not sought any benefit" in exchange for testifying against Juniper. Am. Pet. at 225. In his closing argument, Evans seemed to agree, arguing that Murray's testimony showed that he "wasn't getting anything," but was merely "forced to confront the truth." SH App'x at 2053.

### b. *Falsity*

The parties' stipulations of fact establish that Murray's testimony implying that he had no self-interested motive for testifying was slightly misleading. First, the parties have stipulated that when Murray spoke with police on February 6, 2004, he "wanted assistance from the police

regarding his [probation] violation in exchange for information." Stip. No. 660.  They have stipulated that when Murray spoke with police on June 16, 2004, he asked what the police "could do with his probation violation." Stip. No. 684.  And they have stipulated that Murray only said "that Juniper had confessed to him during a phone call on the day of the shooting" after asking for help with his probation violation. Stip. No. 686.

The Warden argues that the evidence does not show an "agreement" for Murray's testimony. Warden Resp. at 64. But *Napue* prohibits the prosecution from relying on *misleading* (not just false) testimony to obtain a conviction. *See Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967) ("Evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true.").  And, as Evans pointed out in his closing argument, Murray's testimony that he had no agreements with the Commonwealth, had received no promise in exchange for his testimony, and knew nothing about seeking a sentence reconsideration indicated that he was testifying—not for his own personal benefit—but because he was "forced to confront the truth."  SH App'x at 2053.  In light of the parties' stipulations, which show that Murray sought a sentencing benefit before he disclosed any information, that implication was misleading.

The Court will grant summary judgment to Juniper on the falsity prong of Claim XII.B.

### c. *Knowledge*

The parties' stipulations of fact also establish that the prosecution knew that such an implication was misleading. They have stipulated that the prosecution "knew that by the time of Juniper's trial, Murray had already requested something in exchange for his assistance in Juniper's prosecution"; knew that "Murray indicated that Juniper confessed to the murders at the same time he requested this assistance"; and knew that "Murray had asked Investigator Pederson for

76

consideration on his probation violation." Stip. Nos. 732, 734. These stipulations establish that the prosecution knew that Murray's testimony, which implied that he had no self-interested reason for testifying, was misleading.

The Court will grant summary judgment to Juniper on the knowledge prong of Claim XII.B.

### d. Materiality

The Court cannot grant summary judgment on the materiality prong of Claim XII.B. The Court finds no "reasonable likelihood" that Murray's misleading testimony *by itself* "could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. But *Napue* claims are *Brady* claims. *See id.* at 103–04. And a *Brady* claim can be material either on its own or cumulatively with other *Brady* claims. *See, e.g., Kyles*, 514 U.S. at 421. Therefore, because Juniper has established that the prosecution suppressed other favorable evidence the materiality of which the Court cannot determine on the paper record, the Court cannot evaluate cumulative materiality at this time.[97]

The Court will deny summary judgment to both Juniper and the Warden on the materiality prong of Claim XII.B.[98]

---

[97] Neither party addresses which materiality standard applies when the Court evaluates the cumulative materiality of evidence that forms the basis of both *Napue* and run-of-the-mill *Brady* claims. The Fourth Circuit has also not decided the matter. *See United States v. Arias*, Nos. 99-6644, 99-6645, 2000 WL 933010, at *6 (4th Cir. July 10, 2000) (unpublished table decision) (discussing the appellants' argument that the *Napue* "reasonable likelihood" standard, instead of *Brady*'s higher "reasonable probability" standard, applies in such a situation, but declining to decide which standard governs"). Because the Court cannot evaluate the cumulative materiality of any of Juniper's *Brady* claims at the summary judgment stage, it need not decide the issue now.

[98] The Court has already found that the prosecution suppressed Murray's February 6 statement to police, *see supra* pages 48–50, so Juniper has established cause to excuse his procedural default of Claim XII.B. *See Banks*, 540 U.S. at 691. Because the Court will deny summary judgment on the materiality prong of Claim XII.B., it will also deny summary judgment on the prejudice prong of Juniper's procedural default. *See id.*

#### 4. *Claim XIII.A.*

In Claim XIII.A. Juniper alleges that the prosecution violated *Napue* by eliciting and failing to correct Officer Atkinson's testimony indicating that he was unaware of the existence or location of Keshia's apartment when he responded to the 12:44 p.m. 911 call. According to Juniper, this testimony was false. Juniper argues that Officer Atkinson learned, while responding to the 911 call, both the existence of Keshia's apartment and the location of the stairwell leading up to it. Juniper contends that making the jury aware of the falsity of Officer Atkinson's testimony would have impeached either the prosecution's timeline of the murders or the good faith of the investigation, or both.

