IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ANTHONY BERNARD JUNIPER,
        Petitioner,

v.                                                          Civil Action No. 3:11cv746

MELVIN C. DAVIS,
*Warden, Wallens Ridge State Prison*,
        Respondent.

## OPINION

This matter comes before the Court on Petitioner Anthony Bernard Juniper's Amended Petition for a Writ of Habeas Corpus. (ECF No. 366.) In 2005 a jury in the Circuit Court for the City of Norfolk convicted Juniper of, among other things, four counts of capital murder for killing Keshia Stephens, Keshia's brother Rueben, and Keshia's two-year-old and four-year-old daughters, Nykia and Shearyia. The jury recommended the death penalty for each murder, and the Circuit Court sentenced Juniper to death.[1]

The Supreme Court of Virginia affirmed Juniper's conviction on appeal, and the Supreme Court of the United States denied certiorari. Juniper then returned to the Supreme Court of Virginia and unsuccessfully sought habeas relief.

In November 2011 he moved this Court for a stay of execution and then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. After years of contentious litigation, the parties

---

[1] Juniper no longer faces execution because Virginia has abolished the death penalty and converted all existing death sentences to sentences of life imprisonment without the possibility of parole. *See* 2021 Va. Legis. Serv. ch. 344.

filed cross-motions for summary judgment, each of which the Court granted in part and denied in part.[2]

The Court then held a multi-day evidentiary hearing, and it now resolves all of Juniper's remaining claims. Those claims arise under *Brady*,[3] *Napue*,[4] and *Strickland*.[5] At the hearing, the Court assessed only materiality under *Brady* and *Napue* and prejudice under *Strickland*. The Court assumed, without deciding, that Juniper had satisfied all other elements of his claims.[6]

The Court will deny Juniper's petition for a writ of habeas corpus.

## I. FACTUAL BACKGROUND

On January 16, 2004, Keshia Stephens, her younger brother Rueben Harrison, III, and two of Keshia's daughters, four-year-old Nykia Stephens, and two-year-old Shearyia Stephens, were killed in Keshia's apartment in Norfolk, Virginia. Police discovered their bodies in the apartment's master bedroom around 2:20 p.m., after responding to a 911 call. All four had been shot, and

---

[2] The Court detailed this case's lengthy and unusual procedural history in its opinion ruling on the parties' cross-motions for summary judgment.

[3] *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the prosecution violates due process when it withholds material, exculpatory evidence).

[4] *Napue v. Illinois*, 360 U.S. 264 (1959) (holding that the prosecution violates due process when it knowingly offers or fails to correct false or misleading testimony.

[5] *Strickland v. Washington*, 466 U.S. 668 (1984) (holding that deficient performance by trial counsel violates the Sixth Amendment of the United States Constitution if it prejudices the defendant's ability to receive a fair trial).

[6] In its summary judgment opinion, the Court held as a matter of law that Juniper had satisfied many of the other elements of his claims, especially favorability and suppression under *Brady*. (*See* ECF No. 435.) The Court does not disturb those rulings. For simplicity's sake, however, the Court refers throughout this opinion to assuming all elements except materiality and prejudice are satisfied.

Keshia had been stabbed in the abdomen.  The door to Keshia's apartment had been broken in, and the remnants of it lay on the floor of her living room.

The Commonwealth charged Juniper with all four murders.  The prosecution contended that Juniper, who had an on-and-off intimate relationship with Keshia, had gone to her apartment the morning of January 16 to retrieve some of his belongings.  He and Keshia fought, and in the course of that fight he stabbed and shot her, shot her brother and her two young children, and stayed in the apartment for some time before three acquaintances came and picked him up.

The prosecution's evidence of guilt fell into four main categories: forensic evidence, witness testimony about events on the day of the murder, Juniper's confessions, and evidence establishing the time of the killings.  Juniper argues that the Commonwealth wrongfully withheld evidence from him, and that the suppressed evidence would have made a difference at trial.  The Court, therefore, must discuss the trial evidence in some detail.

### A. Forensic Evidence

The Commonwealth presented a great deal of forensic evidence: DNA and fingerprints from Keshia's apartment, as well as expert testimony about ammunition, bullets, and cartridge casings found in and around the bodies.  Significantly, Juniper does not challenge the propriety of the forensic evidence.

The police found all four bodies in the master bedroom.  Each person had been shot, and Keshia had been stabbed.  Police recovered a knife blade and a knife handle from the floor of the master bedroom, detached from each other.  The blade lay near the bedroom doorway—at the foot of the bed and on the opposite side of the room from Keshia's body.  The handle sat near the middle of the room—at the foot of a dresser on the wall across from the bed.

The blade and the handle of the knife had once been connected. The Commonwealth's tool mark expert explained that during the knife's manufacturing process, as the plastic handle cooled, it "pick[ed] up marks" from the wide part of the knife blade, where the blade attached to the handle. SH App'x at 1595.[7] She made a cast of the inside of the knife handle and "compare[d] it to the marks on the knife blade"—unique marks made as part of the "machining tooling process" during the manufacture of the knife. *Id.* at 1595, 1593. Based on her comparison she concluded that the knife blade and handle "at one time . . . were one piece." *Id.* at 1597.

The knife blade "[l]ooked like possibly a steak knife blade and had a serrated edge." *Id.* at 1656. It measured about three inches long and had "a very thin film of blood" on it. *Id.* at 1655. The medical examiner who conducted Keshia's autopsy testified that the knife blade was consistent with Keshia's stab wound. The DNA on the blade came from a single source: Keshia.[8]

The police also recovered a fingerprint on the right side of the knife blade toward the base of the knife, where the blade would have connected to the handle. The fingerprint on the knife blade matched Juniper's right thumb. The Commonwealth's fingerprint expert testified that the tip of Juniper's right thumbprint was on the knife "towards the flat part of the steel, away from the serrated edge." *Id.* at 1628.

The fingerprint expert also testified that "[f]ingerprints are very fragile. They can be wiped away [or] smeared very easily just by the constant handling or the shuffling, touching of other objects against it." *Id.* at 1619. The expert nevertheless acknowledged that it was "possible" that

---

[7] The Court cites to the Appendix submitted with Juniper's state habeas petition as "SH App'x."

[8] Keshia "could not [be] eliminate[d]" as a source of the DNA, and the likelihood of the DNA on the knife handle matching someone other than Keshia was "one in greater than six billion." SH App'x at 1684.

a thumbprint left on a knife could remain intact on the knife if someone later used the knife to stab somebody. *Id.* at 1629.

The detached knife handle had no fingerprints of value on it. The Commonwealth did, however, successfully test it for DNA. The DNA on the knife handle came from a single source: Juniper.[9] The DNA expert testified that the DNA on the knife handle "was very strong"; she collected "a hundred times more" DNA from the knife handle than she did from the knife blade. *Id.* at 1686.

The police also recovered ammunition from around the murder scene. They found an ammunition box and two loose unfired cartridges on the floor of the bathroom connected to the master bedroom.[10] Police recovered eight cartridge casings and two bullets from on and around the bed in the master bedroom, and medical examiners later recovered four bullets from the victims' bodies during the autopsies. All the ammunition recovered—the unfired cartridges, the cartridge casings, and the bullets—was nine-millimeter caliber.

The Commonwealth's firearms expert analyzed all eight cartridge casings and six bullets. All the cartridge casings were fired from the same firearm, as were all six bullets. The expert could not, however, testify that the cartridge casings and bullets had been fired from the same firearm. She could only reach that conclusion if she had a firearm to compare the cartridge casings

---

[9] The DNA on the knife handle was "an identical match to [Juniper's] DNA profile, and the likelihood of the DNA on the knife handle matching someone other than Juniper was "one in greater than six billion." *Id.* at 1688.

[10] The "whole component" shot from a firearm "is called a cartridge." *Id.* at 1580–81. The cartridge case "holds the powder and the bullet," and "during the firing process the explosion of the gun powder . . . push[es] the bullet out of the cartridge case down the barrel of the gun." *Id.* at 1581.

and bullets to, and the police did not submit a firearm for her to analyze.  In fact, they never recovered the weapon used in the murders.

The police did not identify any prints of value from the cartridge casings or bullets recovered from on and around the bed, or from the ammunition box or loose cartridges recovered from the master bathroom.  They did recover one print of value from the cartridge tray inside the ammunition box.  That print did not match Juniper's or the prints of any other known individual.

The police also recovered several cigarette butts from Keshia's apartment.  They found a cigarette butt in the entryway on top of the debris from the broken-down front door.  DNA on that cigarette butt matched Juniper's.[11]  Police also found an ashtray on Keshia's bed with a blanket "kind of thrown over" it.  *Id.* at 1419.  The ashtray contained three cigarette butts and a cigar butt. Keshia's DNA was on the cigar butt and one of the cigarette butts.  The DNA profiles on the other two cigarette butts did not match each other or any other known DNA.

Finally, the police recovered fingerprints and shoeprints from on and around Keshia's broken-in front door.  From the pieces of the front door, they recovered prints of Keshia's right thumb and left palm and of Rueben's left ring finger.  They also recovered four other fingerprints of value, none of which matched Juniper's prints or those of any other known individual.  And they found and photographed three shoeprints from the front door.  None of the Commonwealth's forensic experts ever compared the shoeprints to anything.

### B.  Testimony About Events on the Day of the Murders

Three witnesses—Renee Rashid, Keon Murray, and Tyrone Mings—provided the contours of the prosecution's story of January 16, 2004.

---

[11] Juniper could not "be eliminated as a source," and the likelihood of that DNA matching someone other than Juniper was "on[]e in greater than six billion."  *Id.* at 1695.

6

*1. Direct Testimony*

Renee Rashid had known Juniper for about seven years and had met Keshia through Juniper. On the day of the murders, Juniper called her sometime between nine and ten in the morning[12] and asked her to give him a ride to Keshia's house so he could "get his shit." *Id.* at 1717. Rashid picked Juniper up from his mother's house, about a ten- or fifteen-minute drive from her home. When she first got there, Juniper asked her to get him some cigarettes from the corner store, "[m]aybe two blocks" away. *Id.* at 1709. She returned to Ms. Juniper's house and went inside. There she met Juniper, his mother, and Juniper's friend Keon Murray. Rashid talked to Ms. Juniper for "[s]econds," then she and Juniper left for Keshia's. *Id.* at 1711.

As Rashid could "best recollect[]," the drive to Keshia's apartment took about fifteen or twenty minutes. *Id.* at 1712. When they arrived, Rashid parked in front of Keshia's apartment on the right side of the street with her car parallel to the front of Keshia's apartment building and facing the same direction as traffic. She and Juniper went upstairs, and Keshia let them in. Rueben, Keshia's brother, lay on the couch in the living room, apparently asleep. Nykia and Shearyia were in the bathtub; Keshia told Rashid she was about to give the girls a bath.[13]

As they walked into Keshia's apartment, Juniper "went straight to the back room." *Id.* at 1716. Rashid talked with Keshia for a bit, until Juniper called her into Keshia's bedroom and handed her a DVD player that he had unhooked from the bedroom TV. Rashid held the DVD player while Juniper disconnected it, then she went to the bathroom to talk with the children.

---

[12] She testified that she knew it was between nine and ten in the morning because she woke up "[a]bout nine o'clock or so," cleaned herself up and got dressed, went to Pep Boys to get oil for her car, then returned home. *Id.* at 1703. Juniper called her after she came home from Pep Boys.

[13] Nykia and Shearyia were both naked when the police found the four victims.

7

Shearyia had "magic marker writing" on her face, as though Nykia had drawn on her.[14]  *Id.* at 1721.