Juniper moves for summary judgment on the falsity and knowledge prongs of this claim. The Warden moves for summary judgment on the entirety of it. The Court will deny summary judgment to both parties on all prongs of this claim.

##### a. *The Evidence*

As discussed, Officer Atkinson responded to a 12:44 p.m. 911 call of shots fired at Keshia's apartment building. He testified that after speaking with two women there, Hodge and Frazier, he believed the call was false. He left about thirty minutes later, not having gone to Keshia's apartment or seen the stairs leading up to it.

According to the prosecution's timeline, when Officer Atkinson responded to this 911 call, the door to Keshia's apartment was already broken in; Keshia, Rueben, Nykia, and Shearyia had already been murdered; Mings had already gone to Keshia's apartment and seen Juniper there; and Juniper had already left with Rashid, Murray, and Jones. The prosecution argued that Officer Atkinson did not see the broken-in door or find the victims' bodies because he did not know about

the stairwell leading to Keshia's apartment. That comes from three portions of Officer Atkinson's testimony.

First, Officer Atkinson testified that when he first spoke with Hodge he "had no idea" whether the building had another upstairs apartment in the complex. SH App'x at 1246. Second, he testified that he had no idea that a stairwell led up to Keshia's apartment "until hours later." *Id.* at 1248. Third, he testified that he did not "remember asking [Hodge] directly if there was a second apartment upstairs." *Id.* at 1250.

On the day of the murders, Hodge gave a recorded statement to police investigators describing her interaction with Officer Atkinson and recounting other things she saw on the day of the murders. As relevant to this claim, Hodge said that Officer Atkinson "asked [her] if there was another apartment upstairs, and [she] *told him around on the other side*." Supp. App'x at 2230 (emphasis added). Hodge's statement, if true, directly contradicts Officer Atkinson's testimony.

### b. *Falsity*

The falsity of Officer Atkinson's testimony boils down to a literal he-said, she-said situation. Resolving this conflict would require the Court to disregard one person's statement in favor of the other's—a credibility determination that the Court cannot make on this record. *See Juniper III*, 876 F.3d at 568–69.

The Court will deny summary judgment to both Juniper and the Warden on the falsity prong of Claim XIII.A.[99]

---

[99] Juniper argues that it does not matter for *Napue* purposes whether Officer Atkinson's testimony was false or "merely inconsistent with Hodge's recollection" because "the prosecution had suppressed Hodge's statement, thus depriving the defense of the ability to bring the inconsistency to the attention of the jury." Juniper Reply at 117–18. Juniper's argument relies on a misunderstanding of the nature of a *Napue* claim.

The heart of a *Napue* claim is that the prosecution secured a conviction based on perjured or intentionally misleading testimony. Thus, if Officer Atkinson's testimony was in fact "*merely*

c. *Knowledge and Materiality*

The Court must also deny summary judgment to both Juniper and the Warden on the knowledge and materiality prongs of Claim XIII.A. As to knowledge, because the Court cannot determine on this record whether Officer Atkinson's testimony was false, it certainly cannot determine whether the prosecution *knew* it was false.[100] The Court will deny summary judgment to both Juniper and the Warden on the knowledge prong of Claim XIII.A.

And as to materiality, a *Napue* claim, as a *Brady* claim, can be material either on its own or cumulatively with other *Brady* claims. *See, e.g. Kyles*, 514 U.S. at 421. Again, the Court cannot evaluate cumulative materiality at this time.[101]

*       *       *       *

In sum, the Court will grant summary judgment to Juniper on the falsity and knowledge prongs of Claim XII.B. and deny summary judgment to both Juniper and the Warden on the materiality prong of that claim. The Court will deny summary judgment to both parties on all aspects of Claim XIII.A..

Finally, the Court will evaluate Juniper's single *Strickland* claim.

---

inconsistent with Hodge's recollection," Juniper Reply 117–18 (emphasis added), Juniper would have no *Napue* claim at all. For Juniper to have a *Napue* claim based on Officer Atkinson's testimony, that testimony *must* have been false or misleading. *Cf. Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1333–34 (11th Cir. 2009) (articulating the difference between a *Napue* (or *Giglio*) claim and a *Brady* claim).