While visiting with the children in the bathroom, Rashid heard Juniper and Keshia talking in the bedroom.  Keshia spoke in a "reassuring voice," *id.* at 1723, and said things like "'There's nobody but you.' 'I told you I'm not seeing anybody but you.'"  *Id.* at 1722.  Juniper was "mumbling real low," and Rashid could not make out precisely what he said.  *Id.* at 1723.

As Juniper and Keshia continued to talk, Rashid heard Keshia's "voice start[] to rise."  *Id.* She thought the two might be about to get into an argument, so she went to the bedroom door and encouraged Juniper to leave.  Juniper gave Rashid the DVD player, and they both began to walk toward the door, with Rashid in front and Juniper behind her.  As Rashid walked through the living room, she saw Rueben still lying on the couch.

Rashid went out the front door and heard it shut.  She "assumed" Juniper was behind her, but she did not know.  *Id.* at 1726.  She began walking down the stairs, but "didn't even get halfway down maybe the fifth step or so, [when she] heard boom."  *Id.*  The boom "sounded like the door being kicked in."  *Id.* at 1727.

Scared, Rashid ran down the stairs and to her car without looking back.  Once in her car she rolled the window down on the front passenger side—the side nearest Keshia's apartment. From her car Rashid heard Keshia crying and saying "'I told you I'm not seeing anybody.' 'It's just you.' 'I'm not seeing anybody else.' 'You are the only one.'"  *Id.* at 1728.

Things "got quiet," and Rashid honked her horn and called out to Juniper to leave.  *Id.* Juniper told her, "'Go ahead,'" and Rashid pulled away slowly, heading northwest.  *Id.* at 1729.

---

[14] The medical examiner who performed the autopsy of Nykia and Shearyia testified that Shearyia had what appeared "to be ink marks or magic marker marks on her skin," including "on her nose and cheek."  *Id.* at 1974.

She had just gotten past the stairwell to Keshia's apartment—about half a block from where she had parked—when she heard "boom boom boom boom"—four booms "rapidly in succession." *Id.* The booms came from behind her and to her right (the direction of Keshia's apartment). She testified at trial that the booms "sounded like gunshots," but she admitted that she "wasn't sure they were gunshots at first." *Id.* at 1729, 1730. Because of her original uncertainty, she drove back to Ms. Juniper's house.

At this point in the story, Rashid's testimony began to overlap with the testimony of the prosecution's second eyewitness: Keon Murray.

Murray testified that he had known Juniper since about age nine, and he considered Juniper a "[g]ood friend." *Id.* at 1795. He said he was asleep at Ms. Juniper's house on the morning of the murders and woke up to a "commotion"—Rashid and Ms. Juniper "arguing." *Id.* at 1800. Rashid was crying and "like, in shock." *Id.* at 1801.

Rashid confirmed that when she returned to Ms. Juniper's house, she found Keon still there. She told Ms. Juniper that Juniper would not leave Keshia's apartment, but she did not tell Ms. Juniper about the arguing or the booms. Upon hearing this, Rashid testified that Ms. Juniper "picked up the phone" to call Keshia's apartment and made a phone call. *Id.* at 1731–32.

After the call, Ms. Juniper asked Rashid to pick up John Jones, known as "Little John." Rashid thought that Ms. Juniper wanted her to get Little John in order to "get Anthony out of the house." *Id.* at 1732. Rashid did not know where Little John lived, so Murray went with her.

Rashid and Murray went to John Jones' apartment to pick him up.[15] Jones got into Rashid's car with his girlfriend's one- or two-year-old daughter, and the four of them drove to Keshia's apartment together. When they arrived, Rashid parked her car off the street and across from

---

[15] John Jones did not testify at Juniper's trial.

Keshia's apartment.  Murray testified that he saw "Stickman Ty" "[u]p the street" on Kingston Avenue as he, Jones, and Rashid pulled up to Keshia's apartment.[16]  *Id.* at 1819.  Murray and Jones got out of the car while Rashid and the little girl stayed in the car.

Rashid parked with the rear of her car facing Keshia's apartment.  Murray and Jones walked "behind" her, but she did not see precisely where each man went.  *Id.* at 1735.  Murray testified that he went "to the back of the car" while Jones walked towards Keshia's apartment.  *Id.* at 1813–14.  Jones called Juniper's name," saying things like, "'Come out.' 'Come on.' 'Come on out of there.' 'What you doing?' 'Come on out.' 'Stop that.'"  *Id.* at 1814.  Rashid heard Jones calling Juniper from the direction of Keshia's apartment.  Juniper came out by himself "[s]econds later" and walked to the car.  *Id.* at 1736.  Murray said Juniper carried a black and chrome automatic pistol.  Rashid did not mention seeing a firearm until later.

Juniper got in the front passenger seat, Murray got in behind Juniper, Jones got in behind Rashid, who drove, and the little girl sat in the back between Jones and Murray.  Rashid and Murray both found Juniper out of sorts—Murray said Juniper "look[ed] nervous" and "[l]ike he was in shock," *id.* at 1817, and Rashid said Juniper "appeared to be jittery" and was "breathing real hard," *id.* at 1736.  Murray also testified to seeing a "powdery substance" on Juniper's face that looked like cocaine.  *Id.* at 1817.  Juniper pulled down the passenger side sun visor and looked in the mirror during the drive.

Rashid testified about the drive after leaving Keshia's apartment.  She said that Juniper watched behind them through the sun visor's mirror, saying things like, "'They're behind us, man.' 'There they go right there.' 'The DT behind us.'"  *Id.* at 1737.  She also described an incident during the drive when she had stopped at a red light.  A marked police car sat in traffic to their

---

[16] This comment likely referred to Tyrone Mings, another friend of Juniper.

right and in front of them.  She heard Jones say, "'Man, don't you pull that shit out in here with

. . . my girl's baby in here.'"  *Id.* at 1738–39.  She "cut [her] eye over" toward Juniper and saw

him take a black gun from near his hip and place it in his lap.  *Id.* at 1739.

Rashid and Murray testified differently about who got out of the car where.  On the one

hand, Rashid said that she dropped Juniper, Jones, and the young girl off at Jones' apartment.  She

said she then dropped Murray off at the corner of Johnston Road and Chesapeake Boulevard.  On

the other hand, Murray testified that he did not know where Juniper went after they all left Keshia's

house.  He said that he, Murray, got out of the car at "G Avenue near Evelyn T. Butts," which was

a "[c]ouple blocks" before Chesapeake Boulevard and Johnston Road.  *Id.* at 1818.

Regardless of who got out where, Rashid went home after dropping Murray off and called

Ms. Juniper "as soon as [she] walked in the door."  *Id.* at 1787.  Phone records show a call from

Rashid's house to Ms. Juniper's house at 1:10 p.m.

Tyrone Mings observed a different part of the events of the day of the murder.  Mings lived

with his girlfriend, Melinda Bowser, in an apartment about a block away from Keshia's apartment.

He got "up early" on the morning of the murders.  *Id.* at 1841.  Sometime that morning he got a

phone call from "Keon," who asked him to "check on somebody at Keshia's house or whatever

that he heard some shots."[17]  *Id.*  Although it "took [him] a while," Mings "went down there

eventually."  *Id.*

Mings testified that as he walked up the stairs to Keshia's apartment, he noticed "a big hole

in the doorway."  *Id.* at 1845.  He continued up the stairs, calling for both Keshia and Juniper.  He

entered the apartment, stepping over the debris from the door.

---

[17] Mings also testified about another reason he went to Keshia's apartment that day: Bowser had been trying to get a check from Tinee Giant, where she worked.  Keshia and Bowser worked together there at some point.

As Mings first walked through the doorway he saw "Antman and furniture" in the front room of Keshia's apartment.[18] *Id.* at 1847.  Juniper "had a gun in his hand, [and] some white stuff on his face." *Id.*  Juniper paced back and forth between the living room window and the center of the room.

Although Mings felt "kind of shook up," *id.*, he asked Juniper "[w]hat was going on," and "where Keshia was at," *id.* at 1848.  Juniper told him that Keshia was "[i]n the room." *Id.*  Mings walked down the hallway to the entrance of a bedroom.  Looking in the room, Mings "saw a dude and a baby laying on the bed." *Id.* at 1849.  He called Keshia's name and said "yo to the baby and the dude," but he got no response. *Id.*

Mings went back to the living room, where Juniper had stayed, and told Juniper he had not seen Keshia in the bedroom.  Juniper said that Keshia was "in between the bed and the dresser." *Id.*  Mings went back to the bedroom and again called Keshia's name.  Again he got no response. After this, Mings "just left." *Id.* at 1851.  He went back to his apartment, where he and Bowser decided to call the police.[19]

At some point after he had returned home, Mings "started to walk back down" to Keshia's apartment. *Id.* at 1852.  As he did, he saw Juniper, Murray, and Jones leaving Keshia's apartment.

---

[18] "Antman" and "Ant" were both nicknames for Juniper, whose first name is Anthony.

[19] Mings did not explicitly testify whether he or Bowser called the police when he first returned from Keshia's apartment.  Instead, Mings had the following exchange with the prosecutor:

> Q: [After discussing the situation with your girlfriend] was there a decision made
>   that you should take a further action or do something else?
> A: Yes.
> Q: Tell the members of the jury what you and your girlfriend decided at that time?
> A: Call the police.

SH App'x at 1851–52.  The record does not establish whether they actually called the police at that time.

The three men got into a car parked on the opposite side of Kingston Avenue. Mings said he also saw "a female" in the car, but he could not get a "good look at her." *Id.* at 1854.

After Mings saw Juniper leave, he went back home, and Bowser called the police. The two then stood in front of his apartment. They watched the police arrive and then leave. Figuring that the police "didn't go up there," Mings said they called the police again. *Id.* at 1856. This time, when the police arrived, he and Bowser "just walked down there with them." *Id.* He told the police about the victims inside the apartment. He did not say he had seen Juniper in there with them.

### 2. *Impeachment*

Although Rashid, Murray, and Mings told a largely consistent story of the events on the day of the murders, Juniper's trial counsel attacked their testimony in various ways.

On cross-examination, Juniper's attorney elicited from Rashid that she had not called the police on the day of the murders, or even in the days immediately after the murders. In fact, Rashid admitted that she had waited nearly two weeks—until January 29—to speak to the police about the events of January 16, 2004. She also admitted that she did not reach out to the police until after speaking to a lawyer. She said that she had not gone directly to the police because: "I was afraid of – I didn't know what had happened. I didn't know what to do." *Id.* at 1786.

Juniper's attorney also cross-examined Rashid about inconsistencies between her testimony and her original, January 29, 2004 statement to police. Most fundamentally, Rashid admitted that when she first spoke with the police, she had not mentioned Murray at all. Instead, she originally told the police that Little John just "showed up" at Ms. Juniper's house that day. *Id.* at 1775. Rashid said she omitted Murray from her first statement because she "initially spoke too soon" in telling police that Little John just showed up, but she "was afraid to recant [her] answer

13

because [she] was afraid [the police] would think [she] was lying." *Id.* at 1776.  She said that she remedied her mistake later, on February 3, when she returned to the police station and gave another statement.[20]

Finally, Rashid acknowledged that she had an immunity agreement with the prosecution. The prosecution clarified with her that she had been given immunity "only for the possible crime of misdemeanor accessory after the fact," not "for any felony offense that [she] may have been involved in." *Id.* at 1790–91.

Juniper's attorney attacked Mings in two areas: inconsistencies in previous statements and his criminal history.