[100] Of course, if Officer Atkinson's testimony was false, knowledge of its falsity would be imputed the prosecution. *See Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) ("[K]nowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution.").

[101] The Court has already concluded that the prosecution suppressed Hodge's statement, *see supra* pages 59–60, which establishes cause for Juniper's procedural default of Claim XIII.A. *See Banks*, 540 U.S. at 691. Because the Court will deny summary judgment on the materiality prong of Claim XIII.A., it must also deny summary judgment on the prejudice prong of Juniper's procedural default. *See id.*

### C. Strickland *Claim*

#### 1. *Legal Standard*

For a petitioner to demonstrate ineffective assistance of counsel in violation of the Sixth Amendment, he must satisfy the *Strickland* standard, requiring that "counsel's performance was deficient, and that the deficiency prejudiced the defense." *Jackson v. Kelly*, 650 F.3d 477, 493 (4th Cir. 2011) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* sets a "high bar," and courts must assess trial counsel's efforts with "scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve." *Kelly*, 650 F.3d at 493 (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). The performance prong requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687–88). In making that determination, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Even assuming, however, that a petitioner can satisfy the difficult standard of the performance prong, the petitioner still must show prejudice to his case. *Id.* That showing "requires a substantial, not just conceivable, likelihood of a different result." *Kelly*, 650 F.3d at 493 (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007)).

#### 2. *Claim II*

In Claim II, Juniper asserts that his trial counsel rendered ineffective assistance, in violation of *Strickland*, when they failed to "obtain and present to the jury the favorable information

possessed by Wendy and Jason Roberts." Am. Pet. at 64 (capitalization altered).[102]  Juniper bases this claim on, among other things, Collard's and Kennedy's post-remand deposition testimony. Specifically, Juniper relies on Collard's testimony that the prosecution had told her about the Robertses and the potentially exculpatory nature of what Wendy had seen on the day of the murders, and that Collard told Kennedy to speak with the Robertses. Kennedy, however, could not remember if he ever interviewed them. According to Juniper, this shows that Collard "rendered deficient performance" because she "failed to ensure that Kennedy" actually interviewed the Robertses. Am. Pet. at 65.

Juniper also points to Kennedy's December 31, 2004 neighborhood canvass, which Kennedy conducted nearly one year after the murders and only several days before Juniper's trial began. According to Juniper, Collard performed deficiently by allowing Kennedy to wait so long to canvass the neighborhood for possible witnesses. Juniper argues that by canvassing the neighborhood so long after the murders, Kennedy was sure to get stale information, and by canvassing the neighborhood so soon before trial, he was sure to be unable to follow up on any useful information he might have gotten. Had Kennedy timely canvassed the neighborhood, Juniper asserts that he would have located Wendy and Jason and learned the nature and import of what they saw the day of the murders and presented their testimony to the jury.[103]

---

[102] Juniper pleads Claim II in the alternative to Claim I, maintaining that his trial counsel did not know about the Roberts Material, but if they did, they were constitutionally ineffective for failing to investigate it further and present it at trial.

[103] As he did with Claim XIV, Juniper again passingly asserts that "at least one juror would have voted to acquit Juniper of all charges, *found him death ineligible, or voted against the death penalty*" if the jury had heard this evidence. Am Pet. at 66 (emphasis added). He again makes no argument about how this evidence would have changed the jury's sentencing-stage determination, and it still is unclear what effect the recent commutation of his death sentence would have on any such argument, had he made it.

Only the Warden moves for summary judgment on Claim II.  Although Juniper, as the habeas petitioner, ultimately has the burden of establishing all elements of Claim II, the Warden, as the summary judgment movant, has, in this situation, the burden of "identifying those portions" of the record which "demonstrate *the absence of a genuine issue of material fact*." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis added).  He does not carry that burden.

The Warden's arguments fall into two categories: those asserting that Juniper cannot establish cause to excuse his procedural default of Claim II and those asserting that Claim II lacks merit.

### a. *Procedural Default*

Juniper alleges that he can establish cause to excuse his procedural default of Claim II because, assuming Collard did in fact know about the Robertses, she never told Juniper's habeas counsel that she did and nothing in her files indicates that she did.  And, according to Juniper, at the time Collard "concealed this information," she was "an external impediment" to Juniper's defense because she no longer served as his agent and had instead begun to act against him.  Am. Pet. at 68.