As discussed, although Mings spoke with the police on the day of the murders and told them that he knew of the victims inside the apartment, he said nothing about Juniper.  He acknowledged at trial that he did not implicate Juniper at all until "a couple months" later, when the police spoke with him again about the murders. *Id.* at 1856.  Mings said he originally omitted Juniper because he "feared for [his] safety." *Id.*  On cross-examination Juniper's attorney probed Mings' stated motivation:

> Q: You feared for your safety because you were afraid that [Juniper] might consider you a witness against him?
> A: Yes.
> Q: Well, did you consider yourself safer with him on the street?
> A: Would I consider myself safer?

---

[20] Rashid also acknowledged two other minor inconsistencies between her testimony and her original statement to the police.  She acknowledged that although she had testified that she learned of the murders on a Monday, she initially told the police she had learned of the murders on a Saturday.  When confronted with this inconsistency, she said that she no longer remembered which day she had learned of the murders.  She also acknowledged that although she testified she had *not* initially gone inside Ms. Juniper's house before leaving again to get cigarettes for Juniper, in her original statement to police, she said that she *had* gone inside before leaving to get Juniper cigarettes.  After being confronted with this inconsistency, Rashid reaffirmed her testimony that she had *not* originally gone inside Ms. Juniper's house.

Q: You testified you didn't tell the police he was in the house because you feared for your safety; correct?
A: Yeah. You're right.
Q: If you had told the police that you saw him standing there with a gun and you saw the four victims in the bedroom, wouldn't it have been safe to assume they would have arrested him?
A: Yes.
Q: And, therefore, you would have been safer if you had told them; isn't that correct?
A: I probably would have. I wasn't thinking like that.

*Id.* at 1862. Mings said that, in the end, "the kids caused" him to tell the police about seeing Juniper in the apartment. *Id.* at 1864.

Mings also acknowledged that he had two prior felony drug convictions and was incarcerated at the time of Juniper's trial. He testified that he was serving a one-year sentence on a probation violation for which he had faced an additional five years in prison, and that the judge who had sentenced him for the probation violation knew of his cooperation in Juniper's case. On cross-examination Mings had the following exchange with Juniper's attorney:

Q: So you knew that by agreeing to testify for the Commonwealth you were saving yourself as much as four years in the penitentiary?
A: That could have happened, yes.
Q: Well, not could have happened. That's what you wanted to happen?
A: Yes.
Q: That's what did happen; correct?
A: Yes.

*Id.* at 1860.

Of the three main prosecution witnesses, Murray's testimony provided the most drama. At the beginning of his testimony, after answering several preliminary questions from the prosecution about his criminal history and how he knew Juniper and Keshia, Murray balked. He had the following exchange with the prosecution:

Q: Keon, what I'd like to do if I could is to take you to January 16th in particular of that last year. Do you remember that day?
A: No, ma'am.
Q: You don't remember January the 16th?

15

A: No, ma'am.
Q: Do you remember in January 16th going over to Keshia's house?
A: No, ma'am.
Q: Do you remember being at the defendant's house in the early morning hours of January 16th on Kittrell Street?
A: No, ma'am.
. . . .
Q: What were you doing [on January 16th]?
A: I can't recall.
Q: You can't recall.  Okay.
A: Your Honor?  I mean, I can't do this shit.
The Court: You can't do what?
A: I can't do this.

*Id.* at 1797–99.  The trial court instructed Murray to answer the prosecution's questions, and he testified about the "commotion" he woke up to when Rashid came to Ms. Juniper's house.  *Id.* at 1800.  He soon balked again, saying, "Your Honor, I plead the Fifth, Your Honor."  *Id.* at 1801.

The court excused the jury, Murray left the courtroom, and the prosecution discussed with the court its intention to grant Murray immunity from "the misdemeanor offense accessory after the fact as well as misprision of a felony"—"[t]he only offense[s] [the prosecution could] possibly conceive of" that Murray could incriminate himself of by testifying.  *Id.* at 1804.  Murray retook the stand and, still outside the jury's presence, the prosecution granted Murray that immunity.  The jury came back in, and Murray continued his testimony without further issues.

In addition to his initial reluctance to testify, Murray, like Mings, acknowledged that he had a criminal history.  At the time of trial he was serving a sentence in the Norfolk City Jail for a "felony violation."  *Id.* at 1793.  On cross-examination, Juniper's attorney brought out the fact that Murray's sentence arose from some "probation violation problems," for which he had received a one-year sentence "and two separate six-month sentences."  *Id.* at 1824.  Counsel asked Murray if his "lawyer mention[ed] that [he] could come back in on a reconsideration if [he] cooperated with the Commonwealth."  *Id.* at 1825.  Murray denied "know[ing] anything about that," although he admitted knowing that his cooperation could be brought to the court's attention.  *Id.*

16

Murray also testified about inconsistencies among his different accounts of the day of the murders. Murray acknowledged that he had not spoken to police about the events of January 16 until five or six weeks after the murders, agreeing with Juniper's attorney's statement that he did not talk to the police "[u]ntil they caught up with" him. *Id.* at 1823. Finally, he acknowledged that he had told Juniper's investigator some lies: that he did not know anything about the murders, that he was not at Ms. Juniper's house on the day of the murders, that he did not go with Rashid to Keshia's house on the day of the murders, and that Rashid must have been referring to "some other Keon." *Id.* at 1830–31. He also admitted that he told Juniper's investigator that he had told the police the same things. Juniper's attorney ended his cross-examination of Murray with this:

> Q: But none of [what you told Juniper's investigator] was true?
> A: No, sir.
> Q: But everything you told the jury is true?
> A: Yes, sir.
> Q: How is the jury to know . . . when you are telling the truth and when you are not?
> A: I don't know, sir.

*Id.* at 1832.

### C. *Juniper's Confessions*

In addition to eyewitness testimony implicating Juniper in the murders, the prosecution presented testimony from two people who said that Juniper had confessed in some form.

#### 1. *Keon Murray*

Murray spoke with Juniper on the phone before he and Rashid left Ms. Juniper's house to pick up John Jones. He said that Juniper, who called from Keshia's apartment,[21] told him, "'They gone,'" that "[h]e killed them," and that "the crib—the house surrounded." *Id.* at 1811–12. Juniper

---

[21] Murray said he knew the call came from Keshia's apartment because of the caller ID.

did not say whom he had killed.  Phone records of the incoming calls to Ms. Juniper's house show a call at 11:34 a.m. that day from Keshia's apartment that lasted three minutes and ten seconds.

### 2. *Ernest Smith*

Ernest Smith met Juniper in jail before Juniper's trial.  Smith testified that on October 13, 2004, he and Juniper were playing chess in the day area of the jail's medical pod.  The two had known each other for a couple of months before that day and had only ever talked about chess, which they discussed when they played.  But that day Smith asked Juniper if he had committed the murders.  Juniper answered him right away, saying, "'I killed them.  I killed the kids.  I didn't want to leave no witnesses.'"  *Id.* at 1955.  Juniper told Smith that he suffered bad dreams and "kept seeing Keshia."  *Id.* at 1956.

Smith said he contacted the police with the information about a week and a half later.  It took him so long, he said, because he had "contemplate[ed]" whether he "should do something about it or . . . just sit up there and do nothing."  *Id.* at 1957.  In the end, he decided to testify because it was the right thing to do.  Smith acknowledged that he was serving a five-year sentence for robbery, burglary, and grand larceny convictions, but he said he had not spoken with his attorneys about seeking reconsideration of his sentence based on his cooperation.  He said: "I told the homicide detective that it didn't even matter to me as long as this man go down.  I don't even want no motion for reconsideration."  *Id.*

### D. *Timing Evidence*

At trial, the prosecution presented evidence that the murders had occurred between 10:20 a.m. and 12:44 p.m., but closer to 10:20 a.m.  It based that timeline mainly on three categories of evidence: Rashid's testimony about when she and Juniper arrived at Keshia's house, Mings' testimony about seeing Juniper, Keon, and John leave Keshia's apartment, and two 911 calls.

18

### 1. *Rashid*

Rashid's testimony showed when Juniper arrived at Keshia's apartment.[22] She woke up "[a]bout nine o'clock" on the day of the murders. *Id.* at 1703. She first got to Ms. Juniper's house around 9:40 a.m. and spent about twenty minutes getting Juniper cigarettes and waiting for him to get ready to leave. Then it took about fifteen or twenty minutes to get from Ms. Juniper's house to Keshia's apartment. So even though she said that she did not "recall what time it was" when she and Juniper arrived at Keshia's apartment, she gave and agreed with time estimates that placed their arrival at between 10:15 a.m. and 10:20 a.m. *Id.* at 1760.

Rashid, however, did not know what time she left Keshia's. When defense counsel asked her how long she and Juniper had stayed at Keshia's, she responded, "I can't offer a time because I wasn't – I was not even aware of the time." *Id.* at 1760–61. When pressed further with the question, "Well, it wasn't very long, was it?" she again stated, "I can't offer a time." *Id.* at 1761. Finally, defense counsel recounted for Rashid the events that she had testified occurred in Keshia's apartment and asked her if "all of that [could] have taken more than 10 minutes." *Id.* Rashid said she did not know, and stated again, "I didn't know what time it was when I left." *Id.*

According to the prosecution's theory, as Rashid drove away from Keshia's, "she started hearing what we know to be the shots." *Id.* at 2051.

---

[22] At the beginning of her testimony the prosecutor elicited from Rashid testimony that she was not "keeping track of time[ or] making notes" on the day of the murders, and that any times she gave were only estimates. *Id.* at 1703. Despite that disclaimer, Rashid testified about several specific times that day.

### 2. *Mings*

Mings' testimony established when Juniper left Keshia's apartment. He testified that Bowser called the police shortly after Mings saw Juniper, Murray, and John Jones leaving Keshia's apartment. According to the prosecution's evidence, that 911 call occurred around 12:44 p.m.

### 3. *911 Calls*

The prosecution also relied on two 911 calls to support its timeline of the murders.

First, at about 12:44 p.m. on the day of the murders, Norfolk Police Officer Atkinson responded to a "possible shots fired call sound of a disturbance" in an apartment at 1427 Kingston Ave.[23] *Id.* at 1239. The call "said that the noise was coming from the upstairs apartment, that you had to go upstairs behind the building near trees." *Id.* at 1241. Officer Atkinson arrived at the apartment complex, parked his car, and "went around" to "a set of steps that lead from the back side of the building up toward the front." *Id.* at 1245. These were *not* the stairs to Keshia's apartment. He went up those stairs and was about to knock on a door when an African-American female, Chaunte Hodge, approached him "from the parking lot somewhere." *Id.* After speaking with Ms. Hodge, Officer Atkinson went "back downstairs" to apartment number two and spoke to the woman in *that* apartment, who was Frances Frazier, Hodge's mother-in-law. *Id.* at 1244–45. Hodge and Frazier each denied making the 911 call, and after speaking with them, Officer Atkinson believed that the call he had responded to "was more than likely a false call." *Id.* at 1247. Officer Atkinson stood in the parking lot of the apartment building for about fifteen or twenty minutes chatting with a second officer who had responded to the call, and then left around 1:15 or 1:20 p.m.

---

[23] According to the prosecution's theory, Bowser made this call shortly after Mings saw Juniper, Murray, and Jones leaving Keshia's apartment.

Between 2:00 p.m. and 2:05 p.m. Officer Snyder and his partner responded to a "burglary-in-progress call" at Keshia's apartment.[24]   They arrived about 2:20 p.m.   As Officer Snyder climbed the stairs to Keshia's apartment, "about two stairs in" he noticed that "the whole entire front door had been demolished." *Id.* at 1265. He "stepped over" the debris from the door as he walked into the apartment. *Id.* at 1269. He and his partner found the four victims, cleared the apartment, and then called a paramedic to come and pronounce the bodies dead.

Brian Nichols, the paramedic who responded to Officer Snyder's call, and who testified as an expert in emergency response, got to the apartment at about 2:38 p.m. He examined the bodies and pronounced all four dead based on his findings that none of them were breathing and they all had lividity, or "pooling of blood in the skin," in their extremities. *Id.* at 1311. Nichols noted that Keshia also had "dark, dried blood" on her shirt. *Id.* at 1313. He testified that, based on his training, the dried blood on Keshia and the extent of the lividity in each victim indicated "that this was not an incident that occurred within the last hour." *Id.* at 1317.

### E. Additional Evidence

The prosecution also presented general background evidence about Juniper and his relationship with Keshia. One of Keshia's best friends testified that she learned about Juniper's and Keshia's relationship about a year and a half before Keshia's murder. She described Juniper as "real jealous, insecure, [and] abusive mentally and physically." *Id.* at 1186.

On the day of the murders, Investigator Conway spoke with Keshia and Rueben's father, Mr. Harrison. Mr. Harrison had seen the murders reported on the news, realized that they occurred in his daughter's apartment building, and went to the scene to get more information. Mr. Harrison

---

[24] Mings, who said he had watched the police officers respond to Bowser's 911 call, said that when he saw them leave he "figure[d] they didn't go up there." *Id.* at 1855. So he called the police again.

told Investigator Conway that Keshia had a boyfriend named Anthony who often went by "Ant Man."

The police began trying to contact Juniper the day after the murders. They tried unsuccessfully to locate and speak with him from January 17 through January 22. On January 23, they obtained murder warrants, and "placed him on TV" as wanted for murder. *Id.* at 1503. Juniper turned himself in on January 26, 2004.

## II. UNDISCLOSED EVIDENCE[25]

The vast majority of Juniper's claims currently before the Court allege that the Commonwealth violated *Brady* by failing to turn over favorable information to Juniper's trial counsel. That evidence falls into two main categories: evidence suggesting alternate suspects[26] and additional impeachment evidence.

### A. Alternate Suspect Evidence

As discussed, the prosecution presented evidence showing that the murders occurred between 10:20 a.m. and 12:44 p.m., but closer to 10:20 a.m. Juniper contends that undisclosed evidence could have called that timeline into question and opened the door to investigate others who may have murdered the victims. This evidence includes statements that Keshia's neighbors made to police about people they saw around Keshia's apartment at a time when, according to the prosecution's theory, Juniper had already broken in her front door and murdered everyone inside.

---

[25] Juniper uncovered a mountain of undisclosed evidence in post-remand discovery. The Court has already found much of the newly discovered evidence underlying Juniper's *Brady* and *Napue* claims both favorable and suppressed. (*See generally* ECF No. 434.) As noted, for purposes of the June 21, 2021 evidentiary hearing and this opinion, the Court assumes, without finding, that all the other newly discovered evidence was also favorable and suppressed.

[26] This category includes evidence suggesting that the murders occurred on a timeline that might exclude Juniper as a suspect.

At the heart of these *Brady* claims are the statements of Wendy and Jason Roberts, who lived in the same apartment complex as Keshia.

### *1. The Roberts Material*

The Robertses have given several statements about what they saw the day of the murders. Police interviewed them twice on the day of the murders. They first spoke with Investigator Dennis Jones. Later that day, Wendy spoke to Investigator William Conway. The next day, Investigators Conway and Robert Ford interviewed Wendy and showed her a photo lineup. Jason was present for that interview, but nothing indicates that he gave another statement to the police then.

Years later, on July 23, 2011, Wendy and Jason each signed an affidavit in which they described what they saw on January 16, 2004, and their interactions with police officers. And years after that, on June 21, 2021, Wendy and Jason each testified at the evidentiary hearing in this case. Times and details of their accounts have changed over the years.

### *a. The Robertses' 2004 Statements to Police Officers*

On the day of the murders, Wendy and Jason both spoke with Investigator Dennis Jones. Jones' notes show that Wendy said she saw an African-American man arguing with Keshia twice on the day of the murders—once at about 9:30 or 10:00 a.m. and once at about 12:30 or 12:45 p.m. During the later argument, Wendy heard the man tell Keshia that "she had not better be there when he returned." Supp. App'x at 928.[27]

Wendy recognized both Keshia and the man, telling Jones that "they argue about three or four times a week," and she "thinks [the man] is an ex-boyfriend." *Id.* She also told Jones that

---

[27] The Court cites to the Appendix submitted with Juniper's Amended Petition in this Court as "Supp. App'x."

she recognized the man because he "comes around . . . all hours of the day and night and beeps the horn for" Keshia. *Id.* Jason said he "was not home at the time of the argument," but that he had "seen the people . . . many times." *Id.*

Wendy also told Investigator Jones that she heard "three or four bangs" around 1:30 p.m. that she thought were firecrackers. *Id.* Jason said he also heard the bangs, and he thought it was someone hammering.

At about 9:20 p.m. on January 16, Wendy spoke with Investigator William Conway. Conway described his interview with Wendy in one line: "I spoke with Wendy Roberts, whose statement was consistent with that of the interview given to [Investigator] Jones." App'x at 671.[28]

At 10:40 p.m. the day after the murders, Investigator Conway returned to Wendy's apartment to interview her. This time, Investigator Robert Ford accompanied him, and they brought a photo lineup which included a picture of Juniper. Wendy did not say anything inconsistent with what she had previously told investigators. After viewing the lineup, she chose someone other than Juniper, but said she was "not 100 percent sure." *Id.* at 674. Jason was present, but the record does not indicate what, if anything, he said.

Nothing in the record indicates that anyone from the Norfolk Police Department contacted Wendy or Jason again, and nothing indicates that anyone ever asked them to give a recorded statement.

### b. The Robertses' 2011 Affidavits

On July 23, 2011, Wendy and Jason each signed an affidavit describing what they saw on the day of the murders and recounting their interactions with police officers.

---

[28] The Court cites to the Appendix submitted with Juniper's original petition in this Court as "App'x."

In her affidavit, Wendy said that she heard "someone honking a car horn repeatedly and laying on it" sometime on the morning of January 16, 2004. App'x at 733. "Later that afternoon" she "heard a series of loud pops" as she took her service dog outside. *Id.* She said she "assumed that [she] had heard a truck backfiring." *Id.* As she continued outside with her dog, she "saw a man come out from the stairs leading up to" Keshia's apartment. *Id.* at 734. She saw him "walk[] quickly to a car." *Id.* As he headed to his car, he saw Wendy watching him and said to her, "What the fuck are you looking at lady?" *Id.* He then got in and drove away alone. *Id.* She said she recognized the man as "one of three" African-American men she regularly saw visiting Keshia's apartment. *Id.*

Wendy said that "[w]ithin five minutes" after she heard the loud pops, "a lot of police officers arrived at the apartment building." *Id.* She said that all this "occurred sometime between 1:00 p.m. and 2:30 p.m.," which she knew because she had started to think about picking her grandchildren up from school, which let out at 2:30 p.m. *Id.*

Wendy also said that she spoke with "[a] couple of officers dressed in suits" the day of the murders and told them the same information she included in her affidavit. *Id.* Other officers came later that day and asked her again if she had seen or heard anything. She also said that "two different officers" came to her apartment another day and asked her "to pick out the person [she] saw coming down the stairs and getting in the car on the day of the homicides." *Id.* at 735. Finally, she said that nobody from the prosecutor's office or Juniper's defense team ever contacted her about what she told the police.

Jason wrote in his affidavit that he was "home all day" on the day of the murders. *Id.* at 736. He had not gone to work because he was not feeling well. He said he was in bed that afternoon when he heard gunshots. He "recognized them as gunshots," he said, "because of [his]

experience in Emergency Response." *Id.* He looked out the window and saw an African-American man "running to a car parked in front of" Keshia's apartment building. *Id.* Realizing his mother was outside, he ran out to make sure she was okay. Jason said that "within five minutes . . . a lot of police officers" arrived. *Id.* And "[n]ot long after," he had to go pick up his niece from school. *Id.* at 737. Like Wendy, Jason said that nobody from either the prosecution or Juniper's defense team contacted him.

### c. The Robertses' 2021 Testimony at the Evidentiary Hearing

Wendy and Jason each testified on June 21, 2021, at the evidentiary hearing. Wendy testified that in 1986 she had a stroke and was diagnosed with multiple sclerosis. When asked how the stroke and her multiple sclerosis affect her, she said: "As you can see, I am in a wheelchair. I sometimes have a problem enunciating what I want to say. I stutter. And I might not get the exact word out that I know what it is, but I might not get that exact word out." Hr'g Tr. 115:12–1, June 21, 2021. She said that she experienced similar effects in 2004. In part because of her disability, she followed a set schedule in 2004, centered around taking her service dog outside and getting her grandchildren to and from school. She occupied most of the rest of her time with reading, doing arts and crafts, and errands, not looking out her window at Keshia's apartment building.

On the morning of January 16, 2004, Wendy waited outside with her grandson for his school bus. While waiting, she saw an African-American man sitting in a car "laying on the horn screaming 'I want to see my kids. Bring me down my kids.'" *Id.* at 128:23–24.

The man came back later that day. She could not remember exactly what time he returned, but she testified that it was sometime between 10:30 a.m. and noon. "And he got out of the car and went up in [Keshia's] apartment. And then he came back downstairs and screamed up at the window. He goes, you better not be here. You better be gone by the time I get back. And he

26

pulled out of the parking lot and left." *Id.* at 130:16–20. Wendy did not remember whether she saw him go up to Keshia's apartment: "I know he got in the car, but I don't recall seeing him actually walking upstairs." *Id.* at 131:9–11.

She also said that the same man came back a third time that day. She saw him get out of the car and walk toward Keshia's apartment, although she did not see him go up the stairs to Keshia's apartment. She was preparing to take her dog out, and she heard "four shots, which [she] thought were firecrackers." *Id.* at 133:3. After hearing the shots, she "waited a few minutes," before going outside. *Id.* at 133:23. When she walked outside with her dog, she "saw the same gentleman run across the lawn" towards his car. *Id.* at 133:25–134:1. He looked at her "[a]nd his exact words were, 'What the fuck are you looking at, lady?'" *Id.* at 134:2–3. He then got in the car alone and left. Soon after the man left, police officers arrived and "started putting crime scene tape around the building." *Id.* at 138:22–23.

She described the man as between 5'8" and 6' tall, African-American, about 150 pounds, and in his late twenties or early thirties. She said he had facial hair "like when gentlemen don't shave for a couple of days." *Id.* at 132:11–12.

She said that she spoke to the police that day and "told them what [she] saw," and that she later spoke with police officers when they brought a lineup to her home. *Id.* at 139:2. She said that she was not contacted again about what happened that day until Juniper's federal habeas attorneys reached out to her.

The evidence is, at best murky about who she saw or whether he had anything to do with Keshia.

Jason testified that he "slept in" on January 16, 2004. *Id.* at 81:3. He "heard a pop, pop, pop," that he "construed . . . to be gunshots." *Id.* at 81:4. He ran to the window and saw a "large

27

gentleman" run from Keshia's apartment building to a car. *Id.* at 81:7.  He realized his mom was

outside, so he "ran outside to tend" to her. *Id.* at 81:13.  He did not remember the exact time of

the shots, but he had to pick up his niece from school "maybe half an hour" later, so it would have

been "around the time elementary school gets out." *Id.* at 81:23–24.  He also testified that the

police arrived "not very long after" he saw the man run from Keshia's apartment building. *Id.* at

83:11–13.  He could not give a specific length of time but testified that it was "maybe within the

next hour or two." *Id.* at 89:9.  When shown his affidavit in which he said the police arrived within

five minutes, he said that the affidavit was correct because it "was closer to the event." *Id.* at

95:22.

He said that he spoke with a police officer on the day of the murders and "remember[s]

telling him what [he] saw." *Id.* at 85:7.  He also said he told officers "[e]xactly the same thing"

when they returned to his apartment not long after the day of the murders to show his mother a

photo lineup. *Id.* at 86:23.

Jason testified that he has been diagnosed with fetal alcohol syndrome, which does not

affect his ability to think or understand things but does affect his IQ.  Wendy corroborated Jason's

account.

### 2. *Other Witnesses*

Two other neighbors of Keshia spoke to the police on the day of the murders and gave

information inconsistent with the prosecution's timeline of the murders.

Chaunte Hodge, who lived in the same apartment building as Keshia, spoke to the police

twice on the day of the murders.  Each time she said that, at about 10:45 a.m. that day, she saw a

green car with three men in it pull into the apartment complex, and a light-skinned African-

American man with braids in his hair get out. The man walked towards the entrance of Keshia's apartment. About five minutes later, she saw him get back into his car and drive away.[29]

Patrick Danso, who lived in the apartment complex behind Keshia's, spoke to the police at about 3:00 p.m. on the day of the murders. Danso said that at about 11:30 a.m. that day an African-American man with dreadlocks approached him and asked Danso if he was waiting for someone. The man then walked "between [Keshia's] apartment and the fence behind it" and returned a few minutes later with another man. Supp. App'x at 4974. The second man said to the man with dreadlocks, "Just forget about it[,] it ain[']t worth it." *Id.*[30]

---

[29] Interestingly, the timeline of when Hodge saw the African-American man with dreadlocks is slightly different in the summary of Hodge's original statement to police, documented in Investigators Joseph and Alexanders' Canvass Notes. There, the investigators wrote that Hodge said she saw the man at around 10:50 a.m., and that at 11:00 a.m. she and her mother-in-law spoke with a police officer who said he was responding to a call of shots fired. It is undisputed that Hodge and Frazier spoke with Officer Atkinson sometime shortly after 12:44 p.m. about a call of shots fired, and nothing in the record indicates they spoke with an officer *twice* that day about such a call. Further, Hodge's description of her 11:00 a.m. conversation with the police officer is very similar to Officer Atkinson's description of his conversation with Hodge. Thus, if Hodge did in fact see the man with dreadlocks go toward Keshia's apartment about ten minutes before she spoke with Officer Atkinson, that happened at around 12:30 p.m., not 10:45 or 10:50 a.m.

[30] Juniper also points to additional evidence that supports a different timeline for the murders. A neighbor, Kevin Waterman, heard four loud pops around 1:30 p.m. Juniper's attorneys knew of Waterman at the time of Juniper's trial, so Waterman's statement cannot be the basis of a *Brady* claim.
    Frances Frazier lived in the apartment below Keshia's and told the police at about 1:00 p.m. on January 16, 2004, that she had been home all day and had heard people moving furniture in the morning "and then saw them leave in a car," but she had not heard anything else or any gunshots. Supp. App'x at 2224. Juniper included Frazier's statement in a *Brady* claim in his original petition, which the Court dismissed and may not reconsider because of the mandate rule.
    Although neither witness's statement forms the basis of a *Brady* claim before the Court, the Court can consider their statements in its materiality analysis, in which it considers what effect suppression "might have had on the preparation or presentation of [Juniper']s case." *United States v. Bagley*, 473 U.S. 667, 683 (1985).

### B. Impeachment Evidence

Juniper also points to evidence uncovered in post-remand discovery that would have impeached aspects of Rashid's Murray's, Mings', Smith's, and Officer Atkinson's testimony.

### 1. *The Jones Material*

The Jones Material is comprised of statements John Jones made when questioned by the police on January 23, 2004, and February 5, 2004, and during phone calls he made while in jail. Jones did not testify at trial, but aspects of his statements conflict in some ways with the testimony of several important prosecution witnesses.

Juniper identifies the following inconsistencies between what Jones told investigators on January 23, 2004, and what Rashid, Murray, or Mings testified:

- Jones said that Juniper's mother sent only one of Juniper's friends to get him; he omitted Murray from his account of the trip.

- Jones said the car Rashid drove was burgundy or maroon; other witnesses said the car was brown.

- Jones said the gun Juniper had was a black automatic; other witnesses said it was black and chrome.

- Jones never mentioned Juniper displaying a gun during the car ride from Keshia's apartment; Rashid testified that Jones had reprimanded Juniper for taking the gun out, and Murray testified that Juniper had the gun out at one point.

- Jones said he gave Juniper some alcohol after Juniper got in Rashid's car; no other witness mentioned that.

- Jones said that Juniper smoked in Rashid's car; no other witness mentioned that.

- Jones said that Juniper remained calm as they drove from Keshia's house; both Murray and Rashid testified that Juniper seemed out of sorts.

- Jones said Rashid told him she was a nurse; Rashid said she did not tell Jones what she did for a living.

- Jones said that Juniper wore a black or blue hoody; Rashid said he wore a bulky black jacket.

(Am. Pet., ECF No. 366, at 78–80.)

Juniper also identifies the following inconsistencies between what Jones told investigators on February 5, 2004, and what Rashid, Murray, or Mings testified:

- Jones said he saw a man outside Keshia's apartment building when he, Rashid, and Murray arrived; neither Rashid nor Murray said they saw a man outside the apartment then.

- Jones said that he got in Rashid's car when she and Murray arrived at his apartment; Rashid said that Murray went inside Jones' house, and the two came out together later.

- Jones said that Murray went with him to the bottom of the stairs at Keshia's apartment; in his interviews with police, Murray denied getting out of the car until after Juniper came down, and Murray testified at trial that he stood at the back of Rashid's car and watched Jones go to the bottom of Keshia's stairs.

- Jones said he never saw a policeman during the drive from Keshia's apartment; Rashid testified that Juniper took the gun out of his pocket when a marked police car drove in front of them at a light.

- Jones said that Rashid first dropped him and Juniper off and then drove away with Murray; Murray testified that Rashid dropped him off first; Rashid testified that Murray initially got out of the car with Jones and Juniper and then asked her to take him somewhere and got back in.

- Jones again said that Juniper's gun was a black automatic (not black and chrome, as other witnesses reported); he again said that Juniper smoked in Rashid's car after they left Keshia's (something no other witness reported); he again said that he did not see Juniper take the gun out inside the car (unlike Rashid's testimony); and he again said that Juniper wore a hoody (unlike Rashid, who testified that he wore a bulky jacket).

(*Id.* at 80–82.)

## 2. *The Mings Material*

Post-remand discovery also revealed several pieces of evidence that Juniper says would have impeached Mings' testimony in the following ways:

31

- Mings testified that he saw Juniper in the apartment, holding a gun, with cocaine on his face.

  - In a January 16, 2004 statement to police, Mings denied seeing anybody but the two bodies, and he denied seeing any drugs or guns in the apartment.[31]

- Mings testified that he went to Keshia's house the day of the murders because Murray called, told him he had heard some shots, and asked him to go down there, and also because Mings' girlfriend, Bowser, wanted to speak to Keshia about a check from Bowser's employer.

  - In his January 16 statement, Mings said he went to Keshia's apartment because Bowser told him to let Keshia know that she was about to come over. Mings did not mention Murray calling him.

  - In a May 12, 2004 statement to police, Mings said he went to Keshia's apartment because Murray told him that Juniper and his girlfriend were "fussing," but Mings did not say that Murray mentioned shots fired.

  - Notes of a January 16 police interview with Bowser say that she said she sent Mings to Keshia's apartment because she had called around noon and got no answer.

  - The prosecution's trial preparation notes do not indicate that Murray told Mings he heard gunshots.

- Mings testified that he saw Juniper, Jones, and Murray leaving Keshia's apartment.

  - In a February 6, 2004 statement, Murray said he did not get out of Rashid's car while at Keshia's apartment.

- Mings testified that he went to Keshia's apartment once (when he went in and saw Juniper and the bodies), and started to go there a second time, but stopped when he saw Juniper, Jones, and Murray leaving the apartment.

  - On January 16, Mings told police that he went to Keshia's apartment, saw the door had been kicked in, then went back home and told Bowser, who told him to go back. He said he then returned to the apartment and saw the victims for the first time. Mings did not mention Juniper.

---

[31] Of course, Mings admitted at trial that he had omitted Juniper from his original statement to the police.

- On December 10, 2004, Mings gave a similar description of his trips to the apartment, but this time he said he saw Juniper inside.

- On January 16, Bowser told police that she accompanied Mings on his second trip to Keshia's apartment, and that Mings went up the stairs and into the apartment.

- The prosecution's trial preparation notes indicate that Mings went to Keshia's apartment twice, and started to go a third time when he saw Juniper, Jones, and Murray leaving.

- Mings did not testify about specific times on the day of the murders, and he agreed with the prosecution's statement that he was not "paying attention to [his] watch or the clocks" on that day.  SH App'x at 1841.

  - On January 16, Mings told police that he initially went to Keshia's apartment between 12:00 p.m. and 1:00 p.m.

  - On January 16, Bowser told the police that she tried calling Keshia's apartment around noon and got no answer.

  - On April 21, 2004, Bowser told the prosecution that she tried calling Keshia around 10:00 a.m., but Keshia's voicemail was full, and Bowser sent Mings to Keshia's apartment shortly thereafter.

  - On May 12, 2004, Mings told investigators that he first went to Keshia's apartment around 10:00 a.m., but he was sure it was before noon.

- Mings testified that he and Bowser called 911 twice, and that they called the first time after Mings had seen Juniper, Murray, and Jones leaving Keshia's apartment.

  - On May 12, 2004, Mings said they called 911 three times: "[Police] just rode past the first time.  And, then the second time they just took a long time to come, so we called them a third time.  And that's when they came . . . ."  Supp. App'x at 962.

  - The prosecution's trial preparation notes indicate that Mings and Bowser did not call 911 until after Mings started to go to Keshia's apartment a third time, and that the "[p]olice took a while," so Bowser called twice.  *Id.* at 5119.

- Mings did not testify that he saw anyone near Keshia's apartment when he went there.

  - On January 16, Mings told police that he saw a silver vehicle with a black man in it when he went to Keshia's apartment.  Mings said he

33

asked the man if he had seen anyone go up to Keshia's apartment, and the man said he had not.

Post-remand discovery also uncovered information about Mings' criminal history and his self-interested motive for testifying: records of his 2001 conviction for distribution of cocaine and a January 5, 2005 letter Mings wrote to the Norfolk Circuit Judge presiding over his revocation proceedings.

Mings testified that he had been convicted of two felonies: possession with intent to distribute cocaine in 2001, and possession of narcotics in 2004. He testified that he was serving a one-year sentence for a probation violation at the time of Juniper's trial and would be released in April. On cross-examination he acknowledged that his cooperation in Juniper's case could have led to a more lenient sentence on his probation violation.

In fact, Mings wrote a letter to the Norfolk Circuit Court judge presiding over his probation revocation hearings. The court received that letter on January 5, 2005, two days before Mings testified in Juniper's case. In that letter, he "inform[s]" the judge that he was "removed out of the work rel[ease] program on the count of [his] foolishness." SH App'x at 2854. He says:

> I [know] I've made one mistake but can you please consider the good I've accomplished since my incarceration. I've not only completed a program much more aggressive th[a]n the freedom from within and paid $360 in cash for. I also paid of all my fines in full and a[m] assisting the [C]ommonwealth in a very big case.

*Id.*

Mings also testified that he had been sentenced only to probation for his 2004 possession of narcotics conviction. The records for this conviction, however, contradict that testimony. He was initially sentenced to three years in prison with all but two weekends suspended. On May 5, 2004, the Norfolk Circuit Court issued a capias alleging that Mings had violated the terms of his probation in that case. On June 18, 2004, the Norfolk Circuit Court revoked his probation and

34

sentenced him to 2 years, 11 months, and 24 days of incarceration (the balance of his original three-year sentence). But on August 27, 2004, after Mings moved for reconsideration, the court suspended all of that sentence.

### 3. *The Murray Material*[32]

Post-remand discovery also uncovered the following information that Juniper says could have impeached aspects Murray's testimony: (1) information in the Investigation Notes about Murray's February 6, 2004 interview with police; (2) Murray's February 6, 2004 recorded statement; (3) information in Wray's, Conway's, and Murray's post-remand deposition testimony; (4) Murray's 2006 affidavit; and (5) Norfolk Police Investigator Roger Pederson's Investigation Notes describing his June 15, 2004 interview with Murray about a different murder. Each of these pieces of evidence contains information that, if true, undermines Murray's credibility generally or impeaches specific aspects of his testimony.

Murray gave several accounts of January 16, 2004, that differed in specific ways from his testimony. On February 6, 2004, Investigators Wray and Conway interviewed Murray about whether he had gone with Rashid and Jones to pick Juniper up from Keshia's apartment. As documented in the Investigation Notes, Murray "at first denied having any knowledge of what happened as far as the homicide went, and stated he did not go to Kingston Avenue with Anthony or pick him up." App'x at 713–14. The Investigation Notes state that Wray then "advised" Murray "he was not telling the truth," and Murray agreed "and went on to give the true version of what happened." *Id.* at 714. The investigators then took a taped statement from Murray.

---

[32] Two parts of Murray's testimony also form the basis of one of Juniper's two remaining *Napue* claims.

In his statement, Murray said the following things that conflicted with his testimony:

- He said that he did not get out of the car when they got to Keshia's, but instead he watched Keshia's apartment from the car's side view mirror and held his "window down so [he] could like hear them . . . yelling upstairs." Supp. App'x at 951.

    - At trial, Murray testified that went "to the back of the car" while Jones walked towards Keshia's apartment. SH App'x at 1813–14.

- He also described events during the drive from Keshia's apartment: "[Rashid] pulls off, so we headed back to Norview section. So we come to the red light on Little Creek and Chesapeake Boulevard and we was like trapped in between some cars, so [Juniper] put the gun in there and was like, 'I'm not going to jail, make the right,' forcing [Rashid] to make the right." Supp. Appx at 942. Rashid then "cut through [a] gas station." *Id.* And Juniper "[h]ad the gun in the air, like I'm not going to jail, or whatever, . . . looking all crazy and shit." *Id.*

    - At trial, Murray did not testify about any events during the drive from Keshia's apartment.

- Murray did not mention the phone call with Juniper in which Juniper confessed to him.

Statements Murray made as documented in the investigation notes of Roger Pederson during his June 15, 2004 interview with Murray also conflict with aspects of his testimony and with his February 6, 2004 statement. In his investigation notes, Pederson wrote that Murray "stated that he received a phone call from Juniper that [sic] day of the shooting and he told him that he had shot the people." Supp. App'x at 974. Describing the phone call, Murray said that "he was over [at] Juniper[']s mother's house and Juniper called his mother, and she was very upset, so she handed [Murray] the phone and Juniper stated that they were all dead and he did it. He stated that he wanted his funeral done in a certain way because he was not going to be taken alive." *Id.* At trial, Murray did not mention Juniper's mother first speaking to Juniper, nor did he mention that Juniper gave instructions about his funeral.

Juniper contends that information uncovered in post-remand discovery also calls into question Murray's general credibility. Murray's affidavit says he was "questioned maybe 10

36

different times" in relation to the murders, was told information about what Rashid and Jones had done on the day of the murders, and was "kept . . . in jail and [investigators] let [him] know what the story would be that [he] would have to tell at trial." SH App'x at 3240–41. Wray's and Conway's post-remand deposition testimony also contains information that could be used to argue that police investigators coached Murray about what to say.[33]

Finally, Conway's post-remand deposition testimony also contains information that, around the time of the Stephens family murder investigation, he considered Murray a "jailhouse snitch."[34] Supp. App'x at 3279. Lieutenant Kowalski testified at the evidentiary hearing that Murray was "a very well-known individual," who provided him with information several times between the years of 2000 and 2005. H'rg Tr. at 6:21–22, June 23, 2021.

#### 4. *The Smith Material*

Finally, Juniper says that evidence uncovered in post-remand discovery could have impeached Ernest Smith, who testified that Juniper confessed to him in jail.

Smith testified at the evidentiary hearing that, at the time of her murder, Keshia was a "[f]riend of the family," and that he "[s]omewhat" thought of her as a sister. H'rg Tr. 10:16, 20,

---

[33] The parties' stipulated facts also support this conclusion. The parties stipulated that "[w]hile interrogating Murray on February 6, 2004, Investigator Wray told Murray that the police had evidence contradicting his version of events and showed that evidence to Murray," Stip. No. 335, ECF No. 407; that "Wray told Murray what other witnesses had said," *id.* No. 665; and that "investigators showed Murray photographs of alleged suspects and evidence" before he gave a recorded statement, *id.* No. 666.

[34] The parties' stipulated facts also support this conclusion. The parties stipulated that "[d]uring Investigator Conway's investigation of Murray, he developed information that led Conway to believe that Murray was previously a police informant," Stip. No. 698; that "Murray provided information to police in multiple homicide investigations," *id.* No. 700; and that "Murray noticed that every time he got into a little jam, he could go to the POC for a drug case and the homicide detectives would come talk to him," *id.* No. 703.

June 24, 2021. He said that he saw her "[o]ften," and had babysat her oldest child. *Id.* at 11:5. At trial, Smith did not mention his relationship with Keshia.

Juniper also points to evidence that three inmates other than Smith sought to give the Commonwealth information implicating Juniper in the murders. Essentially, this evidence consists of statements by inmates that many inmates at the Norfolk City Jail wanted to give evidence implicating Juniper as the killer. The record contains transcripts of recorded statements from two of the inmates and a letter and affidavit from the other.

### 5. *The Atkinson Material*

As discussed, Officer Atkinson testified that, at about 12:44 p.m. on the day of the murders, he responded to a "possible shots fired call sound of a disturbance" in an apartment at 1427 Kingston Ave. SH App'x at 1239. He arrived at the apartment complex, parked his car, and "went around" the complex to "a set of steps that lead from the back side of the building up toward the front." *Id.* at 1245. He went up those stairs and was about to knock on a door when Chaunte Hodge approached him "out of the parking lot from somewhere." *Id.* He asked her if she lived in the upstairs apartment, and she "stated that she did." *Id.*

Officer Atkinson also testified that when he first spoke with Hodge he "had no idea" whether the building had another upstairs apartment in the complex, *id.* at 1246, that he did not "remember asking [Hodge] directly if there was a second apartment upstairs," *id.* at 1250, and that he had no idea that a stairwell led up to Keshia's apartment "until hours later," *id.* at 1248.[35]

---

[35] These parts of Officer Atkinson's testimony form the basis of one of Juniper's two remaining *Napue* claims.

After responding to the 911 call Officer Atkinson handwrote a two-page report. His report documented much of what he described in his testimony. Consistent with his testimony, it characterized his interaction with Hodge as follows:

> I saw a stairway on south end of building and went up stairs to knock on the door. As I got to the door a Black female called up to me from around asking if she could help me. I asked if she lived in this apartment. She replied she did.

Supp. App'x at 2225. He also wrote that he "never saw the stairs which [led] to the apartment where it turned out the homicide had occurred." *Id.*

At 5:27 p.m. on the day of the murders, Hodge gave a recorded statement to the police. In that statement she described her interaction with Officer Atkinson. Much, but not all, of her description matched Officer Atkinson's report. But Hodge also said that Officer Atkinson "asked [her] if there was another apartment upstairs," and she "told him around on the other side." *Id.* at 2230 (emphasis added).

Both Officer Atkinson and Chaunte Hodge testified at the evidentiary hearing. At the hearing, Officer Atkinson said he never spoke with a woman who lived in an upstairs apartment. When asked to read his report in which he said that he had spoken with Hodge, who had told him she lived in the upstairs apartment, he said: "I may have left the word 'not' out of that statement, because she came out of the downstairs apartment." Hr'g Tr. 52:22–23, June 21, 2021. "She was standing at the doorway when she called up to me, and that is where she went back in when I left." *Id.* at 53:13–14. He testified that, at the time he responded to the call, he believed "that the entire upstairs was one apartment." *Id.* at 55:19–20.

Chaunte Hodge could remember far less about the day of the murders. She testified that she returned to her apartment that day "around lunch time," and went to her mother-in-law's to check with her. Hr'g Tr. 8:24, June 22, 2021. She said she could not remember if she spoke to any police officers that day. After reading the statement she gave to police the evening of January

39

16, 2004, she said: "It seems like it is accurate. I don't recall all of the events actually that happened that day." *Id.* at 11:6–7. She also testified that, even after reading her statement saying that she spoke with a police officer that day, she did not "recall that part." *Id.* at 11:16.

### III. HABEAS LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 constrains this Court's authority to grant relief by way of a writ of habeas corpus. 28 U.S.C. § 2254 *et seq.* To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a). When a petitioner seeks *federal* habeas relief from a *state* conviction, as Juniper does, AEDPA's limitations are especially strong.

When a state court has adjudicated the merits of a habeas claim, a federal court may only grant a writ of habeas corpus if the adjudicated claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). The parties agree that Juniper did not present any of his remaining claims in state court, so this standard does not govern the Court's analysis.

Instead, the related concepts of exhaustion and procedural default limit Juniper's ability to obtain relief. Principles of federalism and comity "dictate that the state[s] be given the first opportunity to correct constitutional errors" in their own criminal proceedings. *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000). For these reasons, a federal court may not grant a state prisoner habeas relief unless he "has exhausted the remedies available in the courts of the State" of which he is in custody. § 2254(b)(1)(A). The exhaustion requirement "is satisfied so long as a claim has

been 'fairly presented' to the state courts." *Baker*, 220 F.3d at 288 (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).

Procedural default occurs when a federal habeas petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). In Juniper's case, a Virginia court would find his claims barred by the statute of limitations. *See* Va. Code § 8.01-654.1. That means Juniper has procedurally defaulted each of his claims.

Even when a petitioner has procedurally defaulted a claim, however, he may nevertheless obtain review by establishing both cause and prejudice. *Breard*, 134 F.3d at 620. In general, "cause" refers to some "objective factor external to the defense [that] impeded counsel's [or petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999) (quotations omitted).[36] "Prejudice" requires a showing that the alleged trial error not only "created a *possibility* of prejudice" but that it "worked to [the petitioner's] '*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *McCarver v. Lee*, 221 F.3d 583, 592 (4th Cir. 2000) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

Here, if Juniper can show materiality under *Brady* or *Napue*, or prejudice under *Strickland*, he can establish prejudice to overcome his procedural default. *See Banks v. Dretke*, 540 U.S. 668,

---

[36] The following objective, external factors have been held to constitute cause: "(1) interference by officials that makes compliance with the State's procedural rule impracticable; (2) a showing that the factual or legal basis for a claim was not reasonably available to counsel; (3) novelty of a claim; and (4) constitutionally ineffective assistance of counsel." *Wright v. Angelone*, 151 F.3d 151, 160 n.5 (4th Cir. 1995) (cleaned up).

691 (2004) ("[P]rejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes."); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("The standard for *Strickland* prejudice is the same as for *Brady* materiality."); *cf. United States v. Cargill*, 17 F. App'x 214, 228 (4th Cir. 2001) ("Most courts have agreed that the [*Napue*] 'reasonable likelihood' test is more favorable to defendants than the *Brady* 'reasonable probability' standard.").

Because Juniper cannot show *Brady* or *Napue* materiality or *Strickland* prejudice, each of his claims fails.[37]

## IV. ANALYSIS

At this point in the proceeding, three types of claims remain: nine *Brady* claims, two *Napue* claims, and a single *Strickland* claim. The Court assumes that all the evidence underlying Juniper's *Brady* claims was suppressed and is favorable, it assumes that all the testimony underlying his *Napue* claims was false or misleading and the Commonwealth knew it, and it assumes that his trial counsel's performance related to his *Strickland* claim was deficient.

### A. Juniper's Due Process Motion

The Court first addresses a threshold issue relevant to its *Brady* and *Napue* analysis.

On July 12, 2021, Juniper filed a "Motion to Remedy the Due Process Violations Resulting from the Commonwealth's Extended Concealment of Exculpatory Evidence" and a supporting memorandum. (ECF Nos. 582, 583.) In his memorandum, he discusses the vast amounts of

---

[37] In this case, the Court bypasses the cause-and-prejudice analysis and proceeds to the merits of Juniper's claims. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir.1999) (finding that avoiding a procedural-default analysis may be appropriate when a petitioner's claim is "patently without merit").

favorable evidence the Commonwealth—through the original prosecution team during his criminal trial and direct appeals, and through the Attorney General's Office during his post-conviction proceedings—withheld from him for nearly fifteen years, and he highlights what this Court and the Fourth Circuit have characterized as "the Commonwealth's entrenched resistance to transparency in this criminal prosecution and subsequent post-conviction proceedings." *Juniper v. Zook (Juniper III)*, 876 F.3d 551, 566 (4th Cir. 2017) (quoting *Juniper v. Pearson (Juniper I)*, No. 3:11cv746, 2013 WL 1333513, at \*15 (E.D. Va. March 29, 2013). He argues that because of the Commonwealth's behavior, whether resulting from negligence, overzealous prosecution, or bad faith, "evidence has been lost and witnesses have forgotten relevant information." Mem. Supp. at 5, ECF No. 583. He therefore requests "an appropriate remedy." *Id.* at 26.

As an appropriate remedy, he asks: (1) "that the Court disregard the Warden's arguments that the observations of Frances Frazer are irrelevant regarding when the murders were committed because she was home all day and heard nothing for the entire day on January 16, 2004," and (2) that the Court "not consider the Warden's arguments that Juniper's witnesses' failures to recall events and details at the 2021 evidentiary hearing impact determinations regarding their credibility." *Id.*

The Court will deny these requests.[38] The conduct of the Commonwealth at trial, and the Warden during these proceedings, leaves much to be desired. The better course is always to disclose evidence, even if, as here, its materiality is questionable. *Brady* litigation, however,

---

[38] Juniper also suggests that the Court could "[a]lternatively" apply a "rebuttable presumption that any evidence that could not be used to its full effect by Juniper due to the passage of years is material." Mem. Supp. Due Process Motion, ECF No. 583, at 28. Such a remedy would go too far and would contradict *Brady* itself.

always involves failure the produce evidence, and the failure to disclose does not require the Court to ignore what it has seen, heard, and read.

### B. Brady *and* Napue *Legal Standards*

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). Favorable evidence may either be exculpatory or impeaching of the prosecution's case. *See Banks*, 540 U.S. at 691. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Establishing a "reasonable probability" does not require a petitioner "to show by a preponderance of the evidence that disclosure of the evidence would have resulted in acquittal." *United States v. Ellis*, 121 F.3d 908, 915 (4th Cir. 1997). Nor is *Brady*'s reasonable probability standard a sufficiency-of-the-evidence test. *See Strickler*, 527 U.S. at 290 ("[T]he materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions."). Rather, a petitioner satisfies this standard by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

A *Napue* claim is a specific type of *Brady* claim. A *Napue* violation occurs when the prosecution knowingly elicits false or misleading testimony or allows such testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence,

44

allows it to go uncorrected when it appears." (citations omitted)).  A *Napue* violation can occur even if the false testimony "goes only to the credibility of the witness."  *Id.*  That is so because "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  *Id.*  To establish a *Napue* violation, a petitioner must show that: (1) the testimony was false or misleading; (2) the prosecution knew the testimony was false or misleading; and (3) the testimony was material. *Basden v. Lee*, 290 F.3d 602, 614 (4th Cir. 2002).

Although *Napue* claims are *Brady* claims, a different materiality standard governs *Napue* claims.  *United States v. Agurs*, 427 U.S. 97, 103–04 (1976).  To show materiality under *Napue*, a petitioner need only establish "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id.* at 103.  Under *Napue*'s materiality standard, "the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt."  *United States v. Bagley*, 473 U.S. 667, 680 (1985).

Finally, *Brady* evidence can be material either on its own or cumulatively with other evidence.  *See Kyles*, 514 U.S. at 436 n.10.  When a petitioner asserts multiple *Brady* claims, courts must "evaluate the tendency and force of the undisclosed evidence item by item" as well as "its cumulative effect" to determine whether the evidence satisfies the *Brady* materiality standard.  *Id.*

### C.  Brady *Claims: Individual Materiality*

The Court first evaluates the materiality of the suppressed and favorable evidence item by item.  None of Juniper's nine *Brady* claims are material on their own.

Claim I relies on statements Wendy and Jason Roberts made about seeing a man who did not fit Juniper's description arguing with Keshia several times on the day of the murders, including

a statement Wendy gave that she saw Keshia alive and arguing with the man at 12:30 or 12:45 p.m.—after the time the prosecution argued Juniper had murdered Keshia.  As discussed above, Wendy's and Jason's accounts of what they saw on January 16, 2004, have varied dramatically— both from their own statements and from each other's statements.  Based on their testimony at the evidentiary hearing, the Court finds them sincere, but not credible.  Watching them testify, the Court reached the conclusion that they just did not know what they were talking about.  In part because of their shifting stories and the inconsistent accounts they each gave of what occurred on January 16, 2004, and in part because of their demeanor in testifying, no reasonable juror would have believed their timeline of events over the coherent and consistent timeline and accounts Rashid, Murray, and Mings gave.  The Robertses' accounts also would not have called into question the forensic evidence implicating Juniper in the murders or Smith's testimony that Juniper had confessed to him.  For all these reasons, the Roberts Material, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Claim III relies on information about the investigation and questioning of John Jones, Jr. As discussed at length above, *see supra* pages 30–31, the Jones Material could, at most, have impeached trivial aspects of Rashid's, Mings', and Murray's testimony.  Nothing in the Jones Material would have undermined the consistent narrative that each of those witnesses collectively told about the events of January 16.  Nor would it have called into question the forensic evidence implicating Juniper in the murders or Smith's testimony that Juniper had confessed to him.  The Jones Material, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Claims IX.A., X, and XI all rely on evidence related to Mings. As discussed, *see supra* page 31–35, that evidence consists of prior inconsistent statements about, for example, how many times he went to Keshia's apartment, why he went to Keshia's apartment, whether anybody went with him when he went to Keshia's apartment, whether he saw anyone when he went there, how many times he called 911, and his criminal history and his reasons for testifying. None of this evidence would have undermined the consistencies in Rashid's and Murray's accounts of January 16. This evidence also would have revealed that, although some of the details of Mings' accounts of January 16 changed, his overarching narrative remained largely the same—he went to Keshia's apartment, where he saw Juniper[39] and two of the murder victims, and then his girlfriend called the police. Finally, this evidence would not have called into question the forensic evidence implicating Juniper in the murders or Smith's testimony that Juniper had confessed to him. The Mings Material, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Claim XII.A. relies on evidence that would have impeached aspects of Murray's testimony, including his testimony that Juniper confessed to him on the day of the murders and his general credibility. But even if this evidence had led the jury to completely disregard Murray's testimony, it does not, on its own, undermine Rashid's, Mings', or Smith's testimony, or any of the forensic evidence implicating Juniper in the murders. The Murray Material, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

---

[39] Of course, Mings did not mention Juniper in his original statement to the police. But Juniper's attorney impeached him about that at trial. Any additional impeachment on that issue would have been cumulative and does not, on its own, undermine confidence in the verdict.

Claim XIII.B. relates to information about Officer Atkinson's 12:44 p.m. 911 call. That information would have impeached Officer Atkinson's testimony that he did not learn about the existence or location of Keshia's apartment when he responded to that call. A reasonable juror could have found at least two alternative explanations based on that impeachment. First, despite Hodge having told Officer Atkinson about the existence and location of Keshia's apartment, he might not have been listening to her, or he might not have understood the meaning of what she said. Second, if he did understand the importance of what Hodge told him, he might have chosen not to fully investigate the other upstairs apartment. Either of these explanations would likely have led jurors to believe that Officer Atkinson conducted shoddy police work, and they might have placed less—or no—weight on his testimony. Regardless, none of the information underlying Claim XIII.B. would have undermined Rashid's, Murray's, Mings', or Smith's testimony or called into question the forensic evidence implicating Juniper in the murders. The Atkinson Material, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.[40]

Claim XIV relies on statements that two of Keshia's neighbors (Hodge and Danso) gave to the police about people they saw near Keshia's apartment on the day of the murders. Each of them saw a man or men who did not fit Juniper's description go towards Keshia's apartment at a time when, according to the prosecution, the door to the apartment had been kicked in, all four

---

[40] Two other possible explanations exist. First, Officer Atkinson might have actually investigated the other upstairs apartment and found the broken-in door, dead bodies, and Juniper, but chosen not to call back-up or notify anyone of the crime. Second, he might have investigated the other upstairs apartment and found nothing unusual—no broken-in door and no dead bodies—but chosen to falsify his report and testify otherwise so that his timeline would be consistent with the timeline the prosecution presented at trial.

Both explanations are patently incredible and have no support from the record in this case, including the Court's conclusion that Officer Atkinson, who testified at the evidentiary hearing, presented as a credible witness. No reasonable juror could have come to either conclusion.

people had been murdered, and Juniper remained inside. But even if the jury believed Hodge's and Danso's accounts, what they saw does not necessarily undermine the prosecution's timeline. Each witness said only that they saw someone go *towards* Keshia's apartment; not that they saw someone go *into* Keshia's apartment. Their testimony, no matter how credible, does not, on its own, undermine the consistent story Rashid, Mings, and Murray told about the timeline of January 16, 2004. Nor does their testimony call into question the forensic evidence implicating Juniper in the murders or Smith's testimony that Juniper had confessed to him. Hodge's and Danso's accounts, on their own, do not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

Finally, Claim XV relates to evidence that would have impeached Smith's testimony that Juniper confessed to him. This claim relies on evidence that several inmates incarcerated with Juniper sought to give the prosecution evidence inculpating Juniper in the murders. Juniper also, through argument and through Outlaw's testimony at the hearing, points to a culture of snitching and a willingness to falsely implicate Juniper in exchange for a personal benefit. Finally, Juniper argues that Smith's close relationship to Keshia gave him a motive to testify falsely against Juniper. Even assuming that the evidence underlying this claim would have led the jury to entirely disregard Smith's testimony, this evidence still does nothing to undermine Rashid's, Murray's, and Mings' account of January 16, 2004, or the forensic evidence implicating Juniper. This evidence, on its own, does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

### D. Napue *Claims: Individual Materiality*

The Court similarly concludes that neither of Juniper's *Napue* claims are material on their own.

Claim XII.B. relates to parts of Murray's testimony implying that he had no personal motive for testifying against Juniper. At summary judgment the Court held that this implication was misleading and that the prosecution knew it was misleading. The Court also found no "reasonable likelihood" that Murray's misleading testimony, on its own, "could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103. Nothing at the evidentiary hearing changes the Court's determination on this issue. Claim XII.B., on its own, is not material.

Claim XIII.A. relates to Officer Atkinson's testimony that he did not know the existence or location of Keshia's apartment when he responded to the 12:44 p.m. 911 call. The Court denied summary judgment to both Juniper and the Warden on all prongs of this claim.[41] Even assuming, however, that Officer Atkinson's testimony was false and the prosecution knew it was false, it is not individually material. As discussed regarding Claim XIII.B., *see supra* page 48, none of the explanations for Officer Atkinson's false testimony that a reasonable juror could have accepted undermine the other significant evidence of Juniper's guilt—Rashid's, Murray's, and Mings' largely consistent timeline of January 16, 2004; Smith's testimony that Juniper confessed to him; and the forensic evidence implicating Juniper in the murders. As such, even assuming that Officer Atkinson testified falsely and the prosecution knew he testified falsely, it raises "no reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

---

[41] Juniper moved the Court to reconsider its denial of summary judgment to him on the falsity prong of Claim XIII.A. (ECF Nos. 462, 463.) On the first day of the evidentiary hearing, the Court denied that motion "for the reasons stated in the summary judgment motion." Hr'g Tr. 6:18, June 21, 2021.

### E. **Brady** *and* **Napue** *Claims: Cumulative Materiality*

Finally, the Court evaluates the cumulative materiality of all the alleged *Brady* and *Napue* evidence. In doing so, it does not assess whether, even considering all the alleged *Brady* and *Napue* evidence, sufficient evidence still exists to convict Juniper. *Cf. Strickler*, 527 U.S. at 290. Still, the analysis necessarily requires an evaluation of "the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial." *United States v. Ellis*, 121 F.3d 908, 918 (4th Cir. 1997); *see also Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 560 (4th Cir. 1999) ("[T]o assess whether [suppressed favorable evidence is] material, [the Court] must examine it in light of the other evidence presented to the jury."). In other words, the cumulative materiality analysis requires that the Court "first assess the Commonwealth's evidence [of Juniper's guilt] . . . .[,] then weigh against this evidence the strength of [Juniper's] defense. Finally, [the Court] consider[s] whether the [*Brady* and *Napue* evidence], had it been disclosed and used effectively," was material to the outcome of the case. *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003).

#### 1. *Legal Standard*

The Court must first determine which standard (*Napue*'s or *Brady*'s or some combination of the two) governs the Court's cumulative materiality analysis. Both *Brady* and *Napue* claims remain, and the Fourth Circuit has not decided which materiality standard applies when the Court evaluates the cumulative materiality of evidence that forms the basis of both *Napue* and run-of-the-mill *Brady* claims. *See United States v. Arias*, Nos. 99-6644, 99-6645, 2000 WL 933010, at *6 (4th Cir. July 10, 2000) (unpublished table decision) (discussing the appellants' argument that the *Napue* "reasonable likelihood" standard, instead of *Brady*'s higher "reasonable probability"

standard, applies in such a situation, but declining to decide which standard governs).  Not surprisingly, each party argues that the Court should apply the standard that most favors them.

The Court need not decide which standard should govern in this case because it makes no difference in the outcome.   Regardless which standard the Court applies to its cumulative materiality analysis—*Napue*'s reasonable-likelihood or *Brady*'s reasonable-probability—all of Juniper's claims fail.  In other words, assessing the materiality of all of Juniper's *Brady* and *Napue* claims cumulatively, the evidence does not establish a reasonable likelihood that the outcome of his trial would have been different; the favorable evidence the Commonwealth suppressed and the false testimony it knowingly allowed to go uncorrected were "harmless beyond a reasonable doubt." *Bagley*, 473 U.S. at 680.

### 2. *Analysis*

The Court recounted the evidence at trial at length, *see supra* pages 2–22, and it will not do so again here.  Broadly, though, the trial jury heard the following evidence.

First, the jury heard testimony from three individuals, each of whom knew Juniper, and one of whom considered Juniper a good friend.   Those witnesses' versions of events on the morning and early afternoon of January 16, 2004, were largely consistent with each other, and were also partially corroborated by other evidence in the record.

For example, although only Rashid testified about seeing Juniper in Keshia's apartment before the murders, at least two things she testified about support the conclusion that the murders occurred shortly after she left. First, Rashid testified that Nykia and Shearyia Stephens were naked in the bathtub because Keshia said she was preparing to bathe them.  Both of the little girls were naked when police found their bodies.  Second, Rashid testified that Shearyia, the younger of the

girls, had marker on her face, as though Nykia had drawn on her.  At the time of her autopsy, Shearyia had marker on her face, as well as on her back, her hand, and her elbow.

Mings also saw Juniper in Keshia's apartment.  In fact, Juniper directed Mings to the victims' bodies in the apartment, including the specific location that Keshia had fallen.

Further, Murray's and Rashid's description of events lined up.  They both testified that they went to John Jones' apartment to pick Jones up; that Jones got into Rashid's car with his girlfriend's young daughter; that when they arrived at Keshia's apartment, Rashid parked her car off the street and across from Keshia's apartment; and that Murray and Jones got out of the car while Rashid and the little girl stayed in the car.  They both testified that after Juniper came down from Keshia's apartment, Juniper got in the front passenger seat, Murray got in behind Juniper, Jones got in behind Rashid, who drove, and the little girl sat in the back between Jones and Murray.  They both testified that Juniper was out of sorts, and they both testified that Juniper pulled down the passenger side sun visor and looked in the mirror during the drive.

Murray's testimony also lined up with Mings' testimony.  Mings testified that he came home after his original visit to Keshia's apartment, but soon began to return to Keshia's apartment.  As he did, he saw Juniper, Murray, and Jones leave her apartment and get into a car parked across the street.  Murray testified that he had seen someone he identified as "Stickman Ty" up the street from Keshia's apartment when they arrived.  Mings' first name is Tyrone.

Finally, phone records corroborate aspects of both Rashid's and Murray's testimony.  Murray testified that, before leaving Juniper's mother's house he spoke on the phone with Juniper, who had called from Keshia's apartment.  Phone records of the incoming calls to Ms. Juniper's house show a call at 11:34 a.m. that day from Keshia's apartment that lasted three minutes and ten seconds.  Rashid testified that she called Ms. Juniper as soon as she returned home after dropping

off Juniper, Jones, and Murray. Phone records show a call from Rashid's house to Ms. Juniper's house at 1:10 p.m. that day.

To be sure, each witness had credibility issues, many of which Juniper's attorneys brought out on cross-examination. Murray and Mings each had criminal histories, and each stood to benefit from his cooperation against Juniper. Murray and Rashid each acknowledged having been granted immunity in exchange for testifying against Juniper. Rashid acknowledged that she did not even speak to police until nearly two weeks after the murders, and that she only did so after consulting an attorney. Mings acknowledged that he had completely omitted Juniper from his original statement to the police, and Rashid acknowledged that she had originally omitted Murray from her statement to the police. And Juniper's attorney pointed out that Murray had told Juniper's investigator a story of events that completely contradicted his trial testimony.

The jury also heard testimony from two individuals, each of whom said that Juniper had confessed to him. Of course, Juniper's attorney pointed out some of the implausible circumstances around Juniper's confession to Ernest Smith. But, as noted, Murray's account of Juniper calling his mother's house from Keshia's apartment, and confessing in that call, is supported by phone records.

Finally, the jury heard forensic evidence strongly implicating Juniper in the murders. Most importantly, the jury heard that Juniper's DNA was on the detached handle of a knife found in the master bedroom with all four victims. Keshia's DNA, her blood, and Juniper's thumbprint were on a detached blade, also found in the master bedroom with all four victims. The blade and the handle had once been connected, and the blade was consistent with Keshia's stab wound. Juniper's DNA was on a cigarette butt that was found on top of the broken-in door to Keshia's apartment.

In sum, the prosecution's case against Juniper rested on all sorts of evidence: largely consistent eyewitness testimony from people who knew Juniper and at least one of whom considered him a good friend; documentary evidence corroborating aspects of the witnesses' testimony; and forensic evidence strongly linking him to the murders. The prosecution's case against Juniper was, to say the least, strong.

And although post-remand discovery has uncovered many details that the prosecution did not disclose to Juniper's trial attorneys, that evidence would not have changed the jury's verdict.

First, as the Court has stated, it did not find Wendy or Jason Roberts to be credible witnesses. They each have weaknesses that lead the Court to discount their account of events on January 16, 2004. For example, their timelines of January 16, 2004, varied over the years and from each other's.

In light of their lack of credibility, Wendy's and Jason's statements of what they saw on January 16, even when combined with the statements of Patrick Danso, Chaunte Hodge, Frances Frazier, and Kevin Waterman, cannot impeach the prosecution's timeline of events as told through Rashid's, Murray's, and Mings' testimony, or undermine the other forensic, documentary, and confession evidence the jury heard.

Similar reasoning applies to the additional impeachment evidence uncovered in post-remand discovery. As the Court discussed at length, *see supra* pages 30–37, the inconsistencies that post-remand discovery has uncovered between the testimony Rashid, Murray, and Mings gave at trial and their previous statements, or the statements of John Jones, go to minor, collateral aspects of each witness's accounts of January 16. Given the substantial and important ways their testimony lined up—as well as the forensic and documentary evidence corroborating parts of their testimony—no reasonable juror who heard every piece of impeachment evidence Juniper identifies

would have discounted the parts of Rashid's, Murray's, and Mings' testimony that implicated Juniper in the murders.

Adding Murray's and Officer Atkinson's false testimony to the equation does not change the outcome. No reasonable juror would have discounted all the other evidence of Juniper's guilt, even if the juror had been told of the misleading aspects of those two men's testimony.

*     *     *     *

In sum, the evidence of Juniper's guilt was strong and rested on many different pillars. The *Brady* and *Napue* evidence that Juniper points to, even considered cumulatively, does not topple any one of those pillars, let alone all of them. No reasonable likelihood of a different outcome exists, and any errors were harmless beyond a reasonable doubt.

### F. Strickland *Claim: Prejudice*

For the same reason that the Roberts Material is not, on its own, material under *Brady*, *see supra* pages 45–46, Juniper's *Strickland* claim in Count II (premised on the Roberts Material) fails. *See United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("The standard for *Strickland* prejudice is the same as for *Brady* materiality."). Even assuming that his counsel performed deficiently relating to the Robertses, Juniper suffered no prejudice. *Cf. Strickland v. Washington*, 466 U.S. 668, 694 (1984) ( holding that to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

56

## V. CONCLUSION

For all the reasons discussed, the Court will deny Juniper's request for a writ of habeas corpus and dismiss his Amended Petition. (ECF No. 366.) The Court will not grant a certificate of appealability.[42]

An appropriate Order will issue.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 23 August 2021
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[42] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Juniper fails to meet this standard.