The Warden makes three general arguments about why Juniper cannot establish cause to excuse his procedural default.  First, he asserts that Juniper cannot establish that his state habeas counsel did not know that Collard knew about the Robertses.  In support, he points to habeas counsel's inventory of Collards file and related declaration and argues that those documents "do[] not establish whether any of the documents [in Collard's file] i[n] fact contain any reference to the Robertses."  Warden Mem. Supp. at 36.  Although true that the declaration and inventory do not conclusively establish the absence of any mention of the Robertses, it is, at the very least,

reasonable to *infer* from the record that there was no mention of them. This argument of the Warden's fails to show that Juniper cannot establish cause to excuse his procedural default.

The Warden also argues that "Collard swore" in her affidavit that she "would have advised Juniper's habeas counsel of the same recollection" she stated in her affidavit—that she knew about the Robertses and had Kennedy speak with them, and that Kennedy reported to her that Wendy was not credible. *Id.* at 38 (quoting Collard Aff. at ¶ 7.) Because "nothing in [Collard's] deposition disproves that conclusion," the Warden asserts that it is undisputed. *Id.* Juniper's state habeas counsel said in her own affidavit that she had "no recollection" of Collard mentioning "a witness named Wendy Roberts, a witness in a wheelchair, a witness who viewed a photographic lineup and selected the photograph of someone other than Mr. Juniper, or a witness who saw one of the victims alive after Mr. Juniper was supposed to have left the apartment." Supp. App'x at 5106. The Court, therefore, faces a factual dispute that hinges on credibility and cannot be resolved on summary judgment.[104] This argument also fails to show that Juniper cannot establish cause to excuse his procedural default.

### b. *Merits*

The Warden's arguments that Claim II lacks merit are also unfounded. He first argues that Claim II "depends on crediting Collard's statement that trial counsel knew about the information that [the Robertses] gave police. But there is no reason to credit that portion of her affidavit and deposition and not to credit her account of the investigation." Warden Mem. Supp. at 38. But Collard's "account of the investigation" is disputed. Her account differs from Kennedy's. It differs from significant evidence in the record. *See supra* pp. 29–31. And it differs from Wendy's

---

[104] Moreover, Collard did not affirmatively state that she told habeas counsel about the information included in her affidavit; she merely stated she *would* have told habeas counsel that information.

and Jason's affidavits, which state that nobody from Juniper's defense team spoke with them. Those parts of the record provide the Court with numerous reasons, on the Warden's motion for summary judgment, "not to credit [Collard's] account of the investigation" of the Robertses. Warden Mem. Supp. at 38. This argument fails to show that Claim II lacks merit.

The Warden next argues that Juniper's assertion that "Kennedy no longer claims to have interviewed" the Robertses "misstates Kennedy's deposition." *Id.* at 37 (quotations omitted). But that is precisely what Kennedy testified in his deposition. Kennedy testified that, at the time of his deposition, he was "not even sure [he] interviewed" Wendy or Jason. Supp. App'x at 1627. He also testified that if he had interviewed them, he would have included it in his investigative notes (which he did not), and that "if there was anything of any value or any interviews conducted, it should be in [his] report" (which it was not). *Id.* at 1622. On the Warden's motion for summary judgment, Kennedy's testimony is more than sufficient to create a genuine dispute of material fact about whether he actually interviewed the Robertses. This argument of the Warden's fails to show that Claim II lacks merit.

Finally, the Warden argues that "any question as to how Kennedy carried out the interviews would go to the 'effectiveness' of the investigator, not counsel." Warden Mem. Supp. at 37. But this argument misstates the basis of Claim II, which is that although Collard knew of the potentially exculpatory information the Robertses could provide, she failed to either ensure that Kennedy investigated these potential witnesses or investigate them herself. Because it is nonresponsive to the substance of Juniper's claim, this argument, too, fails to show that Claim II lacks merit.

Because the Warden fails to show the absence of any genuine dispute of material fact about either the procedural default or the merits of Claim II, he has not established that he is entitled to judgment as a matter of law. The Court will deny summary judgment to the Warden on Claim II.

## V.  CONCLUSION

For all the reasons discussed, the Court will grant in part and deny in part both Juniper's and the Warden's motions for summary judgment.  It will deny Juniper's Motion to Strike.  The Court will schedule an evidentiary hearing on the remaining claims.

An appropriate Order, summarizing the Court's findings, will issue.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 29 March 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge